Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE, INC. d/b/a SUMMIT ESTATE OUTPATIENT, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>  vs.<br><br>UNITED BEHAVIORAL HEALTH, INC., a California corporation, and VIANT, INC., a Nevada corporation,<br><br>    *Defendants*. | Case No.: 4:20-CV-02249-YGR<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO UNITED BEHAVIORAL HEALTH, INC.'S MOTION TO DISMISS**<br><br>Complaint Filed: April 2, 2020<br>Trial Date:  None Set<br><br>Hearing Date: August 11, 2020<br>Hearing Time: 2:00 p.m.<br>Courtroom:  1 |

# **Table of Contents**

Table of Contents .................................................................................................................... ii

Table of Authorities ............................................................................................................... iii

I.    Introduction ................................................................................................................. 1

II.   Reimbursement Methodology ..................................................................................... 1

III.  The Sherman Act Claim Should Not Be Dismissed. .................................................. 4

   1.   Plaintiffs Have Identified the Relevant Market ..................................................... 4

   2.   Plaintiffs Possess Antitrust Standing & Have Suffered an Antitrust Injury ........... 5

   3.   Plaintiffs Have Plausibly Alleged a Potential Per Se Price-Fixing Violation. ......... 7

   4.   Defendants Have Engaged in Prohibited Price-Fixing ........................................... 8

IV.   The RICO § 1962(c) Claim Should Not Be Dismissed. ........................................... 10

   1.   Plaintiffs Have Plausibly Alleged a RICO Enterprise ......................................... 11

   2.   Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant. ......... 13

     i.    "Federal Health Offenses" as a Specified Unlawful Activity for the Laundering of
Monetary Instruments Is a Predicate RICO Act under 18 U.S.C. § 1961. ................................. 13

     ii.   Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud.............. 13

   3.   Plaintiffs Have Plausibly Pled Proximate Cause ................................................ 14

V.    Plaintiffs' State Law Claims Are Not Preempted by ERISA ..................................... 15

VI.   Plaintiffs' State-Law Claims Are Properly Pled ....................................................... 19

   1.   Plaintiffs' Fraud Based Claims are Properly Pled ............................................... 19

   2.   The Economic Loss Rule Does Not Apply ........................................................... 20

   3.   Plaintiffs Contract Claims Are Properly Pled ...................................................... 21

   4.   The Promissory Estoppel Claim Is Properly Pled ............................................... 22

   5.   Plaintiffs' Claim Under California Business & Professions Code 17200 Is Valid ........... 23

   6.   Plaintiffs' Complaint Properly Alleges a Civil Conspiracy Count ......................... 25

VII.  Conclusion ................................................................................................................ 25

# **Table of Authorities**

**CASES**

*Aerotec Intern., Inc. v. Honeywell Intern., Inc.*,
   4 F. Supp. 3d 1123 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ...................................... 8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ..................................................................................................... 5

*Am. Chem. Soc'y v. Commax Techs., Inc.*,
   2007 WL 963968, (N.D. Cal. Mar. 30, 2007)............................................................................. 13

*Apollo Grp., Inc. v. Avnet, Inc.*,
   58 F.3d 477 (9th Cir. 1995) ....................................................................................................... 22

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   7 Cal. 4th 503 (1994) ................................................................................................................. 25

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
   459 U.S. 519 (1983).................................................................................................................... 5

*Blue Cross of California v. Anesthesia Care Assocs. Med. Grp., Inc.*,
   187 F.3d 1045 (9th Cir. 1999) ................................................................................................... 16

*Bias v. Wells Fargo & Co.*,
   942 F.Supp.2d 915 (N.D. Cal. Apr 25, 2013) ........................................................................... 12

*Blue Shield v. McCready*,
   457 U.S. 465 (1982).................................................................................................................... 5

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ................................................................................................... 20

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008).................................................................................................................... 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).................................................................................................................... 6

*California Spine & Neurosurgery Inst. v. United Healthcare Servs., Inc.*,
   2018 WL 6074567 (C.D. Cal. June 28, 2018) ........................................................................... 23

*California v. American Stores Co.*,
   95 U.S. 271 (1990)...................................................................................................................... 6

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
   532 F.3d 1111 (10th Cir.2008) ................................................................................................... 7

*Cargill Inc. v. Budine,*
2007 WL 2506451 (E.D. Cal. 2007)......................................................................... 6

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
479 U.S. 104 (1986)......................................................................................... 7

*Catholic Healthcare W.-Bay Area v. Seafarers Health & Benefits Plan,*
321 F. App'x 563 (9th Cir. 2008) ......................................................................... 16

*Cirino v. Bank of Am., N.A., 2014 WL 9894432,*
(C.D. Cal. Oct. 1, 2014) .................................................................................. 13

*Crutcher v. Multiplan, Inc.,*
2016 WL 6832644 (W.D. Mo. Nov. 18, 2016)........................................................... 10

*Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.,*
2009 WL 179681 (E.D. Cal. Jan. 26, 2009) ............................................................ 16

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.,*
2013 WL 12114069 (C.D. Cal. Mar. 12, 2013) ......................................................... 12

*Enloe Med. Ctr. v. Principal Life Ins. Co.,*
2011 WL 6396517 (E.D. Cal. Dec. 20, 2011) .......................................................... 23

*Fleet v. Bank of Am. N.A.,*
229 Cal. App. 4th 1403 (2014). .......................................................................... 23

*Fox v. Good Samaritan Hosp.,*
2007 WL 2938175 (N.D. Cal. Oct. 9, 2007).............................................................. 6

*Franco v. Connecticut Gen. Life Ins. Co.,*
818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in part, vacated in part, remanded*, 647 F. App'x 76 (3d
Cir. 2016)................................................................................................... 9

*Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co., et al.,*
Case No. A-19-79278-B (Clark County, NV, June 24, 2020) .......................................... 10

*Friedman v. 24 Hour Fitness USA, Inc.,*
580 F. Supp. 2d 985 (C.D. Cal. 2008) ................................................................... 12

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2d Cir. 2016)............................................................................... 7

*Gomez v. Guthy-Renker, LLC,*
2015 WL 4270042 (C.D. Cal. July 13, 2015) ....................................................... 10, 11

*Groves v. Kaiser Found. Health Plan Inc.,*
2014 WL 12644296 (N.D. Cal. July 10, 2014).......................................................... 17

*Groves v. Kaiser Found. Health Plan Inc.*,
  32 F. Supp.3d 1074 (N.D. Cal. 2014) ................................................................ 17

*In re Aetna UCR Litigation*,
  WL 3970168 (D.N.J. June 30, 2015) .................................................................. 9

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................... 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ................................................... 12

*In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*,
  2018 WL 4945541 (C.D. Cal. June 18, 2018) ............................................ 10, 11

*IV Solutions Inc. v. United Healthcare Services, Inc.*,
  2012 WL 12887401 (C.D. Cal. Nov. 19, 2012) ................................................ 19

*Josef K. v. California Physicians' Serv.*,
  2019 WL 2342245 (N.D. Cal. June 3, 2019) .................................................... 18

*Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*,
  23 Cal. 4th 305 (2000) ...................................................................................... 23

*Kamakahi v. Am. Soc. for Reprod. Med.*,
  2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) .................................................... 7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) .............................................................................. 8

*Law v. Nat'l Collegiate Athletic Ass'n*,
  134 F.3d 1010 (10th Cir. 1998) .......................................................................... 4

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
  140 F.3d 1228 (9th Cir. 1998) ............................................................................ 7

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ............................................................................................ 5

*Marin Gen. Hosp. v. Modesto & Empire Traction Co.*,
  581 F.3d 941 (9th Cir. 2009) ........................................................................ 17, 18

*McKell v. Washington Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) .................................................................... 24, 25

*Morgan v. AT&T Wireless Servs., Inc.*,
  177 Cal. App. 4th 1235 (2009) .......................................................................... 25

