Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE, INC. d/b/a SUMMIT ESTATE OUTPATIENT, on behalf of themselves and all others similarly situated,<br><br>　　　　　*Plaintiffs*,<br><br>　　vs.<br><br>UNITED BEHAVIORAL HEALTH, INC., a California corporation, and VIANT, INC., a Nevada corporation,<br><br>　　　　　*Defendants*. | Case No.: 4:20-CV-02249-YGR<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO VIANT, INC.'S MOTION TO DISMISS**<br><br>Complaint Filed: April 2, 2020<br>Trial Date:　　None Set<br><br>Hearing Date:　August 11, 2020<br>Hearing Time:　2:00 p.m.<br>Courtroom:　　1 |

# **Table of Contents**

Table of Contents ............................................................................................................... ii

Table of Authorities ......................................................................................................... iii

I.      Introduction .......................................................................................................... 1

II.     Reimbursement Methodology ............................................................................. 1

III.    Plaintiffs' Claims Are Not Preempted by ERISA .............................................. 4

IV.     Plaintiffs' State-Law Claims Are Properly Pled ............................................... 8

    1.    Plaintiffs' Fraud Based Claims are Properly Pled .......................................... 8

    2.    Plaintiffs' Claim Under California Business & Professions Code 17200 Is Valid. ................ 10

    3.    Plaintiffs' Complaint Properly Alleges a Civil Conspiracy Count ............................. 12

    4.    The Promissory Estoppel Claim Is Legally Sufficient ....................................... 12

    5.    Plaintiffs Oral Contract and Implied Contract Claims Are Properly Pled ................ 13

    6.    The Economic Loss Rule Does Not Apply to the Misrepresentation Claims or Promissory Estoppel Claim ................ 13

V.      The RICO § 1962(c) Claim Should Not Be Dismissed. ................................. 14

    1.    Plaintiffs Have Plausibly Alleged an Association-In-Fact Enterprise ................... 15

    2.    Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant. ............ 17

       i.    "Federal Health Offenses" as a Specified Unlawful Activity for the Laundering of Monetary Instruments Is a Predicate RICO Act under 18 U.S.C. § 1961. ............ 17

       ii.   Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud............ 18

    3.    Plaintiffs Have Plausibly Pled Proximate Cause ......................................... 19

VI.     Plaintiffs' Sherman Act Claim Is Properly Stated ........................................ 19

    1.    Plaintiffs Possess Antitrust Standing & Have Suffered an Antitrust Injury................ 19

    2.    Plaintiffs Have Plausibly Alleged a Potential Per Se Price-Fixing Violation. ............ 22

    3.    Defendants Have Engaged in Prohibited Price-Fixing........................................ 23

VII.    Conclusion ......................................................................................................... 25

1

## Table of Authorities

2

**Cases**

3

*ABC Servs. Grp., Inc. v. United HealthCare Servs., Inc.,*
4
   2019 WL 4137624 (C.D. Cal. June 14, 2019) ............................................................ 10

5

*Aerotec Intern., Inc. v. Honeywell Intern., Inc.,*
   4 F. Supp. 3d 1123 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ................... 23
6

7

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California,*
   190 F.3d 1051, 1054 (9th Cir. 1999) ............................................................................ 20
8

*Am. Chem. Soc'y v. Commax Techs., Inc.,*
9
   2007 WL 963968, (N.D. Cal. Mar. 30, 2007) ............................................................. 16

10

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
   7 Cal. 4th 503 (1994) ................................................................................................... 12
11

12

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
   459 U.S. 519 (1983) ..................................................................................................... 20
13

14

*Bias v. Wells Fargo & Co.,*
   942 F.Supp.2d 915 (N.D. Cal. Apr 25, 2013) .............................................................. 16

15

*Blue Cross of California v. Anesthesia Care Assocs. Med. Grp., Inc.,*
16
   187 F.3d 1045 (9th Cir. 1999) ....................................................................................... 4

17

*Blue Shield v. McCready,*
   457 U.S. 465, 472 (1982) ............................................................................................. 20
18

19

*Bly-Magee v. California,*
   236 F.3d 1014 (9th Cir. 2001) ....................................................................................... 8
20

21

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639 (2008) ..................................................................................................... 19

22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
23
   429 U.S. 477 (1977) ..................................................................................................... 21

24

*California v. American Stores Co.,*
   495 U.S. 271 (1990) ..................................................................................................... 21
25

26

*Campfield v. State Farm Mut. Auto. Ins. Co.,*
   532 F.3d 1111 (10th Cir.2008) .................................................................................... 22

27

*Cargill Inc. v. Budine,*
28
   2007 WL 2506451 (E.D. Cal. 2007) ........................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986).................................................................................................. 22

*Catholic Healthcare W.-Bay Area v. Seafarers Health & Benefits Plan*,
    321 F. App'x 563 (9th Cir. 2008)............................................................................... 5

*Cirino v. Bank of Am., N.A.*,
    2014 WL 9894432 (C.D. Cal. Oct. 1, 2014)............................................................. 16

*Crutcher v. Multiplan, Inc.*,
    2016 WL 6832644 (W.D. Mo. Nov. 18, 2016) ......................................................... 14

*Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.*,
    2009 WL 179681 (E.D. Cal. Jan. 26, 2009) .............................................................. 5

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.*,
    2013 WL 12114069 (C.D. Cal. Mar. 12, 2013)........................................................ 16

*Enloe Med. Ctr. v. Principal Life Ins. Co.*,
    2011 WL 6396517 (E.D. Cal. Dec. 20, 2011) ......................................................... 12

*Fleet v. Bank of Am. N.A.*,
    229 Cal. App. 4th 1403 (2014). ............................................................................... 12

*Fox v. Good Samaritan Hosp.*,
    2007 WL 2938175 (N.D. Cal. Oct. 9, 2007) ........................................................... 21

*Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co., et al.*,
    Case No. A-19-79278-B (Clark County, NV, June 24, 2020)................................... 14

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (C.D. Cal. 2008) .................................................................... 15

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) .................................................................................... 23

*Gomez v. Guthy-Renker, LLC*,
    2015 WL 4270042 (C.D. Cal. July 13, 2015)........................................................... 14

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................... 14, 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ......................................................... 16

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) .............................................................. 24, 25

*In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*,
    2018 WL 4945541 (C.D. Cal. June 18, 2018) ....................................................... 14, 15

*IV Solutions Inc. v. United Healthcare Services, Inc.*,
    2012 WL 12887401 (C.D. Cal. Nov. 19, 2012) ............................................................. 7

*Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*,
    23 Cal. 4th 305 (2000) ................................................................................................ 12

*Kamakahi v. Am. Soc. for Reprod. Med.*,
    2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ............................................................ 22

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ...................................................................................... 23

*Kochert v. Greater Lafayette Health Services, Inc.*,
    372 F. Supp. 2d 509 (N.D. Ind. 2004), *judgment aff'd*, 463 F.3d 710 (7th Cir. 2006) ................. 21

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) .................................................................................... 22

*Marin Gen. Hosp. v. Modesto & Empire Traction Co.*,
    581 F.3d 941 (9th Cir. 2009) ........................................................................................ 6

*Meidl v. Aetna, Inc.*,
    2017 WL 1831916 (D. Conn. May 4, 2017) ................................................................ 12

*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009) .................................................................................... 11

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,
    578 F. Supp. 2d 1242 (E.D. Cal. 2008) ......................................................................... 9

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir.1993) ............................................................................................ 18

*Nilavar v. Mercy Health System Western Ohio*,
    142 F. Supp. 2d 859 (S.D. Ohio 2000) ........................................................................ 21

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ............................................................................. 13, 14, 18

*Omnicare, Inc. v. Unitedhealth Group, Inc.*,
    524 F. Supp. 2d 1031 (N.D. Ill. 2007) ........................................................................ 20

*Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ...................................................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Orthopedic Specialists of S. California v. ILWU-PMA Welfare Plan*,
   2013 WL 4441948 (C.D. Cal. Feb. 28, 2013) .......................................................... 6

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
   943 F.3d 1243 (9th Cir. 2019) ............................................................................... 19

*Paladin Assoc., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir.2003) ................................................................................ 22

