Matthew M. Lavin, Esq. (*pro hac vice*)
mlavin@napolilaw.com
Wendy A. Mitchell, Esq. (CA SBN 158553)
wmitchell@napolilaw.com
NAPOLI SHKOLNIK, PLLC
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
Telephone: (212) 397-1000
Facsimile: (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
david@dllawgroup.com
Katie J. Spielman, Esq. (CA SBN 252209)
katie@dllawgroup.com
DL LAW GROUP
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE RECOVERY CENTER, INC., on behalf of themselves and all others similarly situated, | Case No.: 4:20-cv-02249-YGR FIRST AMENDED CLASS ACTION COMPLAINT JURY TRIAL DEMANDED FOR ALL ISSUES SO TRIABLE |
| Plaintiffs, | |
| vs. | |
| UNITED BEHAVIORAL HEALTH, a California Corporation, and MULTIPLAN, INC., a New York Corporation, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

Table of Contents ........................................................................................................... i

Introduction ................................................................................................................... 1

Summary of Claims ....................................................................................................... 3

Parties ............................................................................................................................ 6

    Plaintiffs .................................................................................................................. 6

    Defendants .............................................................................................................. 6

Jurisdiction and Venue ................................................................................................. 7

Facts .............................................................................................................................. 8

    Summary of the Facts ............................................................................................. 8

    Usual, Customary, and Reasonable Rate ("UCR") ............................................... 10

    Intensive Outpatient Program Treatment .............................................................. 11

    Federal RICO Allegations ..................................................................................... 13

        The Ingenix Precursor .................................................................................... 13

    The RICO Enterprise ............................................................................................. 16

        The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual,

            Customary, and Reasonable Rates for Reimbursements for IOP Services .............. 16

        The FAIR Health Database ............................................................................. 19

        The Underpayment Scheme's Mechanics ....................................................... 22

        Claims submission ......................................................................................... 26

        Rates of Payment ........................................................................................... 27

        Viant's Methodology ...................................................................................... 28

        Viant Facility Outpatient Review: "Viant OPR" ........................................... 29

        Standard Analytical Files ................................................................................ 29

        Target Pricing: Meet or Beat .......................................................................... 30

        MultiPlan and the Viant Methodology ........................................................... 32

        MultiPlan's Secret Annual Events .................................................................. 32

        MultiPlan's Secret Road Shows ..................................................................... 34

        The Secret Internal Whitepapers .................................................................... 35

        The Network Access Agreement .................................................................... 36

    RICO Predicate Acts .............................................................................................. 36

        Pacific Recovery Solutions ............................................................................ 36

        PCI Westlake .................................................................................................. 43

        Bridging The Gaps ......................................................................................... 49

        Summit Estate ................................................................................................ 55

    RICO Proximate Cause .......................................................................................... 62

i

The Continuing Nationwide Pattern and Other Victims Affected ........................ 62

Facts Specific to Anti-Trust Claims ........................................................................ 63

    The Relevant Market ............................................................................................ 64

    Price Fixing ......................................................................................................... 65

    Anti-Competitive Harm ....................................................................................... 68

General Allegations to All Counts ............................................................................ 69

The Direct Harm Caused to the Plaintiffs and Class ................................................ 69

Class Action Allegations ............................................................................................. 70

The Plaintiff Class ..................................................................................................... 70

Rule 23(a) .................................................................................................................. 70

    Numerosity ........................................................................................................... 70

    Commonality ........................................................................................................ 71

    Typicality ............................................................................................................. 72

    Adequacy .............................................................................................................. 73

Rule 23(b) .................................................................................................................. 73

Causes of Action ........................................................................................................... 74

COUNT I: Violation of RICO, 18 U.S.C. § 1962(c) ............................................... 74

COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d) ......................... 75

COUNT III: Violation of California Business & Professions Code §§ 17200 et seq.

    (Unfair and Unlawful Business Practices of United) ...................................... 76

COUNT IV: Violation of California Business & Professions Code §§ 17200 et seq.

    (Unfair and Unlawful Business Practices of MultiPlan) ................................ 78

COUNT V Intentional Misrepresentation/Fraudulent Inducement ...................... 80

COUNT VI: Negligent Misrepresentation .............................................................. 81

COUNT VII: Civil Conspiracy ............................................................................... 82

COUNT VIII: Breach of Oral and/or Implied Contract ......................................... 83

COUNT IX: Promissory Estoppel ........................................................................... 85

COUNT X: Violations of Section One of the Sherman Act .................................... 86

    Effects .................................................................................................................. 87

    Fraudulent Concealment ...................................................................................... 87

    Damages to Plaintiffs .......................................................................................... 87

Demand for Jury Trial .................................................................................................. 88

ii

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Pacific Recovery Solutions d/b/a Westwind Recovery, Miriam Hamideh PhD Clinical Psychologist Inc. d/b/a PCI Westlake Centers, Bridging the Gaps, Inc., Summit Estate Recovery Center, Inc., bring this action on behalf of themselves and all other similarly situated out-of-network behavioral health providers (collectively, the "Plaintiffs") that provide Intensive Outpatient Program treatment ("IOP") against defendants United Behavioral Health, Inc., ("United") and MultiPlan, Inc. ("MultiPlan") and allege the following:

**Introduction**

1.      Plaintiffs bring this class action on behalf of themselves and all those similarly situated out-of-network behavioral health providers that provide IOP treatment services (the "Plaintiff Class") and who were directly injured by United and MultiPlan's scheme to underpay valid, medically necessary claims.

2.      Each Plaintiff is a behavioral healthcare provider treating patients suffering from mental health and/or substance use disorders ("MH/SUD"). Each is a duly licensed, accredited provider.

3.      Plaintiffs provide medically necessary services for MH/SUD treatment.

4.      The Defendant, United Behavioral Health is one of more than 1,200 'United' Companies. The United companies are not independent, rather they act in concert to maximize profits for the shareholders of United Corporation. MultiPlan, Inc. is a 'cost management' company. Together, United and MultiPlan have formed an enterprise that furnishes a vehicle to deny proper payment for the IOP treatment services that Plaintiffs provided.

5.      United and MultiPlan have also conspired together to withhold proper payment for IOP treatment services from Plaintiffs.

6.      United underpaid all of the claims for medically necessary treatment at issue in this litigation and amounts are still outstanding and owed directly to Plaintiffs, to whom the payments were promised by United.

7.      Plaintiffs seek monetary and injunctive relief.

1

8.    All Plaintiffs in this case are aware that their attorneys also represent patients in the related case before this court styled, *L.D., et al. v. United, et al., Case No. 4:20-cv-02254-YGR*. The Plaintiffs in both matters have waived any perceived or potential conflict.

9.    United is the largest health insurer in the United States, reporting $6.7 billion in profits for the second quarter of 2020, a 97 percent increase from the same period in 2019.[1] United insures approximately 80 million people and controls 14.1% of the commercial healthcare marketplace with annual premiums paid to it totaling $107 billion dollars.

10.    United also controls a large percentage of the commercial healthcare marketplace in the geographic areas where the Plaintiffs reside.

11.    MultiPlan is a private, 'cost-management' company that partners with insurers to reduce the amounts they pay doctors and hospitals.

12.    Together, United and MultiPlan created, developed, managed, and administered the scheme to underpay Plaintiffs and the class.

13.    Every claim at issue in this litigation was required to be paid at a percentage of the usual and customary rate ("UCR"); the rate charged by similar providers of the same services in the same geographic location.

14.    Each of the claims at issue in this litigation was underpaid.

15.    The underpayment directly and proximately damaged Plaintiffs.

16.    The underpayment arose out of the fraudulent scheme of United and MultiPlan.

17.    United and MultiPlan's fraudulent scheme used the wires and mail to fraudulently represent that the claims would be and were paid at the usual and customary rate.

18.    This scheme has been ongoing and continuous for more than two years.

19.    Without Court intervention, this scheme will continue and continue to damage Plaintiffs and the class.

---

[1] *U.S.' Largest Health Insurer Reports $6.7B In Profits Amid COVID, As N.Y. Cuts State Rates*, Newsweek, August 14, 2020, https://www.newsweek.com/us-largest-health-insurer-reports-67b-profits-amid-covid-ny-cuts-state-rates-1525210 (last visited September 14, 2020).

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

20.     This scheme injured the Plaintiffs and the class in their persons and property as Plaintiffs' and the class have a well-established property interest in their claims for services rendered to patients that is directly and proximately damaged by underpayment of the claim.

### Summary of Claims

21.     This action asserts claims under the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, the federal Sherman Acts, California state law claims, and seeks monetary, injunctive, and declaratory relief.

22.     Plaintiffs' federal RICO action is brought pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

23.     Plaintiffs' antitrust claims are brought pursuant to the Sherman Act and other federal anti-trust law.

24.     Together, and as explained more fully in the following sections, United and MultiPlan have formed a federal RICO enterprise (the "Enterprise").

25.     The Enterprise is an ongoing, informal organization with the common purpose of engaging in the fraudulent scheme to underpay MH/SUD providers who do not participate in United's network.

26.     The Enterprise functions as a continuing unit and it came into being on or about January 1, 2015.

27.     The Enterprise furnishes the vehicle through which the acts of racketeering activity are committed.

28.     The acts of racketeering activity, as detailed in later sections, are the development and implementation of the scheme to defraud and use of mail and interstate wire communications in furtherance of that scheme. Pursuant to the scheme, Defendants sought, and did, under-reimburse Plaintiffs for medically necessary IOP services provided to patients, injuring Plaintiffs in their business and property.

29.     The relationships between United and MultiPlan are not merely standard, commercial, contracts; instead, United and MultiPlan exploit their contractual arrangements to provide a fig leaf of legitimacy for their racketeering activity.

30.    The Enterprise has operated continually since 2015 as reflected in the thousands of underpaid claims at issue in this litigation and in the tens of thousands, or more, of underpaid claims to other IOP treatment providers in California and across the country.

31.    Plaintiffs' state law claims rely upon the same facts as Plaintiffs' federal RICO and antitrust claims.

32.    Plaintiffs assert supplemental state law claims for violations of the California Business & Professions Code § 17200, *et seq*, intentional misrepresentation and fraudulent inducement, negligent misrepresentation, civil conspiracy, breach of oral and/or implied contract and promissory estoppel. breach of implied-in-fact contract, unjust enrichment, and declaratory relief.

**Plaintiffs Supplemental State Law Claims are Not Pre-Empted by ERISA**

33.    Plaintiffs do not bring a cause of action under ERISA as the state law claims do not arise under and are not preempted by ERISA. A large percentage of the claims which underlie this lawsuit do not involve ERISA plans.

34.    Plaintiffs' RICO causes of action are not preempted by ERISA, the McCarran-Ferguson Act, or any other statute.

35.    Plaintiffs' state law causes of action are not preempted by ERISA. The U.S. Supreme Court has established a clear test for determining whether a state-law claim is completely preempted by ERISA in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004). Under *Davila,* there is no preemption as Plaintiffs have no inherent ability to bring a claim directly against UBH absent an independent cause of action. Additionally, Plaintiffs' causes of action arise under state law tort law, contracts law (oral and/or implied), equities law and federal statutory law other than ERISA.  For out of network providers amounts due under state law duties do not satisfy the *Davila* test.  *See Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 948 (9th Cir. 2009).

36.    Nor are Plaintiffs' state law claims conflict preempted. It is well established that third-party providers such as Plaintiffs may sue on their own behalf for breach of duties owed to them. *See Catholic Healthcare W.-Bay Area v. Seafarers Health & Benefits Plan*, 321 F. App'x

563, 564 (9th Cir. 2008) ("where a third party medical provider sues an ERISA plan based on contractual obligations arising directly between the provider and the ERISA plan (or for misrepresentations of coverage made by the ERISA plan to the provider), no ERISA-governed relationship is implicated and the claim is not preempted"); *Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.*, 233 Cal. Rptr. 3d 830, 848–49 (Ct. App. 2018) ("where a plan assures a provider that a proposed treatment is covered under the plan but later determines it is not covered, the provider may sue based upon the plan's independent promise to the provider to pay for the services rendered."). Also, that payment may come from an ERISA plan is insufficient for complete preemption or to satisfy the "relates to" requirement under ERISA §§ 502 or 514. *See Ramin M. Roohipour, M.D., Inc., v. ILWU-PMA Welfare Plan et al.*, 2020 WL 472921 (C.D. Cal. Jan. 28, 2020)

37.    In analyzing state law claims, <u>this Court</u> has recently ruled on the same and similar state law causes of action asserted by Plaintiffs here and found that they were **not preempted**. *See Summit Estate, Inc. v. United Healthcare Ins. Co.*, No. 4:19-CV-06724-YGR, 2020 WL 5436655 (N.D. Cal. Sept. 10, 2020) ("the Court does not find that Summit Estate's state-law claims depend on either the existence or the terms of an ERISA plan.") Summit Estate is a Plaintiff in the present matter as well. The claims in the present case do not overlap with those of the *Summit Estate* case because they involve different periods of time and different levels of behavioral healthcare services authorized by United.

38.    This case asserts claims similar to *Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.*, 2009 WL 179681 (E.D. Cal. Jan. 26, 2009) where the court found that the plaintiff-provider's claims asserted against Viant, a MultiPlan subsidiary, were not ERISA preempted. The court found that the claims asserted against Viant arose out of independent obligations. After a lengthy analysis, the court held that when a claim arises out of independent obligations, "[t]he authorities discussed above amply explain how a claim can arise out of a transaction that involves an ERISA benefit plan while nevertheless not be "related" to that plan for purposes of preemption." *Id*. at *6. That is precisely the case here, even though

some claims will involve an ERISA benefit plan, the claims are not "related" to that plan for purposes of preemption.

39.    Plaintiffs here are seeking damages based on the amount of underpayment for each claim and for injunctive relief to prevent Defendants from continuing to operate their fraudulent scheme.

## Parties

### *Plaintiffs*

40.    Plaintiff, Pacific Recovery Solutions d/b/a Westwind Recovery ("Westwind"), is a California Limited Liability Company and a duly licensed behavioral health treatment provider with a primary place of business at 7966 Beverly Blvd Suite 200, Los Angeles, CA 90048.

41.    Plaintiff, Miriam Hamideh PhD Clinical Psychologist Inc. d/b/a PCI Westlake Centers ("PCI Westlake"), is a California corporation and a duly licensed behavioral health treatment provider with a primary place of business 37794 La Baya Dr. # 201, Westlake Village, CA 91362.

