Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
Aaron R. Modiano, Esq. (*pro hac vice*)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE RECOVERY CENTER, INC., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED BEHAVIORAL HEALTH, INC. a California corporation, and VIANT, INC., a Nevada corporation, <br><br> Defendants. | Case No.: 4:20-CV-02249-YGR <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO MULTIPLAN, INC.'S MOTION TO DISMISS** <br><br> Complaint Filed: April 2, 2020 <br><br> Hearing Date:  December 22, 2020 <br> Hearing Time:  2:00 p.m. <br> Courtroom:  1 – Fourth Floor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Table of Contents**

Table of Authorities ................................................................................................................ ii

I.     Introduction ................................................................................................................. 1

II.    The RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed. ................................... 2

   A.    Plaintiffs Plausibly Allege the Existence of an Enterprise ................................ 3

   B.    Multiplan Directed Affairs of the Enterprise ................................................... 5

   C.    Plaintiffs Plausibly Allege Causation .............................................................. 6

   D.    Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b) ................ 7

   E.    Plaintiffs Have Alleged a Conspiracy to Violate RICO .................................. 9

III.   Plaintiffs' Anti-Trust Claims Are Properly Alleged ...................................................... 9

   A.    *Per Se* Buyers Cartel Price Fixing .................................................................. 10

   B.    Rule of Reason ............................................................................................... 10

IV.    Plaintiffs' Anti-Trust Claims Meet 'Plausibility' Requirements ................................. 10

V.     Plaintiffs' State Law Claims Are Not ERISA Preempted ........................................... 11

VI.    Plaintiffs' State Law Claims Are Properly Pled ......................................................... 13

   A.    Plaintiffs' Fraud-Based Claims Are Sufficiently Detailed and Adequately Pled .............. 13

   B.    Plaintiffs' Properly Assert UCL Claims ......................................................... 13

   C.    Plaintiffs' Fraud Based Claims Are Properly Brought ...................................... 14

   D.    Plaintiffs' Negligent Misrepresentation Claim Is Proper .................................. 15

   E.    Plaintiffs' Properly Allege Civil Conspiracy ................................................... 16

   F.    Plaintiffs' Promissory Estoppel Claim Is Proper ............................................. 16

VII.   Conclusion ................................................................................................................. 18

1

**Table of Authorities**

2

**Cases**

3

*American Ad Management, Inc. v. General Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ...................................................................................... 11

4

5

*Bias v. Wells Fargo & Co.*,
   942 F. Supp. 2d 915 (N.D. Cal. 2013) ......................................................... 3, 6, 15, 16

6

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ................................................................................ 15, 16

7

8

*Boyle v. United States*,
   556 U.S. 938 (2009) ........................................................................................................ 4

9

10

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ........................................................................................................ 8

11

*Depot, Inc. v. Caring for Montanans, Inc.*,
   915 F.3d 643 (9th Cir.), *cert. denied*, 140 S. Ct. 223, 205 L. Ed. 2d 127 (2019) ............ 14

12

13

*Diaz v. Gates*,
   420 F.3d 897 (9th Cir. 2005) .......................................................................................... 5

14

15

*Enloe Med. Ctr. v. Principal Life Ins. Co.*,
   No. CIV S-10-2227 KJM-DAD, 2011 WL 6396517 (E.D. Cal. Dec. 20, 2011)............ 19

16

17

*Fleet v. Bank of Am N.A.*, (2014) 229 Cal App 4th 1403 ................................................ 19

18

*Gilbert v. Bank of America*,
   2014 WL 12644028 (N.D. Cal. Sept. 23, 2014) ............................................................ 5

19

20

*Goodwest Rubber Corp. v. Munoz*,
   (1985) 170 Cal. App. 3d 919 ........................................................................................ 21

21

*Heldt v. Guardian Life Ins. Co. of Am.*,
   No. 16-CV-00885-BAS-NLS, 2017 WL 980181 (S.D. Cal. Mar. 13, 2017) ................ 14

22

23

*In re Managed Care Litigation*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) ......................................................................... 3

24

25

*Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*,
   23 Cal. 4th 305 (2000) ................................................................................................. 19

26

27

*Kelly v. United States*,
   140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020) ................................................................... 2

28

*McNally v. United States*,
483 U.S. 350 (1987) ............................................................................................ 2

*Orthopedic Specialists of Southern California v. CALPERS*,
228 Cal.App.4th 644 (2014) .............................................................................. 20

*Pacific Bay Recovery, Inc. v. California Physicians Services, Inc.*,
(2017) 12 Cal.App. 5th 200 ............................................................................... 20

*Pasquantino v. United States*,
544 U.S. 349 (2005) ............................................................................................ 2

*Paulson v. CNF, Inc.*,
559 F.3d 1061 (9th Cir. 2009) ........................................................................... 13

*Regents of the Univ. of Cal. v. Principal Fin. Grp.*,
412 F. Supp. 2d 1037 (N.D. Cal. 2006) ............................................................. 19

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ............................................................................................ 2

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ........................................................................................ 6, 7

*Richardson v. Dallas R. Hall & Associates*,
1996 WL 308261 (N.D. Cal. May 23, 1996) ...................................................... 4

*Saniefar v. Moore*,
2017 WL 5972747 (E.D. Cal. Dec. 1, 2017) ...................................................... 3

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ............................................................................. 15

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ............................................................................. 17

*Summit Estate, Inc. v. United Healthcare Ins. Co.*,
2020 WL 5436655 (N.D. Cal. Sept. 10, 2020) ................................................. 16

