Matthew M. Lavin, Esq. (*pro hac vice*)
Wendy A. Mitchell, Esq. (CA SBN 158553)
Aaron R. Modiano, Esq. (*pro hac vice*)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE RECOVERY CENTER, INC., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED BEHAVIORAL HEALTH, INC. a California corporation, and MULTIPLAN, INC., a New York corporation, <br><br> Defendants. | Case No.: 4:20-CV-02249-YGR <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO UNITED BEHAVIORAL HEALTH, INC.'S MOTION TO DISMISS** <br><br> Complaint Filed: April 2, 2020 <br><br> Hearing Date:    December 22, 2020 <br> Hearing Time:    2:00 p.m. <br> Courtroom:    1 – Fourth Floor |

# Table of Contents

Table of Authorities ................................................................................................... ii

I.      Introduction ........................................................................................................1

II.     Background ..........................................................................................................1

I.      Plaintiffs' RICO §§ 1962(c)&(D) Claims Should Not Be Dismissed. ...........2

   A.    Plaintiffs Have Alleged Racketeering Activity with Particularity..................3

   B.    Plaintiffs Plausibly Allege the Existence of an Enterprise ............................4

   C.    United Directed Affairs of the Enterprise .....................................................7

   D.    Plaintiffs Plausibly Allege Causation ...........................................................8

   E.    Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b).......10

   F.    Plaintiffs Have Alleged a Conspiracy to Violate RICO ..............................11

II.     PLAINTIFFS' ANTI-TRUST CLAIMS ARE PROPERLY BROUGHT..................11

   A.    Plaintiffs Antitrust Arguments in the FAC Are Proper ...............................11

   B.    Plaintiffs Have Antitrust Standing ..............................................................12

     1.   The Harm Caused Was Anti-Competitive ................................................12

     2.   The Conduct Injured Providers Directly..................................................12

     3.   The harm was concrete and not speculative ............................................13

     4.   There is no risk of harm from duplicative recovery ................................13

   C.    Unlawful Restraint ......................................................................................13

   D.    *Per Se* Buyers' Cartel Price-Fixing............................................................14

   E.    Rule of Reason ............................................................................................16

III.    There Is No Overlap with the *LD* Matter .......................................................17

IV.     Plaintiffs' State Law Claims Are Not Conflict Preempted .............................18

V.      Plaintiffs' State Law Claims Are Properly Pled .............................................21

   A.    Plaintiffs' Fraud Claims Satisfy Rule 9(b)..................................................21

   B.    The Economic Loss Rule Does Not Apply..................................................21

   C.    Plaintiffs' UCL Claim Is Proper .................................................................23

   D.    Plaintiffs' Contract and Estoppel Claims Are Properly Pled.......................24

VI.     Conclusion ........................................................................................................25

1

**Table of Authorities**

2

**Cases**

3    *American Ad Management, Inc. v. General Tel. Co.*,
      190 F.3d 1051 (9th Cir. 1999) .................................................................... 15

4    *Apollo Grp., Inc. v. Avnet, Inc.*,
      58 F.3d 477 (9th Cir. 1995) ........................................................................ 27
5
     *Aya Healthcare Servs. v. AMN Healthcare, Inc.*,
6     2018 U.S. Dist. LEXIS 102582 (S.D. Cal. June 19, 2018)..................... 21, 22

7    *Bell Atl. Corp. v. Twombly*,
      550 U.S. 544 (2007)..................................................................................... 19
8
     *Bias v. Wells Fargo & Co.*,
9     942 F. Supp. 2d 915 (N.D. Cal. 2013) ................................................ 3, 8, 26

10   *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) ..................... 26

11   *Boyle v. United States*,
      556 U.S. 938 (2009)....................................................................................... 5
12
     *Bridge v. Phoenix Bond & Indem. Co.*,
13    553 U.S. 639 (2008) ......................................................................... 10, 11, 12

14   *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*,
      2020 WL 2027955 ........................................................................................ 28
15
     *Cal Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*,
16    2019 U.S. Dist. LEXIS 159286 .................................................................... 30

17   *Cal. Dental Ass'n v. FTC*,
      526 U.S. 756 (1999)..................................................................................... 21
18
     *Cisneros v. Petland, Inc.*,
19    972 F.3d 1204 (11th Cir. 2020) ..................................................................... 8

20   *Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
      236 F.3d 1148 (9th Cir. 2001) ..................................................................... 20
21
     *Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.*,
22    2009 WL 179681 (E.D. Cal. Jan. 26, 2009) ................................................ 24

23   *Erlich v. Menezes* (1999) 21 Cal.4th 543............................................................ 27

24   *Holmes v. Sec. Inv. Prot. Corp.*,
      503 U.S. 258 (1992)................................................................................ 10, 11
25
     *Horman v. United States*,
26    116 F. 350 (6th Cir. 1902) ............................................................................. 4

27   *In re Air Passenger Computer Reservation Sys. Antitrust Litig.*,
      694 F. Supp. 1443 (C.D. Cal. 1988) ............................................................ 20
28
     *In re Apple Inc. Device Performance Litig.*,
      386 F. Supp. 3d 1155 (N.D. Cal. 2019) ....................................................... 14

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ........................................................................ 18

*In re Managed Care Litigation*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) ............................................................ 3

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012 ........................................................................ 18

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ............................................................ 14

*Int'l Outsourcing Servs., LLC, v. Blistex, Inc.*,
    420 F. Supp. 2d 860 (N.D. Ill. 2006) ............................................................ 15

*IV Solutions Inc. v. United Healthcare Services, Inc.*,
    2012 WL 12887401 (C.D. Cal. Nov. 19, 2012) .................................................. 24

*Josef K. v. California Physicians' Serv.*,
    2019 WL 2342245 (N.D. Cal. June 3, 2019) ...................................................... 25

*Kelly v. United States*,
    140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020) ...................................................... 2

*Law v. Nat'l Collegiate Athletic Ass'n*,
    134 F.3d 1010 (10th Cir. 1998) .................................................................... 22

*LifeWatch Servs. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018) .................................................................. 19, 21

*McKell v. Washington Mut. Inc.*,
    (2006) 142 Cal. App. 4th 1457 .............................................................. 28, 29

*McNally v. United States*,
    483 U.S. 350 (1987) ................................................................................ 2

*Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009) ................................. 29

*N. Cal. Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp.*,
    2016 U.S. Dist. LEXIS 52444 (N.D. Cal. Apr. 19, 2016) ...................................... 15

*Nat'l Soc'y of Prof'l Engrs v. United States*,
    435 U.S. 679 (1978) .............................................................................. 20

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ........................................................................ 4

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) .................................................................... 17

*Oltz v. St. Peter's Community Hospital*,
    861 F.2d 1440 (9th Cir. 1988) .................................................................... 15

*Omnicare, Inc. v. Unitedhealth Grp., Inc.*,
    524 F. Supp. 2d 1031 (N.D. Ill. 2007) .......................................................... 15

*Paroline v. United States*,

572 U.S. 434 (2014) ............................................................................................. 10

*Pasquantino v. United States*,
544 U.S. 349 (2005) .......................................................................................... 3, 4

*Paulson v. CNF, Inc.*,
559 F.3d 1061 (9th Cir. 2009) ............................................................................. 23

*Rattagan v. Uber Techs., Inc.*,
2020 WL 4818612 (N.D. Cal. Aug. 19, 2020) ..................................................... 14

*Reddy v. Litton Indus., Inc.*,
912 F.2d 291 (9th Cir. 1990) ............................................................................... 14

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ............................................................................................... 2

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ............................................................................................... 9

*Schmuck v. United States*,
489 U.S. 705 (1989) ............................................................................................. 10

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
473 U.S. 479 (1985) ............................................................................................... 6

*See Alabama Power Co. v. Fed. Power Comm'n*,
511 F.2d 383, 389 n.10 (D.C. Cir. 1974) ........................................................... 18