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,
    578 F. Supp. 2d 1242 (E.D. Cal. 2008) ........................................................ 21

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir.1993) ........................................................................ 14

*Nilavar v. Mercy Health System Western Ohio*,
    142 F. Supp. 2d 859 (S.D. Ohio 2000) ...................................................... 6

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) .................................................. 10, 11, 12, 14

*Omnicare, Inc. v. Unitedhealth Group, Inc.*,
    524 F. Supp. 2d 1031 (N.D. Ill. 2007) ...................................................... 6

*Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) .................................................................... 7

*Orthopedic Specialists of S. California v. ILWU-PMA Welfare Plan*,
    2013 WL 4441948 (C.D. Cal. Feb. 28, 2013) ........................................ 17

*Orthopedic Specialists of Southern California v. CALPERS*,
    228 Cal. App. 4th 644 (2014) .................................................................. 22

*Pacific Bay Recovery, Inc. v. California Physicians Services, Inc.*,
    12 Cal. App. 5th 200 (2017) .................................................................... 22

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
    943 F.3d 1243 (9th Cir. 2019) ................................................................ 15

*Paladin Assoc., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir.2003) .................................................................. 7

*Paulson v. CNF, Inc.*,
    559 F.3d 1061 (9th Cir. 2009) ................................................................ 18

*Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.*,
    233 Cal. Rptr. 3d 830 (Ct. App. 2018) .................................................... 16

*Ramin M. Roohipour, M.D., Inc., v. ILWU-PMA Welfare Plan et al.*,
    2020 WL 472921 (C.D. Cal. Jan. 28, 2020) .......................................... 16

*Schmuck v. United States*,
    489 U.S. 705 (1989) ................................................................................ 14

*Schwartz v. Associated Employers Grp. Benefit Plan & Tr.*,
    2018 WL 453436 (D. Mont. Jan. 17, 2018) ............................................ 15

*Sebastian Int'l, Inc. v. Russolillo,*
    128 F. Supp. 2d 630 (C.D. Cal. 2001) ........................... 14

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) ........................... 10

*Semegen v. Weidner,*
    780 F.2d 727 (9th Cir. 1985) ........................... 20

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) ........................... 21

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001).......................... 4

*United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.,*
    660 F. Supp. 2d 1163 (C.D. Cal. 2009) ........................... 21

*United States v. Blinder,*
    10 F.3d 1468 (9th Cir. 1993) ........................... 11

*United States v. Brown,*
    936 F.2d 1042 (9th Cir.1991) ........................... 7

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988) ........................... 12

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ........................... 4

*United States v. Trenton Potteries Co.,*
    273 U.S. 392 (1927) ........................... 8

*Vess v.Ciba-Geigy Corp. USA,*
    317 F. 3d 1097 (9th Cir. 2003) ........................... 21

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010)........................... 4. 6

*Yagman v. Allianz Ins.,*
    2015 WL 5553462 (C.D. Cal. July 9, 2015) ........................... 12

*Youngman v. Nevada Irrigation Dist.,*
    70 Cal. 2d 240 (1969) ........................... 23

**STATUTES**

18 U.S.C. § 1956 ........................... 13

18 U.S.C. § 1961 .................................................................................................................. 13

18 U.S.C. § 24 .................................................................................................................... 13

Business and Professions Code §§ 17200, et seq. ............................................................. 24

California Health & Safety Code section 1371.8............................................................... 25

California Health & Safety Code section 1374.72.............................................................. 25

California Insurance Code section 10144.5 ....................................................................... 25

ERISA § 502(a).................................................................................................................. 17

ERISA § 502(a)(1)(b) ........................................................................................................ 17

ERISA § 514(a).................................................................................................................. 17

Health & Safety Code § 1371.8 ......................................................................................... 25

**RULES**

Fed. R. Civ. P. 12(b)(6).............................................................................................. 17, 18

Fed. R. Civ. P. 8(a) ........................................................................................................... 21

Fed. R. Civ. P. 8(a)(3) ....................................................................................................... 21

Federal Rule of Civil Procedure 9(b)........................................................................... 20, 21

## I.    Introduction

United Behavioral Health ("United") mischaracterizes Plaintiffs' allegations as it wants them to be, not as they are. For example, Plaintiffs *do not* allege—as United contends—that United is required to pay 100% of providers' charges. Plaintiffs allege, "[f]or all the claims at issue here, United represented that the claims would be paid at a percentage of the usual, customary and reasonable ("UCR") rate. As discussed at length herein, and in Plaintiff's complaint, what matters is the UCR calculation. That is what United is required to pay. In reliance upon that representation—that United will pay a usual and customary rate, Plaintiffs agreed to treat United's insureds and timely submitted accurate bills." [ECF 1 ¶ 3]. Plaintiffs submitted the claims for payment to United on industry standard Uniform Billing ("UB") forms under the Healthcare Common Procedure Coding System ("HCPCS") billing code H0015, substance abuse intensive outpatient treatment ("IOP"). [ECF 1 ¶¶ 134-136]. Every underpaid claim in this litigation has the HCPCS code H0015.  Instead of paying the UCR rate for this specific health care cade, United and Viant paid a fraction of the amount due. Plaintiffs never agreed to or negotiated any of these underpayments with Defendants.

## II.    Reimbursement Methodology

There are well-established methods for determining the usual and customary rates for a given health care code.  One is FAIR Health. The FAIR Health database "provide(s) reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[1] Insurers submit pricing information, and FAIR Health uses the "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[2]

The FAIR Health database was created as a part of United's 2009 settlement of the *Ingenix* litigation brought by New York's Attorney General and others. Investigations into Ingenix revealed that it intentionally skewed data to underpay out-of-network healthcare claims by billions of dollars. In 2009 United Healthcare and its affiliates paid 350 million dollars to settle cases arising from the

---

[1] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org /#about, last accessed June 19, 2020

[2] *Id*.

same conduct. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[3] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[4] Thus, calling "UCR" by another name is a formal, not substantive, difference. Some United plans use the term UCR, while others use "eligible expense.[5]" Those terms encompass all of the plan language United uses and has used since 2009.[6] United's obligation to use FAIR Health rates stems from the language of its plans, each of which claims to use available data resources to pay out-of-network benefits based on competitive fees in similar geographic areas.



The goal of the FAIR Health Database is to prevent insurers from using skewed methodologies to underpay, or under-reimburse providers, based on improper UCR or UCR-type

---

* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).
[3] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009, Pg. 14, term no. 4.4: https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_ Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).
[4] *Id.*
[5] "[a rate based] on available data resources of competitive fees in that geographic area." Defendant's Exhibit A to Motion to Dismiss, ECF 35-2 Pg. 5.
[6] *The American Medical Association, et al. v. United Healthcare Corp., et al.*, Civil Action No. 00-2800 (S.D.N.Y).

calculations. The United / Ingenix settlement was years ago, yet United continues to underpay claims. This is the sequel to the Ingenix litigation: rather than Ingenix, United now uses Viant to underpay claims, while at the same time purporting to price claims in accordance FAIR Health methodology.

At issue in this class action is one HCPCS code: H0015. The graph above shows the FAIR Health benchmark amounts for this code compared to what United actually paid Plaintiffs. United pays the lesser of the FAIR Health Benchmark or billed charges. For every single Provider-Plaintiff in this case, UCR, or its congener, is equal to 100% of that providers' billed charges because the billed charges are **_less_** than the FAIR Health benchmark amounts. This means that Plaintiffs' charges for providing intensive outpatient treatment are below what is usual and customary in the industry. Despite this, as alleged and as evidenced by the above graph, United and Viant paid a fraction of Plaintiffs' already-low rates. Thus, contrary to United's representations, the only reason United should have paid 100% of the billed charges is because these rates, these billed charges, are **_below FAIR Health UCR Benchmarks_**.