*Paulson v. CNF, Inc.*,
   559 F.3d 1061 (9th Cir. 2009) ................................................................................. 6

*Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.*,
   233 Cal. Rptr. 3d 830 (Ct. App. 2018) ..................................................................... 5

*Ramin M. Roohipour, M.D., Inc., v. ILWU-PMA Welfare Plan et al.*,
   2020 WL 472921 (C.D. Cal. Jan. 28, 2020) ............................................................ 5

*Schmuck v. United States*,
   489 U.S. 705 (1989)............................................................................................... 18

*Schwartz v. Associated Employers Grp. Benefit Plan & Tr.*,
   2018 WL 453436 (D. Mont. Jan. 17, 2018)............................................................ 4

*Sebastian Int'l, Inc. v. Russolillo*,
   128 F. Supp. 2d 630 (C.D. Cal. 2001) .................................................................. 18

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)............................................................................................... 13

*Semegen v. Weidner*,
   780 F.2d 727 (9th Cir. 1985) .................................................................................. 8

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .................................................................................. 9

*United States v. Blinder*,
   10 F.3d 1468 (9th Cir. 1993) ................................................................................ 14

*United States v. Brown*,
   936 F.2d 1042 (9th Cir.1991) ............................................................................... 22

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) ................................................................................ 16

*United States v. Trenton Potteries Co.*,
   273 U.S. 392 (1927)............................................................................................... 23

*Vess v.Ciba-Geigy Corp. USA*,
  317 F. 3d 1097 (9th Cir. 2003) ............................................................................. 9

*West Penn Allegheny Health System, Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ................................................................................. 20

*Yagman v. Allianz Ins.*,
  2015 WL 5553462 (C.D. Cal. July 9, 2015).......................................................... 16

*Yaralian v. Fastovsky*,
  2016 WL 552675 (C.D. Cal. Feb. 10, 2016) .......................................................... 4

*Youngman v. Nevada Irrigation Dist.*,
  70 Cal. 2d 240 (1969) ....................................................................................... 12

**Statutes**

18 U.S.C. § 1956 ............................................................................................... 17

18 U.S.C. § 1961 ............................................................................................... 17

18 U.S.C. § 24 .................................................................................................. 17

Business and Professions Code §§ 17200, *et seq.* ..................................................... 9

California Health & Safety Code § 1371.8 ............................................................... 10

California Health & Safety Code § 1374.72 ............................................................. 10

California Insurance Code § 10144.5 ...................................................................... 10

ERISA § 502(a) ............................................................................................... 5, 6

ERISA § 514(a) .................................................................................................. 6

Health & Safety Code § 1371.8 ............................................................................ 11

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................ 6

Fed. R. Civ. P. 8(a) ............................................................................................. 9

Fed. R. Civ. P. 8(a)(3) ......................................................................................... 9

Federal Rule of Civil Procedure 9(b)..................................................................... 8, 9

I.      **Introduction**

Viant, Inc. ("Viant") mischaracterizes Plaintiffs' allegations as it wants them to be, not as they are.  The rates of payment for the underlying healthcare claims at issue in this case were **never** negotiated by Plaintiffs.  For every claim at issue, Plaintiffs submitted to United the appropriate claim forms on industry standard forms, commonly known as Uniform Billing ("UB") forms.  Plaintiffs exclusively used the Healthcare Common Procedure Coding System ("HCPCS") billing code H0015, which is the universally recognized service code for substance abuse intensive outpatient treatment ("IOP"). [ECF 1 ¶¶ 138-139]. Every underpaid claim in this litigation has the HCPCS code H0015.[1]

II.     **Reimbursement Methodology**

The FAIR Health database "provide(s) reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[2]  Only insurers, not providers, submit pricing information. FAIR Health states that it then uses "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[3] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

The FAIR Health Database was created as a part of United's 2009 settlement of the *Ingenix* litigation brought by New York's Attorney General and others. Investigations into Ingenix revealed that it intentionally skewed data and underpaid out-of-network healthcare claims by billions of dollars over the life of the scheme. In 2009 United Healthcare and its affiliates paid 350 million dollars to

---

[1] The difference between the instant action, brought by health care providers, and the related action, *L.D.  v. United Behavioral Health*, Case No. 4:20-cv-02254-YGR, brought by United insureds, is that in L.D the plaintiffs were billed for, and paid, their intensive outpatient provider, the difference between what was billed and what United and Viant paid.  The provider-Plaintiffs herein did not get paid by their patients, and are out-of-pocket the difference between their billables and United and Viant's underpayments.

[2] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

[3] *Id*.

settle cases arising from the same conduct.[4] Now Viant filled the gap left by Ingenix's extinction. The goal of the FAIR Health Database is to prevent third party benefits administrators such as Viant from using skewed methodologies to calculate reimbursements based on what is referred to and the "usual, customary, and reasonable," or "UCR" (or its synonyms discussed in the Ingenix settlement) rate. As the Complaint alleges, Viant contracts with United for the sole purpose of skewing the pricing methodology to dramatically underpay claims for financial gain, to the detriment of Plaintiffs.

Further, Plaintiffs properly allege in their Complaint the services that they provide are covered under the Mental Health Parity and Addiction Equity Act (MHPAEA) which requires mental health to benefits to be in parity with medical and surgical benefits. As United clearly states that they rely on FAIR Health for medical and surgical payments, and have done so since 2011[5], parity requires that mental health and substance abuse treatment benefits be determined using the same methodology. Viant, with full knowledge of the parameters of appropriate benefits dispensation, knowingly and willingly conspired with United to treat claims for H0015 inequitably, in breach of MHPAEA.

The above graph shows the FAIR Health benchmark amounts for Intensive Outpatient Treatment ("IOP") compared to amounts Viant caused United to pay. IOP is universally billed under HCPCS code H0015. For every single patient who's claims are at issue in this case, the UCR, Prevailing Charge, or otherwise described amount is equal to 100% of Plaintiffs' healthcare providers' billed charges, because the billed charges are *less* than the FAIR Health benchmark amounts. Despite Viant's protestations to the contrary, the UCR rate for services provided to Plaintiffs is equal to 100% of billed charges ***for these Plaintiffs*** only because their billed charges are ***below FAIR Health Benchmarks***. Plaintiffs' rates are lower than the UCR calculations.

---

[4] *TheAmerican Medical Association, et al. v. United Healthcare Corp., et al*., Civil Action No. 00-2800 (S.D.N.Y.).

[5] United's own website states to the public that "Health care benefit plans managed by UnitedHealth Group affiliates began to use FAIR Health's Benchmarking Databases to determine payment for out-of-network professional services within 60 days of first receiving the applicable FAIR Health Benchmark Database Modules at various times in 2011." *Legal – Payment of out-of-network benefits*, https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last accessed June 29, 2020).

1
2
3
4
5

As the following chart shows, and as alleged in Plaintiffs' Complaint, Defendants' methodology resulted in their patients' claims being reimbursed at rates ranging from 11% to 25% of the FAIR Health reimbursement amount. Essentially, United and Viant paid as little as 11% of the usual, customary and reasonable rates. This intentionally misguided and illegal methodology to underpay claims for intensive outpatient substance abuse claims is at the heart of this action.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22
23
24
25
26

The data contained in this graph has only recently become available to the general public, but Viant has had access to it for years. Evidence in this case will show that Viant employees responsible for Outpatient Repricing (OPR) had FAIR Health data at their fingertips through an in-house claims system at Viant known as "Toolbox," and could have properly applied FAIR Health to its pricing at any time but chose not to do so. Instead, Viant used random, made-up benchmarks to artificially reprice claims so that United and Viant could make as much of a margin as possible at the expense

27
28

* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).

of beneficiaries of plans Viant administered, and the providers who bore the ultimate financial burden of Viant's malfeasance.

An additional wrinkle to this scheme is that United and Viant automatically charge self-funded employer plans the full amount of an out of network providers' billed charges. United and Viant pay a fraction of the cost but still pass on the entire billable cost of treatment to self-funded plans. The difference, or the "margin," is profit. This, however, is deceptive. United and Viant conspire to illegally siphon hundreds of millions of dollars a year using this enterprise, defrauding employer plans, providers and patients alike, all of whom are kept in the dark about this scheme. This is how United and Viant make their ill-gained profits from out of network care. This case is about the damage Viant does to healthcare providers such as the Plaintiffs, who are left bearing the heavy burden of uncompensated care.