42.    Plaintiff Bridging the Gaps, Inc. ("BTG"), is Virginia corporation and a duly licensed behavioral health treatment provider with a primary place of business at 31 South Braddock Street, Winchester, VA 22601.

43.    Plaintiff, Summit Estate Recovery Center, Inc. ("Summit"), is a California corporation and duly licensed behavioral health treatment provider with a primary place of business at 20640 3rd Street Suite 350, Saratoga, CA 95070.

### *Defendants*

44.    Defendant United Behavioral Health ("United") is a California corporation, with its principal place of business at 425 Market Street, 14th Floor, San Francisco, CA 94105. United is a "provider of mental health[2]" and manages behavioral health services for UnitedHealth Group. It is responsible for payment of claims related to behavioral services covered under health plans sponsored or administered by UnitedHealth Group Incorporated or its many wholly owned and

---

[2] 2018 Statement of Information of United Behavioral Health, Document G063267, Filed September 26, 2018.

6

controlled subsidiaries, including United Healthcare. None of the subsidiary companies are independent, rather they all act in concert to maximize profits for the shareholders of UnitedHealth Group.

45. Defendant MultiPlan, Inc. is a New York Corporation with its principle place of business located at 115 5th Avenue, New York, NY 10003. Viant, Inc., is a Nevada corporation and wholly owned subsidiary of MultiPlan. MultiPlan has several wholly owned and controlled subsidiaries, including Viant, all of which act in concert to maximize profits for MultiPlan.

### Jurisdiction and Venue

46. At least one Plaintiff is diverse from the Defendants and the amount in controversy exceeds $5,000,000. Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action where at least one member of a class of plaintiffs is a citizen of a State different from any defendant.

47. The claims asserted involve matters of interstate and national interest, and several of the claims at issue arise under federal law.

48. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 as the other claims are so related that they form part of the same case or controversy.

49. This court has personal jurisdiction over Defendants because United and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. United transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

50. This court has personal jurisdiction over MultiPlan because MultiPlan and/or its subsidiaries transact business so frequently and with such regularity in Northern California that they avail themselves to the protections of California's laws, are at home in this jurisdiction, and subject to the personal jurisdiction of this court.

51. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965: a substantial part of the events or omissions giving rise to the claims alleged

herein occurred in this Judicial District and one or more of the Defendants conducts a substantial amount of business in this Judicial District.

## Facts

*Summary of the Facts*

52.    Plaintiffs are behavioral healthcare providers who provide, among other services, intensive outpatient treatment (or, "IOP") to patients with mental health and/or substance use disorders ("MH/SUD").

53.    Plaintiffs have no pre-existing contract with either United or MultiPlan that establishes the rate that they will be paid for providing IOP treatment to patients.

54.    All of the IOP treatment provided was medically necessary.

55.    All of the IOP treatment was under-paid.

56.    United was required to pay Plaintiffs for the treatment provided based on the usual and customary rate ("UCR").  UCR is a commonly accepted term in the healthcare industry and means generally, the rate charged by similar providers of the same specialty in the same geographic area.

57.    The FAIR Health database, described in more detail in the following sections, allows the public, including Plaintiffs and their patients, to estimate the UCR for IOP treatment in a specified geographic area.

58.    United, for many years, until on or about 2015, was legally required to use the FAIR Health database to calculate UCR in its payment of claims, for reasons discussed below.

59.    The significant differences between the publicly available FAIR Health estimates and actual payments provide compelling evidence that the Plaintiffs were not paid based on the UCR for IOP treatment they provided.

60.    The fairly uniform under-payments received by Plaintiffs, all in different geographic locations, provide compelling evidence that geographic location was not considered in the payment received by Plaintiffs.

61.    Geographic location is part of what determines the UCR.

62.     Most patients cannot shoulder the full costs of MH/SUD treatment and, in the vast majority of cases, the provider bears the full cost of treatment services until they are paid by a commercial payer such as United.

63.     Such is the case with the claims at issue in this litigation.

64.     For all the claims here, the Plaintiffs have received from United less than the UCR based amount they were promised by the provider and are properly owed.

65.     For all healthcare claims relevant to this action the amount of the underpayment remains due and owing to the providers from the Defendants.

66.     After providing services, the Plaintiffs' billing departments transcribed patients' medical charts into standardized billing codes, created invoices with standard charges, medical coding, patient demographics, and submitted the invoices electronically to United via interstate wire communications.

67.     Detailed examples for each Plaintiff are provided in the following sections.

68.     Every claim at issue was approved for payment.

69.     Every claim at issue received an underpayment. Examples of underpayments to each Plaintiff are set forth in the following sections.

70.     Instead of paying a "reasonable" rate to Plaintiffs, the Defendants utilized Viant's methodology to fabricate a fraudulent UCR rate and withhold a substantial part of the payment owed to Plaintiffs.

71.     Both United and MultiPlan had management and control over how Viant's methodology was employed to underpay the Plaintiffs as set forth in more detail in the following sections.

72.     For every claim at issue, the Plaintiffs were paid at a rate that was well below UCR.

73.     The federal RICO enterprise formed between United and MultiPlan used Viant's methodology to justify the fraudulent withholding of most of the payment owed on each and every claim at issue, thereby directly and proximately injuring Plaintiffs in their business and property.

74.    United and MultiPlan exercised management and control over the enterprise as set forth in more detail in the following sections.

75.    Defendants used the enterprise to fraudulently represent to Plaintiffs and others that the rate paid was the UCR rate, using the wires for telephone calls and other communications and the mail by sending explanation of benefits ("EOBs") and electronic data interchange ("EDI") versions of EOBs to through an electronic remittance advice ("ERA").

76.    It was represented to Plaintiffs that they were paid the UCR rate, that the rate was commensurate with the rates paid similar providers in the same geographic area.

77.    Multiple acts of racketeering activity were committed by Defendants against each of the Plaintiffs as set forth in more detail in the following sections.

78.    United and MultiPlan both profited from their participation in the enterprise.

79.    Specifically, the members of the enterprise retained some or all of the amount by which the Plaintiffs and others were underpaid.

80.    The purpose of the enterprise was for Defendants to profit from the underpayments made to Plaintiffs and others.

81.    The Defendants acted in concert to achieve this and the enterprise was under their common control as set forth in detail in the following sections.

82.    The rate generated by Viant's methodology is significantly less than the UCR rate amount.

83.    United and MultiPlan retained the difference between these two amounts, at the providers' expense.

*Usual, Customary, and Reasonable Rate ("UCR")*

84.    For every claim at issue, Plaintiffs and the class did not have a written contract with United or MultiPlan that would establish a contractual rate for their IOP services.

85.    For every claim at issue, Plaintiffs were required to be paid at the UCR rate.

86.    UCR rates are a fixture of the managed care payment system in the United States. When doctors, hospitals or other healthcare providers are out of network and do not have

contracts with health insurance companies, claims from out-of-network are usually required to be paid at UCR rates.

87.     The Centers for Medicare Services (CMS), defines UCR as: "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."[3]

88.     Consumers choose to pay more in the form of higher premiums because they value the ability to receive treatment from out-of-network providers.

89.     Insurance consumers and healthcare providers depend on insurers' good faith calculation of UCR rates. Insurance consumers depend on the ability to determine their expected out-of-pocket costs when choosing an out-of-network provider. Out-of-network depend on the ability to determine their expected payment from the patient and their insurer.

90.     Where, as here, a scheme exists to fraudulently misrepresent the UCR, providers, such as Plaintiffs, most often shoulder the expense.

91.     Plaintiffs have been damaged in the amounts that they were underpaid for the IOP services that they provided.

*Intensive Outpatient Program Treatment*

92.     Intensive Outpatient Programs ("IOPs") are an important tool in traditional behavioral health treatment. IOP is a non-residential, semi-structured level of care that is typically rendered pursuant to a schedule that allows patients to reintegrate into society by returning to work, school, and other functions of daily life. Often, IOP programs are designed to be a support system for patients reintegrating into society from higher, more structured levels of care, such as residential inpatient treatment and partial hospitalization programs.

93.     IOP is a step-down level of care.  Typically, a patient transitions to the IOP level of care after spending a month or more at higher, more structured levels of care such as detoxification, residential inpatient treatment, and partial hospitalization program treatment.

---

[3] Healthcare.gov "Usual Customary or Reasonable"
https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/ (accessed March 20, 2020)

11

94.    Interestingly, United typically does not refer healthcare claims for higher levels of care, such as residential inpatient and partial hospitalization, to MultiPlan for processing. In cases where it does, MultiPlan does not send use Viant's methodology to determine the payment amount, meaning the claim gets paid at a much higher rate, a rate that better approximates UCR, and is usually rate that is acceptable to providers.

95.    Yet, for intensive outpatient treatment, one of the most the most common services provided and billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United frequently sends the claims to MultiPlan who uses Viant's methodologies to process them using the illegal methodologies alleged in this complaint and described in greater detail in the following sections.

96.    Prior to 2019, United defined IOP as "a structured IOP program that maintains hours of service generally 9-19 hours per week […] in an outpatient setting […] to provide education, treatment, and the opportunity to practice new skills outside the program […] focused on addressing the member's condition to the point that the member can be safely, efficiently and effectively transitioned to a lower level of care."[4] According to the guidelines "An Intensive Outpatient Program can be used to treat substance-related disorders or can specialize in the treatment of co-occurring mental health and substance-related disorders." *Id*.

97.    Starting in January 2019, after their guidelines were ruled illegal in *Wit, et al. v United Behavioral Health* (Case No. 14-cv-02346-JCS, N.D. Cal.), United transitioned to the American Society of Addiction Medicine's ("ASAM") level of care guidelines to define its IOP criteria for substance abuse.[5] ASAM classifies IOP as ASAM Level of Care 2.1. Services may be delivered in any appropriate setting that meets state licensure or certification requirements. According to ASAM, IOP care is rendered by a team of appropriately credentialed addiction

---

[4] Optum, United Behavioral Health "Level of Care Guidelines," Doc. No. BH803LOCG052018, pp. 9-10, 19. Effective 05/28/2018

[5] United Healthcare, "Behavioral Health Level of Care Guidelines," https://www.uhcprovider.com/en/health-plans-by-state/tennessee-health-plans/tn-comm-plan-home/tn-cp-behavioral-health.html (last accessed March 20, 2020)

treatment professionals including counselors, psychologists, social workers, addiction-credentialed physicians, and program staff, many of whom have cross-training to aid in interpreting mental disorders and deliver intensive outpatient services. Services are typically offered for at least 9 hours per week. The goal of IOP treatment is to provide a support system including medical, psychological, psychiatric, laboratory, and toxicology. Elements of IOP treatment include counseling, educational groups, occupational and recreational therapy, psychotherapy, Medication Assisted Treatment ("MAT"), motivational interviewing, enhancement and engagement strategies, family therapy, or other skilled treatment services.[6]

*Federal RICO Allegations*

98.    The racketeering acts taken by the Defendant's federal RICO enterprise have their origin in United's past use of the illegal Ingenix scheme.

<u>The Ingenix Precursor</u>

99.    The enterprise formed between United and MultiPlan seeks to reproduce the Ingenix scheme that led United to pay $400 million in settlements in 2009.

100.    This time around, instead of using internally flawed and biased databases as was done with Ingenix, United has employed MultiPlan to play the role of Ingenix and in so doing they have created a federal RICO enterprise.

101.    The New York Attorney General's investigation into Ingenix "uncovered a fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[7]

---

[6] Medicaid Innovation Accelerator Program, "Overview of Substance Use Disorder (SUD) Care Clinical Guidelines: A Resource for States Developing SUD Delivery System Reforms," pp 7, 8, April 2017

[7] *Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges*, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited September 16, 2020).

102.    In 2009 United Healthcare and its affiliates paid $400 million to settle cases arising from the same conduct. Three hundred fifty million dollars was paid to settle a class action against those entities. Another fifty million dollars was paid for the establishment of the FAIR Health database and website. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[8] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[9]

103.    Also in 2009, the Office of the Attorney General for the State of New York announced the results of its investigation into Ingenix in a landmark agreement entitled "Assurance of Discontinuance Under Executive Law § 63(15)" ("Assurance Order"). According to the Assurance Order, the payment rates compiled by Ingenix were based on a "conflict of interest." As the Attorney General concluded that the system "meant to reimburse consumers fairly as a reflection of the market is[,] instead[,] wholly owned and operated by the [insurance] industry" who have an "incentive to manipulate the data they submit to Ingenix so as to depress reimbursement rates they determine using the Ingenix schedules, given their own reimbursement obligations toward consumers."

104.    The rates generated by Ingenix were inadequate because: 1) Ingenix did not audit the data provided by insurers to make sure that the charges properly reflect what providers actually charged in the marketplace; 2) Ingenix used statistically invalid "edits" to exclude a disproportionate amount of high charges from its UCR calculations; and 3) Ingenix "lumped" charges for the same service together regardless of whether the service was provided by a certified specialist with many years of experience or a less experienced provider such that the aggregate UCR rate calculated by the database was artificially low.

---

[8] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009, Pg. 14, term no. 4.4:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_
Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-
Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[9] *Id.*

105.    Although this matter did not ultimately go to a jury, the allegations clearly show that this conduct was intentional.

106.    The Assurance Order required the insurance industry to cease using the Ingenix database and create a "new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates." The Assurance Order also established a "Healthcare Information Transparency Website" to inform and educate the public about reimbursement rates.

107.    This "new" database was funded by United ($50 million), Aetna ($20 million), Wellpoint ($10 million), Cigna ($10 million), MVP Health Care Inc. ($535,000), Independent Health ($475,000), and HealthNow ($212,500).

108.    Out of this settlement, the independent not-for-profit "FAIR Health, Inc." (which stands for "Fair and Independent Research") was created.

109.    When the settlement was announced, Thomas L. Strickland, at the time the Executive Vice President and Chief Legal Officer of UnitedHealth Group, stated: "We are committed to increasing the amount of useful information available in the health care marketplace so that people can make informed decisions, and this agreement is consistent with that approach and philosophy…We are pleased that a not-for-profit entity will play this important role for the marketplace."[10]

110.    Unfortunately, for healthcare providers and the insurance buying public, United's legal obligations under the Assurance Agreement to utilize Fair Health and pay out of network claims at a fair rate predicated upon UCR terminated five years after the creation of Fair Health, in or about 2015.