*Tenet Healthsystem Desert, Inc. v. Blue Cross of California*,
(2016) 245 CA4th 821 ....................................................................................... 17

*United States v. Goldin Indus., Inc.*,
219 F.3d 1271 (11th Cir. 2000) ........................................................................... 5

*United States v. Simon*,
2016 WL 3597579 (N.D. Ind. July 5, 2016) ...................................................... 3

- iii -

*United States v. Turkette,*
   452 U.S. 576 (1981) ............................................................................................. 5

*Wise v. Verizon Commc'ns Inc.,*
   600 F.3d 1180 (9th Cir. 2010) ......................................................................... 14

*Youngman v. Nevada Irrigation Dist.,*
   70 Cal. 2d 240 (1969) ...................................................................................... 19

**Statutes**

18 U.S.C. § 1961(4) .................................................................................................. 4

18 U.S.C. § 1964(c) .................................................................................................. 7

Business and Professions Code §§ 17200, *et seq.* ............................................... 15

**Rules**

Federal Rule of Civil Procedure 9(b) ...................................................................... 16

PRS, *et al.* v. UNITED *et al.* - PLAINTIFFS' OPPOSITION TO MULTIPLAN'S MOTION TO DISMISS
4:20-CV-02249-YGR

1

## I. Introduction

2      Plaintiffs' Amended Complaint is about the fraudulent scheme created by United and

3   Multiplan to underpay valid, medically necessary claims. United and Multiplan fraudulently portray

4   the underpayment of claims as representative of prevailing market rates (FAC ¶¶13-15). They are

5   not. The underpayments are a fraction of prevailing market rates. This scheme enriches United and

6   Multiplan at the expense of patients who are unjustly forced to make up the difference between the

7   prevailing market rate and amount that was paid by their plan. (FAC ¶16). This scheme has been

8   ongoing since 2015 when United was no longer required to utilize the FAIR Health database and has

9   cost patients billions of dollars in unjustified, out-of-pocket expenses. (FAC ¶58).

10     The overarching theme of Multiplan's motion is to obfuscate the comprehensive scheme

11  created by United and Multiplan and the nationwide fraud that is occurring. Plaintiffs' seek to hold

12  the Defendants, United and Multiplan, accountable for their fraudulent conduct. As much of

13  Multiplan's motion (Dkt. 71) makes the same arguments as United (Dkt. 72), Plaintiffs incorporate

14  by reference the arguments made in response to United herein.

15     United and Multiplan's scheme does not involve "legitimate cost-containment efforts" as

16  asserted by Multiplan nor are the Defendants' dealings "entirely above-board." (Dkt. 71, Pg 1).

17  United and Multiplan have formed an ongoing, RICO enterprise to underpay out-of-network mental

18  health / substance use disorder providers such as Plaintiffs. (FAC ¶¶ 24-26). United and Multiplan

19  exploit their contractual arrangements to provide a fig leaf of legitimacy for their racketeering

20  activity. The presence or absence of a commercial contract between United and Multiplan is

21  irrelevant. (FAC ¶ 117). Multiplan implements the fraudulent Viant methodology and profits from

22  the fraud by receiving a cut of the money that United illegally retained. (FAC ¶ 138).

23     This fraudulent methodology and Multiplan's inherent conflicts with patients and providers

24  has recently gained national attention. On November 11, 2020, Muddy Waters Research LLC, a well-

25  respected securities due diligence research and analysis firm based in San Francisco, released a

26  market report on Multiplan[1] which caused Multiplan's stock to plunge 28%. The 14-page report,

27  entitled "Multiplan: Private Equity Necrophilia Meets The Great 2020 Money Grab" was based on

28

---

[1] https://d.muddywatersresearch.com/content/uploads/2020/11/MW_MPLN_11112020.pdf (last accessed 11/23/2020)

1  interviews with former Multiplan executives. This report succinctly addresses many of the same

2  issues as this lawsuit. Of particular relevance to the present litigation are the following excerpts:

> In our view, which we believe is shared in the health insurance industry, MPLN [Multiplan] is not on "right side of healthcare". Rather, **it is a conflicted middleman that actually profits when individual members are regularly stuck with balance bills**. (Pg. 2) (bolding added)
>
> **United customers [health insurers] described MPLN's fee structure as a "scam", while complaining of persistent member balance billing in claims where MPLN was involved**. We learned from two former MPLN executives and a MPLN customer that **MPLN's billing model may enable it to get paid more per claim than the healthcare providers whose bills it reprices.** We understand that major insurers have forced MPLN to reduce its take rate in recent years, in some cases reportedly cutting MPLN's take rate from 12% to 6% of "savings". MPLN has not disclosed this development in its bullish presentations. (Pg. 3-4) (bolding added)
>
> The reality is that MPLN's revenue model actively encourages balance billing: Customer relationships that most expose members to balance bills are the "type of revenue-generating customer that MPLN wants", per one former executive. (Pg. 4-5)
>
> [T]he problem with MPLN is that the company stopped giving customers the level of service that they wanted several years ago, as private equity firms were looting the business for cash. (Pg. 7).
>
> Though MPLN contends it is "on the right side of healthcare", our discussions with former executives and customers revealed a company whose interests conflict with those of its clients... (Pg. 7).