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ............................................................................... 26

*Sonner v. Premier Nutrition Corp.*,
917 F.3d 834 (9th Cir. 2020) ............................................................................... 29

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) ............................................................................. 17

*The Meadows v. Employers Health Ins.*,
47 F.3d 1006 (9th Cir. 1995) ......................................................................... 24, 25

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ................................................................................ 19

*United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*,
660 F. Supp. 2d 1163 (C.D. Cal. 2009) ............................................................... 27

*United States v. Goldin Indus., Inc.*,
219 F.3d 1271 (11th Cir. 2000) ............................................................................. 5

*United States v. Simon*,
2016 WL 3597579 (N.D. Ind. July 5, 2016) ......................................................... 3

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ....................................................................................... 17, 18

*United States v. Turkette*,

452 U.S. 576 (1981) ................................................................................................ 5, 6

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
    714 F.3d 414 (6th Cir. 2013) ............................................................................ 12

*Weiner v. Ocwen Fin. Corp.*,
    2015 WL 4599427 (E.D. Cal. July 29, 2015) .................................................... 8

**Statutes**

15 U.S.C. § 15 ........................................................................................................ 12

18 U.S.C. § 1961(4) ................................................................................................ 4

18 U.S.C. § 1964(c) ................................................................................................ 8

Business and Professions Code §§ 17200, *et seq.* .............................................. 23

California Civil Code section 1611 ........................................................................ 25

Pub. L. No. 111-148, 124 Stat. 119 ...................................................................... 13

**Other Authorities**

SEC Disclosure Form DEFA14A (Churchill Capital Corp) ................................... 15

**Rules**

Fed. R. Civ. P. 15 .................................................................................................. 14

Fed. R. Civ. P. 8(d)(3) ........................................................................................... 28

Fed. R. Civ. P. 9(b) .................................................................................... 4, 12, 26

1

## I.     Introduction

Plaintiffs' Amended Complaint is about the fraudulent scheme created by United and Multiplan to underpay valid, medically necessary claims. United and Multiplan fraudulently portray the underpayment of claims as representative of prevailing market rates (Plaintiffs' First Amended Class Action Complaint, "FAC," ¶¶13-15). They are not. The underpayments are a fraction of prevailing market rates. This scheme enriches United and Multiplan at the expense of providers who are deprived of the difference between the prevailing market rate and the underpayment amount (FAC ¶16). This scheme has been ongoing since 2015 when United was no longer required to utilize the FAIR Health database and has cost providers billions of dollars in lost payments. (FAC ¶58).

The overarching theme of United's motion is to obfuscate the comprehensive scheme created by United and Multiplan and the nationwide fraud that they are committing. Plaintiffs' seek to hold the Defendants, United and Multiplan, accountable for their fraudulent conduct.

## II.     Background

First and foremost, *none* of the causes of action assert ERISA claims. United intentionally misleads the Court when it says, "[i]ndeed, one of the plan members in Plaintiffs' Amended Complaint ("CS") is also a named plaintiff (identified as "BW") in the related *LD* litigation, in which plan members are asserting many of the same claims and allegations under ERISA based on their ERISA plans. CS and all of the other members for whom Plaintiffs seek increased reimbursement were members of ERISA plans." (Dkt. 72, Pg. 3, Ln. 11-15). Next, in the *LD* First Amended Complaint ("LD FAC"), as to *LD* the LD FAC states, "261. Because of United and Multiplan, LD has been denied the full benefits available under the Apple benefit plan and **has been damaged in the amount <u>he has paid out of pocket</u>** for treatment services that should have been paid by United." (LD FAC ¶261) (emphasis added).

This lawsuit is brought on behalf of **Providers**, *not patients*. Providers such as Plaintiffs see patients with all types of health insurance plans, this includes ERISA plans, non-ERISA private plans, and government plans. United's scheme with Multiplan did not distinguish between ERISA and non-ERISA plans, neither does this **Provider** lawsuit. (FAC ¶¶ 33-39). Providers are not privy to plan documents, whether they be ERISA or not, or even whether a plan is subject to ERISA.  Out of

network providers, like the provider Plaintiffs in this case, make decisions to accept a patient's insurance based upon explicit verbal and other assurances made to them by insurance companies at the time the render treatment to the patient. These representations created independent duties owed by United and Multiplan to the provider Plaintiffs, under state law.

"CS" (or "BW" as he is referred to in the *LD* patient lawsuit) has suffered multiple relapses as the result of his addiction, and there are multiple claims for his treatment over many years.  Those claims where CS has himself paid out-of-pocket the balance created by United and Multiplan are contained in the *LD* complaint. Those claims where CS has <u>not paid</u> the balance are in this case, the **Provider** complaint. There is no overlap or duplication of damages at all.

Further, it is inappropriate of United to ask the Court to ignore the important difference between a plan and a summary plan description ("SPD") (Dkt. 72-2). *CIGNA Corp. v. Amara*, 563 U.S. 421, 446 (2011) ("An SPD is separate from a plan, and cannot amend a plan unless the plan so provides.") Insurers are required to provide SPDs to their insureds in accord with ERISA; however, the Supreme Court is clear that an SPD is not a health plan. Despite having ready access to the actual plans, United does not provide any of them. The volume of SPDs attached to United's motion are immaterial and clearly meant as a distraction to the Court as they are not relevant to this **Provider** case.  No provider whose claims are brought here had access to or relied upon them.  Further, no actual employer sponsors of plans are named as defendants, only the third-party administrator, United, and its third-party claims pricer, Multiplan are defendants here.

## III.    Plaintiffs' RICO §§ 1962(c)&(D) Claims Should Not Be Dismissed.

The mail and wire fraud statutes protect property rights. *Kelly v. United States*, 140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020); *McNally v. United States*, 483 U.S. 350, 356 (1987). Plaintiffs' right to be paid for the services they provided represent property in their hands. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property"); *Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005) (entitlement to collect money is property). The right to be paid in full is a property right which may be infringed by a mail or wire fraud violation. "[A] defendant who uses fraud to avoid paying the full amount due for a good or service deprives the victim of property within the meaning of the mail fraud statute." *United States v. Simon*, 2016 WL 3597579, * 11 (N.D. Ind.

July 5, 2016). Just as this Court has found that a consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money in *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013), so too is an underpayment of money owed.

Plaintiffs' property is the object of the Defendant's scheme to defraud. *Pasquantino*, 544 U.S. at 355. United has joined together with Multiplan to reproduce the Ingenix scheme that led United to pay $400 million in settlements in 2009. They joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

It has long been the law that "[i]f the scheme or artifice in its necessary consequence is one which is calculated to injure another, to deprive him of his property wrongfully, then it is to defraud within the meaning of the statute." *Horman v. United States,* 116 F. 350, 352-53 (6th Cir. 1902). Every claim at issue has been adjudicated medically necessary and allowed as payable by the United. (FAC¶ 6, 54-57). What is at issue is not the Plaintiffs' right to receive payments; but rather, Plaintiffs have been grossly underpaid and seek to recover those underpayments.

Here, Plaintiffs' property is the object of the Defendants' scheme to defraud. *Pasquantino*, 544 U.S. at 355. United and Multiplan have joined together to interpose false and fraudulent data as an excuse to avoid paying their obligations to Plaintiffs and others in full. (FAC ¶¶ 114-140). As set forth below, this scheme meets all of RICO's requirements.

**A. Plaintiffs Have Alleged Racketeering Activity with Particularity**

Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail. Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). Plaintiffs have met that standard.

Plaintiffs have identified the patients, services provided, fraudulent communications over the mail and wires, individuals Plaintiffs spoke with, and examples of the written and electronic correspondence between the Plaintiffs and Defendants for every Plaintiff. Allegations for Plaintiff Pacific Recovery Solutions ("PRS") are alleged at FAC ¶¶ 258-287, for PCI Westlake at FAC ¶¶ 288-

316, for Bridging the Gaps at FAC ¶¶ 317-346, and for Summit Estate at FAC ¶¶ 347-377.