As illustrated above and alleged in Plaintiffs' Complaint, Defendants' methodology resulted in Plaintiffs being reimbursed at rates ranging from 11% to 25% of the FAIR Health benchmark. United has had access to this data it for years. Even though United and Viant's employees responsible for Outpatient Repricing (OPR) had FAIR Health data at their fingertips through an in-house claims system at Viant known as "Toolbox," they could have properly applied FAIR Health benchmark pricing at any time but chose not to do so. Instead, they used random, unsubstantiated reimbursement benchmarks to unlawfully make as much of a margin as possible at their customers' expense.

As alleged, United's conduct also violates the Mental Health Parity and Addiction Equity Act. This legislation requires mental health to benefits be in parity with medical and surgical benefits. United states that they have relied on FAIR Health for medical and surgical payments since 2011[7].

---

[7]United's own website states to the public that "Health care benefit plans managed by UnitedHealth Group affiliates began to use FAIR Health's Benchmarking Databases to determine payment for out-of-network professional services within 60 days of first receiving the applicable FAIR Health Benchmark Database Modules at various times in 2011." *Legal – Payment of out-of-network benefits*, https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last accessed June 29, 2020).

Parity requires that mental health and substance abuse treatment benefits be determined using the same methodology. This has not been done.

Finally, in another variation, United and Viant automatically charge self-funded employer plans the full amount of an out of network providers' billed charges and pocket the difference, or margin, between what they charged the employer's self-funded plan (100% of billed charges) and the amount they were able to "save" by underpaying the claim (the Viant payment). Defendants conspire to illegally siphon hundreds of millions of dollars a year using this enterprise, exploiting employer plans, providers, and patients alike. This case seeks to end that.

## III.     The Sherman Act Claim Should Not Be Dismissed.

Plaintiffs possess antitrust standing, have suffered an antitrust injury and have satisfied the notice pleading requirements under Rule 8[8].

### 1.  *Plaintiffs Have Identified the Relevant Market*

There is a nationwide market for mental health and substance abuse disorder treatment even though each treatment facility may not be interchangeable.  Despite United's claims to the contrary, the Plaintiffs have identified these relevant markets to which Defendants apply the same illegal methodology. The Supreme Court has long recognized the validity of a "cluster" market as set forth in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), seeing "no barrier in combining in a single market a number of different products or services where that combination reflects commercial realities." *Id*. at 572. Further "mere profitability or cost savings have not qualified as a defense under the antitrust laws." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1023 (10th Cir. 1998).

Further, the cases cited by United do not apply as Plaintiffs allege a monopsony / oligopsony in their Complaint. United's cases refer to control of the market by sellers rather than buyers. As to a monopsony / oligopsony, "the market is not the market of competing ***sellers*** but of competing ***buyers***." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (internal citations omitted, emphasis added). It is still a violation of the Sherman Act when it is the sellers who are injured as opposed to

---

[8] A heightened pleading standard does not apply to antitrust cases. *See, for example, W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("We conclude that it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases.")

customers or consumers. *Id. citing Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948). The patients, the "consumers," are injured when they receive a balance bill greater than the UCR methodology would dictate; however, that is not the injury in *this* litigation asserted by *these* Plaintiffs[9]. Both Defendants are "buyers" of healthcare services and have undertaken to injure sellers such as Plaintiffs.

### 2. Plaintiffs Possess Antitrust Standing & Have Suffered an Antitrust Injury

In a private antitrust suit under the *Sherman Act* and the *Clayton Act*, a plaintiff must allege a violation and damage that proximately results from the acts and conduct which constitute the violation. *See Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 362 (9th Cir. 1955). In determining antitrust standing, the court looks to five general factors, none of which are explicitly determinative, (1) the nature of the alleged injury, i.e. whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). All five factors weigh in favor of the Plaintiffs.

The Ninth Circuit has four requirements for the first factor: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *See Am. Ad Mgmt.* at 1055. Plaintiffs have alleged unlawful conduct by Defendants throughout their Complaint, as well the injury by the non-UCR methodology that led to reimbursements well below FAIR Health benchmarks. Plaintiffs' injury is "of the type the antitrust laws were intended to prevent."" *Id.* at 1057. Antitrust injury is not limited to "consumers and competitors." The Clayton Act § 4 protects all victims of antitrust injuries. *Id. citing Blue Shield v. McCready*, 457 U.S. 465, 472 (1982); *see also, Cargill Inc. v. Budine*, 2007 WL 2506451 at *5 (E.D. Cal. 2007) (it is the relationship between the alleged unlawful conduct and resulting harm that matters in determining standing).

---

[9] United repeatedly refer to *LD v. United Behavioral Health*, Case No. 4:20-cv-02254 (N.D. Cal.); however, that case is for patients who received and paid balance bills. Providers seek reprocessing.

The deceptively and excessively low prices that Plaintiffs received as a direct result of Defendants' actions are precisely the type of actions that antitrust law is meant to curtail. *See, for example, Omnicare, Inc. v. Unitedhealth Group, Inc*., 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("[it] sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel."); *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (antitrust injury results from "competition-reducing" conduct) Defendants' actions, as alleged in Plaintiffs' Complaint, have corrupted the market, nationwide.

Defendants' actions have forced many providers out of business. The precise extent of which is a factual question. It is also a factual question as to how much the quality of services available to potential patients has suffered as a result. Reduction in the quality of services is also sufficient for antitrust standing and injury. *See Fox v. Good Samaritan Hosp.*, 2007 WL 2938175, at *6 (N.D. Cal. Oct. 9, 2007); *Nilavar v. Mercy Health System Western Ohio*, 142 F. Supp. 2d 859 (S.D. Ohio 2000). When consumers must pay prices that no longer reflect ordinary market conditions, they suffer "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The remaining antitrust factors, (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages, are easily met based on Plaintiffs' allegations. The injury is direct as Defendants implemented a hidden methodology that resulted in significant reimbursements to Plaintiffs. The injury is not speculative as the difference between the methodology used by Defendants and the UCR methodology can be concretely determined through the reprocessing of claims. There is little to no risk of duplicative recovery as Plaintiffs are the only entities entitled to bring these claims. There is little to no complexity in apportioning damages among the Defendants.

The Plaintiffs are also entitled to injunctive relief for Defendants' Clayton Act violations. *See California v. American Stores Co*., 495 U.S. 271 (1990) (a party experiencing harm may nevertheless seek injunctive relief.). The requirements for injunctive relief are more relaxed than those seeking monetary damages as the risk of duplicative recovery is not present. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). The Ninth Circuit stated, "the injury itself need only be

threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction." *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998); *see also, Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999) ("plaintiffs may not have to meet all three factors in the "remoteness" test to maintain an action for antitrust injunctive relief.") Plaintiffs' allegations are sufficient for injunctive relief to prevent the use of United's deceptive, non-UCR methodology.

### 3. Plaintiffs Have Plausibly Alleged a Potential Per Se Price-Fixing Violation.

Antitrust violations are either *per se* illegal or subject to the "rule of reason." *Paladin Assoc., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir.2003). Horizontal market division, as alleged by Plaintiffs, is a "classic *per se* antitrust violation." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir.1991). As another court in this district stated, "[w]hile the traditional horizontal conspiracy case involves an agreement among sellers with the purpose of raising prices to supracompetitive levels, the Sherman Act also applies to abuse of market power on the buyer side-often taking the form of monopsony or oligopsony." *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *7 (N.D. Cal. Mar. 29, 2013). Defendants' conduct is horizontal as Plaintiffs' have alleged a *de facto* oligopsony. And while the insureds and beneficiaries are the health care consumer, it is the insurer and their agents/repricers that are the buyers of healthcare services. The insurers and their agents/repricers form an oligopsony and there is a *per se* antitrust violation when "the buyers have market power to decrease market demand for a product and thereby lower prices." *Id.* quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir.2008). It is a fundamental principle that "antitrust law is concerned with influences that corrupt market conditions, not bargaining power" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 (2d Cir. 2016). United and Viant's actions, as alleged in the Complaint, corrupt market conditions nationwide.