Viant lurks in the shadows of benefits administration, functioning as both a tool to underpay claims for United's benefit, and a buffer against United's liability for underpaying claims. As the complaint alleges, however, Viant pays the bills and is the engine driving the underpayment. Viant also serves as a convenient scapegoat when Plaintiffs call United to complain about the underpayments. As is to be expected, Viant's Motion to Dismiss seeks to allow it to escape back into the shadows of benefits administration, behind ERISA-based subterfuge, without facing consequences for its deliberate, fraudulent and damaging role in underpaying claims. Viant should not escape liability for its role as United's agent in duplicating the Ingenix grift.

### III.   Plaintiffs' Claims Are Not Preempted by ERISA

Viant incorrectly asserts that Plaintiffs' state law claims are preempted by ERISA. First, every claim at issue involves the underpayment of the claim and not the right to payment. Second, Viant has made no showing that every patient with an underpaid claim had an ERISA plan. Third, and most importantly, Plaintiffs' state law claims arise from duties that are completely independent of an ERISA governed relationship. There are no ERISA plan terms that require interpretation, this case is about the illegal methodology used by Defendants.

Further, "[a]s the Ninth Circuit and several others have explained, a third-party provider's claim for damages does not implicate a relationship Congress sought to regulate under ERISA."

1  *Schwartz v. Associated Employers Grp. Benefit Plan & Tr.*, 2018 WL 453436 at *12 (D. Mont. Jan.

2  17, 2018) (citations omitted). Contrary to Viant's assertion, controlling Ninth Circuit precedent holds

3  that even when an assignment exists that permits a provider to bring derivative claims under ERISA,

4  that does not convert the provider's third-party claims to ERISA claims. *See Blue Cross of California*

5  *v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1052 (9th Cir. 1999) ("we find no basis

6  to conclude that the mere fact of assignment converts the Providers' claims into claims to recover

7  benefits under the terms of an ERISA plan."). Further, the case cited to by Viant, *Yaralian v.*

8  *Fastovsky*, 2016 WL 552675 (C.D. Cal. Feb. 10, 2016) is an unpublished decision that involved an

9  ERISA plan participant, not a third-party provider. It is not binding and not relevant. A plan

10 participant is not a third-party with duties owed to them outside of the plan.

11      It is well established that third-party providers such as Plaintiffs may sue on their own behalf

12 for breach of duties owed to them. *See Catholic Healthcare W.-Bay Area v. Seafarers Health &*

13 *Benefits Plan*, 321 F. App'x 563, 564 (9th Cir. 2008) ("where a third party medical provider sues an

14 ERISA plan based on contractual obligations arising directly between the provider and the ERISA

15 plan (or for misrepresentations of coverage made by the ERISA plan to the provider), no ERISA-

16 governed relationship is implicated and the claim is not preempted"); *Port Med. Wellness, Inc. v.*

17 *Connecticut Gen. Life Ins. Co.*, 233 Cal. Rptr. 3d 830, 848–49 (Ct. App. 2018) ("where a plan assures

18 a provider that a proposed treatment is covered under the plan but later determines it is not covered,

19 the provider may sue based upon the plan's independent promise to the provider to pay for the services

20 rendered."). Also, that payment may come from an ERISA plan is insufficient for complete

21 preemption or to satisfy the "relates to" requirement under ERISA §§ 502 or 514. *See Ramin M.*

22 *Roohipour, M.D., Inc., v. ILWU-PMA Welfare Plan et al.*, 2020 WL 472921 (C.D. Cal. Jan. 28, 2020)

23      The facts alleged in this case are similar to those of *Doctors Med. Ctr. of Modesto, Inc. v. The*

24 *Guardian Life Ins. Co. of Am.*, 2009 WL 179681 (E.D. Cal. Jan. 26, 2009) where Viant, a defendant

25 in that case, made many of the same arguments it raises here. Those same arguments were rejected

26 by that court. In that case, plaintiff, a medical center, alleged claims against Viant that were

27 specifically found not to be preempted by ERISA. After a lengthy analysis, the court held that when

28 a claim arises out of independent obligations, "[t]he authorities discussed above amply explain how

1   a claim can arise out of a transaction that involves an ERISA benefit plan while nevertheless not be

2   "related" to that plan for purposes of preemption." *Id.* at *6. That is precisely the case here, even

3   though some claims will involve an ERISA benefit plan, the claims are not "related" to that plan for

4   purposes of preemption.

5       Viant's preemption argument also misrepresents the important differences between ***complete***

6   preemption and ***conflict*** preemption. Complete preemption under ERISA § 502(a) is "really a

7   jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain

8   instances where Congress intended the scope of a federal law to be so broad as to entirely replace any

9   state-law claim." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir.

10  2009) (internal citations omitted). Conflict preemption under ERISA § 514(a), by contrast, is a

11  defense that may be raised in response to state-law claims (*See Marin* at 950) and is not one of the

12  enumerated defenses in Fed. R. Civ. P. 12(b)(6).

13      The Ninth Circuit's holding in *Marin* is particularly applicable to the complete preemption

14  analysis in this case. Plaintiffs' state-law causes of action do not come within the scope of ERISA §

15  502(a)(1)(b) and are therefore not completely preempted. As Plaintiffs' claims do not involve the

16  denial of benefits, they fail the first prong of the *Davila* test. *See Marin* at 949 ("We conclude that

17  the Hospital's state-law claims based on its alleged oral contract with MBAMD were not brought,

18  and could not have been brought, under § 502(a)(1)(B). Therefore, the Hospital's state-law claims do

19  not satisfy the first prong of *Davila*."); *Orthopedic Specialists of S. California v. ILWU-PMA Welfare

20  Plan,* 2013 WL 4441948, at *5 (C.D. Cal. Feb. 28, 2013) ("plaintiff could not have brought its state-

21  law claims under section 502(a)(1)(B), and therefore the first prong of *Davila* is not satisfied."). As

22  in *Marin* and *Orthopedic Specialists*, Plaintiffs state-law claims are based on the failure to reimburse

23  at "UCR rates" and arise from an independent legal duty between the Defendants and Plaintiffs. This

24  also fails the second *Davila* prong. *See Orthopedic Specialists* at *5 ("[r]egardless of the terms of the

25  ERISA plan here, if defendant made the alleged representations to plaintiff, defendant was under an

26  independent legal duty not to breach").

27      Therefore, the second prong of *Davila* is also not met. As the Ninth Circuit explained in

28  *Marin*, "we ask only whether "there is no other independent legal duty that is implicated" by a

1    defendant's actions. We do not ask whether that legal duty provides for a similar remedy, such as the

2    payment of money." *Id.* at 950.

3         Viant's conflict preemption argument is entirely inappropriate at this stage of litigation.

4    Conflict preemption is an affirmative defense and not one of the enumerated defenses that may be

5    raised in a motion pursuant to Fed. R. Civ. P. 12(b)(6). A state-law cause of action "relates" to an

6    ERISA plan whenever it has "a 'connection with' or 'reference to'" such a plan. *Paulson v. CNF,*

7    *Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009). The relationship test is used to determine whether a cause

8    of action has a "connection with" an ERISA plan. The relationship test looks to whether the claim

9    bears on an ERISA-regulated relationship, such as plan-participant, plan-employer, or plan sponsor-

10   plan participant. *Id.* A state-law claim has a "reference to" an ERISA plan only if (1) the law acts

11   immediately and exclusively upon ERISA plans, or (2) the existence of ERISA plans is essential to

12   the law's operation. *Id.*

13        Here, Plaintiffs' state law causes of action do not relate to ERISA. Plaintiffs' unfair business

14   practices, breach of contract, misrepresentation, civil conspiracy, breach of contract, and promissory

15   estoppel do not act immediately or exclusively on ERISA plans, and the existence of an ERISA plan

16   is not essential to their operation. The causes of action likewise do not bear on an ERISA-regulated

17   relationship. Indeed, Plaintiffs provided treatment to patients insured under ERISA plans and non-

18   ERISA policies alike.

19        Plaintiffs are not traditional ERISA entities – they are not insurance companies or third-party

20   administrators managing ERISA claims, employers providing ERISA benefits, or patients entitled to