111.    Not long after the termination of its obligations under the Assurance Agreement, United reverted to its old tricks.  Free of the terms of the settlement and a court order requiring it pay out of network healthcare providers using a UCR rate, but aware of the scrutiny it would

---

[10] *Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars*, NY OAG Press Release January 13, 2009.

receive for creating its own database again, United sought out the services of a third party, MultiPlan, to perpetrate the same fraud.  That is what this case is about, at its essence:  the substitution of Multiplan and Viant for Ingenix.

112.    The present litigation differs from the prior litigation in that the methodology employed by MultiPlan through Viant now plays the role formerly filled by the Ingenix databases.[11]

113.    By incorporating MultiPlan and Viant's methodology into the fraud, United's attempt to avoid liability has instead created a RICO enterprise.

*The RICO Enterprise*

The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual,

Customary, and Reasonable Rates for Reimbursements for IOP Services

114.    Federal "RICO is widely regarded as a broad statute; indeed, RICOs text itself 'provides that its terms are to be "liberally construed to effectuate its remedial purposes."'" *Boyle v. United States*, 556 U.S. 938, 944 (2009).[12] RICO's breadth of language and construction is particularly evident in the enterprise concept. Included within the definition of enterprise is "*any* union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4) (emphasis added).

115.    Defendants, United and MultiPlan, have associated to form an ongoing informal organization, with the common purpose of engaging in a course of conduct, including the development and implementation of a scheme to fraudulently underpay out-of-network IOP services.

---

[11] See "Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars" (Jan. 13, 2009), available at https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends (last accessed June 19, 2020)

[12] *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly.").

116.    Defendants joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

117.    The presence or absence of a commercial contract between United and MultiPlan is irrelevant.

118.    An association does not stop becoming an association because the relationships between its members are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose includes some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *United States v. Turkette*, 452 U.S. 576, 580-81 (1981). *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

119.    The enterprise between United and MultiPlan is the vehicle for the illegal, racketeering activity of mail and wire fraud. Examples of these activities performed at the direction of both Defendants are set forth in the following sections for every Plaintiff.

120.    The Defendants share a common purpose in performing these activities, to gain financial benefits as the direct result of the fraudulent scheme.

121.    Both Defendants worked together to develop the false and fraudulent UCR rates that were applied to Plaintiffs and IOP providers.

122.    This is clearly set forth in use and development of internal non-public "Whitepapers" described in the following sections. The Whitepapers provided the roadmap that United and MultiPlan jointly developed to produce specific, fraudulent, UCR rates.

123.    United determined the fraudulent rates for under-payment that would be presented as UCR, showing its management over the enterprise, and MultiPlan developed the methodology employed through Viant to achieve United's low rates, without regard to actual usual and customary rates.

124.    United's management of the enterprise is also shown by the fraudulent information United provided when it verified each patient's out-of-network rates. United "verified" that it would pay the UCR reasonable rate for services knowing that it would never do so. Examples of these fraudulent verifications made to each Plaintiff are provided in the following sections.

125.    United's communication of these same fraudulent representations over the wires and by the mail also show its management over the enterprise. Examples of these fraudulent communications are provided in the following sections.

126.    United's issuing of the actual under-payment to the Plaintiffs and other IOP providers shows its management over the scheme.

127.    For all of these under-payments, United compensates MultiPlan based on the amount by which the claims are underpaid.

128.    Plaintiffs and providers have a property interest in their claims and the right to be paid for them.

129.    Underpaying the claims by fraudulent means deprives Plaintiffs and providers of their property.

130.    United and MultiPlan have profited and continue to profit from this fraud.

131.    The Enterprise is the vehicle for Defendants' fraudulent acts of racketeering activity.

132.    United profits by fraudulently retaining money that should be paid for IOP treatment.

133.    MultiPlan profits when United pays it for successfully implementing Viant's fraudulent methodology.

134.    MultiPlan's implementation of Viant's methodology to further the fraudulent scheme and further the purpose of the enterprise shows MultiPlan's management over the enterprise.

135.    Further, there are relationships among the entities associated with the enterprise.

18

136.    United contracts with MultiPlan to provide a fig leaf of legitimacy to their activities.

137.    United and MultiPlan coordinate their efforts in undertaking the racketeering activities.

138.    United and MultiPlan share the money obtained from Plaintiffs and other victims of the scheme.

139.    The relationships between United and MultiPlan are sufficient to permit them to pursue the enterprise's purpose.

140.    The enterprise functions as a continuing unit. These relationships between United and MultiPlan continue to the present and the enterprise continues to pursue its purpose.

<u>The FAIR Health Database</u>

141.    United could have avoided this litigation if they had employed an actual UCR methodology in determining out-of-network IOP rates.

142.    The creation of the FAIR Health database was intended to provide one such methodology. At the time of its creation, New York Attorney General Andrew Cuomo believed that the FAIR Health database would solve the inherent conflicts of interest that plagued the Ingenix databases.

143.    The FAIR Health database claims "to provide reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[13] No providers submit pricing information, only insurers do so. FAIR Health claims that it then uses "information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients."[14] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

---

[13] FAIR Health Consumer, "About FAIR Health," accessed at
https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

[14] *Id.*

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

144.    The purpose and intent behind the establishment of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments, as was done using Ingenix.

145.    As set forth earlier, United had utilized the Ingenix databases to significantly under reimburse valid claims.  This is the exact same conduct United and MultiPlan are accused of committing in this complaint.

146.    In past litigation, United has asserted to courts that FAIR Health "analyzes and groups medical procedures by codes, the geographical area where the procedures were performed, and the amount charged by the providers. This database is often used by private health insurers to calculate the "usual and customary" fee for specific procedures and inform the amounts that they will be willing to pay to out-of-network providers." *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (N.Y. Sup. Ct. 2015).

147.    United was required to use FAIR Health's UCR methodology until the expiry of the settlement agreement with the New York Attorney General.[15]

148.    United began using FAIR Health in 2011 and did so, as required, until 2016.[16]

149.    The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[17] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[18]

---

[15] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009: https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_ Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[16] *Id.*

[17] *Id.*

[18] *Id.*

150.    When the FAIR Health requirement expired in or about 2015, United began planning to resurrect the fraudulent scheme by forming an enterprise with MultiPlan wherein MultiPlan assumed the functions previously performed by Ingenix, with its wholly owned subsidiary Viant's methodology standing in for the Ingenix databases.

151.    As Plaintiffs billed less for IOP treatment than the similar providers in the same geographic area, the Plaintiffs UCR rate is equal to 100% of that providers' billed charges. The FAIR Health benchmark amounts allow providers such as Plaintiffs to compare their billed charges to the billed charges of other, similar providers in the same geographic area. When billed charges are less than the FAIR Health benchmark amounts, the provider will expect to be paid at 100% of billed charges. When a provider's charges exceed the FAIR Health benchmark, the provider can estimate what they will be paid based on the appropriate FAIR Health benchmark.

* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was



accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).

152.    The goal of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments. Defendants' methodology produced rates ranging from

11% to 25% of the FAIR Health benchmark. Plaintiffs do not assert that FAIR Health is the only possible method for determining UCR; rather, it is an accepted method for determining UCR. That Defendants' scheme generates rates ranging from 11% to 25% of the comparable FAIR Health benchmark shows that Defendants' payment rate is not reflective of UCR as illustrated above.

153.    Even though United and Viant's employees responsible for Outpatient Repricing (OPR) had FAIR Health data at their fingertips through an in-house claims system at Viant known as "Toolbox," they could have properly applied FAIR Health benchmark pricing at any time but chose not to do so. Instead, they employed a fraudulent, underpayment scheme that damaged providers and Plaintiffs in their persons and property.

154.    United represents to the general public that where payment for out-of-network services is to be made at the usual and customary rate, United "most commonly refer[s] to a schedule of charges created by FAIR Health, Inc. ('FAIR Health') to determine the amount of the payment."[19]

155.    As described more fully in the following sections, this statement is demonstrably false.

<u>The Underpayment Scheme's Mechanics</u>

156.    Instead of reimbursing providers, including Plaintiffs, at UCR rates, United deployed a scheme to underpay claims for its own benefit, and for the benefit of its associates, forming an enterprise with MultiPlan to reap profits from underpaying claims.

157.    This scheme injured not only Plaintiffs but all out-of-network providers of IOP services.

158.    The goals of United's scheme were to pocket the difference between the fair and reasonable price of healthcare (the UCR) and the underpaid amount; for United to retain funds that should have been paid to providers; to eliminate competition between contracting and non-

---

[19] https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last visited June 10, 2020).

contracting providers; to push non-contracting providers into unfavorable contracts with United; and to avoid liability for the scheme (the "underpayment scheme").

159. United conspired with MultiPlan Inc. to perpetrate the underpayment scheme.

160. MultiPlan Inc. promotes itself across the health insurance industry as an unregulated cost management company. MultiPlan offers a menu of services for "cost control." Some of the above services are legitimate, but others are fraudulent.

161. MultiPlan offers a host of mechanisms for "cost control." It has an internal engine, known within the company as FRED. FRED takes inputs from the claims United forwards to it, and routes them to the chosen repricing tool. Publicly, Viant summarizes its methodology as follows: a tool to evaluate "outpatient claims for opportunities to reduce the charges to levels that are usually charged by the provider and customarily charged by similar providers in the area for equivalent services" based on "on payer-established parameters."[20]

162. In reality, however, Viant's calculations and methodology are not completely or even partially transparent: *i.e.* they are deliberately opaque. Viant uses a complex methodology implemented by a proprietary software engine designed to cull the lowest possible number from a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area.

163. Despite having access to the largest database of provider data in the country, FAIR Health, at the click of button, Viant does not utilize the FAIR Health database's charge data.

164. Viant does not utilize the FAIR Health data because, as the database is widely accessible, as designed, doing so would make Viant's fraudulent manipulations readily apparent.

165. Instead, Viant utilizes a much less robust and more easily manipulated data set in its underpayment methodology. Viant's methodology recalls the passage from Mark Twain's

---

[20]MultiPlan Payer Resource Center: "Viant Facility Usual & Customary Review"
https://www.multiplan.com/payers/resourcecenter/salescenter/pdfs/MKT5101_Viant_Facility_UC_Review.pdf. Last accessed September 21, 2020.

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

*Autobiography*, quoting Benjamin Disraeli, "[t]here are three kinds of lies: lies, damned lies, and statistics."

166.    Viant's methodology thus operates by culling data from a "Outpatient Standard Analytical File" ("SAF"). An SAF is composed of data that are collected from Medicare Part B providers for services rendered to Medicare beneficiaries by the Department of Health and Human Services (DHHs) / Centers for Medicaid and Medicaid Services (CMS).

167.    Using a SAF from CMS to fabricate a UCR rate is improper for numerous reasons. First, the patient demographics of Medicare patients will differ significantly from and not be representative of the patient demographics in the commercial market. Second, the MH/SUD facilities that provide IOP treatment to patients with commercial insurance will not be 'similar' to those that may provide IOP treatment to a Medicare beneficiary. Facilities providing IOP treatment to a Medicare beneficiary have no reasonable expectation that they will be paid for IOP treatment as Medicare does not provide coverage for IOP treatment. These expectations and agreements are set forth in greater detail as to each Plaintiff in the following sections. Facilities providing IOP treatment to patients with commercial insurance expect to be paid by the payer for the IOP treatment they provide. Further, the facilities submitting Medicare claims will be institutional providers such as hospitals and home health agencies that are licensed to accept Medicare. IOP treatment providers are not licensed to accept Medicare and cannot be licensed to accept Medicare for IOP treatment because Medicare does not reimburse IOP treatment. Mental health facilities and treatment providers have different licenses than do medical and surgical facilities and providers. Third, the SAF does not provide rates based on the provider's geographic location; instead, it provides a *national* number. Geographic location is an essential component of the UCR rate.

168.    The claims information in the SAF does not include the provider's charge data, the claims data only includes the amounts paid on the claim. As IOP claims are not covered or paid under Medicare, the SAF file will not show any payments for IOP treatment and thus be completely unsuitable for determining appropriate IOP rates.

169.    IOP treatment falls under HCPCS[21] code H0015: "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education."[22]

170.    The SAF data are particularly ill-suited and susceptible to manipulation for IOP treatment because HCPCS code H0015 is not even a service covered or paid for by Medicare hence there is little to no data for H0015 in the SAF. Any data for H0015 that is present will not be a representative sample because it will only reflect H0015 claims for Medicare beneficiaries and no H0015 claims are covered by Medicare.

171.    As such, the SAF, comprised of data from providers treating Medicare beneficiaries will not provide an accurate representation of IOP providers as the HCPCS code applicable to IOP treatment is not eligible to be paid by Medicare.

172.    As the SAF contains no charge data for services that Medicare does not cover, the SAF has no data about the IOP services at issue in this case.

173.    Instead of using FAIR Health that does contain actual data for HCPCS H0015, the Viant methodology "crosswalks" the healthcare claims. "Crosswalking" is technical jargon for the process of using rates for one service to come up with or fill-in rates for another service.

174.    FRED uses crosswalking to fill gaps when it does not have enough data to come up with a valid output number. This is the act opposite of using a UCR calculation, such as FAIR Health, which would be based on actual data from actual providers, something both MultiPlan and United have at their literal fingertips if they were to choose to use it.

---

[21] "HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and  services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers." *HCPCS (HCPCS - Healthcare Common Procedure Coding System) – Synopsis*, https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html (last visited September 23, 2020).

[22] https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2020-Alpha-Numeric-HCPCS-File (last visited September 23, 2020).

175. The Viant methodology's crosswalking, reflects a subjective decision that is directed by United and implemented by MultiPlan. The crosswalking is not subject to independent review, scrutiny, or oversight.

176. The crosswalking is wholly unnecessary given the presence of FAIR Health and the other data available to United and Viant.

177. MultiPlan does not disclose or even admit to the data "proxies" it uses in Viant's methodology.

178. The "proxies" are selected by MultiPlan based on direction given by United and used by the Viant methodology to provide fraudulently low payment amounts.

179. The direction given by United and implementation undertaken by MultiPlan shows that both United and MultiPlan exercised management and direction over the RICO enterprise.