## II.     The RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed.

The mail and wire fraud statutes protect property rights. *Kelly v. United States*, 140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020); *McNally v. United States*, 483 U.S. 350, 356 (1987). Plaintiffs' right to be paid for the services they provided represent property in their hands. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property"); *Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005) (entitlement to collect money is property). The right to be paid in full is a property right which may be infringed by a mail or wire fraud violation. "[A] defendant who uses fraud to avoid paying the full amount due for a good or service deprives the victim of property within the meaning of the mail fraud statute." *United States v. Simon*, 2016 WL 3597579, * 11 (N.D. Ind.

July 5, 2016)[2]. Just as this Court has found that a consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property (*Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013)), so too is an underpayment of money owed. Much of Multiplan's argument overlaps with that of United (Dkt. 72) and Plaintiffs' incorporate by reference their responses as if fully set forth herein without repeating them.

As set forth in Plaintiffs' United response, the acts of mail and wire fraud are alleged with sufficient particularity.

Multiplan's assertion that the FAC lack allegations that the mail and wire fraud crossed state lines, citing *Saniefar v. Moore*, 2017 WL 5972747, *10 (E.D. Cal. Dec. 1, 2017) and *Richardson v. Dallas R. Hall & Associates*, 1996 WL 308261, *2 (N.D. Cal. May 23, 1996) are both misplaced. In *Saniefar* "Plaintiff alleges that Defendants (all based in California) filed lawsuits against California businesses (including Plaintiff's) in courts in the state of California." *Id*. at *10 (E.D. Cal. Dec. 1, 2017). In *Richardson* involves a *lis pendens* on a single property and the plaintiff failed to allege that phone communications regarding the property crossed state lines. *Id* at *2.

By contrast, here Plaintiffs' provide the phone numbers called by their agents (FAC ¶¶ 261, 267, 268, 274, 275, 279, 281, 282, 291, 297, 298, 304, 305, 311, 320, 326, 327, 333, 334, 341, 350, 357, 358, 364, 365, 371). The number provided for Viant provided in PRA's was the same for each Plaintiff, 1-800-598-6888. It is reasonable to infer that these calls from multiple Plaintiffs located in different states did cross state lines. Similarly, the PRA that provided the phone number and included the "CY" explanation can reasonably be inferred to have crossed state lines.

### A. Plaintiffs Plausibly Allege the Existence of an Enterprise

RICO is generally regarded as a broad statute and, indeed, RICO's text "provides that its terms are to be "liberally construed to effectuate its remedial purposes."" *Boyle v. United States*, 556 U.S.

---

[2] *Accord, In re Managed Care Litigation*, 298 F. Supp. 2d 1259, 1279-80 (S.D. Fla. 2003) ("Plaintiffs, however, argue that services indeed can be considered property, and allegations that they performed the services and were defrauded out of rightful monetary payments easily falls under the rubric of a property interest. The Court agrees. The allegations in part concern a scheme using claims processing mechanisms to deny, diminish, and delay payments for services that have been performed.  Therefore, the providers are being deprived of a property right—in this case money rightfully theirs—in perhaps the most legally primitive sense.").

938, 944 (2009), *quoting* Pub. L. No. § 904(a), 84 Stat. 922, 947 (1970). RICO's breadth of language and construction is particularly evident in the enterprise concept. *Boyle*, 556 U.S. at 949. Included within the definition of enterprise is "**any** union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The Supreme Court has emphasized that the "term 'any' ensures that the definition has a wide reach and the very concept of an association in fact is expansive") *Boyle*, 556 U.S. at 944 (internal citation omitted). Thus, an association-in-fact enterprise may be *any* group of persons associated together for a common purpose of engaging in a course of conduct. *Boyle*, 556 U.S. at 946, *quoting United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise may be formal or informal, and requires only three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Turkette* 452 U.S. at 583. "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

Multiplan raises mostly the same arguments as those asserted by United (Dkt. 72) and Plaintiffs reincorporate the arguments asserted there as if fully set forth herein without repeating them here. Plaintiffs have amply set forth allegations showing for more than a mere commercial contract.

Further, Multiplan's argument that Plaintiffs have not suffered an injury and their citations to *Gilbert v. Bank of America*, 2014 WL 12644028, *4 (N.D. Cal. Sept. 23, 2014) and *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) because "they were paid appropriately" is a legal conclusion that Multiplan may assert as a defense; but, it is not supported by the lengthy allegations in the FAC asserting the opposite. Plaintiffs have set forth at length in response to United's motion (Dkt. 72) Plaintiffs' property interest in being fully paid. This Court in a prior RICO action stated, "[a] consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013). The same rationale applies to Plaintiffs who were wrongfully deprived of money when they were underpaid.

### B.  Multiplan Directed Affairs of the Enterprise

Plaintiffs specifically allege numerous ways in which Multiplan directed the affairs of the RICO enterprise. As set out by the Supreme Court:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise,4 but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

The following specific allegations as to Multiplan meet these requirements:

Multiplan's implementation of Viant's methodology to further the fraudulent scheme and further the purpose of the enterprise shows Multiplan's management over the enterprise. FAC ¶ 134

The Viant methodology's crosswalking, reflects a subjective decision that is directed by United and implemented by Multiplan. The crosswalking is not subject to independent review, scrutiny, or oversight. FAC ¶ 175

The "proxies" are selected by Multiplan based on direction given by United and used by the Viant methodology to provide fraudulently low payment amounts. The direction given by United and implementation undertaken by Multiplan shows that both United and Multiplan exercised management and direction over the RICO enterprise. FAC ¶¶ 178-9.