**B.  Plaintiffs Plausibly Allege the Existence of an Enterprise**

RICO is generally regarded as a broad statute and, indeed, RICO's text "provides that its terms are to be "liberally construed to effectuate its remedial purposes."'" *Boyle v. United States*, 556 U.S. 938, 944 (2009), *quoting* Pub. L. No. § 904(a), 84 Stat. 922, 947 (1970). RICO's breadth of language and construction is particularly evident in the enterprise concept. *Boyle*, 556 U.S. at 949. Included within the definition of enterprise is "**any** union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The Supreme Court has emphasized that the "term 'any' ensures that the definition has a wide reach and the very concept of an association in fact is expansive") *Boyle*, 556 U.S. at 944 (internal citation omitted).

Thus, an association-in-fact enterprise may be *any* group of persons associated together for a common purpose of engaging in a course of conduct. *Boyle*, 556 U.S. at 946, *quoting United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise may be formal or informal, and requires only three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Turkette* 452 U.S. at 583. "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

United argues that there cannot be an enterprise because the only relationship between the United Defendants and Multiplan is a routine contractual relationship. (Dkt. 72, Pg. 9 Ln. 15 – Pg. 10 Ln. 19). They rely upon the Court's earlier ruling that "[t]he allegations in the complaint describe a contractual relationship between defendants that required Viant to negotiate reimbursements on behalf of United." (Dkt. 61, Pg. 12 Ln. 13-15). Plaintiffs have gone to great lengths to plead the illegal, fraudulent RICO enterprise in the FAC. United and Multiplan shared a common purpose to develop false and fraudulent reimbursement rates that were applied to Plaintiffs and IOP providers. (FAC ¶¶ 119-121). United and Multiplan jointly developed 'Whitepapers,' a detailed roadmap used

1  to develop their fraudulent scheme. (FAC ¶¶ 123, 247-253). Plaintiffs detail the association of United

2  and Multiplan in an ongoing, informal association with the common purpose of engaging in a course

3  of conduct, including the development and implementation of a scheme to fraudulently underpay out-

4  of-network IOP services. (FAC ¶ 115). The presence or absence of a commercial contract between

5  United and Multiplan is irrelevant.

6  An association does not stop becoming an association because the relationships between its

7  members are documented in a contract, nor does anything in the definition of enterprise insulate from

8  liability those whose common purpose includes some legal activity. RICO's definition of enterprise

9  "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal

10  enterprises than it does legitimate ones." *Turkette*, 452 U.S. at 580-81 (1981). *See also, Sedima,*

11  *S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both

12  'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal

13  activity nor immunity from its consequences.") (internal citation omitted).

14  The enterprise between United and Multiplan is the vehicle for the illegal, racketeering

15  activity of mail and wire fraud. Plaintiffs have alleged a solid basis for their belief that the rates paid

16  to them are a fraction of what they should be (FAC ¶¶ 141-155); they set forth the mechanics of the

17  scheme (FAC ¶¶ 156-183); the claims submission process (FAC ¶¶ 184-191); the purpose of the

18  underpayments (FAC ¶¶ 192-198); how Multiplan and United utilized the distorted Viant

19  methodology of distorted databases and inappropriate "target" pricing ((FAC ¶¶ 199-229), and how

20  all of this was developed, implemented, and managed by the Defendants (FAC ¶¶ 230-257).

21  The FAC alleges a common unlawful purpose amongst the members of the enterprise to avoid

22  paying the required usual and customary reimbursement rates for the services in question. This

23  common purpose is achieved by manipulating reimbursement rates through a false and fraudulent

24  database. The fraudulent reimbursement rates are developed jointly by Multiplan and United. Indeed,

25  the rates are what the United Defendants have directed Multiplan to "target." Defendants know that

26  the rates they are using are not based on objective, reliable data.

27  Demonstrating the absence of any "above-board course of dealing" or "ordinary commercial

28  contractual relationship," Defendants cannot explain why the same IOP claims, performed at the same

facilities and charged at the same amount, are reimbursed at dramatically different rates:

| SUMMIT ESTATE SAMPLE CLAIMS EXPERIENCE* | | | | | | | |
|---|---|---|---|---|---|---|---|
| YEAR | BILLED | UNITED (VIANT) | UNITED (NON VIANT) | MERITAIN | AETNA | ANTHEM | UMR (UNITED SUBSIDIARY) |
| **2018** | $1,875.00 | $229.56 | n/a | $1,593.75 | $1,166.44 | $1,687.50 | $1,749.94 |
| **2019** | $2,156.25 | $229.81 | $2,156.25 | n/a | $1,380.80 | $1,940.63 | $1,832.81 |

*Data is based on average claim experience across multiple claims for multiple patients in the indicated calendar year.

The table above is culled from data related to Plaintiff Summit Estate but the claims experience depicted in it is similar for all Plaintiffs in this case and for the putative class. This chart depicts rates paid by various insurance companies for IOP services to Summit Estate. It also includes data reflecting what United pays for IOP claims when its claims are **not** sent to Viant to pricing. For each patient whose data was used to compile the above chart, benefits were verified over the phone during a verification call. In every single instance, the insurance company's representative stated that claims would be paid based on rates charged by similar providers in the rendering provider's geographic area, also known as the usual, reasonable and customary rate, or "UCR." This is a standard term and representation made in out of network healthcare transactions.

As shown in the above table, claims paid by United and priced by Viant/Multiplan regularly averaged $1,000.00 *less* than what other insurance companies paid for the same IOP services, **and over $1800 *less* than what United paid to Summit Estate when claims were not processed through Viant**. As this chart and multiple references in the FAC to the agnostic FairHealth database make clear, the surprise rates priced by Viant were *anything but* competitive.

If the reimbursement rates were "above-board," Defendants would not otherwise pay several the rates they already claimed were "reasonable and customary." Nor would an "above-board" program produce wildly different reimbursements for the same services provided so close in time. Likewise, comparison of the reimbursement paid by Defendants against the FAIR Health Benchmark (FAC ¶¶ 141-155), created because of the United's prior Ingenix fraud, confirms that Plaintiffs have not been appropriately reimbursed.

Also contrary to United's arguments, a common purpose of making money does not insulate members of an enterprise from liability where their methods are illegitimate. The common purpose

of making money <u>by fraud</u> is sufficient to find a RICO enterprise. *See, for example, Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1212 (11th Cir. 2020) (collecting cases). *Weiner v. Ocwen Fin. Corp.*, 2015 WL 4599427, at *10 (E.D. Cal. July 29, 2015). Because the complaint clearly alleges that the members of the enterprise stand to gain sufficient financial benefits from their scheme to avoid paying Plaintiffs what they are owed, Plaintiffs have properly alleged a "common purpose" for the purposes of RICO. *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) ("Plaintiffs have also explicitly alleged that the enterprise members, including the vendors and brokers, "devised a scheme to defraud borrowers and obtain money from them by means of false pretenses."")

### C.  United Directed Affairs of the Enterprise

United contends that the FAC fails to allege facts sufficient to establish that they participated in the operation or management of the enterprise. As set out by the Supreme Court:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise,4 but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Plaintiffs specifically allege numerous ways in which United has satisfied this requirement in the FAC, stating, for example:

> The Viant methodology's crosswalking, reflects a subjective decision that is directed by United and implemented by Multiplan. The crosswalking is not subject to independent review, scrutiny, or oversight. FAC ¶175

> The "proxies" are selected by Multiplan based on direction given by United and used by the Viant methodology to provide fraudulently low payment amounts. FAC ¶178

> The Viant methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allowed United and its competitors to discuss the customizations they wanted in the pricing with Multiplan, directly. FAC ¶234

> The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf. FAC ¶236

United's representatives provided direction to Multiplan such that Multiplan would revise its Whitepapers to ensure that the Viant methodology would underpay claims such as those filed by Plaintiffs. FAC ¶250.