Furthermore, as a result of the target price-based underpayment scheme, Defendants, not the market, set prices. This corrupts the market because Plaintiffs cannot make well-informed patient admission decisions that align with their financial needs. United, utilizing Viant, only paid reimbursements well below market prices and kept this information from Plaintiffs and the putative class until after the IOP services had been provided. This prevented Plaintiffs from making informed

decisions in accepting patients. The facts will show Plaintiffs ultimately treated many of United's insureds at the expense of other potential patients[10] insured by other health insurance providers or self-pay patients, clearly corrupting market conditions. In areas of the country with very providers, injury to even one provider may be an antitrust violation. *See Aerotec Intern., Inc. v. Honeywell Intern., Inc.*, 4 F. Supp. 3d 1123, 1136 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ("injury to a single competitor can constitute injury to competition when the relevant market is both narrow and discrete and market participants are few"). This will be a fact intensive determination.

### 4. *Defendants Have Engaged in Prohibited Price-Fixing*

Under California and Federal antitrust law, price-fixing is illegal *per se* without regard to any of its effects. Further, "[t]he power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 999 (9th Cir. 2000) *quoting United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927). It it is well-established that "price-fixing" can apply to rates for medical services and the healthcare industry. *See Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332 (1982) (action of physicians setting maximum fees was *per se* unlawful under first section of Sherman Act.) The Supreme Court in *Maricopa* held, "the claim that the price restraint will make it easier for customers to pay does not distinguish the medical profession from any other provider of goods or services…The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered." *Id.* at 350. Defendants' implementation of a non-UCR fixed price methodology, commonly referred to as the "target price" is anti-competitive price-fixing inimical to a fair and competitive market. Discovery into these agreements and target-pricing will establish this *per se* violation of the Sherman Act.

Finally, Plaintiffs allegations are factually distinguishable from *Franco v. Connecticut Gen.*

---

[10] United misstates the relationship between the instant action and the related action, *L.D. v. United Behavioral Health*, Case No. 4:20-cv-02254-YGR and accuses Plaintiffs of seeking double recovery. This is untrue. In the L.D., or patient case, the Plaintiffs were billed for, and paid, their intensive outpatient provider, the difference between what was billed and what United and Viant paid. The provider-Plaintiffs herein did not get paid by their patients, and are out-of-pocket the difference between their billables and United and Viant's underpayments.

*Life Ins. Co.*, 818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in part, vacated in part, remanded*, 647 F. App'x 76 (3d Cir. 2016), and *In re Aetna UCR Litigation*, WL 3970168 (D.N.J. June 30, 2015), and other "*Ingenix*" cases cited by United. Plaintiffs' allegations address the illegal non-UCR *methodology* and the need for claims reprocessing. As stated in *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011), one of the "*Ingenix*" cases:

> the NYAG determined that health insurers who participate in the Ingenix data collection have an incentive to provide artificially low claims information and, thus, produce a "garbage in, garbage out" effect. On January 13, 2009, the NYAG issued its "Health Care Report: The Consumer Reimbursement System is Code Blue," which concluded that the Ingenix Database was an "industry-wide problem," "a rigged system," "fraudulent," "and critically ill." In response to the investigation, UHG, WellPoint, and other participating insurers entered into agreements with the NYAG to discontinue use of the Ingenix Database and to establish an independent system to determine UCR reimbursements. Even the United States Congress became involved, with the Senate Committee on Commerce, Science, and Transportation holding two hearings on how the healthcare industry calculates UCR reimbursements for [out-of-network services].

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1017 (C.D. Cal. 2011)

The scheme alleged by Plaintiffs is similar to the *Ingenix* scheme referred to above, and not the post-settlement cases cited by United. The *Ingenix* methodology had been discontinued from use at the time of the "*Ingenix*" decisions cited by United. There, providers sought monetary damages and brought RICO and antitrust claims under patient assignments or as third-party beneficiaries. Plaintiffs advance neither of these positions.

At issue is a methodology other than what was represented and promised to Plaintiffs. This is not a matter of a carrier failing to disclose reimbursement metrics, it is the representation that an objective UCR methodology was being used with the FAIR Health database that was created out of the *Ingenix* settlement. The FAIR Health database is available to the general public and has been found by several states to be an appropriately independent and objective database. The actual, arbitrary and hidden methodology used by Defendants has disrupted the market and forced many class members to shutter. It also effects individuals' ability to receive substance abuse treatment services, and the quality of the services. This is not speculative; this does not create a risk of duplicative damages. Reprocessing claims will give Plaintiffs the relief they seek. United's

arguments ignore these fundamental differences and only distract from the Plaintiffs' actual antitrust allegations simply because Plaintiffs use the term "UCR" in their Complaint.

## IV.    The RICO § 1962(c) Claim Should Not Be Dismissed.

Plaintiffs' RICO § 1962(c) Claim (Count VII) should not be dismissed. RICO claims are to "be liberally construed to effectuate its remedial purposes" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) *quoting Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) and "[RICO] has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Sedima* at 499. Each inappropriate application of non-UCR methodology and the ensuing actions that flowed from such application are sufficient predicate acts for Defendants' RICO violation.

Several Courts have found RICO violations plausible based on allegations that an insurer and its third-party payor when hidden, illegal methodologies were used in determining claim reimbursements. *See, for example, Crutcher v. Multiplan, Inc.*, 2016 WL 6832644 (W.D. Mo. Nov. 18, 2016); *Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co., et al.*, Case No. A-19-79278-B (Clark County, NV, June 24, 2020).

Plaintiffs' allegations go well beyond a mere "commercial relationship" between Viant and United. This is not an arms'-length commercial relationship, and United's contract with Viant is far from 'routine.' United and Viant share a common purpose to illegally and deceptively use a non-UCR methodology and underpay HCPCS H0015 claims for their mutual profit. Plaintiffs' allegations resemble those in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) more than the cases cited by United including *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. July 13, 2015). *Gomez* cites *Odom* approvingly and distinguishes its facts. Unlike *Odom,* in *Gomez* a payment processor was truly a mere conduit for the transactions and not part of a RICO enterprise. Another court criticized *Gomez* for the very proposition United now asserts. *See In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*, 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018) ("Taken at face value, this *[Gomez]* is an interesting conclusion, considering RICO's broad "enterprise" definition. Indeed, it would be strange to prevent RICO from reaching any case where two parties have a contractual relationship—a conclusion Wells Fargo seems to encourage the Court to adopt.")

Plaintiffs have alleged "a common purpose to deceive" sufficient for a RICO enterprise. *See*

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 981 (N.D. Cal. 2018) (distinguishes its facts from *Gomez* ("[t]hese allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings. Rather, like the allegations regarding Microsoft and Best Buy in *Odom*, Plaintiffs' allegations support that Defendants shared a common purpose to deceive."). Corporations may constitute a RICO enterprise. *See United States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) ("If a corporation can form part of an "associated in fact" enterprise, *a fortiori*, a group of corporations should be able to constitute the entire enterprise.") Also, United and Viant, both corporations named as RICO defendants, each represent a legal entity and, alone, may be charged as the RICO enterprise. *See In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*, 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018).