21   ERISA benefits. Rather, Plaintiffs are third-party providers contracted with Defendant to provide

22   services for an expected amount. *See IV Solutions Inc. v. United Healthcare Services, Inc.*, 2012 WL

23   12887401 at *8-9 (C.D. Cal. Nov. 19, 2012) (finding §514 did not preempt state law claims arising

24   out of independent contracts between a third-party healthcare provider and an ERISA administrator)

25        This case is readily analogized to *Wit, et al. v. United Behavioral Health*, No. 14-CV-02346-

26   JCS (hereinafter "*Wit*"). In *Wit*, Judge Spero specifically found that, for many years, United

27   Behavioral Health denied claims using guidelines that were based solely on profit and cost saving

28   rather than the actual clinical needs of members who suffered from mental health and/or substance

1    use disorders. While the class that was certified in *Wit* was appropriately limited to participants and

2    beneficiaries who were denied benefits under ERISA plans, the Court's findings regarding the plans'

3    "medical necessity" language extended to ERISA plans and non-ERISA policies alike. All of the

4    plans at issue in *Wit* included, as a condition of coverage, the requirement that the requested treatment

5    be consistent with generally accepted standards of care. Further the Court concluded that the illegal

6    Guidelines are not Plan terms. *Id*. at *14.

7          Plaintiffs similarly seek to prove that the process behind "UCR" is fundamentally at

8    loggerheads with the accepted meaning of the term. Unlike *Wit*, none of the claims here were denied

9    and could not therefore be brought under ERISA § 502(a)(1)(b). In *Wit* the Court did not stop at the

10    phrase "medically necessary" as used in the plans. Instead, it looked behind the phrase and found

11    illegal Guidelines being applied that were not part of any plan. Here, Plaintiffs will prove that behind

12    "UCR" lie the dishonest and illegal activities of Defendants. These activities are not plan terms.

13    Plaintiffs seek a fair reprocessing of claims, not the payment itself in the present action. When the

14    Court ultimately orders all HCPCS 0015 claims reprocessed for ERISA and non-ERISA plans under

15    a legitimate and legal process, then plan terms will apply. Defendants nationwide grift should not be

16    permitted to masquerade as no more than a "plan term."

17    **IV.    Plaintiffs' State-Law Claims Are Properly Pled**

18          ***1.    Plaintiffs' Fraud Based Claims are Properly Pled***

19          Plaintiffs' fraud-based claims are properly pled. The causes of action for intentional

20    misrepresentation/fraudulent inducement and for negligent misrepresentation set forth the factual

21    basis for the claims and put Defendants on notice of the specific misconduct they must defend against

22    in this action.

23          Fraud claims are subject to Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*,

24    236 F.3d 1014, 1018 (9th Cir. 2001). A plaintiff "must state with particularity the circumstances

25    constituting fraud" (Fed. R. Civ. P. 9(b)) and the allegations must be "specific enough to give

26    defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that

27    they can defend against the charge and not just deny that they have done anything wrong." *Semegen*

28    *v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). The Complaint does this.

1    Plaintiffs' Complaint alleges Defendants represented to the Plaintiffs they would be and were

2    paid based on the UCR methodology set forth in the Complaint. United and Viant are both bound by

3    these representations. Plaintiffs were specifically told that the UCR methodology would be applied

4    and that there would not be any post claim negotiations/repricing [ECF 1 ¶¶ 169-171, 195-97, 202-

5    4, 209-11]. These representations were false and Defendants, collectively employed a hidden

6    methodology other than UCR that resulted, upon Plaintiffs' information and belief, in unreasonably

7    low benefit amounts and payments. [ECF 1 ¶¶ 169-173]. As alleged in Plaintiffs' Complaint, the

8    misrepresentations were made to induce Plaintiffs to provide out of network treatment to United's

9    insureds and beneficiaries [ECF 1 ¶¶ 291-95]. Plaintiffs acted in reliance on the misrepresentations

10   by admitting and treating the United's insureds and beneficiaries. They have been damaged by the

11   application of a hidden non-UCR methodology. Although the patients were United's insureds and

12   beneficiaries, both Defendants participated in and profited from the fraudulent activities alleged.

13   Viant misconstrues the specificity required under Fed. R. Civ. P. 9(b). Plaintiffs are not

14   required to state the specific identity of the individual(s) making the fraudulent statements; rather,

15   Rule 9(b) requires sufficient particularity to enable the defendant to be aware of and prepare a defense

16   against the allegations of fraud. *See, for example, Multifamily Captive Grp., LLC v. Assurance Risk*

17   *Managers, Inc.*, 578 F. Supp. 2d 1242, 1249 (E.D. Cal. 2008); *Swartz v. KPMG LLP*, 476 F.3d 756,

18   764 (9th Cir. 2007) ("[t]here is no absolute requirement that where several defendants are sued in

19   connection with an alleged fraudulent scheme, the complaint must identify false statements made by

20   each and every defendant."). Plaintiffs' Complaint alleges Viant's role in the fraud and the particular

21   misconduct that they engaged in by hiding the true, arbitrary, self-serving, non-UCR methodology

22   behind UCR language and the "negotiations" that they engaged in with Plaintiffs.

23   Plaintiffs' cause of action for a misrepresentation based on negligence is pled as an alternative

24   cause of action to intentional fraudulent inducement. This is permitted under Fed. R. Civ. P. 8(a)(3).

25   In the Ninth Circuit, Rule 9(b) and its specificity requirements do not apply to claims for negligent

26   failure to disclose. *See Vess v.Ciba-Geigy Corp. USA*, 317 F. 3d 1097, 1106 (9th Cir. 2003). As this

27   count alleges negligent conduct, the same standard applies to the negligent misrepresentation claim.

28   Plaintiffs' Complaint has met the notice-pleading requirements of Fed. R. Civ. P. 8(a) that apply to

1   this cause of action.

2        The Complaint goes into great detail in identifying the fraudulent scheme the Defendants are

3   participating in, the role of each Defendant, and the misrepresentations made by each Defendant and,

4   as such, these causes of action are factually and legally supported by the allegations in the Complaint.

5        ## 2.   Plaintiffs' Claim Under California Business & Professions Code 17200 Is Valid.

6        Viant argues that the UCL cause of action for violation of California's unfair competition law,

7   set forth in Business and Professions Code §§ 17200, *et seq*. should be dismissed. As Plaintiffs allege

8   throughout their Complaint, the claims at issue should have been paid based on application of the

9   UCR methodology, not a sham negotiation and arbitrary target price. Both United and Viant

10  represented to Plaintiffs that reimbursement rates were determined using the UCR methodology.

11  Based on that methodology, a payment amount could be calculated or at least reasonably estimated

12  by Plaintiffs in making business decisions. In fact, United's own website states, "FAIR Health

13  provides health care consumers with an estimate of how much out-of-network services will cost

14  them" and even provides a percentile chart for a specific procedure code with data from FAIR health.[7]

15       However, as alleged in the Complaint, claim reimbursement was based on Viant's sham

16  negotiations and an arbitrary target price created by United and Viant. Defendants engaged in what

17  appears to be a new species the egregious practice of post-claim underwriting. The "negotiation" and

18  "target price" all seek to redefine the methodology for claim underwriting and benefits determination

19  *after* the claim is presented and specifically for claims that have already been determined to be valid,

20  covered claims. United and Viant then change the price of those claims *post hoc.* Such conduct meets

21  and exceeds the threshold for an unfair business practice. The UCL prohibits unlawful, unfair, and

22  fraudulent business practices.

23       Viant incorrectly argues that the UCL claims are inadequate because they do not show a

24  statutory violation of any type. The allegations of the complaint establish a clear violation of

25  California Health & Safety Code section 1371.8 and Defendants violation of California's mental

26  health parity laws, including but not limited to California Health & Safety Code section 1374.72 and

27

28  ───────────────

[7] *Legal – Payment of out-of-network benefits*, https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last accessed June 29, 2020)

California Insurance Code section 10144.5. Viant's comparison to the unpublished, *ABC Servs. Grp., Inc. v. United HealthCare Servs., Inc.*, 2019 WL 4137624 (C.D. Cal. June 14, 2019) is inapplicable to the allegations in this case. Unlike *ABC*, Plainitffs have made more than conclusory as the representations, communications, and payments that were made. Further, Plaintiffs have specifically alleged the methodology required to be used in determining payment amounts and how it was not done.