180. MultiPlan, as payment for access to the Viant methodology, receives a percentage of the difference between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

181. For all of the claims here, United conspired with MultiPlan to utilize Viant to generate and pay artificially depressed rates with no resemblance to the methodology United claimed to have used in mailed correspondence, electronic correspondence,  its published media, and telephone conversations with Plaintiffs.

182. Plaintiffs were harmed in their businesses and property by Defendants' scheme. They were deprived the fair value of their services, and lied to by the Defendants who told them that their rates were consistent with an objective calculation of usual, customary, and reasonable rates and comparable with rates charged by their local competitors.

183. Plaintiffs bring this suit to recover the fair value of their services, to enjoin Defendants from continuing their fraud, and to ensure appropriate damages are levied against Defendants for their racketeering enterprise such that the verdict shall be precautionary for all payers contemplating using the false and fraudulent pricing tool.

Claims submission

184.    Plaintiffs' claims submission process operated as follows: Plaintiffs' billing departments translated the patients' medical charts into standardized billing codes, created invoices with standard charges, coding and patient demographics, and submitted the invoices electronically to United.

185.    The invoices were all submitted using standardized claims forms UB-04 forms. Every claim at issue in this case was submitted directly to United through an electronic clearinghouse to the unique United Payer ID.

186.    After receiving the claims, they were processed, approved for payment, the payment amount was determined, and the claims were paid to the provider with accompanying notes about how much the patient owed and United's explanation for the amount it paid.

187.    The invoices were all submitted using standardized claims forms called UB-04 forms to United.

188.    The claims were submitted both electronically using an Electronic Data Interchange ("EDI") process, by facsimile, or by mail.

189.    After United received the claims, they were processed, approved for payment, the payment amount was determined, and then the claims were underpaid to the Plaintiffs with accompanying notes about how much the patient owed and United's explanation for the amount it paid.

190.    Within the billing process, known in the healthcare industry as the "revenue cycle."

191.    United used MultiPlan's Viant methodology in a scheme to underpay Plaintiffs' claims for Defendants' benefit.

<u>Rates of Payment</u>

192.    When United processed the claims at issue in this case, it had to decide how much it would pay for services.

193.    Instead of deciding how much to pay internally, and despite having hundreds of millions of lines of claim data and years of claims history to reference, a database of payment

information it paid to create, and its own in-house data analytics company, United outsourced the task of claims pricing.

194.    United knew that it was required to pay Plaintiffs' IOP claims based on rates equivalent to amounts charged for similar services by similar providers in the treating providers' geographic areas.

195.    However, instead of using the FAIR Health Database or its own internal data, United used MultiPlan to produce rates. The lower the rate that MultiPlan produced, the more money MultiPlan was paid.

196.    MultiPlan offered a menu of pricing tools that it knew would be used to produce fraudulently depressed payment rates for the UCR for IOP services.

197.    For all of the claims at issue here, United and MultiPlan agreed to use the Viant methodology instead of one of MultiPlan's other, legitimate services.

198.    United deliberately avoided using MultiPlan's legitimate services because those services priced claims at rates higher than what United wanted pay. United opted to use Viant's methodology because it knew, based on meetings between United and MultiPlan, that the payment rates Viant's methodology would produce would be artificially low.

<u>Viant's Methodology</u>

199.    The following summary represents a high-level overview of the Viant methodology for pricing claims:

200.    The pricing process starts with United forwarding a claim to MultiPlan. At its sole discretion, United chooses which claims to price internally, which claims to send for one of MultiPlan's other, legitimate, pricing services, and which claims to price through Viant.

201.    United sends claim information to MultiPlan via a software "electronic data interchange" program ( "EDI"). The EDI process allowed United to communicate several critical inputs to MultiPlan:

- Claims Information (Policy Type, Charge Amount, CPT/HCPCS Codes)

- Designated Repricing Tool (Data iSight, Negotiations, Viant, Rental Networks, or some combination of those tools)

28

- The Benchmark "target price" for the claim (i.e. the benchmark price that determined MultiPlan's compensation); or

- The percentile (usually 60% or 40%) of the manipulated, "crosswalked" SAF database to use to set a benchmark rate (explained below).

202.    Once MultiPlan received information from UHC, it started the repricing process by sending UHC's inputs through its "Claims Savings Engine" known internally as FRED which routed the claim to Viant.

203.    At issue here are only claims sent to Viant for repricing.

### Viant Facility Outpatient Review: "Viant OPR"

204.    The Viant Outpatient Review or "Viant OPR" is the methodology that was employed to provide the false appearance of legitimacy to the underpayment amount.

205.    Viant OPR compared the claims sent to it with "similar" claims in the SAF.

206.    The fatal flaw however, as set forth above, was that the SAF contained no "similar" claims.

### Standard Analytical Files

207.    The backbone of the Viant OPR tool is the "Standard Analytical File" or "SAF." The SAF is a collection of the claims data from every claim submitted to Medicare during a several year period, anonymized then condensed into a single database. Within that database are amounts that every hospital and facility charged for the services they provided to Medicare beneficiaries. Viant's OPR uses the amounts those Medicare facilities charge to determine its rates.

208.    The SAF does not contain any charge information from intensive outpatient substance use providers, like those whose claims are at issue here. The SAF does not contain any charge data for non-participating providers. Those two gaps in the SAF file make the Viant OPR system a bad fit for repricing the claims at issue here, because there was no data in the database for Viant to manipulate, and because a database that includes only Medicare participating providers is categorically faulty when the database is used to price claims for Medicare non-participating providers.

209.    When the Viant OPR engine did not have any data from the SAF to reprice claims, Viant's software engineers, in effect, made it up. Software engineers, not clinicians, would decide on services that were "close-enough" to the billed services, and then use the "close-enough" services' rates to reprice claims. The process of finding the "close-enough" service was known internally at MultiPlan as "Crosswalking." Crosswalking was undisclosed, inaccurate, and inappropriate for services that Medicare does not cover.

210.    Even when Viant made-up a rate, that still wasn't good enough.  Viant would still apply the percentile chosen by United (usually 60% or 40%) to lower the rate even more.

211.    Viant never disclosed how or why it chose the services that were "close enough" to Plaintiffs' services.

212.    When Viant chose what services were "close enough" to Plaintiffs, it also used a nation-wide median rate. That meant that Viant did not adjust the rate based on geographic inputs. Every time Viant claimed that geography was a factor in pricing of the Plaintiffs' services, it was lying.

213.    Every time MultiPlan made a representative that the Viant OPR rates it paid were based on similar providers in a similar geographic area, it was lying, because the services were not the same.

214.    MultiPlan had complete control over the technical methodology of the Viant tool, and how it implemented the inputs and changes requested by United, and used its control to manipulate and misrepresent rates for its own benefit, for the purpose of making as much money as possible.

<u>Target Pricing: Meet or Beat</u>

215.    In addition to the corrupted Viant methodology, United sent Viant a "target rate" for each claim.

216.    The "target rate" is United's arbitrarily selected rate for IOP treatment.

217.    United sent MultiPlan the target rate for each claim at issue in this litigation.

218.    The target rate thus became the benchmark amount to be paid for the IOP claim. Within MultiPlan this was known as a "meet or beat" price.

219.    In all cases, United had complete control over the Target Price and MultiPlan had complete control over its use in the Viant methodology.

220.    This flow chart summarizes the process Defendants use to illegally price the claims:



221.    The Viant methodology's imperative was to beat United's Target Price. MultiPlan was compensated based on if and by how much it could undershoot that benchmark.

222.    Typically, MultiPlan pocketed at least 4% of the "savings" amount, or the difference between the Target Price and the amount a provider was actually paid.

223.    The dollar amount that United ultimately paid for the claims in this case was the lowest of three numbers: Target Price, Billed Amount, or Viant produced rate. In every case, the compensation structure agreed upon between MultiPlan and United incentivized artificially low rate and, invariably, the application of the Viant produced rate.

31

224.    Once the Viant methodology yielded its supposedly data-backed rate, it returned the rate information to United via the EDI.

225.    United or its subsidiary then issued under-payment to Plaintiffs at the rate "derived" from the Viant methodology.

226.    While United would represent, among other things, that the Viant methodology derived rate was comparable to, and based on, what similar providers in Plaintiffs' geographic area charged or accepted for the same or similar services, in fact the purpose of the scheme was to produce a rate that was neither reasonable nor customary.

<u>MultiPlan and the Viant Methodology</u>

227.    MultiPlan actively offered the Viant methodology to United and other insurers as a product capable of underpaying claims with minimal provider pushback. MultiPlan knew and explained to United that the Viant methodology could provide the appearance of legitimacy and offer cover for the fraudulent underpayment of IOP claims.

228.    United believed that the "independent" Viant methodology could shield it from liability as compared to what had happened with Ingenix even though the scheme was the same.

229.    MultiPlan and United worked out the details of their racketeering activities and created their enterprise to carry out their racketeering activities through, among other things, in person meetings and events and documents called Whitepapers.

<u>MultiPlan's Secret Annual Events</u>

*Meetings of the Buyer's Cartel*

230.    MultiPlan secretly discussed the Viant OPR Review methodology with United and its market competitors, including Cigna, at annual events hosted by the Client Advisory Board of MultiPlan ("CAB"). The "CAB" consists of the senior marketing individuals at MultiPlan including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

231.    At these events, all of MultiPlan's insurance company clients would come together, at various locations around the country, to discuss, among other topics, the Viant repricing scheme and how to make more money off it.

232.    These secret meetings established a forum for market competitors such as United and Cigna to create a buyer's cartel and collude with MultiPlan to suppress the rates paid to healthcare providers.

233.    During these events, MultiPlan presented slide shows outlining the profits or "savings" that could made using Viant methodology.

234.    The Viant methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allowed United and its competitors to discuss the customizations they wanted in the pricing with MultiPlan, directly.

235.    Both United and MultiPlan had management and oversight of the RICO enterprise that they formed to use Viant's methodology in their racketeering activities.

236.    The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf.

237.    The CAB emphasized that MultiPlan's healthcare repricing tools were unregulated.

238.    The absence of regulation allowed United and MultiPlan to jointly develop the underpayment scheme unfettered.

239.    United and other insurers who are competitors of United, such as Cigna, partnered with MultiPlan to use the Viant methodology so that the "UCR" rate produced through Viant's methodology could be presented as "independent" and "defensible," permitting United and other insurers to abdicate their responsibility for the derived rates.  All of this was hyperbole meant to hide the fraud.

240.    MultiPlan emphasized to United and other insurers that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant

methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed.

241.    Strategies were discussed for how to handle situations where dissatisfied providers, such as the Plaintiffs in this case,  pushed back or challenged the amount, the Viant methodology and rate was deceitfully presented as a "fair" and "transparent" justification for the underpayment.

242.     MultiPlan, United, and United's competitors, depended on keeping the actual terms and methodology of Viant secret.

MultiPlan's Secret Road Shows

*Meetings of the Enterprise*

243.    MultiPlan's CAB, including representatives Susan Mohler of MultiPlan and Dale White, MultiPlan's Executive Vice President of Sales, also brought secret "Road Shows" or client status updates mixed with sales pitches directly to United (and to other insurers that directly compete with United) and presented PowerPoint slideshows detailing the profits that could be realized by insurers using the Viant pricing methodologies.

244.    During the Road Shows and in subsequent interactions, The CAB produced detailed descriptions of Viant's methodology through internal non-public "Whitepapers" and sought input from United on how it would like its claims routed through the myriad MultiPlan payment engines, including Viant OPR, to achieve the most profits for United.

245.    Representatives of United and MultiPlan discussed the OPR Review pricing methodology in detail at these Road Shows and other ways to illegal lower the rates paid to providers with United representatives such as Rebecca Paradise, the Vice President of Out of Network Payment Strategies at United.

246.    The Whitepapers are essential to the implementation of the scheme and formation of the enterprise between United and MultiPlan to carry out their racketeering and other illegal activities and were developed through the collaboration of United and MultiPlan.

The Secret Internal Whitepapers

247.    MultiPlan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at MultiPlan, and manager of United's account, Susan Mohler and Dale White provided United with these internal non-public Whitepapers. The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers.

248.    Whitepapers are secret internal documents that explain, in detail, exactly how the Viant methodology could be implemented to output literally any payment price United wanted and achieve for any result, regardless of what a healthcare provider had been promised a claim would pay.

249.    Executives from United including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, reviewed, commented, and provided feedback on MultiPlan's Whitepapers in order to structure United's relationship with MultiPlan and implement the Viant methodology to underpay claims in whatever manner would make the most money for United and Multiplan.

250.    United's representatives provided direction to MultiPlan such that MultiPlan would revise its Whitepapers to ensure that the Viant methodology would underpay claims such as those filed by Plaintiffs.

251.    The Whitepapers explain that United would set performance standards which were defined by Target Prices. MultiPlan would use Viant to derive a price under the Target Price. United would pay MultiPlan a percentage of the "savings" generated by use of the Viant methodology.

252.    The Whitepapers also explain that United could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at.

253.    As such, these jointly developed Whitepapers provide a partial blueprint of the Enterprise, the vehicle that would be used to carry out the fraudulent racketeering acts that directly damaged Plaintiffs through the underpayment of valid, medically necessary IOP claims.

254.    The National Network Access Agreement ("Agreement") is a written contract between United and MultiPlan the sets out how United and MultiPlan will profit from the proceeds of the Viant underpayments.

255.    Rebecca Paradise of United and Jaqueline Kienzle of MultiPlan are the custodians of this Agreement.

256.    Exhibits and Amendments to this Agreement detail the fee and incentive structure between the parties and how United compensates MultiPlan for access to the Viant methodology. It also discusses how MultiPlan receives a percentage of the margin between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

257.    Although a benign legal contract between business on its face, the Agreement actually serves as convenient cover and a vehicle for the parties to share the ill-gotten gains of the Viant Pricing methodology.

*RICO Predicate Acts*

Pacific Recovery Solutions

258.    Plaintiff Westwind was established in 2016 and is licensed to provide IOP behavioral health treatment, and other related services, by the California Department of Healthcare Services, and is accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

259.    Westwind has treated more than 18 patients for whom claims for payment of IOP services were underpaid by Viant.

260.    United's and MultiPlan's scheme has left Westwind unpaid for years' worth of IOP services. United and MultiPlan have caused Westwind to be underpaid at least $521,345.18. Below is a representative sample of claims that have been underpaid.