Multiplan had complete control over the technical methodology of the Viant tool, and how it implemented the inputs and changes requested by United, and used its control to manipulate and misrepresent rates for its own benefit, for the purpose of making as much money as possible. FAC ¶ 214.

In all cases, United had complete control over the Target Price and Multiplan had complete control over its use in the Viant methodology. FAC ¶ 219.

Multiplan secretly discussed the Viant OPR Review methodology with United and its market competitors, including Cigna, at annual events hosted by the Client Advisory Board of Multiplan ("CAB"). The "CAB" consists of the senior marketing individuals at Multiplan including Susan Mohler, Multiplan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics. FAC ¶ 230.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Viant methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allowed United and its competitors to discuss the customizations they wanted in the pricing with Multiplan, directly. FAC ¶ 234.

The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf. FAC ¶236.

The absence of regulation allowed United and Multiplan to jointly develop the underpayment scheme unfettered. FAC ¶238.

Multiplan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at Multiplan, and manager of United's account, Susan Mohler and Dale White provided United with these internal non-public Whitepapers.  The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers. Whitepapers are secret internal documents that explain, in detail, exactly how the Viant methodology could be implemented to output literally any payment price United wanted and achieve for any result, regardless of what a healthcare provider had been promised a claim would pay. FAC ¶¶ 247-248.

These facts, if proven, would establish that the United Defendants played a role in operating or managing the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

## C.  Plaintiffs Plausibly Allege Causation

Plaintiffs' plausible allege causation despite Multiplan's protestations to the contrary. (Dkt. 71, Pg. 11). RICO creates a civil cause of action on behalf of "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter. . . ." 18 U.S.C. § 1964(c). As set forth elsewhere and in Plaintiffs' FAC, the injury to Plaintiffs is for the underpayment amount for unreimbursed claims. There is *no overlap* with claims of patients in *LD* whose injuries are their *out-of-pocket* expenses. Multiplan also asks the Court to extend the causation requirement in a manner already rejected by the Supreme Court. In *Bridge,* the Court held "[i]f petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement… no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud." Bridge, 553 U.S. at 648. The RICO enterprise is the vehicle used by United and Multiplan to fraudulently underpay claims

1    resulting in a direct injury to the Plaintiffs. The allegations of the FAC are clear on this and satisfy

2    RICO's requirements.

3    **D.  Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b)**

4           Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail.

5    Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud

6    so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6

7    F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). This standard is met.

8    Much of Defendant's attack on the fraud claims is predicated on fundamentally misunderstanding the

9    fraud alleged in Plaintiffs' Complaint. In addition to the racketeering activity, the predicate acts of

10   mail and wire fraud referred to above, the Complaint goes into great detail identifying the dates,

11   content, and other information of the misrepresentations made to Plaintiffs by Defendants in addition

12   to the activity that directed and implemented the illegal Viant methodology. Defendants know exactly

13   the factual basis for the fraud causes of action asserted against them and those causes of action are

14   factually and legally supported by the allegations in the Complaint.

15          Many of the same arguments made by Multiplan are those raised by United (Dkt. 72) and

16   Plaintiffs reassert their responses to them as if they were set forth herein. Multiplan's argument that

17   Plaintiffs have "failed to show where Multiplan was involved at all" (Dkt. 71, Pg. 5) is specifically

18   addressed.

19          Plaintiffs name specific individuals from Multiplan that participated in the fraud:

20   Multiplan secretly discussed the Viant OPR Review methodology with United and its
     market competitors, including Cigna, at annual events hosted by the Client Advisory
21   Board of Multiplan ("CAB"). The "CAB" consists of the senior marketing individuals
     at Multiplan including Susan Mohler, Multiplan's Vice President of Marketing, and
22   Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice
     President of Network Strategy Network and Michael McEttrick, the Vice President
23   Healthcare Economics. (FAC ¶ 230)
24
25   Multiplan's CAB, including representatives Susan Mohler of Multiplan and Dale White,
     Multiplan's Executive Vice President of Sales, also brought secret "Road Shows" or
26   client status updates mixed with sales pitches directly to United (and to other insurers
     that directly compete with United) and presented PowerPoint slideshows detailing the
27   profits that could be realized by insurers using the Viant pricing methodologies. (FAC
     ¶ 243)
28

Multiplan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at Multiplan, and manager of United's account, Susan Mohler and Dale White provided United with these internal non-public Whitepapers.  The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers. (FAC ¶ 247)

Executives from United including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, reviewed, commented, and provided feedback on Multiplan's Whitepapers in order to structure United's relationship with Multiplan and implement the Viant methodology to underpay claims in whatever manner would make the most money for United and Multiplan. (FAC ¶ 249)

Plaintiffs have asserted what these actors did:

The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf. (FAC ¶ 237)

At these events, all of Multiplan's insurance company clients would come together, at various locations around the country, to discuss, among other topics, the Viant repricing scheme and how to make more money off it. These secret meetings established a forum for market competitors such as United and Cigna to create a buyer's cartel and collude with Multiplan to suppress the rates paid to healthcare providers. During these events, Multiplan presented slide shows outlining the profits or "savings" that could made using Viant methodology. (FAC ¶¶ 231-3).