These facts, if proven, would establish that United played a role in operating or managing the RICO enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

### D. Plaintiffs Plausibly Allege Causation

RICO creates a civil cause of action on behalf of "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter. . . ." 18 U.S.C. § 1964(c). In a RICO case based upon acts of mail or wire fraud, "[t]he gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (*quoting Schmuck v. United States*, 489 U.S. 705, 712 (1989)). This is true even if the mailing itself contains no false information, *Schmuck*, 489 U.S. at 715, because "the indictable act under § 1341 is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud." *Bridge*, 553 U.S. at 652.

Although a plaintiff seeking to recover damages in a civil RICO action must establish that the defendant's violation was a proximate cause of the plaintiff's injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); fundamentally, RICO proximate causation is "a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 272 n. 20), and 659 (refusing to "ignore *Holmes*' instruction that proximate cause is generally not amenable to bright-line rules"); *Paroline v. United States*, 572 U.S. 434, 444 (2014) (quoting *Bridge*'s description of proximate cause as "a flexible concept")[1]. Having rejected a bright-line test for proximate causation, the Court identified a series of motivating principles to guide application of the directness requirement:

First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing

---

[1] The application of the direct injury requirement in RICO is sui generis. *Holmes,* 503 U.S. at 272 n. 20 (Consequently, "use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached.")

claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. *Holmes*, 503 U.S. at 269-70 (citations omitted).

Defendants' challenge to proximate causation rest on the assumption that reliance is required in all mail and wire fraud cases. That assumption is incorrect and specifically refuted by the Supreme Court. *Bridge* held that reliance is (1) not an element of mail fraud itself, 553 U.S. at 648-50, (2) not an element of 18 U.S.C. § 1962(c), *id.*, (3) and is not required by 18 U.S.C. § 1964(c). *Id. at 654-58*. Simply put, if a plaintiff's injuries are directly caused by the violator, its conduct cannot be barred from recovery by a reliance requirement that is not to be found in the mail or wire fraud statutes or in RICO itself.

*Bridge* unequivocally holds that <u>directness</u> does not contain within it a requirement of <u>reliance</u>: "the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim." 553 U.S. at 653, quoting *Anza*, 547 U.S. at 476 (Thomas, J. concurring in part and dissenting in part). Removing any doubt, *Bridge* specifies that "One can conduct the affairs of a qualifying enterprise through a pattern of . . . [racketeering activity indictable as mail fraud] without anyone relying on a fraudulent misrepresentation." *Bridge*, 553 U.S. at 649. In other words, while reliance *may* serve as a proxy for legal and factual causation, *it is not* a condition of their existence.  553 U.S. at 649 ("one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation."). "For RICO purposes, reliance and proximate cause remain distinct—if frequently overlapping—concepts. While reliance is 'often used to prove . . . the element of causation,' that does not mean it is the only way to do so." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013) (internal quotations omitted). Or, as *Bridge* put it, "the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." 553 U.S. at 659 (citation omitted). The unavoidable conclusion is that reliance does not matter if facts plausibly showing direct injury are alleged. *See*

1    *also*, *Wallace*, 714 F.3d at 420 ("A plaintiff need only show use of the mail in furtherance of a scheme

2    to defraud and an injury proximately caused by that scheme."). Plaintiffs have done so here.

3          As in *Bridge*, Plaintiffs' injuries are "a foreseeable and natural consequence" of Defendants'

4    scheme.  553 U.S. at 658. And, as in *Bridge*, there are no independent factors that could account for

5    plaintiffs' injury and no risk of duplicative recoveries by plaintiffs removed at different levels of

6    injury from the violation. Because none of the harm for which Plaintiffs seek to recover was first

7    visited upon a third person, their claims do not require the court to go beyond the first step in regard

8    to damages. Similarly, there are no more immediate victims who are better situated or motivated to

9    sue than Plaintiffs. Because no one other than Plaintiffs is entitled to claim reimbursement for that

10   underpaid care, no one else has a better incentive to vindicate the law as a private attorney general.

11   *Bridge*, 553 U.S. at 658.

12      **E.  Plaintiffs' RICO Claims Are Pled with Sufficient Particularity Under Rule 9(b)**

13         Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail.

14   Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud

15   so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6

16   F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). This standard is met.

17   Much of Defendant's attack on the fraud claims is predicated on fundamentally misunderstanding the

18   fraud alleged in the FAC. In addition to the racketeering activity, the predicate acts of mail and wire

19   fraud identified in the FAC, the FAC goes into great detail identifying the dates, content, and other

20   information of the misrepresentations made to Plaintiffs *and other Providers* by Defendants in

21   addition to the activity that directed and implemented the fraudulent, illegal Viant methodology.

22   Therefore, United knows exactly the factual basis for the fraud causes of action asserted against it.

23         Further, Plaintiffs have plead that what United underpays is not a "competitive fee" in the

24   relevant zip code. Taking United's UCR argument to its logical conclusion (Dkt. 72 Pg. 14-15),

25   United can determine UCR means whatever it wishes it to mean, it can do so in secrecy, and make

26   whatever representations it wishes without ever being held accountable for the truth of its statements.

27   Ultimately, it will be through discovery that Plaintiffs will prove this (though Plaintiffs already have

28   provided the Court substantial of evidence of it). <u>Through discovery Plaintiffs will prove that</u>

1  "competitive fees based on available data resources" does in fact mean 80th percentile of

2  UCR/FairHealth in at least two ways: 1: with economic data and price data for the area, and 2: by

3  showing that united has paid at that rate in the past and is doing so now as well with plans with the

4  exact same language. Plaintiffs have pled with sufficient particularity at this stage.

5  ### F. Plaintiffs Have Alleged a Conspiracy to Violate RICO

6  The only argument asserted by the Defendants with regard to Plaintiffs' claim under 18 U.S.C.

7  § 1962(d) is that it should fail because no claim is properly alleged under § 1962(c).  Because a claim

8  has been alleged under § 1962(c), that argument necessarily fails.

9  ## IV.  Plaintiffs' Antitrust Claims Are Properly Brought

10  The court should deny Defendant's motion to dismiss Plaintiffs' anti-trust claims because in

11  the FAC 1) Plaintiffs' Antitrust Arguments were proper, 2) United's participation in a Buyers Cartel

12  harmed competition in *per se* violation of Section 1 of the Sherman Act, 3) the harm was of the type

13  the Sherman Act was designed to prevent, and 4) a rule of reason analysis further supports a ruling

14  in Plaintiff's favor.

15  ### A. Plaintiffs Antitrust Arguments in the FAC Are Proper

16  United claims that the FAC runs away from or contradicts the original Complaint. (Dkt. 72

17  pp. 13 ¶ 2). To the contrary, the original Complaint's claims under § 1 of the Sherman Act and § 4 of

18  the Clayton Act suffered defects which the FAC remedied via elaboration, not contradiction, as

19  permitted by the Federal Courts. Fed. R. Civ. P. 15. *See* Dkt 1 ¶ 390-395: "United and Viant

20  combined, conspired and/or agreed with its Co-Conspirators in a horizontal price fixing conspiracy

21  that sought, and was able, to artificially lower, fix or maintain the price paid to Plaintiffs the Class by

22  United as "UCR."" This is precisely the argument that the FAC expands upon. Defendant cites *Reddy*

23  *v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990); *In re Apple Inc. Device Performance*

24  *Litig.*, 386 F. Supp. 3d 1155, 1180 (N.D. Cal. 2019); *Rattagan v. Uber Techs., Inc.*, 2020 WL

25  4818612, at *3 (N.D. Cal. Aug. 19, 2020) to bolster an argument that Plaintiffs' FAC is not written

26  on a clean slate. Plaintiffs' FAC does not seek a clean slate, but rather seeks to elaborate and fill in

27  the nuance of their original Sherman Act argument such that it remedies deficiencies in the original

28  pleading. Defendants also cite to *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,

1    ("WellPoint II"), 903 F. Supp. 2d 880, 903–06 (C.D. Cal. 2012) without context.