### 1. *Plaintiffs Have Plausibly Alleged a RICO Enterprise*

United's misrepresents the allegations actually contained in the Plaintiffs' Complaint. United and Viant shared a common purpose to deceive even though such purpose is not even required to create an association-in-fact enterprise. United and Viant acted in concert to develop policies, practices, and procedures governing the processing and payment of claims *independent of any actual plan terms*. This enterprise had the purpose of deceiving plan sponsors, insureds, beneficiaries, and healthcare providers to their detriment and the financial benefit of Defendants. The service agreement that United has with Viant will be sought in discovery and, upon information and belief, this agreement masks the true policies, practices, and procedures. Defendants have created an enterprise that determines Outpatient Repricing (OPR) tied to a target price that is not made known to plan sponsors, insureds, beneficiaries, and healthcare providers and then pays claims at or below the target price. The target price is an arbitrarily low amount determined by the Defendants and is not based on FAIR health data even though Defendants have had access to the FAIR health database since its inception. This is the enterprise that presents itself as UCR while it is anything but. Both Defendants profit from this enterprise that exists independent from any plan terms.

As in *Odom*, the enterprise between United and Viant has a common purpose to deceive. This is above and beyond normal commercial relationships. This common purpose to deceive is alleged in Plaintiffs' Complaint and creates a RICO enterprise. Plaintiffs allege that United and Viant had far

more than "routine commercial dealing.". [ECF 39 Pg. 17]. Further, an association-in-fact enterprise can exist without all members sharing the same fraudulent purpose. *See Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008). *Friedman* is cited approvingly in *Yagman v. Allianz Ins.*, 2015 WL 5553462, at *2 (C.D. Cal. July 9, 2015) for the proposition that a RICO enterprise may be premised on contractual relationships for financial services. *See also, Bias v. Wells Fargo & Co.*, 942 F.Supp.2d 915, 942 (N.D. Cal. Apr 25, 2013) (finding that plaintiff sufficiently alleged a RICO enterprise consisting of a bank and third-party vendors and brokers who provided default-related services "at the core of the scheme"); *Downey Surgical Clinic, Inc. v. Ingenix*, Inc., 2013 WL 12114069, at *12 (C.D. Cal. Mar. 12, 2013) ("By sharing the information with each other, Plaintiffs have sufficiently alleged a "hub-and-spoke" type enterprise because they have alleged agreement among the Plan Defendants.")

United and Viant have a necessary common purpose every bit as dishonest as the defeat device in the Volkswagen diesel litigation. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *17 (N.D. Cal. Oct. 30, 2017) ("allegations are sufficient to satisfy the four elements of their § 1962(c) RICO claim. They have plausibly alleged that Bosch partnered with Volkswagen to implement the defeat device in the affected vehicles, and by doing so participated in the conduct of a years-long enterprise to defraud U.S. regulators and consumers.")

Although "RICO does not require intentional or "purposeful" behavior by corporations charged as members of an association-in-fact....[n]or does RICO require that the association-in-fact be a conspiracy; there must be an enterprise regardless of whether there is any conspiracy to engage in the predicate acts of racketeering," Defendants' behavior is nonetheless intentional. *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988). No unlawful "common purpose" is required for a RICO enterprise in the Ninth Circuit even though Plaintiffs have alleged one. *See Cirino v. Bank of Am., N.A.*, 2014 WL 9894432, at *10 (C.D. Cal. Oct. 1, 2014). Rather, "a corporation may fulfill the requirement if it: (1) made the RICO activities possible and profitable by providing a legal shield for the illegal activity, and (2) also functioned to achieve objectives that were not illegal." *Am. Chem. Soc'y v. Commax Techs., Inc.*, 2007 WL 963968, at *4 (N.D. Cal. Mar. 30, 2007). United and Viant made the RICO activities alleged possible; it is irrelevant whether there were other objectives that

were not illegal. Thus, United and Viant have anything but a routine service contract, and United's claims to the contrary do not make it so, especially on the pleadings at this early stage of litigation.

### 2. *Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant.*

### i. *"Federal Health Offenses" as a Specified Unlawful Activity for the <u>Laundering of Monetary Instruments</u> Is a Predicate RICO Act under 18 U.S.C. § 1961.*

The Federal Health Offenses asserted by Plaintiffs constitute unlawful activity that can form the basis of a RICO claim as they are included in the specified unlawful activities defined in Code section relating to the laundering of monetary instruments. A claim for the laundering of monetary instruments is a specified predicate act under RICO. Under 18 U.S.C. § 1961 "(1) "racketeering activity" means…(B) any act which is indictable under any of the following provisions of title 18, United States Code…section 1956 (relating to the laundering of monetary instruments)" and pursuant to 18 U.S.C. § 1956(c)(7), "any act or activity constituting an offense involving a Federal health care offense" is included in the definition of "specified unlawful activity." 18 U.S.C. § 1956(c)(7)(F). Federal health care offenses are defined at 18 U.S.C. § 24. Plaintiffs have alleged Defendants' violation of Federal health care offenses in their Complaint. *See* [ECF 6 ¶¶ 355-359].

18 U.S.C. § 1956 states, "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity -- (A)(i) with the intent to promote the carrying on of specified unlawful activity…a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity." As set forth in Plaintiffs' Complaint, Defendants have conducted numerous such financial transactions as their proceeds derive from specified unlawful activity, the aforementioned Federal health care offenses.

### ii. *Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud*

Plaintiffs have sufficiently alleged and pled RICO predicate acts of mail and wire fraud. In pleading these acts, "[t]he only aspects…that require particularized allegations are the factual circumstances of the fraud itself... Rule 9(b) "requires the identification of the circumstances constituting fraud ***so that the defendant can prepare an adequate answer from the allegations***." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (emphasis added, citation omitted). It is

not Defendants fraudulent calls and letters that are the scheme, it is the creation and use of Outpatient Repricing (OPR) tied to a target price that is not made known to plan sponsors, insureds, beneficiaries, and healthcare providers and then paying claims at or below the target price while representing to the world that the UCR methodology was used. The wire and mail communications are incidental to this scheme. Further, upon information and belief, the wire and mail communications did cross state lines. Indeed, given the diversity between the parties, it is impossible for the communications not to have crossed state lines. Defendants' mailings and wire communications are only "incident to an essential part of the scheme," they only need to be in furtherance of a scheme to defraud, and do not themselves need to be fraudulent or untrue. *See Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 635 (C.D. Cal. 2001) *citing Schmuck v. United States*, 489 U.S. 705 (1989).

Plaintiffs allege that the mail and wire communications were in furtherance of the underlying scheme. Plaintiffs are not required to describe every single mail and wire communication in detail; instead, they must be specific enough to "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir.1993) (internal quotation marks and citation omitted). However, should the Court find Plaintiffs' allegations insufficient, Plaintiffs request leave to conduct discovery as to Viant and United, as the scheme alleged is similar to insider trading in that the specific details are only in Defendants' possession. Indeed the Ninth Circuit in *Neubronner* recognized that limited discovery is appropriate. *Id.* at 671 ("But surely we can not expect a private plaintiff in an insider trading case to plead with the specificity Rule 9(b) requires without allowing some limited opportunity for discovery.")

### 3. *Plaintiffs Have Plausibly Pled Proximate Cause*

The Ninth Circuit takes an expansive view of proximate cause under RICO, stating "proximate cause [under RICO] is "a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case."" *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1250 (9th Cir. 2019) *quoting Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008). As alleged in the Complaint and *supra*, Plaintiffs have strong reason to believe that they were harmed as a direct result of Defendants' scheme to utilize a

non-UCR methodology and sham negotiations to massively underpay IOP claims. This unlawful enterprise also profited at the expense of patients and plan sponsors.

Plaintiffs were not privy to the inner workings of the scheme. Instead, they only knew United's external representations as to the UCR methodology, plus Viant's written, wire confirmations they adhered to and implemented that methodology. Even though direct reliance is not a required RICO element (*see Painters* at 1259), Plaintiffs and the putative class clearly relied on Defendants to employ the stated methodology and issue payments according to that methodology.