Plaintiffs' Complaint also satisfies the fraud prong of a UCL claim. "A fraudulent business practice is one in which members of the public are likely to be deceived." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009) (citation and internal quotation marks omitted). To be actionable under the UCL, a representation may be untrue, or it "may be accurate on some level, but will nonetheless tend to mislead or deceive." *McKell* at 1471. The complaint alleges that United and Viant made representations that valid claims would be paid using the UCR methodology. Defendants did not disclose that valid claims where coverage had already been determined were being re-underwriting using a different methodology that ultimately led to payments well below those that would be expected under a true UCR methodology. These allegations are sufficient to state a claim for deceptive business practices.

Moreover, Plaintiffs allege that Defendants knew prior to patients receiving treatment or claims being processed that they would not use the UCR methodology in processing the claims. Through Defendants' course of conduct, including its confirmation of coverage and authorization of treatment, Plaintiffs were encouraged to provide treatment. At every step, they were misled by Defendants into believing that they would have their claims processed under the UCR methodology. Defendants did not disclose relevant information, namely, that they would use arbitrary target prices and sham negotiations as the framework for processing and reimbursing valid claims. These allegations are sufficient to state a UCL claim for deceptive business practices.

California law is specifically designed to protect healthcare providers, such as Plaintiffs and the putative class, against such post-claim underwriting and *ex post facto* actions. Specifically, the California Legislature has enacted Health & Safety Code § 1371.8, which requires, in relevant part:

> **"A health care service plan that authorizes a specific type of treatment by a provider shall not rescind or modify this authorization after the provider renders the health**

**care service in good faith and pursuant to the authorization for any reason**" (emphasis added)

Plaintiffs and the class they represent seek to represent are not asking for automatic reimbursement from Defendants, they are asking for a fair and equitable reprocessing of all claims that does not rely on a hidden, non-UCR methodology and sham negotiations. Numerous courts have found that "reprocessing," the relief sought by Plaintiffs, is not monetary relief. *See, for example, Meidl v. Aetna*, Inc., 2017 WL 1831916, at \*21 (D. Conn. May 4, 2017) (a reprocessing order is not properly treated as monetary relief…[t]he fact that certain class members may end up receiving payment—after this case is closed, as a result of the reprocessing—is too attenuated to treat the reprocessing itself as a form of monetary damages."). This is an appropriate, equitable remedy under the UCL. In the event the Court finds Plaintiffs' UCL claim deficient, Plaintiffs respectfully request leave to amend their complaint to cure any pleading deficiencies.

### 3. *Plaintiffs' Complaint Properly Alleges a Civil Conspiracy Count*

A civil conspiracy claim requires a showing of the formation and operation of a conspiracy, and damages resulting from wrongful acts committed in furtherance of the conspiracy. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-511 (1994). Plaintiffs' cause of action for civil conspiracy pleads and establishes these elements. This cause of action incorporates all the general and class allegations preceding it by reference, including all of the detailed allegations set forth in paragraphs 28-61 under the topic heading "Alliance of United and Viant." These allegations clearly lay out the nature, execution, and harm caused by the conspiracy.

### 4. *The Promissory Estoppel Claim Is Legally Sufficient*

Plaintiffs' cause of action is for promissory estoppel is sufficient and properly pled. Under promissory estoppel, "a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969); *accord Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000). The elements of the claim are: "(1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise." *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1412 (2014)..

Verification communications may constitute an appropriate predicate for promissory estoppel. See, e.g., *Regents of the Univ. of Cal. v. Principal Fin. Grp*., 412 F. Supp. 2d 1037, 1042 (N.D. Cal. 2006) (concluding that insurer demonstrated intent to be bound to pay health care provider because insurer verified coverage and authorized treatment on multiple occasions); *Enloe Med. Ctr. v. Principal Life Ins. Co.*, 2011 WL 6396517 at \*6 (E.D. Cal. Dec. 20, 2011) (noting that courts diverge on whether treatment authorization evinces a promise to pay and stating that "in some instances, a contract may be created on an authorization call"). As such, the allegations in Plaintiffs' Complaint are sufficient and amount to more than "routine verification and/or preauthorization communications" as in the cases cited by Viant.

In this case, the only issue is the non-UCR methodology that Defendants applied to all of Plaintiffs claims, that Plaintiffs reasonably believe led to significant underpayment. In all of the claims, the need for the services and/or medical necessity of those services is not in dispute, only the methodology that led to underpayment. Plaintiffs' show justifiable reliance by Plaintiffs as to the representations made by Defendants as to the methodology employed in reimbursing valid claims. This cause of action is based on Defendants' promises made as to UCR methodology, as represented in the preadmission VOB communications, would be applied. United and Viant should be required to reprocess all claims under a true UCR methodology.

### 5.  *Plaintiffs Oral Contract and Implied Contract Claims Are Properly Pled*

Although Viant's motion does not contest Plaintiffs' oral contract and implied contract claims, Viant claims to incorporate the arguments made by United in their motion to dismiss. As United did include such an argument, Plaintiffs reassert their response thereto as if fully set forth herein.

### 6.  *The Economic Loss Rule Does Not Apply to the Misrepresentation Claims or Promissory Estoppel Claim*

Although Viant's motion does not assert the economic loss rule precludes the misrepresentation and promissory estoppel claims. Viant claims to incorporate the arguments made by United in their motion to dismiss. As United did include such an argument, Plaintiffs reassert their response thereto as if fully set forth herein.

///

1

## V.     The RICO § 1962(c) Claim Should Not Be Dismissed.

2          Plaintiffs' RICO § 1962(c) Claim (Count VII) should not be dismissed. RICO claims are to

3   "be liberally construed to effectuate its remedial purposes" *Odom v. Microsoft Corp.*, 486 F.3d 541,

4   547 (9th Cir. 2007) *quoting Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985). Also, "[RICO]

5   has become a tool for everyday fraud cases brought against respected and legitimate enterprises."

6   *Sedima* at 499. Further, each inappropriate application of the non-UCR methodology and the actions

7   by Defendants that flowed from such application are more than sufficient to show that Viant

8   committed "two predicate acts" despite their claims to the contrary. [ECF 38 Pg. 14].

9          Further, Plaintiffs have asserted far more than a mere "commercial relationship" between

10  Viant and United. Viant is far more than a mere conduit and the contract between Viant and United

11  is far from 'routine.' United and Viant shared a common purpose to illegally and deceptively

12  underpay HCPCS H0015 claims for their mutual profit. United and Viant do not have an arms'-length

13  commercial relationship. Several Courts have found RICO violations plausible based on allegations

14  that an insurer and its third-party payor when hidden, illegal methodologies were used in determining

15  claim reimbursements. *See, for example, Crutcher v. Multiplan, Inc.*, 2016 WL 6832644 (W.D. Mo.

16  Nov. 18, 2016); *Fremont Emergency Services (Mandavia), Ltd. v. United HealthCare Insurance, Co.,*

17  *et al.*, Case No. A-19-79278-B (Clark County, NV, June 24, 2020).

18         Plaintiffs' allegations resemble those in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir.

19  2007) than the cases cited by Viant including *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D.

20  Cal. July 13, 2015). First, *Gomez* cites *Odom* approvingly and distinguishes its facts where a payment

21  processor, a mere conduit for the transactions, was not part of a RICO enterprise. Further, another

22  California District Court has criticized *Gomez* for the very proposition Viant relies on. *See In re Wells*

23  *Fargo Ins. Mktg. & Sales Practices Litig.*, 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018) ("Taken

24  at face value, this *[Gomez]* is an interesting conclusion, considering RICO's broad "enterprise"

25  definition. Indeed, it would be strange to prevent RICO from reaching any case where two parties

26  have a contractual relationship—a conclusion Wells Fargo seems to encourage the Court to adopt.")