**Representative Claims for Pacific Recovery Solutions**

**Patient CA**

261.    CA is a behavioral health patient who received treatment from PRS.  On 10/31/2018, as part of the pre-admission insurance verification process, so as to determine

36

whether or not to render services, the Provider called United at the phone number on the back of CA's United ID card, 866-734-7670, to determine how much would be paid for treatment provided to CA.

262.     During the call, a United representative named "Tera B" informed the Provider it would be paid at **80%** of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at **100%** of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 11/24/2018 and gave the authorization number IFKJ4Y-03 to the Provider as confirmation. The Provider then rendered the services in good faith based upon the verification call and the authorization call.

263.     Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

264.     For example, on 11/12/2018, the Provider electronically submitted an invoice to United for one date of service for $9,000.00, the amount of the Provider's standard per diem charge for five days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

265.     On 11/12/2018, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

266.     On 11/29/2018 United electronically transferred payment to the Provider of $1,084.30 in the form of an electronic funds transfer. The amount was equivalent to only 12% of the billed charge and far below any reasonable calculation of a percentile of UCR. According

to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

267.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient TM**

268.    TM is a behavioral health patient who received treatment from PRS.   On 05/29/2018, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of TM's United ID card, 877-342-3210, to determine how much would be paid for treatment provided to TM.

269.    During the call, United representative named "Mick B." informed the Provider it would be paid at **60%** of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at **100%** of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with "Carolyn" at United on 11/9/2018, and gave the authorization number T9XJ4A-05 to the Provider as confirmation. The Provider then rendered the services in good faith based upon the verification call and the authorization call.

270.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to

treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

271.    For example, on 11/12/2018, the Provider electronically submitted an invoice to United for one date of service for $9,000.00, the amount of the Provider's standard per diem charge for five days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

272.    On 11/12/2018, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

273.    On 11/29/2018 United electronically transferred payment to the Provider of $1,084.30 in the form of an electronic funds transfer.  The amount was equivalent to only 12% of the billed charge and far below any reasonable calculation of a percentile of UCR.  According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

274.    With the underpayment, United also sent a Provider Remittance Advice (PRA).  The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive

the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient DE**

275.    DE is a behavioral health patient who received treatment from PRS.   On 01/18/2019, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of DE's United ID card, 877-342-3210, to determine how much would be paid for treatment provided to DE.

276.    During the call, United's agent named "AVR" informed the Provider it would be paid at **60%** of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at **100%** of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 03/07/2019, and gave the authorization number 6NL38L-03 to the Provider as confirmation. The Provider then rendered the services in good faith based upon the verification call and the authorization call.

277.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

278.    For example, on 03/15/2019, the Provider electronically submitted an invoice to United for one date of service for $6,600.00, the amount of the Provider's standard, 2019, per diem charge for three days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

279.    On 03/15/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse'.  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by

United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

280.    On 04/04/2019 United electronically transferred payment to the Provider of $650.58 in the form of an electronic funds transfer.  The amount was equivalent to only 10% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

281.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

### Facts Relevant to All PRS Claims and Allegations

282.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider.  In fact, neither of that information is used by Viant when it calculates prices.  The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

283.    Importantly, for higher levels of services provided to these three Patients, including residential inpatient treatment and partial hospitalization, United paid the claims

41

precisely as it had promised on the verification call, at 60%, 80% or 100% of a rate based on UCR.  This incongruity highlights the fraud present in the payment of IOP claims.  IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment.  Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and MultiPlan were going to use to price the claim.

284.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services rendered to the Patient and to other United patients.

285.    The Provider has been directly harmed by this underpayment.

286.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

287.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

PCI Westlake

288.     Plaintiff, PCI Westlake, was established in 2015. PCI Westlake is licensed to provide IOP behavioral health treatment, and other related services, by the California Department of Healthcare Services of, and is accredited by JCAHO.

289.     Since 2015, PCI Westlake has treated more than 9 United patients for whom claims for payment of IOP services were repriced by Viant.

290.     United's and MultiPlan's scheme has left PCI Westlake unpaid for years' worth of IOP services. United and MultiPlan have caused PCI Westlake to be underpaid at least $86,225.67. Below is a representative sample of claims that have been underpaid.

**Representative Claims for PCI Westlake**

**Patient KH**

291.     KH is a behavioral health patient who received treatment from PCI Westlake.  On 09/06/2018, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of KH's United ID card, 866-365-7157, to determine how much would be paid for treatment provided to KH.

292.     During the call, a United representative named "Chris S" informed the Provider it would be paid at 50% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR. A United representative named "Johnny C", also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 09/10/18 and gave the authorization number 6RWWRW-01 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

293.     Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

294.     For example, on 09/20/2018, the Provider electronically submitted an invoice to United for two dates of service for $3,300.00, the amount of the Provider's standard per diem charge for three days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown infra, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

295.     On 09/20/2018, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse'.  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

296.     On 10/24/2018 United mailed payment to the Provider of $301.16 in the form of a check.  The amount was equivalent to only 9.1% of the billed charge and far below any reasonable calculation of a percentile of UCR. According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

297.     With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient JM**

298.    JM is a behavioral health patient who received treatment from PCI Westlake.  On 10/15/2018, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of SM's United ID card, 1-800-333-8724, to determine how much would be paid for treatment provided to JM.

299.    During the call, a United representative named "Lise M" informed the Provider it would be paid at 70% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR. A United agent named "Terry" also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 10/18/18, and gave the authorization number 47RYDF-01 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

300.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

301.    For example, on 11/15/2018, the Provider electronically submitted an invoice to United for three dates of service for $4,950.00, the amount of the Provider's standard per diem charge for three days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown infra, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

302.    On 11/15/2018, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

45

303.    On 12/05/2018 United mailed payment to the Provider of $560.10 in the form of a check.  The amount was equivalent to only 11.3% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

304.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient SM**

305.    SM is a behavioral health patient who received treatment from PCI Westlake.  On 09/25/2016, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of SM's United ID card, 1-800-888-2998, to determine how much would be paid for treatment for treatment provided to SM.

306.    During the call, a United representative named "Sasha M" informed the Provider it would be paid at 60% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR.  A United representative named "Josh" also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 09/30/2019, and gave the authorization number #0FZ0RK000 to the Provider as confirmation.

The provider then rendered the services in good faith based upon the verification call and the authorization call.

307.     Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

308.     For example, on 12/23/2019, the Provider electronically submitted an invoice to United for three dates of service for $3,300.00, the amount of the Provider's standard per diem charge for two days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown infra, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

309.     On 12/23/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

310.     On 01/15/2020 United mailed payment to the Provider of $286.84 in the form of a check.  The amount was equivalent to only 8.6% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

311.     With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If

47

you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Facts Relevant to All PCI Westlake Claims and Allegations**

312.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, that information is not used by Viant when it calculates prices. The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is <u>not</u> based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

313.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance. Notwithstanding the absense of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for intensive outpateint services rendered to the Patient and to other United patients.

314.    The Provider has been directly harmed by this underpayment.

315.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim. This money had already been paid to United through the Patient's insurance premiums. The profit or 'margin' from this underpayment was shared by United and MultiPlan.

316.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

1

<u>Bridging The Gaps</u>

2      317.    Plaintiff, Bridging the Gaps ("BTG"), was established in 2001. BTG is licensed

3  by the State of Virginia to provide IOP behavioral health treatment, and other related services

4  and is accredited by JCAHO.

5      318.    Since 2015, BTG has treated more than 21 patients for whom claims for payment

6  of IOP services were underpaid.

7      319.    United's and MultiPlan's scheme has left BTG unpaid for years' worth of IOP

8  services. United and MultiPlan have caused BTG to be underpaid by at least $456,387.37. Below

9  is a representative sample of claims that have been underpaid.

10        **Representative Claims for Bridging The Gaps ("BTG")**

11                        **Patient JS**

12      320.    JS is a behavioral health patient who received treatment from BTG. On

13  06/23/2017, as part of the pre-admission insurance verification process, so as to determine

14  whether or not to render services, the Provider called United at the phone number on the back of

15  JS's United ID card, 1-800-888-2998, to determine how much would be paid for treatment

16  provided to JS.

17      321.    During the call, a United representative named "June" informed the Provider it

18  would be paid at 80% of a rate based upon UCR until the patient's deductible and out of pocket

19  maximum were met.  Once the out of pocket maximum was met, United said claims would be

20  paid at 100% of a rate based upon UCR.  United also explicitly authorized the services and claims

21  discussed herein during a phone call with the Provider and gave the authorization number

22  AUTH# QNCT4I – 01  to the Provider as confirmation. The provider then rendered the services

23  in good faith based upon the verification call and the authorization call.

24      322.    Armed with this information and United's many assurances regarding the

25  expected rate of payment and authorizations, the Provider decided to admit the Patient to

26  treatment and provided the services but United did not pay the rate that had been quoted on the

27  verification call.

28

49

323.    For example, on 08/14/2017, the Provider electronically submitted an invoice to United for one date of service for $6,250.00, the amount of the Provider's standard per diem charge for 5 days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

324.    On 08/14/2017, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

325.    On 10/05/2017 United sent payment to Provider via the United States Mails of $1,224.15 in the form of a paper check.  The amount was equivalent to only 19.5% of the billed charge and far below any reasonable calculation of a percentile of UCR.    According to the verification call, this claim should have been paid at the 100% of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

326.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient GE**

327.    GE is a behavioral health patient who received treatment from BTG.  On 02/14/2019, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of GE's United ID card, 1-800-552-9551, to determine how much would be paid for treatment provided to GE.

328.    During the call, a United representative named "M.J. E." informed the Provider it would be paid at 70% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider and gave the authorization number BJPXWR-01 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

329.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

330.    For example, on 04/29/2019, the Provider electronically submitted an invoice to United for one date of service for $6,250.00, the amount of the Provider's standard per diem charge for 5 days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

331.    On 04/29/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

332.   On 5/23/2019 United sent payment to Provider via the United States Mails of $1,224.15 in the form of a paper check.  The amount was equivalent to only 19.5% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at 100% of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

333.   With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient MR**

334.   MR is a behavioral health patient who received treatment from BTG.   On 04/23/2019, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of MR's United ID card, 1-800-552-9551, to determine how much would be paid for treatment provided to MR.

335.   During the call, a United representative named "Tasha T" informed the Provider it would be paid at 50% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider and gave the authorization number GKDZVA-0 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

336.     Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

337.     For example, on 06/21/2019, the Provider electronically submitted an invoice to United for one date of service for $5,000.00, the amount of the Provider's standard per diem charge for 4 days of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

338.     On 06/21/2020, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse'.  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

339.     On 08/08/5019 United sent payment to Provider via the United States Mails of $979.32 in the form of a paper check.  The amount was equivalent to only 19.5% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at 100% of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

340.     With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive

the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Facts Relevant to All BTG Allegations and Claims Above**

341.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider.  In fact, that information is not used by Viant when it calculates prices. The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

342.    Importantly, for higher levels of services provided to these three Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 50%, 70%, 80% or 100% of a rate based on UCR minus the patient's cost sharing.  This incongruity highlights the fraud present in the payment of IOP claims.  IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment.  Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and Mutiplan were going to use to price the claim.

343.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have

1    unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services

2    rendered to the Patient and to other United patients.

3        344.    The Provider has been directly harmed by this underpayment.

4        345.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider

5    of property – money - that should have been paid to the Provider for the claim.  This money had

6    already been paid to United through the Patient's insurance premiums.  The profit or 'margin'

7    from this underpayment was shared by United and MultiPlan.

8        346.    For more than two years before the date of the filing of this action and continuing,

9    for many similar Patients with identical healthcare claims, the Provider has been systematically

10    misled and underpaid by United, MultiPlan and Viant.

11                            Summit Estate

12        347.    Plaintiff, Summit Estate, was established in 2017.  Summit is licensed to provide

13    IOP behavioral health treatment, and other related services, by the California Department of

14    Healthcare Services and is accredited by JCAHO.  Summit Estate is the 3d ranked treatment

15    center based on quality of clinical services in the State of California according to Newsweek

16    magazine.

17        348.    Since 2017, Summit has treated more than 13 United patients for whom claims

18    for payment of IOP services were underpaid.

19        349.    United's and MultiPlan's scheme has left Summit unpaid for years' worth of IOP

20    services. United and MultiPlan have caused Summit to be underpaid at least $600,000.00.

21                    **Representative Claims for Summit Estate**

22                            **Patient CS**

23        350.    CS is a behavioral health patient who received treatment from Summit Estate.

24    On 06/27/2019, as part of the pre-admission insurance verification process, so as to determine

25    whether or not to render services, the Provider called United at the phone number on the back of

26    CS's United ID card, 1-800-700-6997, to determine how much would be paid for treatment

27    provided to CS.

28

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

351.    During the call, a United representative named "Lise A." informed the Provider it would be paid at 60% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 08/23/2019, and gave the authorization number SP2FQG-02 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

352.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

353.    For example, on 8/29/2019, the Provider electronically submitted an invoice to United for one date of service for $2156.25, the amount of the Provider's standard per diem charge for one day of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

354.    For example, on 8/29/2019, the Provider electronically submitted an invoice to United for one date of service for $2156.25, the amount of the Provider's standard per diem charge for one day of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

355.    On 08/29/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

356.    On 09/13/2019 United electronically transferred payment to the Provider of $291.12 in the form of an electronic funds transfer.  The amount was equivalent to only 13.5% of the billed charge and far below any reasonable calculation of a percentile of UCR.  According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

357.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888."  These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Patient JZ**

358.    JZ is a behavioral health patient who received treatment from Summit Estate.  On 07/03/2019, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of JZ's United ID card, 1-800-700-6997, to determine how much would be paid for treatment provided to JZ.

359.    During the call, a United representative "John" informed the Provider it would be paid at 60% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met.  Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR.  United also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 08/28/2019, and gave the authorization number

64CLTY-04 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

360.    Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

361.    For example, on 8/29/2019, the Provider electronically submitted an invoice to United for one date of service for $2156.25, the amount of the Provider's standard per diem charge for one day of IOP treatment.  The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

362.    On 08/29/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse".  The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726.  The claim was received by United on the same date.  United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

363.    On 09/13/2019 United electronically transferred payment to the Provider of $291.12 in the form of an electronic funds transfer.  The amount was equivalent to only 13.5% of the billed charge and far below any reasonable calculation of a percentile of UCR.   According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum.  The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

364.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call. Remark code CY reads: "This claim has been reduced by the amount that is

58

above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

### Patient RB

365.     RB is a behavioral health patient who received treatment from Summit Estate. On 07/19/2019, as part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider called United at the phone number on the back of RB's United ID card, 1-800-700-6997, to determine how much would be paid for treatment provided to RB.