The Whitepapers explain that United would set performance standards which were defined by Target Prices. Multiplan would use Viant to derive a price under the Target Price. United would pay Multiplan a percentage of the "savings" generated by use of the Viant methodology. The Whitepapers also explain that United could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at. (FAC ¶¶ 250-1)

Plaintiffs' have also alleged specific content:

Multiplan emphasized to United and other insurers that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed. Strategies were discussed for how to handle situations where dissatisfied providers, such as the Plaintiffs in this case,  pushed back or challenged the amount, the Viant methodology and rate was deceitfully presented as a "fair" and "transparent" justification for the underpayment. (FAC ¶¶ 240-2)

During the Road Shows and in subsequent interactions, The CAB produced detailed descriptions of Viant's methodology through internal non-public "Whitepapers" and sought input from United on how it would like its claims routed through the myriad

Multiplan payment engines, including Viant OPR, to achieve the most profits for United. (FAC ¶¶ 244-5)

All of these allegations are *in addition to* "the communications between Plaintiffs and United during the initial phone calls, the communications between the Plaintiffs and Multiplan following the submission of claims, and the written statements sent to Plaintiffs and patients following claim submissions show, United and Multiplan represented that Plaintiffs and the Class were being compensated at the UCR as agreed to and required." (FAC ¶ 486) and the PRA's that contained statements such as "the remark code of "CY" indicating that United used Multiplan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification call.   Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, **please call Viant directly** at 1-800-598-6888." (FAC ¶ 267) (bolding added).

These allegations are more than sufficient to permit Multiplan purpose to prepare and adequate answer and defense and, as such, the requirements of Rule 9(b) are met.

**E.  Plaintiffs Have Alleged a Conspiracy to Violate RICO**

The only argument asserted by the Defendants with regard to Plaintiffs' claim under 18 U.S.C. § 1962(d) is that it should fail because no claim is properly alleged under § 1962(c). Because a claim has been alleged under § 1962(c), that argument necessarily fails.

**III.    Plaintiffs' Anti-Trust Claims Are Properly Alleged**

The court should deny Defendant's motion to dismiss Count 10 of the FAC because in the FAC 1) Antitrust Arguments were proper, 2) United's participation in a Buyers Cartel harmed competition in *per se* violation of Section 1 of the Sherman Act, 3) the harm was of the type the Sherman Act was designed to prevent, and 4) a rule of reason analysis further supports a ruling in Plaintiff's favor. Many of the same arguments raised by United in their motion (Dkt. 72) are raised by Multiplan and Plaintiffs' reassert them as if fully set forth herein.

Plaintiffs meet the four factor anti-trust standing articulated in *American Ad Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999) as alleged in their response to United's motion.

Based on the facts pled, Plaintiffs satisfy the first pleading requirement of a Sherman Act § 1 claim and remedy the deficiency the court articulated in its Order Granting Defendant's Motion to Dismiss. (Dkt. 61 Pg. 7).

### A. *Per Se* Buyers Cartel Price Fixing

Multiplan asserts substantially the same arguments as United opposing Plaintiffs' *per se* price fixing allegations and Plaintiffs' reassert the arguments made in response to United's motion (Dkt. 72).

Multiplan's relationships with United and its competitors was not "parallel." It was part of an agreed upon strategy to control the playing field for benefit expense by deliberately underpaying providers. There were no negotiations involved in the claims in question. By allowing United and its competitors to pool both their data and purchasing power with one another, including competitors Aetna, Cigna and the Blue Card Entities, United and Multiplan stood to receive the benefit of a putative data exchange, the benefits of aggregated purchasing power, and the benefit of strength in numbers insofar as liability for underpayment was concerned. In its whitepapers, promotional materials, and marketing presentations, Multiplan touted the strength in numbers.

### B. Rule of Reason

For the same reasons set forth in response to United's motion (Dkt. 71), even if the *per se* analysis fails, which it should not, there is ample evidence of unfair competition in restraint of interstate commerce to support a Sherman Act § 1 claim under a rule of reason analysis. Plaintiffs have pled sufficient facts to state a plausible inference of Anti-competitive behavior in violation of Section 1 of the Sherman Act, the court should Deny Defendant's Motion to Dismiss.

### IV. Plaintiffs' Anti-Trust Claims Meet 'Plausibility' Requirements

Multiplan argues that Plaintiffs' claims fail to meet the *Iqbal* and *Twombly* plausibility standards because "when one considers the "obvious alternative explanation" of managed care programs designed and implemented to hold down excessive health care costs for the benefit of plan sponsors, plan participants, and society as a whole, then Multiplan's and United's conduct appears in a whole new light – a much more plausible one than Plaintiffs' tale of intentional and negligent misrepresentations, conspiracy, racketeering, and anticompetitive conduct. Other than conclusory and

1    unsupported characterizations — which, again, the Court must disregard — nothing in Plaintiffs'

2    recitation of purported meetings between Multiplan and United, or the purported exchange of

3    information in whitepapers and other communications, presents a plausible case of wrongdoing."

4    (Dkt. 71 Pg. 7). This is essentially a restatement of the same fraud that Plaintiffs' seek to redress.

5          Multiplan provides no such "obvious alternative explanation" as to why "CY" claims were

6    paid at rates that are a fraction of FAIR Health, claims paid by United that were not processed using

7    the Viant methodology, and well below SCA's that were agreed to by these very same Plaintiffs.