2    **B.  Plaintiffs Have Antitrust Standing**

3    Plaintiffs meet the four factor anti-trust standing articulated in *American Ad Management,*

4    *Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999).

5    *1.    The Harm Caused Was Anti-Competitive*

6    Defendant's conduct harmed competition because the artificially deflated reimbursement

7    rates it used Multiplan to pay to out of network providers excluded those providers from serving any

8    patients insured under United plans. The ultimate harm, lost profits resulting from what amounted to

9    artificially low payments resulting from the agreement of purchasers, refusal to deal and exclusion

10   from the market, is a recognized anti-trust harm that confers standing under Section 4 of the Sherman

11   Act at 15 U.S.C. § 15. *See Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440 (9th Cir. 1988), *N.*

12   *Cal. Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp.*, 2016 U.S. Dist.

13   LEXIS 52444, at *14 (N.D. Cal. Apr. 19, 2016) (cases where providers' exclusion from the provision

14   of services in a defined healthcare space conferred anti-trust standing) *see also, Omnicare, Inc. v.*

15   *Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) (" "[i]n a buyers' conspiracy

16   case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices

17   from members of the buyers' cartel.")

18   *2.    The Conduct Injured Providers Directly*

19   Defendant's conduct harmed Plaintiffs directly. The viability of any healthcare business

20   depends on providers, such as Plaintiffs, ability to receive payment from insurers. That is the entire

21   premise of the Patient Protection and Affordable Care Act: to address the fact that individuals cannot

22   pay for care without meaningful indemnification from third-party payers (insurers). Pub. L. No. 111-

23   148, 124 Stat. 119. Plaintiffs' and most providers' businesses depends on payment from private

24   insurers. (Dkt. 62 ¶ 395).

25   When United underpaid claims in violation of their representations to provide meaningful

26   coverage, they deprived Plaintiffs of money and placed them at a competitive disadvantage with

27   respect to providing care. Plaintiffs pled specific facts showing exactly how they were underpaid, and

28   to what extent. As such they have pled a direct injury. As alleged in the FAC, United abuses their

leverage with Plaintiffs and other providers to bolster their profits and eliminate competition, trade is restrained and an anti-trust injury flows.

### 3. The harm was concrete and not speculative

The FAC goes into detail on the concrete amount of harm caused by lost profits stemming from United's anti-competitive behavior, and future losses from loss of business and/or bankruptcy are calculable and finite. Plaintiffs lost the difference between what they were underpaid and what they should have been paid. That amount is fixed as there is no prospect of duplication from any future patient collections (which would be rejected and returned if received).

### 4. There is no risk of harm from duplicative recovery

At the time the suit was filed, and for all claims that are brought by Plaintiffs, there is no prospect of duplicative future patient collections. The methodology of healthcare billing itself forecloses duplication. United's motion mischaracterizes and misapprehends how healthcare finance operates. There are multiple payer safeguards against duplicative payment. In the off-chance that a patient and United both paid Plaintiffs the underpayment amount, that payment would be refused or promptly refunded by Plaintiffs. As such, the four requirements of anti-trust standing are met, and Plaintiffs' anti-trust claims should be reviewed on their merits.

### C. Unlawful Restraint

Plaintiffs FAC includes facts specific enough to support a reasonable inference that United and its co-conspirators' actions were for purposes of eliminating competition and creating oligopsony power, in satisfaction of the requirements of *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987). (Dkt. 62 ¶¶ 230-242; 408-411; 415). Plaintiffs describe the white-papers, marketing materials, and promotional investor materials, as well as meetings and marketing pitches that form the factual basis for the Sherman Act Claims.

The facts pled in the FAC center around United and Multiplan's conspiracy to unlawfully profit from fraudulent activity and reap the rewards of exploiting out-of-network providers. The conspiracy was designed to further a host of aims that flow from United's and Multiplan's conspiracy to free United from its obligations to pay a reasonable amount to Plaintiffs and other providers. By joining together, the Defendants and co-conspirators put collective pressure on Plaintiffs and other

1    providers to shut their doors, sign disadvantageous contracts, or operate at a loss. By controlling

2    prices paid, United, Multiplan, and their co-conspirators created a textbook oligopsony, a

3    fundamental restraint of trade. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).

4           Plaintiffs satisfy the first pleading requirement of a Sherman Act § 1 claim and remedy the

5    deficiency the court articulated in its Order Granting Defendant's Motion to Dismiss. (Dkt. 61 Pg. 7).

6    The facts pled include numerous "plus factors" sufficient to give rise to an inference of conspiracy.

7    *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092-93 (9th Cir. 2015) (citing

8    *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012); *In re Flat Glass Antitrust Litig.*,

9    385 F.3d 350, 368-69 (3d Cir. 2004) (each holding that facts pled about motive to conspire, nature of

10   conspiracy weigh in favor of a finding of a finding that claims satisfy the plausibility standard

11   articulated in *Twombly* in a Sherman Act § 1 claim).

12          **D.  *Per Se* Buyers' Cartel Price-Fixing**

13          Plaintiffs plead sufficient facts to establish a plausible oligopsony, a *per se* violation under §

14   1 of the Sherman Act. "A combination formed for the purpose and with the effect of raising,

15   depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce

16   is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223. As pled in the FAC,

17   United conspired with its competitors and Multiplan to depress the price paid for IOP treatment

18   services. *See* SEC Disclosure Form DEFA14A (Churchill Capital Corp) (describing Multiplan's

19   mutual clients United, Cigna and Anthem, and the dominant and expanding market share in

20   discussions before the SEC).

21          Through various industry meetings, including through meetings and shared professionals on

22   boards of America's Health Insurance Plans and similar industry organizations, through the copious

23   amounts of shared data between competitors resulting from the data access Multiplan possessed

24   which competitors knew they were paying for, United and its co-conspirators agreed to partake of the

25   mutual benefit of utilizing Multiplan to depress prices paid to OON providers to rates so low that

26   United and its competitors could exercise sole discretion over both utilization and reimbursement.

27   (Dkt. 62 ¶ 414-415). *See Alabama Power Co. v. Fed. Power Comm'n*, 167 U.S. App. D.C. 145, 511

28   F.2d 383, 389 n.10 (D.C. Cir. 1974) ("Although the anticompetitive effects of information are usually

1  discussed with reference to a market characterized by oligopoly on the supply side alone,

2  concentration may occur among purchasing firms as well; circulation of transaction data may allow

3  a few buyers to gain at the expense of many sellers."), *See also, Todd v. Exxon Corp.*, 275 F.3d 191,

4  201 (2d Cir. 2001).

5      United and its Competitors conduct was not parallel. It was part of an agreed upon strategy to

6  control the playing field for benefit expense by deliberately underpaying providers. There were no

7  negotiations involved in the claims in question. Each private insurer stood to gain from collecting

8  additional premiums for PPO products without covering OON services, in the same way that any

9  oligopsony stands to gain from controlling its sellers. *See LifeWatch Servs. v. Highmark Inc.*, 902

10 F.3d 323, 330 (3d Cir. 2018) (Provider pled adequate circumstantial evidence to find a horizonal

11 agreement to fix prices to be paid for a covered service or product). United cites to a range of

12 inapplicable "rimless" antitrust cases. Here, there is a "rim." As pled throughout the FAC, United's

13 goal in pairing with Multiplan was to take advantage of the fruits of an oligopsony – the rim. By

14 pooling both its data and purchasing power with other Payors, including Aetna, Cigna and the Blue

15 Card Entities, United stood to receive the benefit of a putative data exchange, the benefits of

16 aggregated purchasing power, and the benefit of strength in numbers insofar as liability for

17 underpayment was concerned. In its whitepapers, promotional materials, and marketing

18 presentations, Multiplan touted the strength in numbers as a feature of its services. United bought in

19 to what it knew was a ready-made oligopsony. The "bespoke" elements of its agreement did not cause

20 substantive changes in its participation in the buyers' cartel. (Dkt. 72 pp. 15 ¶ 2). The content of the

21 FAC includes enough circumstantial evidence to overcome the "plausibility" standard put forth in

22 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). *See LifeWatch Servs. v. Highmark Inc.*, 902

23 F.3d 323 (equivalent facts pled put Plaintiff's Sherman Act Claim over the threshold for *Twombly*

24 analysis).