## V. <u>Plaintiffs' State Law Claims Are Not Preempted by ERISA</u>

United incorrectly asserts that Plaintiffs' state law claims are preempted by ERISA. First, every claim at issue involves the underpayment of the claim and not the right to payment. Second, United has made no showing that every patient with an underpaid claim had an ERISA plan. Third, and most importantly, Plaintiffs' state law claims arise from duties that are completely independent of an ERISA governed relationship. There are no ERISA plan terms that require interpretation, this case is about the illegal methodology used by Defendants independent of ERISA.

Further, "[a]s the Ninth Circuit and several others have explained, a third-party provider's claim for damages does not implicate a relationship Congress sought to regulate under ERISA." *Schwartz v. Associated Employers Grp. Benefit Plan & Tr.*, 2018 WL 453436 at *12 (D. Mont. Jan. 17, 2018) (citations omitted). Also, controlling Ninth Circuit precedent holds that even when an assignment exists that permits a provider to bring derivative claims under ERISA, that does not convert the provider's third-party claims to ERISA claims. *See Blue Cross of California v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1052 (9th Cir. 1999) ("we find no basis to conclude that the mere fact of assignment converts the Providers' claims into claims to recover benefits under the terms of an ERISA plan."). Most of the cases relied upon by United involve a plan participant, but a plan participant is not a third-party privider with duties owed to them outside of the plan.

It is well established that third-party providers such as Plaintiffs may sue on their own behalf for breach of duties owed to them. *See Catholic Healthcare W.-Bay Area v. Seafarers Health & Benefits Plan*, 321 F. App'x 563, 564 (9th Cir. 2008) ("where a third party medical provider sues an ERISA plan based on contractual obligations arising directly between the provider and the ERISA

plan (or for misrepresentations of coverage made by the ERISA plan to the provider), no ERISA-governed relationship is implicated and the claim is not preempted"); *Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.*, 233 Cal. Rptr. 3d 830, 848–49 (Ct. App. 2018) ("where a plan assures a provider that a proposed treatment is covered under the plan but later determines it is not covered, the provider may sue based upon the plan's independent promise to the provider to pay for the services rendered."). Also, that payment, if any, may come from an ERISA plan is insufficient for complete preemption or to satisfy the "relates to" requirement under ERISA §§ 502 or 514. *See Ramin M. Roohipour, M.D., Inc., v. ILWU-PMA Welfare Plan et al.*, 2020 WL 472921 (C.D. Cal. Jan. 28, 2020)

The facts alleged in this case are similar to those of *Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.*, 2009 WL 179681 (E.D. Cal. Jan. 26, 2009). There, plaintiff, a medical center, alleged similar state law claims that were found not to be preempted by ERISA. After a lengthy analysis, the court held that when a claim arises out of independent obligations, "[t]he authorities []amply explain how a claim can arise out of a transaction that involves an ERISA benefit plan while nevertheless not be "related" to that plan for purposes of preemption." *Id.* at *6. That is precisely the case here.  While some claims involve an ERISA benefit plan, they are not "related" to or "have a close connection to ERISA plans" [ECF 39, Pg. 18] as alleged by United.

While United touts its own prior decisions, *Groves v. Kaiser Found. Health Plan Inc.*, 32 F. Supp.3d 1074 (N.D. Cal. 2014) and *Groves v. Kaiser Found. Health Plan Inc.*, 2014 WL 12644296 (N.D. Cal. July 10, 2014), these cases are inapposite. Plaintiffs are not plan participants. They are third-party providers asserting claims in their own right based upon independent duties owed to them.

United also misrepresents important differences between ***complete*** preemption and ***conflict*** preemption. Complete preemption under ERISA § 502(a) is "really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009) (internal citations omitted). Conflict preemption under ERISA § 514(a) is a defense to be raised in response to state-law claims (*See Marin* at 950) and is not one of the enumerated defenses in Fed. R. Civ. P. 12(b)(6). Also, United's conflict preemption argument is inappropriate at this stage of litigation. Conflict

preemption is an affirmative defense and not one of the enumerated defenses that may be raised in a motion pursuant to Fed. R. Civ. P. 12(b)(6). .

The Ninth Circuit's holding in *Marin* is particularly applicable herein. Plaintiffs' state-law causes of action do not come within the scope of ERISA § 502(a)(1)(b) and are therefore not completely preempted. Since Plaintiffs' claims do not involve the denial of benefits, they fail the first prong of the *Davila* test. *See Marin* at 949 ("We conclude that the Hospital's state-law claims based on its alleged oral contract with MBAMD were not brought, and could not have been brought, under § 502(a)(1)(B). Therefore, the Hospital's state-law claims do not satisfy the first prong of *Davila*."); *Orthopedic Specialists of S. California v. ILWU-PMA Welfare Plan,* 2013 WL 4441948, at *5 (C.D. Cal. Feb. 28, 2013) ("plaintiff could not have brought its state-law claims under section 502(a)(1)(B), and therefore the first prong of *Davila* is not satisfied."). As in *Marin* and *Orthopedic Specialists*, Plaintiffs state-law claims are based on the failure to reimburse at "UCR rates"—an independent legal duty between the Defendants and Plaintiffs. This also fails the second *Davila* prong. *See Orthopedic Specialists* at *5 ("[r]egardless of the terms of the ERISA plan here, if defendant made the alleged representations to plaintiff, defendant was under an independent legal duty not to breach").

United improperly cites to another of this Court's prior decisions, *Josef K. v. California Physicians' Serv.*, 2019 WL 2342245 (N.D. Cal. June 3, 2019).  It contends that Plaintiffs' claims are ERISA claims in state-law garb. Yet *Josef K.* involved a single claim brought under an ERISA Plan against an third-party that denied a claim. The Court was left to choose between a state claim, or a finding that the third party was in fact an ERISA fiduciary. The court found that the third party was akin to an ERISA fiduciary and allowed the (a)(3) claim to proceed, making the state law claim unnecessary and moot, not preempted. *Josef K.* is also distinguishable in that the complaining defendant was a third-party independent reviewer. That entity's decision was final, and determined whether the plaintiffs' claims would be paid. It was in that posture, a third-party reviewer who decided whether or not a claim was paid, and not Providers where coverage has already been determined, that the court invoked ERISA fiduciary status. *Id.* Plaintiffs dispute the methodology used to process the claims, not the manner in which the benefits were processed.

As such, the second prong of *Davila* is also not met. As the Ninth Circuit explained in *Marin*,

"we ask only whether "there is no other independent legal duty that is implicated" by a defendant's actions. We do not ask whether that legal duty provides for a similar remedy, such as the payment of money." *Id.* at 950.

A state-law cause of action "relates" to an ERISA plan whenever it has "a 'connection with' or 'reference to'" such a plan. *Paulson v. CNF, Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009). The relationship test is used to determine whether a cause of action has a "connection with" an ERISA plan. The relationship test looks to whether the claim bears on an ERISA-regulated relationship, such as plan-participant, plan-employer, or plan sponsor-plan participant. *Id.* A state-law claim has a "reference to" an ERISA plan only if (1) the law acts immediately and exclusively upon ERISA plans, or (2) the existence of ERISA plans is essential to the law's operation. *Id.*

Here, Plaintiffs' state law causes of action do not relate to an ERISA plan. Plaintiffs' unfair business practices, breach of contract, misrepresentation, civil conspiracy, breach of contract, and promissory estoppel do not act immediately or exclusively on ERISA plans, and the existence of an ERISA plan is not essential to their operation. Nor do they bear on an ERISA-regulated relationship. Indeed, Plaintiffs treated patients insured under ERISA plans and non-ERISA policies alike.