27         Plaintiffs have alleged "a common purpose to deceive" which is sufficient for a RICO

28  enterprise. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,

295 F. Supp. 3d 927, 981 (N.D. Cal. 2018) (distinguishes its facts from *Gomez*, "[t]hese allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings. Rather, like the allegations regarding Microsoft and Best Buy in *Odom*, Plaintiffs' allegations support that Defendants shared a common purpose to deceive.

Further, corporations may constitute an entire RICO enterprise. *See United States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) ("If a corporation can form part of an "associated in fact" enterprise, *a fortiori*, a group of corporations should be able to constitute the entire enterprise.") Also, United and Viant, both corporations named as RICO defendants, each represent a legal entity and, alone, may be charged as the RICO enterprise. *See In re Wells Fargo Ins. Mktg. & Sales Practices Litig*., 2018 WL 4945541, at *4 (C.D. Cal. June 18, 2018).

### 1. *Plaintiffs Have Plausibly Alleged an Association-In-Fact Enterprise*

Viant misrepresents the allegations actually made in the Plaintiff's Complaint. For example, even though such a purpose is not even required to create an association-in-fact enterprise, Plaintiffs allege that United and Viant shared a common purpose to deceive. United and Viant acted in concert to develop policies, practices, and procedures governing the processing and payment of claims *independent of any actual plan terms*. This enterprise had the purpose of deceiving plan sponsors, insureds, beneficiaries, and healthcare providers to their detriment and to Defendants' financial benefit. The service agreement that United has with Viant will be sought in discovery and, upon information and belief, this agreement masks the true policies, practices, and procedures underlying the alleged scheme,

Defendants have created an enterprise that determines Outpatient Repricing (OPR) tied to a target price that is not made known to plan sponsors, insureds, beneficiaries, and healthcare provider. They then pays claims at or below the target price. The target price is an arbitrarily low amount determined by the Defendants, that disregards the FAIR health data that Defendants have had access to since its inception. This is the enterprise that presents itself as paying UCR while it is anything but. To be clear, this enterprise that exists independent from any plan terms.

As in *Odom*, the enterprise between United and Viant has a common purpose to deceive. This is above and beyond the normal commercial relationships. This common purpose to deceive is alleged

1    in Plaintiffs' Complaint and creates a RICO enterprise and Plaintiffs' allegations show that Viant did

2    more "than carry out the terms of its service contract with United." [ECF 39 Pg. 17]. *See In re*

3    *Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927

4    (N.D. Cal. 2018). Further, at least one California District Court has found that an association-in-fact

5    enterprise can exist without all members sharing the same fraudulent purpose. *See Friedman v. 24*

6    *Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008). *Friedman* is cited approvingly in

7    *Yagman v. Allianz Ins.*, 2015 WL 5553462, at *2 (C.D. Cal. July 9, 2015) for the proposition that a

8    RICO enterprise may be premised on contractual relationships for financial services. *See also, Bias*

9    *v. Wells Fargo & Co.*, 942 F.Supp.2d 915, 942 (N.D. Cal. Apr 25, 2013) (finding that plaintiff

10   sufficiently alleged a RICO enterprise consisting of a bank and third-party vendors and brokers who

11   provided default-related services "at the core of the scheme"); *Downey Surgical Clinic, Inc. v.*

12   *Ingenix*, Inc., 2013 WL 12114069, at *12 (C.D. Cal. Mar. 12, 2013) ("By sharing the information

13   with each other, Plaintiffs have sufficiently alleged a "hub-and-spoke" type enterprise because they

14   have alleged agreement among the Plan Defendants.")

15   United and Viant share the necessary common purpose through their enterprise that is every

16   bit as dishonest as the defeat device in the Volkswagen diesel litigation.  There the court found the

17   partnership between Volkswagen and Bosch in implementing the defeat device sufficient to establish

18   a common purpose. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.*

19   *Litig.*, 2017 WL 4890594, at *17 (N.D. Cal. Oct. 30, 2017) ("allegations are sufficient to satisfy the

20   four elements of their § 1962(c) RICO claim. They have plausibly alleged that Bosch partnered with

21   Volkswagen to implement the defeat device in the affected vehicles, and by doing so participated in

22   the conduct of a years-long enterprise to defraud U.S. regulators and consumers.")

23   Here, United and Viant are witting co-conspirators even though "RICO does not require

24   intentional or "purposeful" behavior by corporations charged as members of an association-in-

25   fact….[n]or does RICO require that the association-in-fact be a conspiracy; there must be an

26   enterprise regardless of whether there is any conspiracy to engage in the predicate acts of

27   racketeering." *United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988).

28   Further, no unlawful "common purpose" is required for a RICO enterprise in the Ninth Circuit

1   even though Plaintiffs believe that they have alleged as such. *See Cirino v. Bank of Am., N.A.*, 2014

2   WL 9894432, at *10 (C.D. Cal. Oct. 1, 2014).  Rather, "a corporation may fulfill the requirement if

3   it: (1) made the RICO activities possible and profitable by providing a legal shield for the illegal

4   activity, and (2) also functioned to achieve objectives that were not illegal." *Am. Chem. Soc'y v.*

5   *Commax Techs., Inc.*, 2007 WL 963968, at *4 (N.D. Cal. Mar. 30, 2007). United and Viant made the

6   RICO activities alleged possible; it is irrelevant whether there were other objectives that were not

7   illegal. As set forth in the Complaint, United and Viant have anything but a vanilla commercial

8   contract for services and Viant's contrary claims do not make it so, especially on a motion to dismiss.

9   **2.   *Plaintiffs Have Plausibly Alleged Predicate RICO Acts by United & Viant.***

10   **i.   *"Federal Health Offenses" as a Specified Unlawful Activity for the <u>Laundering of</u>***

11   ***<u>Monetary Instruments</u> Is a Predicate RICO Act under 18 U.S.C. § 1961.***

12   The Federal Health Offenses asserted by Plaintiffs constitute unlawful activity that can form

13   the basis of a RICO claim as they are included in the specified unlawful activities defined in Code

14   section relating to the laundering of monetary instruments. A claim for the laundering of monetary

15   instruments is a specified predicate act under RICO. Under 18 U.S.C. § 1961 "(1) "racketeering

16   activity" means…(B) any act which is indictable under any of the following provisions of title 18,

17   United States Code…section 1956 (relating to the laundering of monetary instruments)" and pursuant

18   to 18 U.S.C. § 1956(c)(7), "any act or activity constituting an offense involving a Federal health care

19   offense" is included in the definition of "specified unlawful activity." 18 U.S.C. § 1956(c)(7)(F).

20   Federal health care offenses are defined at 18 U.S.C. § 24. Plaintiffs have alleged Defendants'

21   violation of Federal health care offenses in their Complaint. *See* [ECF 6 ¶¶ 355-359].

22   18 U.S.C. § 1956 states, "[w]hoever, knowing that the property involved in a financial

23   transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct

24   such a financial transaction which in fact involves the proceeds of specified unlawful activity -- (A)(i)

25   with the intent to promote the carrying on of specified unlawful activity…a financial transaction shall

26   be considered to be one involving the proceeds of specified unlawful activity." Based on the

27   allegations in the Complaint, Defendants have conducted numerous such financial transactions as

28   their proceeds derive from specified unlawful activity, the aforementioned Federal health care

1    offenses.

2         *ii.   Plaintiffs Have Sufficient Alleged RICO Predicate Acts of Mail and Wire Fraud*

3         Plaintiffs have sufficiently alleged and pled RICO predicate acts of mail and wire fraud. In

4    pleading these acts, "[t]he only aspects…that require particularized allegations are the factual

5    circumstances of the fraud itself... Rule 9(b) "requires the identification of the circumstances

6    constituting fraud s*o that the defendant can prepare an adequate answer from the allegations*."

7    *Odom v. Microsoft Corp*., 486 F.3d 541, 554 (9th Cir. 2007) (emphasis added, citation omitted). It is

8    not Defendants' fraudulent calls and letters that are the scheme, it is the creation and use of Outpatient

9    Repricing (OPR) tied to a target price that is not made known to plan sponsors, insureds, beneficiaries,

10   and healthcare providers and then paying claims at or below the target price while representing to the

11   world that the UCR methodology was used. Any wire and mail communications are incidental, and

12   upon information and belief such communications did cross state lines. Indeed, given the diversity

13   between the parties, it is impossible for these communications not to have crossed state lines.