366.     During the call, a United representative named "Jeff U." informed the Provider it would be paid at 60% of a rate based upon UCR until the patient's deductible and out of pocket maximum were met. Once the out of pocket maximum was met, United said claims would be paid at 100% of a rate based upon UCR. United also explicitly authorized the services and claims discussed herein during a phone call with the Provider on 09/11/2019, and gave the authorization number Y8B8KL-02 to the Provider as confirmation. The provider then rendered the services in good faith based upon the verification call and the authorization call.

367.     Armed with this information and United's many assurances regarding the expected rate of payment and authorizations, the Provider decided to admit the Patient to treatment and provided the services but United did not pay the rate that had been quoted on the verification call.

368.     For example, on 09/30/2019, the Provider electronically submitted an invoice to United for one date of service for $2156.25, the amount of the Provider's standard per diem charge for one day of IOP treatment. The Provider's charge for these services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

369.    On 09/30/2019, an invoice was submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoice was submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date. United routed this claim to MultiPlan who, in turn, routed the claim to Viant to be priced using the OPR Review pricing tool.

370.    On 10/11/2019 United electronically transferred payment to the Provider of $291.12 in the form of an electronic funds transfer. The amount was equivalent to only 13.5% of the billed charge and far below any reasonable calculation of a percentile of UCR. According to the verification call, this claim should have been paid at the 100th percentile of a rate based upon UCR, because the patient had met his/her out of pocket maximum. The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate.

371.    With the underpayment, United also sent a Provider Remittance Advice (PRA). The PRA contained the remark code of "CY" indicating that United used MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call. Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

**Facts Relevant to All Summit Estate Claims and Allegations**

372.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, that information is not used by Viant when it calculates prices. The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a

similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

373.    Importantly, for *higher* levels of services provided to these three Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 60% or 100% of a rate based on UCR. This incongruity highlights the fraud present in the payment of IOP caims.  IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment.  Yet, for IOP treatment, one of the most most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and Mutiplan were going to use to price the claim.

374.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absense of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for intensive outpateint services rendered to the Patient and to other United patients.

375.    The Provider has been directly harmed by this underpayment.

376.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

377.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

*RICO Proximate Cause*

378.    Every Plaintiff has been directly injured by Defendants' scheme.

379.    The objective of the scheme is to formulate a fraudulent basis for under reimbursing the Plaintiffs and IOP providers across the country.

380.    In implementing this scheme, Defendants have under paid Plaintiffs on thousands of claims.

381.    They have done so on a systematic basis as part of their regular way of doing business and will continue to do so until the legal process forces them to stop.

382.    There are no other victims of this scheme who have been directly injured, or more directly injured than Plaintiffs, by Defendants' fraudulent conduct.

383.    As the most directly injured victims, Plaintiffs can be counted on to vindicate the law as private attorneys general.

384.    Plaintiffs' injuries are not just the foreseeable and natural consequence of Defendants' scheme, they are the objective of the scheme.

*The Continuing Nationwide Pattern and Other Victims Affected*

385.    This Complaint sets forth the manner in which the Enterprise was the vehicle for Plaintiffs' injuries; however, the Enterprise causes damages beyond those done to Plaintiffs that they seek to recover.

386.    The Enterprise also damages the IOP patients' employers

387.    These damages are separate from the damages to Plaintiffs and other IOP providers.

388.    The Enterprise is used to damage the person and property of patients' employers because it takes the full amount of an IOP providers billed charges from the employer for the IOP claim but does not remit the full amount taken to the IOP provider. Instead, the IOP provider

receives an amount that is well below their billed charges and the difference is retained by the Enterprise as their profit.

*Facts Specific to Anti-Trust Claims*

389.    Section 1 of the Sherman Act prohibits actions in restraint of trade. Sections 4 and 16 of the Sherman Act create a private cause of action. The Sherman Act makes it illegal for buyers of goods to agree to what they will pay for a given good or service. MultiPlan, through its Viant Outpatient Review (OPR) tool provided a mechanism by which United and its competitors including fellow insurers Cigna, Aetna and Anthem[23], fellow insurers, fixed prices at what they knew were anti-competitive levels, thereby harming Plaintiffs.

390.    United, knew and intended that, by using MultiPlan's Viant pricing tool in combination with its competitors in the industry, it would reap short term profits, eradicate future liability for its insureds' out-of-network substance use disorder services while still selling plans purporting to cover out of network care, gain the monopsony control of payments that attends to a price-fixing ring.

391.    Plaintiffs, and every member of the class they represent, were underpaid in exactly the same way, pursuant to exactly the same scheme, suffering damages in the difference between a fair and reasonable rate of payment, and the payment generated by MultiPlan and paid by United and its competitors including Cigna, Aetna and Anthem.

392.    The way in which Viant derived its out of network prices was misrepresented to the public but accurately represented to United, Cigna, Aetna and Anthem in multiple presentations made to United and other insurers. United and its competitors agreed to implement the Viant tool with full knowledge of each other's plans to implement the tool. They knew that the illegal tool would depress the prices they paid to providers by the 70% that MultiPlan promised them.

---

[23] See: MultiPlan and Churchill Capital "Proxy Soliciting Material" SEC submission Pursuant to Section 240.14a-12 accessed at https://sec.report/Document/0001104659-20-083091/tm2024675d1_defa14a.htm last accessed 9/24/2020.

393.    Together, this buyer's cartel controls more than 50% of the commercial health insurance market in the United States.

394.    The result was a price fixing ring and buyers' cartel that functioned to artificially depress prices insurers paid for IOP services in violation of Section 1 of the Sherman Act's prohibition on practices that harm competition.

<u>The Relevant Market</u>

395.    In the United States, the only practical purchaser of Plaintiffs' services were private health insurers like Defendant. The United States Congress recognized that insurance companies, not individuals, are the purchasers of healthcare services when it passed the Patient Protection and Affordable Care Act (the "Affordable Care Act") which required Americans to carry health insurance. Pub. L. No. 111-148, 124 Stat. 119. Congress passed that law because it recognized that without insurance, the consumption of healthcare services would bankrupt uninsured patients.

396.    The Affordable Care Act also prescribed limits on the amount of any individual could owe for care they received. The implication, that insurers like defendant are liable for the entire cost of healthcare once patients' "out-of-pocket maximum" amounts are reached, makes insurers responsible for, and the purchasers of healthcare for the privately insured segment of the population.

397.    Healthcare services are goods capable of being bought and sold. Insofar as the American Healthcare System is concerned, payment for a service is no different from payment for a drug or a device. All relevant healthcare services correspond with a code, which is then priced and paid for by insurers. This is identical to the code, price and payment system for durable medical equipment and pharmaceuticals. As such, the purchaser-seller relationship for IOP services is capable of being fixed in the same way as the market for a drug.

398.    United and its co-conspirators were in the business of controlling amounts they spent on healthcare services. Their profitability depended on how much they spent, and who they spent it with. As such, Defendants sought to wrest as much control as possible over their

expenditures by engaging in the anti-competitive practices alleged in this complaint, at the expense of every out-of-network substance use disorder patient.

399.    For Plaintiffs, the only feasible purchasers of the services they provide were insurance companies like United and its competitors.

400.    Thus, the buyer-seller relationship between Plaintiffs and Defendant and its competitors implicated the competitiveness of actors within a defined market, implying existence of a market vulnerable to the types of manipulations and abuses the Sherman Act was designed to prevent.

401.    It is critical to note that cost control and overall expenditure minimization are not the same thing. Insurance companies, whose profits are capped at 15% of premiums for many of the insurance products they sell, have an incentive to increase the size of the total outlay for the system, so that they can have 15% of a larger number.

402.    Insurance companies tout, in their assorted motions, themselves as making some sort of good-hearted effort to control costs for the benefit of insureds by using Viant and MultiPlan's services. This is not the case. Cost control, as applied to out of network services, is merely a way to perfect the accuracy of defendants' annual underwriting, to eliminate out of network care options, and to exert total control over purchase prices.

403.    Underpaying patients' substance use disorder claims does not stand to benefit patients, or the employers who pay their premiums, in any meaningful way. It is a tactic to reduce financial liability for insurers only. It is part of insurers' strategy to use Horizontal price fixing to gain complete control over expenditures for care.

<u>Price Fixing</u>

404.    Since 1948, the Supreme Court has recognized that Buyers' Cartels violate section 1 of the Sherman Act when they fix prices in a way that effects intra-state commerce.  In *Mandeville Island Farms* the Supreme Court reversed an order granting buyer-defendants' motion to dismiss and held that Beat refiners, who were the only foreseeable purchasers of Beats in Northern California, were liable under a buyers' cartel theory when they conspired to fix prices they would pay.

405.    Here, like in *Mandeville Farms* a group of purchasers used MultiPlan's Viant tool to fix prices at artificially low levels to achieve anti-competitive purposes. The 'artifice' of the Viant tool is discussed at length herein.

406.    The terms of United's agreement to fix prices is set out in United and MultiPlan's Network Access Agreement. MultiPlan has contracts with United's competitors, including but not limited to Cigna, Aetna, and Anthem, setting out similar or identical arrangements for the use of the Viant OPR price fixing tool.

407.    United agreed to fix prices using Viant in substantial part because it knew its competitors were also using Viant to underpay claims at the same or similar rates. United knew that if it and its competitors all underpaid out of network claims, out of network providers would either have to close their doors or sign disadvantageous contracts with United.

408.    United's competitors including Cigna, Aetna, and Anthem, learned of each other's mutual participation in the scheme to underpay claims at annual meetings hosted by MultiPlan. At those events, MultiPlan described to United and its competitors, including Cigna and Aetna the available means by which MultiPlan could facilitate the reduction and maintenance of prices at artificially depressed rates. Competitors discussed MultiPlan's menu of services among themselves.

409.    At the annual meetings, United and the aforementioned competitors discussed means by which MultiPlan and its competitors could benefit from the mutual use of MultiPlan's menu of cost containment services, including Viant.

410.    United's knowledge of its competitors' participation in the buyers' cartel was enhanced by Viant's Client Advisory Board, or CAB. The CAB would discuss potential changes in and expansions of the deployment of MultiPlan's services, including Viant, in ways that could help keep United competitive with its competitors, who United knew were also MultiPlan Customers.

411.    The function of the Client Advisory Board was, among other things, designed to create a tacit means by which United and its competitors could share secret pricing data for their own benefit. United also knew that by sharing pricing data covertly, through the Client Advisory

Board, with its competitors including Cigna, it could reap the benefits that attenuate a price fixing ring.

412.    The client advisory board was comprised of members of Viant's sales team including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

413.    UHC gained specific knowledge of competitor's pricing information from the CAB's biannual "Road-Shows." Road Shows which were in person meetings where MultiPlan could explain the staggering success of its application of tools including Viant OPR to United in "saving" the insurers money. At the Road Shows, the CAB also explained how other MultiPlan customers including Cigna, Aetna, and Anthem were deploying the price-fixing methodology. At the Road Shows offered United the chance to input feedback and make requests about adjusting or expanding the use of any underpayment methodologies.

414.    United knew that it and its competitors stood to mutually benefit by eliminating or drastically reducing the instance of out of network care, while continuing to collect escalated premiums for insurance products that covered out of network care. United knew that the prices it and its competitors, especially Cigna used Viant OPR to pay rates that were less than amounts it would have paid had there been free competition amongst sellers and buyers.

415.    United and its competitors, including but not limited to Cigna, Aetna and Anthem, thus had mutual knowledge that they were making mutual use of Viant to fix prices for out of network services.[24] United and its competitors' mutual knowledge that they were all using a false and fraudulent database to depress prices below competitive rates created a buyers cartel, whereby all  users of Viant's services who were aware of their competitors use of the same services were participants in the price-fixing ring.

---

[24] *See: SEC Disclosure Form DEFA14A (Churchill Capital Corp)* (describing MultiPlan's mutual clients United, Cigna and Anthem and dominant and expanding market share in discussions before the SEC)

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

Anti-Competitive Harm

416.    Plaintiffs suffered the type of harm the Sherman Act was enacted to prevent when they were wrongly forced to subsidize the amounts underpaid by defendants, accept drastically reduced prices, and/or sign disadvantageous purchase contracts with Defendants.

417.    Defendants and their competitors including but not limited to Cigna, Aetna, and Anthem, who use the Viant tool make up a substantial section of the insurer-purchaser market nation-wide.

418.    National insurers engage in commerce across state lines.

419.    United alone provides insurance for between 15-20% of privately insured Americans. United alone held a 15-20% market share for the services Plaintiffs offered. When Defendant underpaid claims by between 70-90%, Defendant alone caused plaintiffs net payments for IOP services to decrease by between 10-25%. In combination with Defendant's competitors' including but not limited to Cigna, Aetna and Anthem, use of Viant, annual receivables were further reduced to levels that caused substantial injury to the business and property of Plaintiffs and the class they represent.

420.    A 10-25% reduction to annual receivables for IOP services was fatal to the continued existence of thousands of providers like plaintiffs nationwide and injured every remaining provider in the amount of 10-25% of their annual receivable incomes for IOP services. Many providers went out of business as the direct result of Defendant and its co-conspirator's anti-competitive behavior.

421.    Many other providers were harmed in their property because they were wrongly deprived the fair payment for their services, they would have received absent Defendant's and its Competitors' including but not limited to Cigna, Aetna, and Anthem entities' anti-competitive practices.

422.    The purpose of the Sherman Act was to protect competition in markets. United's behavior allowed it and its co-conspirators to eliminate competition between sellers in the market for Intensive Outpatient Program healthcare services.

423.     Ultimately, the behavior enabled United and its Competitors including Cigna, Aetna and Anthem to make substantial progress in their goal to eliminate the need to pay for any out of network IOP care, because IOP providers could not remain in business when the nations' largest insurer and its co-conspirators conspired to reduce payments to anti-competitive levels.