8    Multiplan provides no such alternative explanation because there is none. Plaintiffs have more than

9    plausibly alleged that the Viant methodology does not produce a "competitive fee" in the relevant zip

10   code and, through discovery, Plaintiffs will prove that that a "competitive fee" based on available

11   does in fact mean the 80th percentile of UCR / FAIR Health in at least two ways: 1) with economic

12   data and price data for the area, and 2) by showing that past payments from payers such as United

13   and others cannot reasonably be extrapolated to the rates produced by the Viant methodology.

14       **V.   Plaintiffs' State Law Claims Are Not ERISA Preempted**

15         This Court already addressed substantially the same issue in *Summit Estate* finding against

16   ERISA preemption stating, "Summit Estate's state-law claims are based in tort or equitable concepts

17   and do not necessarily depends on the existence or terms of an ERISA plan." *Summit Estate* 2020

18   WL 5436655 at *2. The same result is appropriate here.

19         Multiplan makes the incorrect statement that "Plaintiffs' concession that ERISA plans are

20   involved with respect to a number of their claims" (Dkt. 71 pg. 3) as Plaintiffs do no such thing.

21   Plaintiffs acknowledge that many patients do have insurance with ERISA governed plans; however,

22   that is not the same as having their claims "involved with" ERISA plans. Plaintiffs' state claims do

23   not depend upon ERISA plan terms or duties and obligations arising thereunder. Multiplan recycles

24   the same "relate to" arguments that have been repeatedly rejected their expansive, all-encompassing

25   interpretation. Further, it is for this reason that no actual plans are named defendants in this action.

26         Ninth Circuit law is clear on the issue of claims by *health care providers* against insurers for

27   failure to pay for health care services rendered, that such claims are not preempted by ERISA. Section

28   514 provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter

relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). A state cause of action "relates" to an ERISA plan whenever it has "a '<u>connection with</u>' or <u>reference to</u>'" such a plan. *Paulson v. CNF, Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009) (emphasis added). The relationship test is used to determine whether a cause of action has a "connection with" an ERISA plan. The relationship test looks to whether the claim bears on an ERISA-regulated relationship, such as plan-participant, plan-employer, or plan sponsor-plan participant. *Id.* A state claim has a "reference to" an ERISA plan only if (1) the law acts *immediately* and *exclusively* upon ERISA plans, or (2) the existence of ERISA plans is *essential* to the law's operation. *Id.*

As Multiplan's arguments largely repeat those asserted by United (Dkt 72), Plaintiffs' response to United's state-law preemption arguments are incorporated herein and, instead of having the Court review the same response twice, Plaintiffs' will instead focus on the inapplicability of the cases cited by Multiplan.

The unpublished *Heldt v. Guardian Life Ins. Co. of Am.*, No. 16-CV-00885-BAS-NLS, 2017 WL 980181 (S.D. Cal. Mar. 13, 2017) itself, states "**[t]he claim alleges Defendant breached the terms of the Policy**, and it requires an analysis of the Policy's terms" *Id.* at *8. This is an ERISA beneficiary alleging a breach an ERISA plan. It is readily distinguished from the allegations of the Providers asserted in the FAC.

Multiplan also notes the Court's earlier citation to *Wise v. Verizon Commc'ns Inc.*, 600 F.3d 1180, 1191 (9th Cir. 2010). Again, *Wise* was a claim brought by an employee against a former employer. Here, the analysis in *Marin* is more on point as Plaintiffs state-law claims implicate independent duties. As the Ninth Circuit recently held in claims alleging fraud against insurance plans, "plaintiffs' state-law claims are not "alternative enforcement mechanisms" to ERISA claims because ERISA does not have an enforcement mechanism that regulates misrepresentations by insurance companies." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 667 (9th Cir.), *cert. denied*, 140 S. Ct. 223, 205 L. Ed. 2d 127 (2019). The misrepresentations made are at the core of Plaintiffs' state law claims.

Multiplan also cites to *Paulsen v. CNF Inc.*, 559 F.3d 1061 (9th Cir. 2009) that held there was no conflict preemption under ERISA 514(a) and the citation referred to by Multiplan references

1    ERISA 502(a) complete preemption (*Id.* at 1082-3). In addressing conflict preemption, the court

2    stated, "the Employees are not suing for benefits based on plan language—they are suing for state

3    law negligence damages" *Id.* at 1084 and found unpersuasive the defendant's argument that "recovery

4    from Towers Perrin on state law negligence claims would result in an increase in the value of plan

5    assets under section 4044(c) and would alter, and thus interfere with, the prioritized payment scheme

6    under section 4044(a)" *Id.* at 1084–85. *Paulsen* actually supports Plaintiffs' state law claims when

7    the appropriate section of the decision is reviewed.

8       **VI.    Plaintiffs' State Law Claims Are Properly Pled**

9          **A.  Plaintiffs' Fraud-Based Claims Are Sufficiently Detailed and Adequately Pled**

10        Fraud claims are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b).

11   *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Allegations must be "specific enough

12   to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged

13   so that they can defend against the charge and not just deny that they have done anything wrong."

14   *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d

15   915, 935 (N.D. Cal. 2013) (allegations sufficient as "Plaintiffs describe the content of the omission as

16   the failure to inform them that the fees were marked-up and that the majority of the fees ultimately

17   went to Wells Fargo, and not third-party vendors performing the services.")

18        As discussed below, Plaintiffs have gone into great detail to meet and exceed the plausibility

19   standard and put Defendants on specific notice of the facts and issues they must address.