25     Finally, it bears mentioning that "money saving," the cited "legitimate goal" that United's

26 counsel puts forward for underpaying claims, is only one of the co-conspirators' goals of conspiracy.

27 By eliminating out-of-network expenses, United can still collect elevated premiums for illusory out-

28 of-network benefits, can direct money towards the services its own managed care providers offer, and

1   can extend its liberty to pay what it wants to who it wants when it wants regardless of the propriety

2   thereof. The elimination of out of network options is one of the goals of each of the conspirators using

3   Multiplan, and is illegitimate.

4       **E.  Rule of Reason**

5       Even if the *per se* analysis fails, which it should not, there is ample evidence of unfair

6   competition in restraint of interstate commerce to support a Sherman Act § 1 claim under a rule of

7   reason analysis. "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement

8   is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Prof'l Engrs v.*

9   *United States*, 435 U.S. 679, 691 (1978). Courts in the Ninth Circuit employ a burden-shifting

10  framework to apply the rule of reason, which requires the plaintiff, as the first step, to "delineate a

11  relevant market and show that the defendant plays enough of a role in that market to impair

12  competition significantly." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1150 (9th Cir.

13  2001) (citation and internal quotation marks omitted).

14      Here, the relevant market is that for the provision of Intensive Outpatient Services to privately

15  insured Americans. The market is national. The general presumption that a defendant needs to possess

16  50-60% or greater is not applicable here. *In re Air Passenger Computer Reservation Sys. Antitrust*

17  *Litig.*, 694 F. Supp. 1443, 1456 (C.D. Cal. 1988). Courts have established that markets for healthcare

18  services qualify as defined markets for Rule of Reason analysis. *Aya Healthcare Servs. v. AMN*

19  *Healthcare, Inc.*, Case No. 17cv205-MMA, 2018 U.S. Dist. LEXIS 102582, at *48 (S.D. Cal. June

20  19, 2018); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999); *LifeWatch Servs. v. Highmark Inc*. 902

21  F.3d 323. Market share calculous shifts when HMO only plans (like those administered by Kaiser

22  Permanente representing half of California insureds) are removed from the equation. In terms of

23  underwriting PPO plans with Out-of-Network benefits, United and its subsidiaries alone approximate

24  a dominant market share. Furthermore, there is no "replacement" for United's insureds in the market.

25  As such, United has significant market power.

26      Because United's insureds constitute a substantial portion of irreplaceable purchasers of care,

27  and because United has agreed with co-conspirators who would be putative replacements for it in the

28  market, United's conspiracy with Multiplan to underpay claims constitutes an unfair restraint of trade.

1   The anticompetitive effect of Multiplan's and United's restraint of trade is to limit or eliminate out

2   of network providers' ability to participate in the market for Intensive Outpatient Services.

3   Defendant's market share and anticompetitive effects arguments fail because they gloss the realities

4   of the defined market.

5       As noted above, courts use the quick-look analysis when "an observer with even a

6   rudimentary understanding of economics could conclude that the arrangements in question could

7   have an anticompetitive effect on customers and markets." *Cal Dental Ass'n*, 526 U.S. at 770.

8   Moreover, "[w]here a practice has obvious anticompetitive effects . . . there is no need to prove that

9   the defendant possesses market power. Rather, the court is justified in proceeding directly to the

10  question of whether the procompetitive justifications advanced for the restraints outweigh the

11  anticompetitive effects under a 'quick look' rule of reason." *Law v. Nat'l Collegiate Athletic Ass'n*,

12  134 F.3d 1010, 1020 (10th Cir. 1998).

13      United and Multiplan's practice, detailed in the complaint, of misrepresenting the nature of

14  Viant's services in order to pay devastatingly low reimbursement rates, restrains trade and is unfair

15  under a "quick look" analysis, which is appropriate here. *Aya Healthcare Servs. v. AMN Healthcare*,

16  *Inc.*, No. 17cv205-MMA (MDD), 2018 U.S. Dist. LEXIS 102582, at *(S.D. Cal. June 19, 2018).

17      Because, based on the foregoing, Plaintiffs have pled sufficient facts to state a plausible

18  inference of Anti-competitive behavior in violation of Section 1 of the Sherman Act, the court should

19  Deny Defendant's Motion to Dismiss.

20  **V.    There Is No Overlap with the *LD* Matter**

21      There is no duplication in claims between cases brought by providers, and cases brought by

22  patients. There is a single "pot" of outstanding, underpaid funds. Some patients paid balance bills,

23  the vast majority did not. Those patients able to pay balance bills are plaintiffs in *LD*. Patients that

24  could not pay balance bills left the providers, the Plaintiffs here, to pursue those amounts from United

25  and Mutliplan. The harms do not overlap. Every time a claim was underpaid either the patient was

26  harmed, or the provider was harmed, but not both. The difference between each of those articulated

27  harms is the dividing line along which *LD* and *PRS* respective plaintiff classes is drawn. In both cases,

28  harm was direct. Patients in the LD case have been harmed when they paid balances they should not

have been liable for but for United and Multiplan's underpayments. On the other hand, the Providers in this case have been harmed when United and Multiplan underpaid claims and that amount is still outstanding.

Defendants' briefing in this case tries to abstract the issues. Facts matter. The facts here are not that a benefit plan's beneficiaries need the protection of ERISA as intended by congress. Uniform benefit administration is not at issue – United and Multiplan worked the same illegal scheme in Virginia, California, and Florida. The facts are that United Healthcare is attempting to inappropriately use ERISA as a shield to escape reckoning. This court should not, as United urges, conflate United Healthcare and the benefit plans it administers claims for. This Provider case is not a case about plans or plan assets, it is a case about an insurance company that has no interest in cost control (in fact it has an entire line of business devoted to spending as much of the Medicare and Medicaid program's money as possible). It is a case that is seeking just treatment for an underserved population. The preemption arguments, especially, must fail.

## VI.  Plaintiffs' State Law Claims Are Not Conflict Preempted

As set forth in the FAC, Plaintiffs' state law claims are not ERISA preempted (FAC ¶¶ 33-39). *None* of these claims involve a denial of benefits. *Every* claim was underpaid. Since this Court stated in its previous ruling, "Plaintiffs' allegations do not raise the reasonable inference that they had an agreement with United **apart from the patients' ERISA plans** that governed the amounts of United's reimbursements for the IOP services in question" (Dkt. 61, Pg. 18, Ln. 17-19), Plaintiffs have set forth in the FAC the duties that are separate and apart from the patients' ERISA plans. Further, as stated above, not all of the patients treated by Plaintiffs had ERISA plans. The claims brought by the Providers are non-derivate and not brought by assignment from any patient  They are based upon the providers business dealings with United and Multiplan and the independent duties created during phone calls and other interactions as detailed in the FAC, not on ERISA plans.