Plaintiffs are not traditional ERISA entities – they are not insurance companies or third-party administrators managing ERISA claims, employers providing ERISA benefits, or patients entitled to ERISA benefits. Rather, Plaintiffs are third-party providers contracted with Defendant to provide services for an expected amount. *See IV Solutions Inc. v. United Healthcare Services, Inc.*, 2012 WL 12887401 at *8-9 (C.D. Cal. Nov. 19, 2012) (finding §514 did not preempt state law claims arising out of independent contracts between a third-party healthcare provider and an ERISA administrator)

This case is readily analogized to *Wit, et al. v. United Behavioral Health*, No. 14-CV-02346-JCS (hereinafter "*Wit*"). In *Wit*, Judge Spero specifically found that, for many years, United Behavioral Health denied claims using guidelines that were based solely on profit and cost saving rather than the actual clinical needs of members who suffered from mental health and/or substance use disorders. While the class that was certified in *Wit* was appropriately limited to participants and beneficiaries who were denied benefits under ERISA plans, the Court's findings regarding the plans' "medical necessity" language extended to ERISA plans and non-ERISA policies alike. All of the

plans at issue in *Wit* included, as a condition of coverage, the requirement that the requested treatment be consistent with generally accepted standards of care. Further the Court concluded that the illegal Guidelines are not Plan terms. *Id*. at *14.

Plaintiffs similarly seek to prove that the process behind "UCR" is fundamentally at loggerheads with the accepted meaning of the term. Unlike *Wit*, none of the claims here were denied and could not therefore be brought under ERISA § 502(a)(1)(b). In *Wit* the Court did not stop at the phrase "medically necessary" as used in the plans. Instead, it looked behind the phrase and found illegal Guidelines being applied that were not part of any plan. Here, Plaintiffs will prove that behind "UCR" lie the dishonest and illegal activities of Defendants. These activities are not plan terms. Plaintiffs seek a fair reprocessing of claims, not the payment itself in the present action. When the Court ultimately orders all HCPCS 0015 claims reprocessed for ERISA and non-ERISA plans under a legitimate and legal process, then plan terms will apply. Defendants nationwide grift should not be permitted to masquerade as no more than a "plan term."

## VI.    Plaintiffs' State-Law Claims Are Properly Pled

### 1.    *Plaintiffs' Fraud Based Claims are Properly Pled*

Plaintiffs' fraud-based claims are properly pled. The causes of action for intentional misrepresentation/fraudulent inducement and for negligent misrepresentation clearly set forth the factual basis for the claims and put Defendants on notice of the specific misconduct they must defend against in this action. Fraud claims are subject to Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). A plaintiff "must state with particularity the circumstances constituting fraud" (Fed. R. Civ. P. 9(b)) and the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). The Complaint does this.

Plaintiffs' Complaint alleges Defendants represented to the Plaintiffs they would be and then were paid based on the UCR methodology. United and Viant are both bound by these representations. Plaintiffs were specifically told that the UCR methodology would be applied and that there would not be any post claim negotiations/repricing [ECF 1 ¶¶ 169-171, 189, 195-97, 202-4, 209-11]. These

representations were false and Defendants, United and Viant together, employed a hidden methodology other than UCR that resulted, upon Plaintiffs' information and belief, in unreasonably low benefit amounts and payments. [ECF 1 ¶¶ 169-173]. As alleged in Plaintiffs' Complaint, the misrepresentations were made to induce Plaintiffs to provide out of network treatment to United's insureds and beneficiaries [ECF 1 ¶¶ 291-95]. Plaintiffs acted in reliance on the misrepresentations by admitting and treating the United's insureds and beneficiaries. They have been damaged by the application of a hidden non-UCR methodology. Although the patients were United's insureds and beneficiaries, both Defendants participated in and profited from the fraudulent activities alleged.

United misconstrues the specificity that is actually required under Fed. R. Civ. P. 9(b). Plaintiffs are not required to state the specific identity of the individual(s) making the fraudulent statements; rather, Rule 9(b) requires sufficient particularity to enable the defendant to be aware of and prepare a defense against the allegations of fraud. *See, for example, Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 578 F. Supp. 2d 1242, 1249 (E.D. Cal. 2008); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ("[t]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant."). Plaintiffs' Complaint alleges United's role in the fraud and the particular misconduct that they engaged in by hiding the true, arbitrary, self-serving, non-UCR methodology behind UCR language and representations made to Plaintiffs.

Plaintiffs' cause of action for a misrepresentation based on negligence is pled as an alternative cause of action to intentional fraudulent inducement. This is permitted under Fed. R. Civ. P. 8(a)(3). In the Ninth Circuit, Rule 9(b) and its specificity requirements do not apply to claims for negligent failure to disclose. *See Vess v.Ciba-Geigy Corp. USA*, 317 F. 3d 1097, 1106 (9th Cir. 2003). As this count alleges negligent conduct, the same standard applies to the negligent misrepresentation claim. Plaintiffs' Complaint has met the notice-pleading requirements of Fed. R. Civ. P. 8(a) that apply to this cause of action. The Complaint goes into great detail in identifying the fraudulent scheme and, as such, these causes of action are factually and legally supported by the allegations in the Complaint.

### 2. The Economic Loss Rule Does Not Apply

United claims the economic loss rule bars the fraud based and promissory estoppel claims,

relying on *United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F. Supp. 2d 1163 (C.D. Cal. 2009). However, the *United Guar.* court recognized that a properly pled fraudulent inducement claim would not be barred by the economic loss rule. *Id.* at 1188. The economic loss rule does not apply to the count for intentional misrepresentation/fraudulent inducement. Plaintiffs' reliance is both plausible and clearly alleged in the Complaint. As Plaintiffs' negligent misrepresentation and promissory estoppel claims are based on the same conduct and allegations, they also are not subject to the economic loss rule. The fraud and promissory estoppel claims are based on the representations for using UCR methodology and that Viant would not be involved in the claims reimbursement methodology at all.

The policy rationale behind the economic loss rule in *United Guar.* is specific to the facts of that case. At issue there were written commercial contracts specially addressing and allocating financial risk of fraud claims (*Id.* at 1185-1186). In the process of negotiating and creating a complex written commercial contract, those parties decided to contractually define their available fraud remedies, effectively subsuming a traditional tort claim into one for breach of contract. The economic loss rule generally involves written contracts that contractually allocate risk. United relies on *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477 (9th Cir. 1995), involving a written contract in which "…risks could have been--and indeed were--allocated by the parties in their contractual agreement." (*Id.* pg. 480) and *Bristol SL Holdings, Inc. v Cigna Health Life Ins. Co.*, 2020 WL 2027955 (C.D. Cal. Jan, 6, 2020) where the dismissal was based on the courts conclusion that it was not specifically pled, not the economic loss rule. The rationale for the economic loss rule is not present in cases like this one.

### 3. *Plaintiffs Contract Claims Are Properly Pled*

The breach of oral contract and implied contract claims stated in Count V are properly stated. They are based on the preadmission verification of benefits process (not the insurance policies/plans) where United stated and agreed that it would pay Plaintiffs under the UCR methodology. United misrepresents Plaintiffs' allegations by claiming that the plans do not pay 100% of Plaintiffs' billed charges. In instances where UCR is higher than the billed charge, the plans do pay 100% of the billed charge. Provider-Plaintiffs were told they would be reimbursed using the UCR methodology but they do not ask the Court to determine this amount for every claim. Plaintiffs seek an appropriate

reprocessing order, using the UCR methodology. An obligation to pay is not at issue. Underpaid by an illegal process is. United's obligation to pay using a legal, honest methodology, based on its representations to providers, is extra-plan. The fact that certain policy documents set forth payment methodologies consistent with the general industry concept of UCR does not change this fact.