14        Here Defendants' mailings and wire communications are only "incident to an essential part

15   of the scheme," they only need to be in furtherance of a scheme to defraud, and do not themselves

16   need to be fraudulent or untrue. *See Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 635 (C.D.

17   Cal. 2001) *citing Schmuck v. United States*, 489 U.S. 705 (1989). Plaintiffs' Complaint alleges that

18   the communications by mail and wire were in furtherance of the underlying scheme. Plaintiffs'

19   Complaint is not required to describe every single piece of mail and wire communication in detail;

20   instead, the is required to be specific enough to "to give defendants notice of the particular misconduct

21   which is alleged to constitute the fraud charged so that they can defend against the charge and not

22   just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir.1993)

23   (internal quotation marks and citation omitted).

24        However, should the Court find Plaintiffs' allegations insufficient, the Plaintiffs would

25   request leave to conduct limited discovery as to Viant and United as the scheme alleged is similar to

26   one of insider trading with specific details only being in Defendants' possession. In such cases, in the

27   Ninth Circuit in *Neubronner* recognizes that limited discovery is appropriate. *Id.* at 671 ("But surely

28   we can not expect a private plaintiff in an insider trading case to plead with the specificity Rule 9(b)

1 requires without allowing some limited opportunity for discovery.")

2       ***3. Plaintiffs Have Plausibly Pled Proximate Cause***

3       The Ninth Circuit takes an expansive view of proximate cause under RICO, stating

4 "proximate cause [under RICO] is "a flexible concept that does not lend itself to a black-letter rule

5 that will dictate the result in every case."" *Painters & Allied Trades Dist. Council 82 Health Care*

6 *Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1250 (9th Cir. 2019) *quoting Bridge v. Phoenix*

7 *Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

8       As outlined in the Complaint and *supra*, Plaintiffs have strong reason to believe that they were

9 harmed as a direct result of Defendants scheme to utilize a non-UCR methodology and sham

10 negotiations to massively underpay Plaintiffs' IOP claims at the expense of Plaintiffs and, though

11 outside the scope of this particular case, the enterprise also profited at the expense of patients and

12 plan sponsors. Plaintiffs and the putative class were not privy to the inner workings of the scheme.

13 Instead, they only knew of the representations that United made to the world as to the UCR

14 methodology and Viant's statements in written and wire communications that they adhered to and

15 implemented that methodology. Only by reprocessing every IOP claim under a fair, transparent

16 methodology can Plaintiffs and the putative class be made whole and have the scheme ended.

17 Injunctive relief is also appropriate to prevent this scheme from continuing to harm Plaintiffs and the

18 putative class. Further, even though direct reliance is not a required RICO element (*see Painters* at

19 1259), Plaintiffs and the putative class relied on Defendants to employ the stated methodology and

20 issue payments according to that methodology.

21       **VI.**   **Plaintiffs' Sherman Act Claim Is Properly Stated**

22       Plaintiffs' Sherman Act claim should not be dismissed as Plaintiffs possess antitrust standing

23 and have sustained an antitrust injury. At the outset it is important to note that healthcare services are

24 well within the scope of antitrust law despite Viant's assertions to the contrary. The Supreme Court

25 applied antitrust law to rates for medical services and the healthcare industry in *Arizona v. Maricopa*

26 *Cty. Med. Soc.*, 457 U.S. 332 (1982).

27       ***1. Plaintiffs Possess Antitrust Standing & Have Suffered an Antitrust Injury***

28       Under the *Sherman Act* and the *Clayton Act*, a plaintiff must allege a violation of the antitrust

laws and damage that proximately results from the acts and conduct which constitute the violation. *See Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 362 (9th Cir. 1955). In determining antitrust standing, the court looks to five general factors, none of which are explicitly determinative, (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (impossible to formulate black-letter rule that will apply to every situation). All five factors are in Plaintiffs' favor.

As to the first factor, the Ninth Circuit has parsed it further into four requirements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *See Am. Ad Mgmt.* at 1055. Here, Plaintiffs allege unlawful conduct by Defendants throughout their Complaint. Next, Plaintiffs allege they were injured through Defendants' application of the non-UCR methodology that led to reimbursements well below what was reasonably expected under a legitimate UCR methodology. This injury flows from the alleged unlawful conduct. As to the fourth element, it "must be "of the type the antitrust laws were intended to prevent."" *Id.* at 1057. This injury is not limited to "consumers and competitors" but that the Clayton Act § 4 protects all victims of antitrust injuries. *Id citing Blue Shield v. McCready*, 457 U.S. 465, 472 (1982); *see also, Cargill Inc. v. Budine*, 2007 WL 2506451 at *5 (E.D. Cal. 2007) (noting that the relationship between the defendant's alleged unlawful conduct and the resulting harm to plaintiff that matters in determining standing).

The deceptively and excessively low prices that Plaintiffs received as a direct result of Defendants' actions are precisely the type of actions that antitrust law is meant to curtail. *See, for example, Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel."); *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (noting that antitrust injury results from a "competition-reducing" aspect of defendant's conduct).

1        Defendants actions, as alleged in Plaintiffs' Complaint, have corrupted the market,

2  nationwide, and have forced many substance abuse treatment providers out of business. The number

3  and extent of providers forced out of business as a direct result of Defendants' antitrust actions is a

4  factual question. By reducing the number of substance abuse treatment providers, it is also a factual

5  question as to how much the quality of services available to potential patients has suffered. Reduction

6  in the quality of services provided as a direct result of Defendants' actions is sufficient for antitrust

7  standing and an antitrust injury. *See Fox v. Good Samaritan Hosp.*, 2007 WL 2938175, at *6 (N.D.

8  Cal. Oct. 9, 2007) ("plaintiff does offer evidence that suggests a reduction in the quality of services

9  to patients as a result of the suspension of plaintiff's pediatric critical care privileges."); *Kochert v.

10  Greater Lafayette Health Services, Inc.*, 372 F. Supp. 2d 509, 515 (N.D. Ind. 2004), *judgment aff'd*,

11  463 F.3d 710 (7th Cir. 2006) ("To show an antitrust injury, [plaintiff] must prove that the exclusive

12  contract affected the price, quantity or quality of anesthesia services, not just her own welfare.");

13  *Nilavar v. Mercy Health System Western Ohio*, 142 F. Supp. 2d 859 (S.D. Ohio 2000) (antitrust injury

14  alleged where plaintiff alleged that not only had his ability to compete been restrained but that such

15  resulted in higher prices, lower quality, and less choice for consumers).

16        Typically, for the conduct to result in antitrust injury, the harm to competition must occur in

17  a relevant market in which the plaintiff competes or is a purchaser; however, when consumers,

18  because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer

19  "injury of the type the antitrust laws were intended to prevent and that flows from that which makes

20  defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

21        The remaining antitrust factors, (2) the directness of the injury; (3) the speculative measure

22  of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages, are

23  easily met based on Plaintiffs' allegations. The injury is direct as Defendants implemented a hidden

24  methodology that resulted in significant underpayments to Plaintiffs. The injury is not speculative as

25  the difference between the methodology used by Defendants and the UCR methodology can be

26  concretely determined through the reprocessing of claims. There is little to no risk of duplicative

27  recovery as Plaintiffs are the only entities entitled to bring these claims. There is little to no

28  complexity in apportioning damages among the Defendants.

Further, the Plaintiffs are also entitled to injunctive relief for Defendants' Clayton Act violations. *See California v. American Stores Co*., 495 U.S. 271 (1990) (a party experiencing harm may nevertheless seek injunctive relief.). Also, the requirements of a plaintiff seeking injunctive relief are more relaxed than those seeking monetary damages as the risk of duplicative recovery is not present. *See Cargill, Inc. v. Monfort of Colorado*, *Inc.*, 479 U.S. 104 (1986). The Ninth Circuit summarized the differences between injunctive relief and antitrust damages: "the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction." *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998); *Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999) ("plaintiffs may not have to meet all three factors in the "remoteness" test to maintain an action for antitrust injunctive relief.") Here, Plaintiffs' allegations are also sufficient to seek injunctive relief against Defendants to prevent them from using the deceptive, non-UCR methodology in reimbursement amounts.