*General Allegations to All Counts*

424.     For decades, commercial payors, including United, have purported to reimburse for out-of-network services according to the UCR rates. Reimbursement at UCR rates is so well-established that some states, including California, require certain health plans to reimburse out-of-network services at rates using criteria that parallel the industry-standard for determining UCR. *See, e.g.*, 28 C.C.R. § 1300.71(a)(3)(B) (referring to prevailing provider rates **charged** in the general geographic area in which the services were rendered); Fla. Stat. Ann. § 641.513(5) (referring to "usual and customary provider **charges**" for similar services in the community where the services were provided). Because the industry standard traditionally has been for payment according to the UCR, out-of-network providers and their patients reasonably expect claims to be paid based on UCR.

425.     This understanding and usage was further confirmed during the initial VOB and authorization calls between Plaintiffs and United.

426.     In correspondence received by Plaintiffs, both from United and MultiPlan, as set forth in greater detail below, the Defendants fraudulently represented that the underpayment amount was based on UCR rates.

427.     This representation was deliberate and false.

428.     It is arbitrary, capricious, improper, and a breach of plan terms for United to pay rates other than a true UCR arrived at under a fair methodology.

*The Direct Harm Caused to the Plaintiffs and Class*

429.     All the claims at issue here were underpaid to Plaintiffs and the Class. These are all claims for which out-of-network rates for IOPs are meant to be paid at amounts based on the UCR rate.

430.    United has systematically underpaid the Plaintiffs and the Class since the beginning of the claims period for the present litigation.

431.    United intentionally led Plaintiffs and the Class to believe that rates were determined based on a UCR rate.

432.    As alleged above, when Plaintiffs contacted United to verify out-of-network rates during the pre-admission VOB calls, United routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by Viant.

433.    Plaintiffs then agreed to provide services and receive payment from United at the UCR rate.

434.    It is well established that Plaintiffs and providers have a property interest in their claims and the right to be paid for them.

435.    Underpayment of Plaintiffs' and other providers' claims is a deprivation of their property interest and direct damage to them.

## Class Action Allegations

### *The Plaintiff Class*

436.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are satisfied in this case.

437.    Plaintiffs bring this class action on behalf of the Plaintiff Class, defined as:

All out-of-network behavioral health providers in the United States who provided IOP services and whose claims for those services were underpaid by United due to use of the MultiPlan's Viant pricing methodologies, during the class period.

### *Rule 23(a)*

#### Numerosity

438.    This putative plaintiff class includes thousands of mental health and substance use disorder treatment providers throughout the United States and is therefore so large as to make

joinder of all members impracticable within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

Commonality

439.    Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of law or fact common to all class members, including, but not limited to, the following:

a. Whether the Defendants have underpaid the Plaintiff Class for out-of-network mental health and substance use disorder services based upon improper methodologies for pricing UCR rates;

b. Whether Defendants made false representations to the Plaintiff Class as to how claims for out-of-network mental health and substance use disorder services would be paid;

c. Whether the Defendants falsely representing the method that was used to pay the claims for out-of-network mental health and substance use disorder services at the time such claims were paid;

d. Whether the Defendants falsely represented the method that was used to pay the claims for out-of-network mental health and substance use disorder at the time such claims were appealed;

e. Whether the Defendants falsely represented that the patients owed the Plaintiffs and Class amounts which should have been paid by the Defendants, and are not the financial liability of the patients;

f. Whether the improper methodologies and systematic misrepresentations employed by the Defendants made it futile for the Plaintiffs and Class to appeal the claims;

g. Whether interest should be added to the payment of unpaid amounts;

h. Whether Defendants' conduct in California violates California Business and Professions Code § 17200 *et seq.* ;

i.   Whether Defendants' conduct violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA);

j.   Whether United conduct violated their duty of faith and fair dealing to the Plaintiffs and Class in employing the Viant methodology for IOP claims;

k.   What process and data the Viant methodology used in payment determinations;

l.   Whether MultiPlan made fraudulent to representations to Plaintiffs and the Class as to the Provider and Class' claims for mental health and substance use disorder services provided to patients;

m.   Whether Defendants engaged in pre-authorization conversations with Plaintiffs and Class prior to the member receiving treatment;

n.   Whether MultiPlan received any appeals from Plaintiffs, Class, or members following benefit determinations;

o.   What payments were made to the Plaintiffs and Class;

p.   Whether the Viant methodology adequately and/or accurately applies the relevant UCR in determining benefit amounts;

q.   Whether the data used in the Viant methodology accurately reflect the relevant UCR in the relevant geographical area;

r.   Whether the service "proxies" used in the Viant methodology accurately reflect the relevant UCR in the relevant geographical area;

<u>Typicality</u>

440.   The claims of Provider plaintiffs are typical of the claims of the defined plaintiff class, within the meaning of Rule 23(a)(3) of the Federal Rules of Civil Procedure, and are based on and arise out of the same uniform and standard illegal practices of the Defendants, as alleged herein by the Plaintiffs. The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members. If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

Adequacy

441.    Provider plaintiffs are committed to pursuing this action and are prepared to serve the proposed class in a representative capacity with all of the obligations and duties material thereto. They will fairly and adequately represent the interests of the members of the proposed class within the meaning of Rule 23(a)(4) of the Federal Rules of Civil Procedure, and will not have any interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

442.    Plaintiffs have retained competent counsel experienced in class action litigation, which will adequately prosecute this action, and will assert, protect and otherwise well represent the named Class representatives and absent class members.

### Rule 23(b)

443.    The prosecution of separate actions by individual class members would create a risk of adjudication with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to this action, or could substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

444.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible rights within the Plaintiff Class. Fed. R. Civ. P. 23(b)(1)(A).

445.    United's and MultiPlan's actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole, within the meaning of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

446.    The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common or general proof will be used for each member of the class to establish each element of their claims, as identified above. Additionally, proceeding as a class action is superior to other

available methods of adjudication. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**Causes of Action**

*COUNT I: Violation of RICO, 18 U.S.C. § 1962(c)*

447. The Plaintiffs re-allege and restate the facts set forth above as if they were fully set forth herein.

448. The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

449. United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

450. As set forth above, since at least January 1, 2015, United and MultiPlan have been and continue to be, a part of an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

451. The Enterprise is comprised of at least United and MultiPlan.

452. The Enterprise was and is engaged in activities that span multiple states and affect interstate commerce.

453. Each of United and MultiPlan have an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

454. Each United Defendant and MultiPlan exercise management and/or control over the affairs of the Enterprise.

455. United and MultiPlan utilize the Viant methodology to obtain fraudulent rates that are then communicated out across state lines using the mail and wires as set forth above.

456. The Enterprise had, and continue to have, the common and continuing purpose of dramatically underpaying Plaintiffs in order unlawfully obtain and keep the difference between the appropriate and "reasonable" amount and the underpaid amount for their own benefit and the benefit of the Enterprise.

457.    As set forth above, United and MultiPlan have, since at least January 1, 2015, been, and continue to be, engaged in a scheme to defraud the Plaintiffs by committing a series of unlawful acts which constitute predicate racketeering acts under 18 U.S.C. §§ 1961(1)(B) and 1962(c), involving multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

458.    As a direct and proximate result of United and MultiPlan's violations of 18 U.S.C. § 1962(c), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

*COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d)*

459.    The Plaintiffs reassert and reallege the facts set forth above as if fully set forth herein.

460.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

461.    United and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

462.    As set forth above, since at least January 1, 2015, the Defendants have been, and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least United and MultiPlan.

463.    United and MultiPlan were, and continue to be, associated with the Enterprise and knowingly conspired, within the meaning of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c) by conducting and participating, directly or indirectly, in the management, overseeing, and conduct in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1962(c), including multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, in order to defraud the Physicians of a reasonable rates for services.

464.    As a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), the Plaintiffs were injured in their business, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

*COUNT III: Violation of California Business & Professions Code §§ 17200 et seq.*

*(Unfair and Unlawful Business Practices of United)*

465. The General and Class Allegations are hereby repeated as if fully set forth herein.

466. This cause of action is brought pursuant to California law.

467. Defendant, United, has engaged in unfair and unlawful business acts and practices by, *inter alia*:

    a. using arbitrary, capricious and improper methods to improperly and intentionally underprice and underpay out-of-network IOP mental health and substance use disorder claims;

    b. employing MultiPlan as a third-party repricing entity without disclosing this agreement to Plaintiffs during the VOB process or at any time prior to IOP treatment being rendered;

    c. employing MultiPlan as a third-party repricing entity without a contract or agreement with Plaintiffs, the Class, and/or patients, permitting them to do so for the underpaid claims at issue;

    d. concealing and/or omitting material information in EOBs, ERAs, and other correspondence concerning the manner in which United and MultiPlan determine the payment amount for IOP out-of-network claims;

    e. representing to Plaintiffs and the Class that United would pay IOP services at the UCR, when in fact United disregarded the UCR and paid arbitrarily low rates for IOP services;

    f. paying arbitrarily low rates for IOP services uniformly across the country in disregard of the prevailing charges in the community;

    g. misrepresenting the reasonable and customary rates of out-of-network IOP to Plaintiffs and the Class;

    h. failing to correctly and accurately apply the criteria used to calculate UCR rates as set forth in Title 28 of the California Code of Regulations, section 1300.71(a)(3)(B), and by failing to comply with California Health and Safety

Code § 1371 and 28 C.C.R. § 1300.71 by knowingly, among other things, engaging in an "unfair payment pattern," including, but not limited to, delaying payment of claims, reducing the amount of payment, failing on a repeated basis to pay uncontested portions of claims within the time period specified in Health and Safety Code §§ 1371 et seq., and not paying reasonable and customary rates.

468.     This conduct by United constitutes illegal and unfair business practices under California Business and Professions Code § 17200, *et seq*. As a result of their acts of unfair competition, United has and continues to receive and retain monies that rightfully belong to Plaintiffs and the Class as compensation for rendering covered, medically necessary IOP services.

469.     Additionally, United's unfair competition practices are likely to continue and/or increase absent judicial intervention. This conduct threatens not only the economic well-being and future viability of the Plaintiffs and the Class, but the health of the public in midst of a nationwide opioid crisis.

470.     California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby. Plaintiffs seek, on behalf of themselves and the Class, restitution of an amount to be proved at trial, plus applicable statutory interest, which is the amount that the United is obligated to pay the Plaintiffs and the Class for the IOP services they provided.

471.     United should be specifically ordered to disgorge amounts which represent the difference between what United underpaid the Plaintiffs and Class using an arbitrarily low payment rate and total billed charges on past claims, which appropriately represent the UCR.

472.     Plaintiffs seek, on behalf of themselves and the Class, an injunction prohibiting United's ongoing conduct in using or engaging Viant and/or any third-party repricing entity for IOP out-of-network claims. Furthermore, the injunction should force United to correctly price past and future out-of-network IOP claims by determining UCR based on appropriate data.

473.    The legal remedies of the Plaintiffs and Class are inadequate in that United's unfair and unlawful conduct is ongoing and repeated litigation to correct its ongoing actions is inefficient for the parties and the Court.

*COUNT IV: Violation of California Business & Professions Code §§ 17200 et seq.*

*(Unfair and Unlawful Business Practices of MultiPlan)*

474.    The General and Class Allegations are hereby repeated as if fully set forth herein.

475.    This cause of action is brought pursuant to California law.

476.    Defendant, MultiPlan, has engaged in unfair and unlawful business acts and practices by, *inter alia*:

a.    using arbitrary, capricious and improper methods to improperly underprice out-of-network IOP claims;

b.    improperly representing that the proposed payment amount reflects the UCR;

c.    improperly representing that MultiPlan represents the patient, despite the clear conflict of interest and financial incentives to the contrary provided in the agreement(s) between United and MultiPlan;

d.    Makings such material misrepresentations on PADs and other correspondence sent to the Plaintiffs, the class, and the patients;

e.    interfering with the contract between the Plaintiffs, the Class, and their Patients;

f.    conspiring with United to uniformly underpay IOP services across the country;

g.    failing to disclose to Plaintiffs and the Class that the proposed payment rates are arbitrarily set by United and MultiPlan and misrepresenting those fraudulent rates to Plaintiffs and the Class as UCR rates;

h.    preventing the timely and full payment of IOP claims;

i.    preventing Plaintiffs and the Class from appealing the underpayment;

j.    refusing to disclose the methodology by which IOP claims are priced;

*PRS, et al. v. United, et al.* – AMENDED CLASS ACTION COMPLAINT

k.  concealing and/or omitting material information in written and wire communications with Plaintiffs and the Class;

l.  entering into agreement(s) with United that constituted illegal "kick-backs" or "rebates" in exchange for underpayment of Plaintiffs and the Class at rates well below the UCR.

477.    This conduct by MultiPlan constitutes illegal and unfair business practices under California Business and Professions Code § 17200, *et seq*. As a result of their acts of unfair competition, MultiPlan has and continues to receive and retain monies that rightfully belong to Plaintiffs and the Class as compensation for rendering covered, medically necessary IOP services.

478.    Additionally, MultiPlan's unfair competition practices are likely to continue and/or increase absent judicial intervention. This conduct threatens not only the economic well-being and future viability of the Plaintiffs and the Class, but the health of the public in midst of a nationwide opioid crisis.

479.    California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby. Plaintiffs seek, on behalf of themselves and the Class, restitution of an amount to be proved at trial, plus applicable statutory interest, which is the UCR that the Plaintiffs and the Class should have been paid and underpayment they received for the IOP services provided.

480.    MultiPlan should be specifically ordered to disgorge amounts that it received as "kick-backs," "rebates," or other unlawful incentives and payments it received in exchange for its "cost containment" of IOP claims for United.

481.    Plaintiffs seek, on behalf of themselves and the Class, an injunction prohibiting MultiPlan's ongoing conduct interfering with the agreements between Plaintiffs, the Class, and patients. MultiPlan should be prohibited from contacting or otherwise engaging with the Plaintiffs and/or the Class on the payment of IOP claims.

482.    The legal remedies of the Plaintiffs and Class are inadequate in that MultiPlan's unfair and unlawful conduct is ongoing and repeated litigation to correct its ongoing actions is inefficient for the parties and the Court.

*COUNT V Intentional Misrepresentation/Fraudulent Inducement*

483.    Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

484.    Plaintiffs bring this Count under the Federal and State common law causes of action for Intentional Misrepresentation.