20         **B.  Plaintiffs' Properly Assert UCL Claims**

21        Multiplan asserts that the Plaintiffs' UCL cause of action for violation of California's unfair

22   competition law, set forth in California Business and Professions Code §§ 17200, *et seq.* is inadequate

23   on number of inapplicable grounds, including that Plaintiffs' have failed to satisfy any one of the

24   three prongs for a UCL claim. (Dkt. 71, Pg. 11). United attacks the Plaintiffs' UCL claim for mainly

25   the same reasons (Dkt. 72) and Plaintiffs reassert the arguments made in response to United's motion

26   as if they were fully set forth herein without repeating them.

27        Assessing the UCL claim in *Bias* this Court stated, "At this juncture, the Court need only

28   determine whether the allegations, taken as true, state a plausible claim. Given the nature of the

1    alleged scheme, the Court finds that Plaintiffs' allegations of Wells Fargo's conduct, as pled, satisfy

2    the second test, namely the conduct is plausibly immoral, unethical, oppressive, unscrupulous, or

3    substantially injurious to consumers. As to the third test, the Court cannot find as a matter of law that

4    the supposed benefits outweigh Plaintiffs' injuries." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915,

5    933 (N.D. Cal. 2013) (internal citations omitted).

6        Multiplan's assertion that Plaintiffs' cannot seek an equitable remedy as Plaintiffs' other state

7    law causes of action seek legal remedies has been recently rejected by this Court where it stated,

8    "[t]he Court concludes that allowing a plaintiff to plead a claim for injunctive relief under the UCL

9    in the alternative to claims for legal remedies is consistent with the broad remedial purpose of the

10   UCL, and is also consistent with Section 17205 of the UCL, which provides that UCL remedies are

11   "cumulative" to other available remedies." *Summit Estate, Inc. v. United Healthcare Ins. Co.*, No.

12   4:19-CV-06724 YGR, 2020 WL 5436655, at *9 (N.D. Cal. Sept. 10, 2020). The same result is

13   appropriate here.

14   **C.  Plaintiffs' Fraud Based Claims Are Properly Brought**

15       The causes of action for intentional misrepresentation/fraudulent inducement and negligent

16   misrepresentation clearly set forth the factual basis for the claims and put Defendants on notice of

17   the specific misconduct it must defend against in this action.

18       Claims sounding in fraud are subject to the pleading requirements of Federal Rule of Civil

19   Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under the federal rules,

20   a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R.

21   Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants

22   notice of the particular misconduct which is alleged to constitute the fraud charged so that they can

23   defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*,

24   780 F.2d 727, 731 (9th Cir. 1985). The FAC does this.

25       The FAC alleges United represented to the provider plaintiffs they would be paid based on the

26   UCR at amounts ranging from 70-90 percentile, that Multiplan would not be involved in any post

27   claim negotiations/repricing, that these representations were false and that United used Multiplan in

28   order to pay unreasonably low amounts not supported by any legitimate data base or methodology,

1    the misrepresentations were made to induce Plaintiffs to provide out of network treatment to United

2    insureds, Plaintiffs acted in reliance on the misrepresentations by admitting and treating the United

3    patients, and Plaintiffs have been damaged by the severe underpayments (complaint at paragraphs

4    172, 173, 178, 197, 204, 211 and 218).

5    In *Multifamily Captive Grp., LLC  v. Assurance Risk Managers, Inc.,* 578 F. Supp. 2nd 1242

6    (E.D. Cal.2008) at page1249 the court discussed the rule of specific fraud pleading, stating as follows:

7        "Rule 9(b) does not require plaintiffs to provide the identity of the individual(s)
8        making the alleged fraudulent statements. *See Swartz v. KPMG LLP,* 476 F.3d 756, 764
         (9th Cir.2007) (" [t]here is no absolute requirement that where several defendants are
9        sued in connection with an alleged fraudulent scheme, the complaint must identify false
         statements made by each and every defendant." ); *Marcelos v. Dominguez,* No. C08-
10       00056, 2008 WL 2788173, *6 (N.D.Cal. July 18, 2008). At a minimum, plaintiffs must
         "identify the role of each defendant in the alleged fraudulent scheme." *Swartz,* 476 F.3d
11       at 765.

12       Plaintiffs have satisfied the pleading requirement for fraud under Rule 9(b). They
13       have identified the date and content of the alleged misrepresentations. (See FAC ¶¶ 10-
         53, 61). Plaintiffs have also identified the role of each defendant in the alleged fraud.
14       Since this information gives defendant sufficient notice to defend against the particular
         misconduct that is the basis of plaintiffs' claim, plaintiffs have pleaded fraud with
15       particularity as required by Rule 9(b).

16

17    The FAC goes into great detail in identifying the fraudulent scheme the Defendants are

18    participating in, the role of each Defendant, and the misrepresentations made by each Defendant.  It

19    is respectfully submitted that Multiplan knows exactly the factual basis for the fraud causes of action

20    asserted against it and that those causes of action are factually and legally supported by the

21    allegations of the complaint.

22    **D.  Plaintiffs' Negligent Misrepresentation Claim Is Proper**

23    The third count of the complaint alleges a misrepresentation claim based on negligence as an

24    alternative cause of action to the intentional fraudulent inducement count. Multiplan labels this a tag

25    along claim, although alternative claims are permitted under Federal Rules of Civil Procedure, Rule

26    8(a)(3).

27    As to the merits of the negligent misrepresentation cause of action allegations, Plaintiffs

28    respectfully refer to the discussion in the directly preceding point above as the facts and

circumstances concerning the misrepresentations in the second count are incorporated by reference in the third count.