Ninth Circuit law is clear, however, on the issue of claims by *health care providers* against insurers for failure to pay for health care services rendered, that such claims are not preempted by ERISA. Section 514 provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). A

state cause of action "relates" to an ERISA plan whenever it has "a '<u>connection with</u>' or '<u>reference to</u>'" such a plan. *Paulson v. CNF, Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009) (emphasis added). The relationship test is used to determine whether a cause of action has a "connection with" an ERISA plan. The relationship test looks to whether the claim bears on an ERISA-regulated relationship, such as plan-participant, plan-employer, or plan sponsor-plan participant. *Id.* A state claim has a "reference to" an ERISA plan only if (1) the law acts *immediately* and *exclusively* upon ERISA plans, or (2) the existence of ERISA plans is *essential* to the law's operation. *Id.*

The preemption analysis in this case should follow that of *Doctors Med. Ctr. of Modesto, Inc. v. The Guardian Life Ins. Co. of Am.*, 2009 WL 179681 (E.D. Cal. Jan. 26, 2009). Multiplan's subsidiary Viant was a Defendant in that matter. There, plaintiff, a medical center, not an ERISA entity, alleged claims similar to Plaintiffs' state law claims, that were specifically found not to be preempted by ERISA. After a lengthy analysis, the court held that when a claim arises out of independent obligations, "[t]he authorities []amply explain how a claim can arise out of a transaction that involves an ERISA benefit plan while nevertheless not be "related" to that plan for purposes of preemption." Id. at *6. That is precisely the case here, even though some claims will involve an ERISA benefit plan, the claims are not "related" to that plan for purposes of preemption.

None of Plaintiffs' state law causes of action do not relate to ERISA, they do not act immediately or exclusively on ERISA plans, and the existence of an ERISA plan is not essential to their operation. The causes of action likewise do not bear on an ERISA-regulated relationship. Plaintiffs are not traditional ERISA entities – they are not insurance companies or third-party administrators managing ERISA claims, employers providing ERISA benefits, or patients entitled to ERISA benefits.

Rather, Plaintiffs are third-party providers contracted with Defendant to provide services for an agreed-upon amount. *See IV Solutions Inc. v. United Healthcare Services, Inc.*, 2012 WL 12887401 at *8-9 (C.D. Cal. Nov. 19, 2012) *The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th Cir. 1995), is directly on point. In *The Meadows*, the Ninth Circuit concluded that a third-party service provider's state law claims were not preempted by ERISA. Id. at 1007. *The Meadows* court specifically analyzed the Section 514 preemption argument raised by Defendant UBH here.

In *The Meadows*, a substance abuse treatment facility confirmed through telephone calls and letters that two patients, John and Patricia Friedel, had insurance coverage under Employers Health. *Id*. at 1007–08. With respect to Ms. Friedel, the insurer "stated he was covered" in a telephone conversation. *Id*. On the basis of these assurances, The Meadows provided services to the Friedels. *Id.* However, "[d]espite these oral and written representations of coverage, Employers Health refused to pay The Meadows for the Friedels' treatment." *Id.* The Meadows filed an action against Employers Health in the Arizona Superior Court suing "only as a third-party health care provider for claims that were non-derivative and independent of those which the Friedels might have had suing for damages and not for policy benefits." *Id.* On the basis of non-derivative filing, the district court held that ERISA did not preempt The Meadows' independent state law claims. *Id.* The Ninth Circuit affirmed the district court's ruling, holding that "claims by a third-party who sues an ERISA plan not as an assignee of a purported ERISA beneficiary, but as an *independent* entity claiming *damages*" are not preempted by ERISA section 514. *Id.* at 1009. Plaintiffs are not traditional ERISA entities. Instead, they are providers that made a deal to provide rehabilitation treatment in exchange for an agreed-upon payment amount.

Defendant also cites to *Josef K. v. California Physicians' Serv.*, 2019 WL 2342245 (N.D. Cal. June 3, 2019)[2] to argue that Plaintiffs' claims are preempted by ERISA. Josef *K.* is akin to *Pilot Life* and distinguishable from the present situation. In *Josef K.* the plaintiff alleged "improper, inaccurate, and incomplete review of [the] claim denial" (*Id.* at *3) that interfered with the contract at issue. These are not denied claims, these are illegally underpaid claims where the underpayment resulted from a comprehensive, illegal, fraudulent scheme.

---

[2] *Josef K.* involved a single claim brought under an ERISA Plan against an ERISA fiduciary. The court was left to choose between a state claim against the alleged ERISA fiduciary, or finding that the third party was in fact an ERISA fiduciary with liability under the statute. The court found that the third party was akin to an ERISA fiduciary and allowed the (a)(3) claim to proceed, making the state law claim unnecessary and moot, not preempted. *Josef K.* is also distinguishable from herein in that the complaining defendant was third party independent reviewer, selected by the Department of Managed Health Care, to review a claim denial. That entity's decision was final, and determined whether or not the plaintiffs' claims would be paid. It was in that posture--a third party reviewer who decided whether or not a claim was paid—and not a provider as herein, that the court invoked ERISA fiduciary status.

As such, Plaintiffs' state law claims are not preempted, and Defendant's motion should be denied.

## VII.    Plaintiffs' State Law Claims Are Properly Pled

### A.  Plaintiffs' Fraud Claims Satisfy Rule 9(b)

Fraud claims are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 935 (N.D. Cal. 2013) (allegations sufficient as "Plaintiffs describe the content of the omission as the failure to inform them that the fees were marked-up and that the majority of the fees ultimately went to Wells Fargo, and not third-party vendors performing the services.")

### B.  The Economic Loss Rule Does Not Apply

United cites *United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009) in which the court recognized that a properly pled fraudulent inducement claim is not barred by the economic loss rule. Although in that case, the fraudulent inducement claim was dismissed by the court for not meeting pleading standards, the *United Guar* court specifically held at page 1188:

> The economic loss rule poses no barrier to a properly pled fraudulent inducement claim: "[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for fraud." *Lazar v. Superior Court,* 12 Cal.4th 631, 645, 49 Cal.Rptr.2d 377, 909 P.2d 981(1996)."

Here, the properly alleged fraudulent inducement claim is related to oral/implied contracts and supported by factual allegations. It is clearly not subject to the economic loss rule. Neither, for the reasons discussed below, are the other fraud claims.

*United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F. Supp. 2d 1163 (C.D. Cal. 2009) further elaborated on the economic loss rule, stating at page 1180:

> "Though the economic loss rule is easy to state, the rule's application and exceptions are more conceptually difficult. Most of the parties' arguments address the rule. Applying the rule to the present circumstances requires considering the rule's exceptions and policy rationales.

1
2
3
4
5
6
7

The rule 'prevents the law of contract and the law of tort from dissolving into one another.' *Robinson Helicopter Co., Inc. v. Dana Corp.,* 34 Cal.4th 979, 988, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004) (internal modification and quotations omitted). By preventing tort claims-and, thus, tort damages-the rule encourages parties to reach a mutually beneficial private bargain. Limiting recovery to contract damages makes it easier for parties to " estimate in advance the financial risks of their enterprise." *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 106, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995) (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 515, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 694, 254 Cal.Rptr. 211, 765 P.2d 373 (1988)…"[Underlining added]

8
9
10
11
12
13
14

The policy rationale for the economic loss rule arguably makes sense in cases like *United Guar.* which involved a written commercial contract in which "…sophisticated parties reached a bargain that expressly allocates the risk of misrepresentations-including fraudulent misrepresentations."  (*Id*, 1185). Thus, in the process of negotiating and creating a complex written commercial contract, those parties decided to contractually define their available fraud remedies. By way of example, the *Apollo Grp., Inc. v. Avnet, Inc.,* 58 F.3d 477 (9th Cir. 1995) case cited by Defendant involved a written contract in the context of a commercial transaction.