In arguing against the contract and promissory estoppel causes of action, United cites and relies on inapplicable cases, *Orthopedic Specialists of Southern California v. CALPERS* 228 Cal. App. 4th 644 (2014) and *Pacific Bay Recovery, Inc. v. California Physicians Services, Inc.* 12 Cal. App. 5th 200 (2017). In *Pacific Bay*, the allegations, at best, alleged that the insurer would pay something for some, unspecified treatment. In *Pacific Bay*, the plaintiff's primary cause action relied upon a specific California insurance regulation which the court found applied only to emergency service providers. *California Spine & Neurosurgery Inst. v. United Healthcare Servs.*, Inc., 2018 WL 6074567 (C.D. Cal. June 28, 2018) addressed *Pacific Bay* and found that an action for breach of contract could lie based on "a specific, agreed-upon percentage of the UCR rate" *Id*. at *3. Plaintiffs allegation more closely resembles C*alifornia Spine* than the cases cited by United.

### 4. The Promissory Estoppel Claim Is Properly Pled

Plaintiffs' cause of action is for promissory estoppel is sufficient and properly pled. Under promissory estoppel, "a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969); *accord Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000). The elements of the claim are: "(1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise." *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1412 (2014)..

The verification and authorization communications occurred between Plaintiffs and United are an appropriate predicate for an agreement and/or promissory estoppel. *See, for example, Regents of the Univ. of Cal. v. Principal Fin. Grp.*, 412 F. Supp. 2d 1037, 1042 (N.D. Cal. 2006) (concluding that insurer demonstrated intent to be bound to pay health care provider because insurer verified coverage and authorized treatment on multiple occasions); *Enloe Med. Ctr. v. Principal Life Ins. Co.*,

2011 WL 6396517 at *6 (E.D. Cal. Dec. 20, 2011) (noting that courts diverge on whether treatment authorization evinces a promise to pay and stating that "in some instances, a contract may be created on an authorization call"). As such, Plaintiffs' allegations are sufficient and amount to more than routine verification and/or preauthorization communications as in the cases cited by United.

In this case, the only issue is the non-UCR methodology that Defendants applied to all of Plaintiffs' claims that Plaintiffs reasonably believe led to significant underpayment. In all of the claims, the need for the services and/or medical necessity of those services is not in dispute, only the methodology that led to underpayment. Plaintiffs' show justifiable reliance by Plaintiffs as to the representations made by Defendants as to the methodology employed in reimbursing valid claims. The Complaint does not base the promissory estoppel cause of action on promises made in the insurance contracts, but rather the promises made that the UCR methodology as presented in the preadmission VOB communications would be applied.

### 5. *Plaintiffs' Claim Under California Business & Professions Code 17200 Is Valid.*

United argues that the UCL cause of action for violation of California's unfair competition law, set forth in Business and Professions Code §§ 17200, *et seq*. should be dismissed. As repeatedly alleged, the claims at issue should have been paid based on application of the UCR methodology, not a sham negotiation and arbitrary target price. Both United and Viant represented to Plaintiffs that reimbursement rates were determined using the UCR methodology. Based on that methodology, a payment amount could be calculated or at least reasonably estimated by Plaintiffs in making business decisions. In fact, United's own website states, "FAIR Health provides health care consumers with an estimate of how much out-of-network services will cost them" and even provides a percentile chart for a specific procedure code with data from FAIR health.[11]

Plaintiffs' claims were not paid based on the UCR methodology, rather, they were based on Viant's sham negotiations and an arbitrary target price created by United and Viant. Instead of paying claims based on the stated UCR methodology, Defendants engaged in what appears to be a new species the egregious practice of post-claim underwriting. The "negotiation" and "target price" all

---

[11] *Legal – Payment of out-of-network benefits*, https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last accessed June 29, 2020)

seek to redefine the methodology for claim underwriting and benefits determination *after* the claim is presented and specifically for claims that have already been determined to be valid, covered claims. United and Viant then change the price of those claims *post hoc.* Such conduct meets and exceeds the threshold for an unfair business practice. The UCL prohibits unlawful, unfair, and fraudulent business practices. A "business practice need only meet one of the three criteria to be considered unfair competition." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006).

Plaintiffs' allegations establish a clear violation of California Health & Safety Code section 1371.8 and violation of California's mental health parity laws (California Health & Safety Code section 1374.72 and California Insurance Code section 10144.5). Plaintiffs have made more than conclusory allegations as to the representations, communications, and payments that were made.

Plaintiffs' Complaint also satisfies the fraud prong of a UCL claim. It alleges multiple fraud causes of action showing that Defendants engaged in a fraudulent business practices. "A fraudulent business practice is one in which members of the public are likely to be deceived." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009) (citation and internal quotation marks omitted). Under the UCL, a representation may be untrue, or it "may be accurate on some level, but will nonetheless tend to mislead or deceive." *McKell* at 1471. "A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" the UCL. *Id.* (citation omitted).

The complaint alleges that United and Viant made representations that valid claims would be paid using the UCR methodology. Defendants did not disclose that valid claims would be re-underwritten using a different, illegal methodology. These allegations are sufficient to state a claim for deceptive business practices. Defendants knew they would not use the UCR methodology in processing the claims when they were representing the contrary to Plaintiffs. Defendants' course of conduct, including its confirmation of coverage and authorization of treatment encouraged Plaintiffs to provide treatment. Defendants never disclosed that they would use arbitrary target prices and sham negotiations as the framework for processing and reimbursing valid claims. These allegations are sufficient to state a UCL claim for deceptive business practices. California law is specifically designed to protect healthcare providers, such as the Plaintiffs and the class they seek to represent

such post-claim underwriting and *ex post facto* actions. Specifically, the California Legislature has enacted Health & Safety Code § 1371.8, which requires, in relevant part:

> "**A health care service plan that authorizes a specific type of treatment by a provider shall not rescind or modify this authorization after the provider renders the health care service in good faith and pursuant to the authorization for any reason**, including but not limited to, the plans' subsequent recession, cancellation, or modification of the enrollee's or subscriber's contract or the plan's subsequent determination that it did not make an accurate determination of the enrollee's or the subscriber's eligibility…" (emphasis added)

United misrepresents or misunderstands the damages sought by Plaintiffs. Plaintiffs and the class they represent seek to represent are not asking for automatic reimbursement from Defendants, they are asking for a fair and equitable reprocessing of all claims as prior payment was determined based on a hidden, non-UCR methodology and sham negotiations. Numerous courts have found that "reprocessing," the relief sought by Plaintiffs, is not monetary relief. *See, for example, Meidl v. Aetna*, Inc., 2017 WL 1831916, at *21 (D. Conn. May 4, 2017) (a reprocessing order is not properly treated as monetary relief…[t]he fact that certain class members may end up receiving payment—after this case is closed, as a result of the reprocessing—is too attenuated to treat the reprocessing itself as a form of monetary damages."). This is an appropriate, equitable remedy under the UCL. In the event the Court finds Plaintiffs' UCL claim deficient, Plaintiffs respectfully request leave to amend their complaint to cure any pleading deficiencies.

### 6. *Plaintiffs' Complaint Properly Alleges a Civil Conspiracy Count*

A civil conspiracy claim requires a showing of the formation and operation of a conspiracy, and damages resulting from wrongful acts committed in furtherance of the conspiracy. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-511 (1994). Plaintiffs' cause of action for civil conspiracy pleads and establishes these elements. This cause of action incorporates all the general and class allegations preceding it by reference, including all of the detailed allegations set forth in the Complaint under the topic heading "Alliance of United and Viant." These allegations clearly lay out the nature, execution, and harm caused by the conspiracy.

### VII. <u>Conclusion</u>

Wherefore, it is respectfully submitted that the motion to dismiss should be denied. If the court is inclined to sustain any part of the motion, Plaintiffs requests leave to amend any deficiencies.

Dated: July 2, 2020

NAPOLI SHKOLNIK PLLC
 /s/ Matthew M. Lavin
Matthew M. Lavin
Wendy A. Mitchell

DL LAW GROUP
 /s/ David M. Lilienstein
David M. Lilienstein
Katie J. Spielman

*Attorneys for Plaintiffs*
*And the Putative Class*