### 2. Plaintiffs Have Plausibly Alleged a Potential Per Se Price-Fixing Violation.

To determine whether an alleged restraint is unreasonable, the court must decide at the threshold whether it is per se illegal or whether it must be analyzed under the "rule of reason." *Paladin Assoc., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir.2003). Horizontal market division is a "classic *per se* antitrust violation." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir.1991). Plaintiffs have sufficiently alleged a horizontal market division in their Complaint as the alleged conduct shows a *de facto* oligopsony. As another court in this district stated, "[w]hile the traditional horizontal conspiracy case involves an agreement among sellers with the purpose of raising prices to supracompetitive levels, the Sherman Act also applies to abuse of market power on the buyer side-often taking the form of monopsony or oligopsony." *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *7 (N.D. Cal. Mar. 29, 2013). Here, while the insureds and beneficiaries are the health care consumer, it is the insurer that is the *per se* buyer of the healthcare services. In essence, the health insurers form an oligopsony as health care buyers. Further, "[i]n a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices." *Id.* quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir.2008). As multi-billion

1    dollar corporations with significant operations across the nation, Defendants have significant market

2    power nationwide.

3            It is a fundamental principle that "antitrust law is concerned with influences that corrupt

4    market conditions, not bargaining power" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 (2d Cir.

5    2016). United and Viant's actions, as alleged in the Complaint, are influences that corrupt market

6    conditions nationwide. Defendants use of a hidden, target price based methodology set by

7    Defendants, not the market, in determining reimbursement amounts corrupts the market because

8    Plaintiffs and the putative class could not make well-informed patient admission decisions that

9    aligned with their financial needs when United utilizing Viant, as the true health care buyer would

10   only pay prices well below market prices and kept this information from Plaintiffs and the putative

11   class until after the IOP services had been provided. This prevented Plaintiffs and the putative class

12   from making an unfettered decision as to admitting patients and it is likely that the facts will show

13   Plaintiffs ultimately admitted many of United's insureds and beneficiaries at the expense of potential

14   patients insured by other health insurance providers or self-pay patients. Thus, Plaintiffs have alleged

15   that Defendants' actions have corrupted market conditions. The degree of corruption is a factual

16   determination but is not dispositive of their being an antitrust violation.

17           Moreover, in areas of the country with very few substance abuse treatment providers, the

18   injury to even one provider may be an antitrust violation. *See Aerotec Intern., Inc. v. Honeywell*

19   *Intern., Inc.*, 4 F. Supp. 3d 1123, 1136 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ("injury

20   to a single competitor can constitute injury to competition when the relevant market is both narrow

21   and discrete and market participants are few"). Ultimately, this will be a fact intensive determination.

22           ***3.    Defendants Have Engaged in Prohibited Price-Fixing***

23           Under both California and Federal antitrust law, price fixing is illegal *per se* without regard

24   to any of its effects. Further, "[t]he power to fix prices, whether reasonably exercised or not, involves

25   power to control the market and to fix arbitrary and unreasonable prices." *Knevelbaard Dairies v.*

26   *Kraft Foods, Inc.*, 232 F.3d 979, 999 (9th Cir. 2000) *quoting United States v. Trenton Potteries Co.*,

27   273 U.S. 392, 397 (1927). Contrary to Viants's assertions, it is well-established that "price-fixing"

28   can apply to rates for medical services and the healthcare industry. *See Arizona v. Maricopa Cty.*

1   *Med. Soc.*, 457 U.S. 332 (1982) (action of physicians setting maximum fees was *per se* unlawful

2   under first section of Sherman Act.) The Supreme Court in *Maricopa* held, "the claim that the price

3   restraint will make it easier for customers to pay does not distinguish the medical profession from

4   any other provider of goods or services." *Id*. at 349. The Court continued, "[t]he anticompetitive

5   potential inherent in all price-fixing agreements justifies their facial invalidation even if

6   procompetitive justifications are offered." *Id.* at 350. Defendants agreements and implementation of

7   a non-UCR fixed price, commonly referred to among defendants as the "target price" is anti-

8   competitive price fixing that prevents a fair and competitive market. A factual inquiry into the details

9   of Defendants actions and these agreements will ultimately show that Defendants engaged in price-

10  fixing, a *per se* violation of the Sherman Act.

11      Finally, Plaintiffs allegations are factually distinguishable from *In re Wellpoint, Inc. Out-of-*

12  *Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) and other "UCR" cases cited

13  by Viant. In one of the prior *Wellpoint* decisions, the same court stated "the gravamen of the [antitrust]

14  allegation is that the participating insurers conspired amongst themselves to fix ONS reimbursements

15  (something that Ingenix was not in the business of paying because Ingenix is not an insurer)" *In re*

16  *WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011) and

17  declined to dismiss the antitrust claim. However, most importantly, that same decision states:

18      an investigative task force of the NYAG determined that health insurers who participate in
19      the Ingenix data collection have an incentive to provide artificially low claims information
20      and, thus, produce a "garbage in, garbage out" effect. On January 13, 2009, the NYAG
        issued its "Health Care Report: The Consumer Reimbursement System is Code Blue,"
21      which concluded that the Ingenix Database was an "industry-wide problem," "a rigged
        system," "fraudulent," "and critically ill." In response to the investigation, UHG,
22      WellPoint, and other participating insurers entered into agreements with the NYAG to
        discontinue use of the Ingenix Database and to establish an independent system to
23      determine UCR reimbursements. Even the United States Congress became involved, with
        the Senate Committee on Commerce, Science, and Transportation holding two hearings on
24      how the healthcare industry calculates UCR reimbursements for [out-of-network services].

25  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1017 (C.D.

26  Cal. 2011)

27  The scheme alleged by Plaintiffs is similar to the *Ingenix* scheme referred to above. The *Ingenix*

28  methodology had been discontinued from use at the time of the "UCR" decisions cited by Viant.

The *Wellpoint* decision included providers that the court found lacked valid assignments to bring RICO and Antitrust claims *on behalf of their patients*, *Id.* at 897, and continues "damages attributable to WellPoint's wrongful conduct would entail considerable speculation regarding how the Subscribers would have behaved had WellPoint accurately disclosed its ONS reimbursement metrics, including whether a subscriber would have selected a different ONS provider or an in-network  provider, or would have agreed to pay the balance had they been informed of the lower ONS reimbursement figures upfront." *Id.* at 901-902.

This case is similar to the original litigation and distinct from the UCR litigation because Plaintiffs challenge the use of a methodology other than what was represented and promised. This is not a matter of a carrier failing to disclose reimbursement metrics, it is the representation that an objective UCR methodology was being used, the UCR methodology stated it used the FAIR Health database that was created out of the *Ingenix* settlement. The FAIR Health database is available to the general public and has been found by several states to be an appropriately independent and objective database. Further, Plaintiffs are not bringing their antitrust claims by virtue of assignments from their patients. Plaintiffs are asking that the claims be reprocessed using the methodology that they actually claim to use. The arbitrary and hidden methodology that was actually used has disrupted the market nationwide and forced many class members to shutter. This not only has economic effects, it also effects the ability of an individual to receive substance abuse treatment services and the quality of the services. This is not speculative, does not create a risk of duplicative damages. Once claims are reprocessed using the methodology they were promised, the Plaintiffs will have the relief that they seek. Viant's assertions ignore these fundamental differences and hope to distract the Court on the actual antitrust allegations in Plaintiffs' Complaint simply because the term "UCR" appears in Plaintiffs' Complaint.

**VII.    Conclusion**

For all of the reasons set forth herein, Defendant Viant's Motion to Dismiss should be denied in its entirety. Should the Court find any of Plaintiffs' pleadings deficient, Plaintiffs respectfully request to amend in order to cure any deficiencies.

**[Signature page follows.]**

Dated: July 2, 2020                                    **NAPOLI SHKOLNIK PLLC**

                                                          /s/ Matthew M. Lavin
                                                       Matthew M. Lavin
                                                       Wendy A. Mitchell

                                                       **DL LAW GROUP**
                                                          /s/ David M. Lilienstein
                                                       David M. Lilienstein
                                                       Katie J. Spielman

                                                       *Attorneys for Plaintiffs*
                                                       *And the Putative Class*