485.    The elements of fraudulent inducement are: (1) misrepresentation; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages. *See, e.g., Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075 (C.D. Cal. 2017), *aff'd*, 747 F. App'x 643 (9th Cir. 2019). The elements of Intentional Misrepresentation are the same. *See, for example, Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).

486.    As the communications between Plaintiffs and United during the initial phone calls, the communications between the Plaintiffs and MultiPlan following the submission of claims, and the written statements sent to Plaintiffs and patients following claim submissions show, United and MultiPlan represented that Plaintiffs and the Class were being compensated at the UCR as agreed to and required.

487.    Plaintiffs followed all United and MultiPlan's policies and procedures when trying to obtain payment at the agreed upon rate, the UCR.

488.    The Plaintiffs would not have continued to admit United's patients had they known that United intended to employ MultiPlan and the Viant methodology to reprice the IOP claims after services were provided.

489.    Given the pattern, practice, and scale of these misrepresentations MultiPlan's and United's practices cannot have been other than intentional.

490.    United knew that their insureds would still receive IOP treatment when they verified rates and gave payment terms, MultiPlan knew that the more money it fraudulently "saved" United, the more money it would make.

491.    United knew it would keep money that should have been for patients' IOP treatment.

492.    Both United and MultiPlan knew that they were deceiving the Plaintiffs as to a true and accurate UCR.

493.    United and MultiPlan also knew that they would be pushing the more expensive, out-of-network providers out of business.

494.    All of this was done to induce reliance by the Plaintiffs to provide IOP treatment services and preclude means of effective challenge to the underpayment of Plaintiffs.

495.    United did not pay Plaintiffs the UCR as it represented it would.

496.    This tort claim is not precluded by the economic loss rule and it is predicated upon fraud, conspiracy, and criminal acts. Claims for fraudulent inducement are recognized as an exception to the economic loss rule as they arise from conduct that is intentional and intended to harm. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).

497.    United and MultiPlan's conduct clearly goes beyond 'useful business practices' and are independent of the breach of contract in this action.

498.    Plaintiffs and the Class are entitled to damages in an amount to be proven at trial for the underpayment of claims.

### COUNT VI: Negligent Misrepresentation

499.    Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

500.    Plaintiffs bring this Count under the Federal and State common law cause of action for Negligent Misrepresentation.

501.    Plaintiffs' verification of patients' eligibility, rates, and payment at UCR for IOP services was a representation that United would cover each patient's IOP treatment and this representation was not true.

502.    United did not intend to pay a UCR based rate for IOP services.

503.    Similarly, MultiPlan knew that the Viant methodology did not produce an amount equivalent to the actual UCR rate as doing so would preclude MultiPlan from receiving any payments from United.

504.    It was the intent of United and MultiPlan that the Plaintiffs would rely on the representations made to them.

505.    As a result of United's and MultiPlan's misrepresentations, the Plaintiffs and the Class have been damaged in the amount that they were underpaid for IOP services in an amount to be determined at trial.

*COUNT VII: Civil Conspiracy*

506.    Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

507.    Plaintiffs bring this Count pursuant to the Federal and State common law cause of action for civil conspiracy.

508.    The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages.

509.    As described at length in the *supra*, the elements are clearly met.

510.    As to the first element, United and MultiPlan are the parties that conspired together. They engaged in a common plan to illegally underpay the claims at issue and to do so by deceptive, dishonest, and fraudulent means.

511.    The acts set forth above clearly describe a common plan to commit tortious acts and that United and MultiPlan committed such acts pursuant to their agreement and in furtherance of the conspiracy.

512.    The element of damages is likewise described in detail *supra* in setting forth the underpayments to Plaintiffs and the class.

513.    The conspiracy between United and MultiPlan caused Plaintiffs to be underpaid tens of millions, or more, of dollars while United was unjustly enriched by this amount and

kicked back a portion of the illicit proceeds to MultiPlan to reward them for their participation in the conspiracy.

### COUNT VIII: Breach of Oral and/or Implied Contract

514.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

515.    Plaintiffs bring this Count under the Federal and State common law cause of action for Breach of Oral and/or Implied Contract.

516.    Based on the facts alleged *supra*, including United verifying insurance coverage to Plaintiffs through detailed calls, verifying/stating the payment rate Plaintiffs would receive relative to the UCR and/or billed charges through detailed calls, the Plaintiffs and United entered into enforceable oral and/or implied contracts whereby the Plaintiffs would provide IOP treatment and would be paid as agreed.

517.    As described above, numerous oral representations were made by United to Plaintiff and there were continued actions and course of dealings such that oral and/or implied contracts were formed.

518.    The detailed calls described above constitute the oral representations made between the parties. The lengthy course of conduct and dealing between the parties shows sufficient predicate that Plaintiffs and the Class relied on United's prior conduct wherein Plaintiffs and United used UCR as the method and/or standard by which to set the reasonable value/payment amount for the services to be provided by Plaintiffs.

519.    All of the calls and representations followed an identical format and resulted in identical promises and representations by United.

520.    The Plaintiffs fully and substantially complied with all their obligations formed under the oral and/or implied contract between the parties.

521.    The Plaintiffs rendered IOP treatment to United's insureds at a rate agreed to between them, the UCR.

522.    At no time did the Plaintiffs breach the terms of their contracts with United.

523.    Any breaches by Plaintiffs were minor and not material.

524.    After rendering the IOP treatment services, the Plaintiffs properly and timely invoiced United for the care they provided using the appropriate authorization numbers, revenue codes, and procedure codes.

525.    United breached their agreements with Plaintiffs by not paying UCR and instead sending the claims to MultiPlan as described *supra.*

526.    United's actions in employing MultiPlan have resulted in the gross underpayment of all claims at issue in the present litigation.

527.    Breach of a contract consists of four elements: (1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages.

528.    As to the first element, as set forth above, detailed verification calls, including an agreement to payment at UCR were conducted between the parties. The Plaintiffs and the Class also had an extended course of dealing with United wherein they reasonably could rely on their representations of payment rate and UCR. Plaintiffs' and United agreed orally and/or implicitly, that the payment rate for the IOP services would be determined using the UCR as the method and/or standard for determining the payment rate (California Civil Code section 1610). Plaintiffs and United understood that in determining the payment amounts, United would/was using UCR to establish the reasonable value of the services provided by Plaintiff (California Civil Code section 1611).

529.    In the bargained for exchange, the Plaintiffs provided IOP services and United was to pay for the services at an accurate, appropriate, UCR rate. This rate was understood by both parties to be consistent with United's published definition of UCR rates.

530.    Therefore, the requisite meeting of the minds occurred, and a contract was formed between the parties.

531.    As to the second element, performance by the plaintiff or excuse for nonperformance, the Plaintiffs rendered the IOP treatment services. Only claims for IOP treatment services that were actually rendered to patients were submitted for payment on the appropriate claim forms to United.

532.    As to the third element, breach by the defendant, United underpaid Plaintiffs and the Class for IOP services that were provided.

533.    The fourth element, damages, is the direct consequence of United's breach. United underpaid the Plaintiffs and the Class and rates demonstrably below a fair and accurate UCR rate.

534.    Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

*COUNT IX: Promissory Estoppel*

535.    Plaintiffs re-allege and incorporate the allegations above, as though such allegations were fully stated herein.

536.    Plaintiffs bring this Count under the Federal and State common law cause of action for Promissory Estoppel.

537.    The elements of promissory estoppel are (1) a clear promise, (2) reasonable reliance, (3) substantial detriment, and (4) damages measured by the extent of the obligation assumed and not performed.

538.    United made the clear promise to pay UCR for IOP services.

539.    MultiPlan made the clear promise that it had calculated the UCR for IOP services.

540.    Plaintiffs reasonably relied on the promises of both United and MultiPlan.

541.    It is United and MultiPlan's promise to pay the UCR that is the specific promise that forms the basis of this promissory estoppel claim.

542.    As to the second element, reasonable reliance, there was a well-established course of conduct where Plaintiffs had been promised payment at the UCR rate and had received payment at the UCR rate; therefore, reliance was reasonable.

543.    The third element, substantial detriment, is clear. Plaintiffs were greatly underpaid paid for the claims at issue here because they were paid at a fake, low "UCR." The failure to pay at a true and accurate UCR shows Plaintiffs' and the Class' substantial detriment.

544.    The fourth element, damages 'measured by the extent of the obligation assumed and not performed' is met as Plaintiffs were promised payment at UCR rates for the IOP services

Plaintiffs rendered, subject to any co-insurance or deductible amounts for which the patient is responsible.

545.    All IOP services at issue in this litigation were vastly underpaid.

546.    United incurred the obligation to pay for IOP services at the UCR. United's contract with MultiPlan and MultiPlan's interjection into the payment process likewise bound them to this obligation.

547.    As such, Plaintiffs and the Class are entitled to damages resulting from the underpayment in an amount to be proven at trial.

*COUNT X: Violations of Section One of the Sherman Act*

548.    Throughout the class period, Defendant and its competitor co-conspirators such as Cigna, caused MultiPlan to engage in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in healthcare services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

549.    This combination and conspiracy consisted of an agreement, understanding and concerted action among Defendant and its co-conspirators by way of a contract with MultiPlan, the substantial objective of which was to artificially depress prices paid for out of network substance use disorder treatment in order to eliminate the existence of out of network IOP care providers, and reap the benefit of underpayments.

550.    For the purpose of forming and effectuating their combination and conspiracy, defendant and its co-conspirators did those things which they combined and conspired to do, including, among other things, discussing, forming and implementing agreements to depress and maintain artificially depressed prices for Out of Network healthcare services.

551.    In 2009, the New York Attorney General's office announced that Defendant United had agreed to pay $400,000,000 in fines, the largest fine ever levied in domestic health insurance industry. The conspiracy at the heart of that settlement was similar to the conspiracy Defendants engaged in here.  The court in that case found that the Sherman Act claims survived a motion to dismiss.  The settlement in that instance precluded the ultimate adjudication of claims against Defendant.

1

<u>Effects</u>

2    552.    As a result of the combination and conspiracy between defendant and its co-

3    conspirators, out-of-network healthcare prices for healthcare services were artificially depressed.

4    553.    The conduct of defendant and its co-conspirators was undertaken for the purpose

5    and with the specific intent of depressing and maintaining prices for HCS in order to eliminate

6    Out-of-network providers from the marketplace in order to obtain sole and complete control of

7    purchase prices, in *per se* violation of Section 1 of the Sherman Act.

8

<u>Fraudulent Concealment</u>

9    554.    Throughout the Class Period, defendant and its co-conspirators intended to and

10    did affirmatively and fraudulently conceal their wrongful conduct and the existence of their

11    unlawful combination and conspiracy from Plaintiffs and the other members of the Class, and

12    intended that their communications with each other and their resulting actions be kept secret

13    from Plaintiff and other Class members.

14    555.    Plaintiff and the Class had no knowledge of the wrongful conduct alleged herein,

15    or of any of the facts that might have led to discovery thereof, until on or about April 15, 2020

16    when the FAIR Health Database released the true and accurate data showing "Charges Generally

17    Provided By Similar Providers In A Similar Geographic Area."

18    556.    Plaintiff and members of the Class could not have discovered the combination

19    and conspiracy alleged herein at any earlier date by the exercise of reasonable due diligence,

20    because of the deceptive practices and techniques of secrecy employed by defendant and its co-

21    conspirators to avoid detection of and affirmatively conceal their actions.

22    557.    Based on the foregoing, providers of services for the benefit of defendant and its

23    co-conspirators, including plaintiff and members of the Class, were unaware that prices for the

24    services they provided had been artificially depressed and maintained as a result of the wrongful

25    conduct as alleged in this Complaint.

26

<u>Damages to Plaintiffs</u>

27    558.    As a direct result of the unlawful conduct alleged in this Complaint, prices for the

28    services they provided which were purchased by Defendant and its co-conspirators were fixed

87

and maintained at artificially low and noncompetitive levels. Plaintiff and members of the Class were not able to sell their healthcare services at prices determined by free and open competition, and consequently have been injured in their business and property in that, inter alia, they have sold their services for less than they would have sold for in a free, open and competitive market. Plaintiffs cannot state at this time the precise amount of damages sustained by Plaintiffs and the class. A precise determination of damages will require discovery from the books and records of defendant and its co-conspirators.

**Demand for Jury Trial**

559.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment against the Defendants as follows:

1.    Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

2.    Appointing the Plaintiffs as Class Representatives for the Class;

3.    Designating Matthew M. Lavin, Esq. and Paul J. Napoli, Esq. of Napoli Shkolnik, PLLC, as counsel for the Class;

4.    For general, special, restitutionary and compensatory damages in an amount according to proof.

5.    That the Court adjudge and decree that defendant and its co-conspirators engaged in an unlawful combination and conspiracy in violation of Section 1 of the Sherman Act.

6.    That the Court adjudge and decree that defendant and its co-conspirators are jointly and severally liable for threefold the damages resulting from their conduct.

7.    That the Court enter judgment for plaintiffs and each of them against defendant and its co-conspirators and each of them, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorney's fees.

8.  That defendant and its co-conspirators, their respective affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behavior, be restrained from, in any manner: continuing, maintaining, or renewing in any manner the contract, combination or conspiracy herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect.

9.  For treble damages for those claims arising under the Federal RICO and Sherman Acts;

10. For prejudgment interest on amounts wrongfully withheld.

11. Injunctive and equitable relief enjoining Defendants from the conduct alleged herein and/or other appropriate equitable relief;

12. Declaring that United's payments were improper underpayments,

13. Declaring that United's payment methodologies were and are improper;

14. Declaring that MultiPlan's rate determination and the Viant methodologies are improper;

15. Declaring that United and MultiPlan have engaged in an illegal, prohibited, RICO enterprise;

16. Ordering United and MultiPlan to provide transparency as to the methodology applied in the future processing of claims and that the methodology be approved by the Court;

17. For attorney's fees and costs pursuant to statute;

18. and such other and further relief as the Court may deem appropriate, including but not limited to awarding a surcharge, disgorging Defendants unjust enrichments from their wrongful conduct.

Dated: September 24, 2020          **NAPOLI SHKOLNIK, PLLC**

By:  _/s/ Matthew M. Lavin_
Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
*Attorneys for Plaintiffs and the Putative Class*

89