### E.   Plaintiffs' Properly Allege Civil Conspiracy

The conspiracy claim requires a showing of the formation and operation of a conspiracy, and damages resulting from wrongful acts committed in furtherance of the conspiracy. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511. The complaint pleads and establishes these elements.

The civil conspiracy claim incorporates all the general and class allegations preceding it by reference. This includes all of the detailed allegations setting forth the alliance of United and Multiplan. Based on the level of detail provided, Plaintiffs are at a loss as to how the allegations clearly laying out the nature, execution and harm of the conspiracy could be questioned.

A claim for civil conspiracy "imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994). The effect of a conspiracy is to implicate all conspirators whether they actually carry it out or not. *Wyatt v. Union Mortgage Co.*, 24 Cal. 3rd 773, 784 (1979).

Multiplan was not a dupe in this situation. It was a knowing, intentional participant in the fraudulent scheme alleged in the complaint. It is responsible for all of the actions of its co-conspirator which are imputed to it.

### F.  Plaintiffs' Promissory Estoppel Claim Is Proper

Under the equitable doctrine of promissory estoppel, "a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969); *accord Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000). The elements of the claim are: "(1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise." *Fleet v. Bank of Am N.A.*, (2014) 229 Cal App 4th 1403, 1412.

1   The verification and authorization communications that occurred in factual circumstances

2   similar to what is alleged in the complaint constitute an appropriate predicate for promissory

3   estoppel. *See, e.g.*, *Regents of the Univ. of Cal. v. Principal Fin. Grp.*, 412 F. Supp. 2d 1037, 1042

4   (N.D. Cal. 2006) (concluding that insurer demonstrated intent to be bound to pay health care provider

5   because insurer verified coverage and authorized treatment on multiple occasions); *Enloe Med. Ctr.*

6   *v. Principal Life Ins. Co.*, No. CIV S-10-2227 KJM-DAD, 2011 WL 6396517 at *6 (E.D. Cal. Dec.

7   20, 2011) (noting that courts diverge on whether treatment authorization evinces a promise to pay

8   and stating that "in some instances, a contract may be created on an authorization call").

9   In this case, the only issue is the amount of payment, not the necessity of the services. In all

10  of the claims the need for the services and/or authorization of those services is not in dispute, only

11  the payment amount. The FAC does not base the promissory estoppel cause of action on promises

12  made in the insurance contracts, but rather the promises made between Defendants and Plaintiffs.

13  Defendants should be estopped from paying anything other than the promised represented UCR

14  amount.

15  In arguing against this cause of action, Multiplan incorrectly relies on the inapplicable cases

16  of *Pacific Bay Recovery, Inc. v. California Physicians Services, Inc.* (2017) 12 Cal.App. 5th 200, in

17  which the Court of Appeal rejected the substance abuse provider's argument that it was entitled to be

18  compensated based on the UCR. However, *Pacific Bay* is completely different from this case. It was

19  a case in which the provider questionably attempted to rely on inapplicable Knox Keene act provisions

20  allowing emergency providers to receive the UCR, even though the services Pacific Bay provided

21  were not emergency services.

22  In *Pacific Bay*, as to the allegations of what Blue Shield represented, Pacific Bay alleged only

23  that Blue Shield would pay for the services. It did not allege that it was told it would receive a rate

24  based on UCR, only that it "was led to believe it 'would be paid a portion or percentage of its total

25  billed charges, which charges correlated with usual, reasonable and customary charges'" (*Id.*, at 216).

26  In this case, the FAC specifically alleges that in a multitude of conversations Defendants

27  represented/agreed they would pay UCR or a plan determined percentile of UCR, depending on the

28  applicable plan.

1    In this case, the complaint alleges that payments would be made based on the UCR, and that

2  the services were provided based on and in reliance upon that fact. By representing that it would pay

3  the UCR, a term of art in the industry, Defendants provided a recognized method by which the amount

4  it would pay would be objectively determined.

5    UCR is a certain and well-known term, and analogous to the concept of Fair Market Value in

6  the real estate or other industries. In *Goodwest Rubber Corp. v. Munoz* (1985) 170 Cal. App. 3d 919,

7  921, the court held that "Fair Market Value" was a certain enough price or method to determine

8  consideration to support an action for specific performance.

9    Multiplan argues there can be no reliance to support the promissory estoppel claim. However,

10 under California law, a claim for civil conspiracy "imposes liability on persons who, although not

11 actually committing a tort themselves, share with the immediate tortfeasors a common plan or design

12 in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994).

13 The effect of a conspiracy is to implicate all conspirators whether they actually carry it out or not.

14 *Wyatt v. Union Mortgage Co.*, 24 Cal. 3rd 773, 784 (1979). Thus, by virtue of the conspiracy, reliance

15 is established.

16 **VII.    Conclusion**

17    By reason of the foregoing, it is respectfully submitted that the motion to dismiss

18 should be denied. If the court is inclined to sustain any part of the motion, Plaintiffs respectfully

19 requests leave to amend.

20                    **[SIGNATURE PAGE FOLLOWS]**

21

22

23

24

25

26

27

28

1

Dated: November 23, 2020

**NAPOLI SHKOLNIK PLLC**

2

3

/s/ _____

Matthew M. Lavin

Wendy A. Mitchell

4

Aaron R. Modiano

5

6

**DL LAW GROUP**

7

/s/ _____

David M. Lilienstein

8

Katie J. Spielman

9

*Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28