15
16
17
18
19
20
21
22

The *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*, 2020 WL 2027955 case cited by Defendant is not on point as although the court discussed the economic loss rule, its dismissal order as to the fraud claims was primarily based on the specificity of pleading issue, as evidenced by the fact the *Bristol* court granted leave to amend. The fraud claims alleged in the complaint are grounded on fraudulent inducement to enter into oral/implied contracts and supported by detailed, factual allegations. The essence of the fraud-based claims is that Defendant fraudulently induced the out of network Providers to treat its insureds based on the representations that they would be paid for such services at the UCR.

23
24
25
26

The contracts alleged in the complaint were either oral or implied, not the written insurance contracts. There was no discussion or negotiation of other terms, let alone remedies in the event of fraud. Defendant does not admit that these contracts exist; rather it argues against any implied or oral contracts in this motion to dismiss.

27
28

So, there is a possibility in this case the court/jury could find that there is no oral or implied contract, but there is fraud. For this reason, among others, it does not make sense to apply the

economic loss rule at this stage. In fact, doing so would run afoul of Plaintiff's right to plead inconsistent alternative legal causes of action under Fed. R. Civ. P. 8(d)(3).

### C.  Plaintiffs' UCL Claim Is Proper

United attacks the UCL claim for violation of California's unfair competition law, set forth in Business and Professions Code §§ 17200, *et seq*. for various reasons, including that Plaintiffs' have not satisfied any of the three prongs of the UCL. The UCL prohibits unlawful, unfair, and fraudulent business practices. A "business practice need only meet one of the three criteria to be considered unfair competition." *McKell v. Washington Mut. Inc*. (2006) 142 Cal. App. 4th 1457, 1471. The standing requirement for a UCL claim is codified in Business and Professions Code section 17204 which states in part that a private Plaintiff must show that it:  "suffered injury in fact and has lost money or property as a result of the unfair competition."

In *Day v. Alta Bates Medical Center* (2002) 98 Cal.App. 3rd 243, 248 the California Supreme Court discussed the standing requirement, sating as follows:

> "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. (See, e.g., *Hall v. Time Inc., supra,* 158 Cal.App.4th at pp. 854-855, <u>70 Cal.Rptr.3d 466</u> [cataloguing some of the various forms of economic injury].) Neither the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of " lost money or property," nor can or need we supply an exhaustive list of the ways in which unfair competition may cause economic harm. It suffices to say that, in sharp contrast to the state of the law before passage of Proposition 64, a private plaintiff filing suit now must establish that he or she has personally suffered such harm." [Underlining Added]

The FAC alleges Providers were treated unfairly and suffered an injury in fact. They provided services worth much more that the fractional amount paid and would not have entered into agreements to treat United's insureds had United truthfully and fairly and disclosed its true intent to pay well below UCR. The FAC satisfies the fraud prong of a UCL claim in that it pleads multiple fraud causes of action showing that United has engaged in a fraudulent business practice. "A fraudulent business practice is one in which members of the public are likely to be deceived." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009) (citation and internal quotation marks omitted). To

1    be actionable under the UCL, a representation may be untrue, or it "may be accurate on some level,

2    but will nonetheless tend to mislead or deceive." *McKell*, 142 Cal. App. 4th at 1471.

3         The FAC also satisfies the other UCL prongs in that in addition to fraud/fraud causes of action,

4    it alleges conduct which is both unfair and contrary to law. Defendant cites *Sonner v. Premier*

5    *Nutrition Corp.*, 917 F.3d 834, 844 (9th Cir. 2020) for the proposition that Plaintiffs' have not

6    established there is no adequate remedy at law. In *Sonner*, the plaintiff attempted, well after the close

7    of pleadings on the eve of trial, do drop all of its viable claims in place of a UCL claim.  A similar

8    argument to Defendant's based on *Sonner* was recently made and rejected by the court in *In re Juul*

9    *Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 197766 at *223

10   (N.D. Cal. Oct. 23, 2020).  The FAC clearly alleges that Plaintiffs lack an adequate legal remedy as

11   to both Defendants at paragraphs 473 and 482. It is also clear that Plaintiffs legal claims (which are

12   vigorously contested by Defendants in this motion and undoubtedly in the future) are not coextensive

13   with the requested equitable injunctive relief which relates to future conduct by Defendants, as

14   alleged at paragraphs 472 and 481 of the FAC.

15        **D.  Plaintiffs' Contract and Estoppel Claims Are Properly Pled.**

16        The breach of oral contract and breach of implied contract counts allege claims based on

17   promises made by United to the Plaintiffs (not the insurance policies/plans) wherein United

18   consistently specifically stated and agreed that it would pay based on the UCR. The promissory

19   estoppel claim is based on the same allegations.

20        By representing that it would pay a rate based on UCR, a known term in the industry, United

21   provided a method by which the amount it would pay would be objectively determined. That is an

22   appropriate consideration recognized in California Civil Code section 1610 which states: "When a

23   consideration is executory, it is not indispensable that the contract should specify its amount or the

24   means of ascertaining it. It may be left to the decision of a third person, or regulated by any specified

25   standard."

26        Even if there was a legitimate question about using UCR as the method to ascertain the

27   payment amount, California Civil Code section 1611 would apply to fix the payment

28   amount/consideration at what the Providers' services were "reasonably worth." *Cal Spine &*

1    *Neurosurgery Inst. v. United Healthcare Ins. Co.*, Case No. 19-CV-02417-LHK, 2019 U.S. Dist.

2    LEXIS 159286 is both on point and instructive, stating at page 4:

3         In this way, the instant action closely mirrors *Summit Estate, Inc. v. Cigna Healthcare*

4         *of California, Inc., 2017 U.S. Dist. LEXIS 167462, 2017 WL 4517111 (N.D. Cal. Oct.*
        *10, 2017)*. In *Summit*, the plaintiff's complaint alleged that the defendants "advised"

5         plaintiff that "[d]efendants would pay for treatment at the usual, reasonable and
        customary rate." *2017 U.S. Dist. LEXIS 167462, 2017 WL 4517111, at \*3*. The court

6         determined that this was sufficient to state a claim for both breach of implied contract
        and breach of oral contract. *2017 U.S. Dist. LEXIS 167462, [WL] at \*4*…

7

8    United's reliance on *Pacific Bay Recovery, Inc. v. California Physicians Services, Inc.* (2017)

9    12 Cal.App. 5th 200 is misplaced. In that case, the Court of Appeal rejected the substance abuse

10    provider's argument that it was entitled to be compensated based on the UCR. However, *Pacific Bay*

11    is completely different from this case. It was a case in which the provider questionably attempted to

12    rely on inapplicable Knox Keene act provisions allowing emergency providers to receive the UCR,

13    even though the services Pacific Bay provided were not emergency services. In *Pacific Bay*, Pacific

14    Bay alleged only that Blue Shield would pay for the services. It did not allege that it was told it would

15    receive the UCR, only that it "was led to believe it 'would be paid a portion or percentage of its total

16    billed charges, which charges correlated with usual, reasonable and customary charges'" (*Id*., at 216).

17    In this case, the FAC clearly alleges the Providers were told they would be paid a rate based

18    upon UCR. This is not an allegation of a belief, as was the case in *Pacific Bay*, but rather an allegation

19    of fact as to an appropriate method to determine the payment rate. The FAC does not base the

20    promissory estoppel cause of action on promises made in the insurance contracts, but rather the

21    promises made in the preadmission VOB communications. United should be required to pay the

22    claims and estopped from paying anything other than the represented UCR.

23    **VIII.    Conclusion**

24    By reason of the foregoing, it is respectfully submitted that the motion to dismiss

25    should be denied. If the court is inclined to sustain any part of the motion, Plaintiffs respectfully

26    requests leave to amend.

27                 [SIGNATURE PAGE FOLLOWS]

28

Dated: November 23, 2020

**NAPOLI SHKOLNIK PLLC**

/s/_____
Matthew M. Lavin
Wendy A. Mitchell
Aaron R. Modiano

**DL LAW GROUP**

/s/_____
David M. Lilienstein
Katie J. Spielman

*Attorneys for Plaintiffs*