# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED BEHAVIORAL HEALTH, ET AL., <br><br> Defendants. | CASE NO.  4:20-cv-02249 YGR <br><br> **ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND** <br><br> Re: Dkt. Nos. 71, 72, 80 |

Plaintiffs[1] bring this putative class action against defendants United Behavioral Health ("United") and MultiPlan, Inc. ("MultiPlan") for claims arising out of United's alleged failure to reimburse plaintiffs at "a percentage" of the Usual, Customary, and Reasonable Rates ("UCR") for Intensive Outpatient Program ("IOP") services, which plaintiffs provided to patients with health insurance policies administered by United.  The Court dismissed a prior iteration of the complaint in its entirety, with leave to amend.  Plaintiffs filed a First Amended Complaint ("FAC"), in which they assert, on their own behalf and on behalf of a proposed class of similarly-situated out-of-network IOP providers, claims under Section 1 of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and multiple claims under California law.

Now pending are two motions to dismiss all claims in the FAC with prejudice under Federal Rule of Civil Procedure 12(b)(6) on the grounds that: (1) plaintiffs' claims under Section 1 of the Sherman Act and RICO fail for lack of statutory standing; (2) plaintiffs' state-law claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"); and (3) all claims in the FAC continue to be inadequately pleaded.

---

[1] Plaintiffs are Pacific Recovery Solutions d/b/a Westwind Recovery, Miriam Hamideh PhD Clinical Psychologist Inc. d/b/a PCI Westlake Centers, Bridging the Gaps, Inc., and Summit Estate Recovery Center, Inc.

United States District Court
Northern District of California

1   Having carefully considered the pleadings and the parties' briefs[2], and for the reasons set

2   forth below, the Court **GRANTS** the motions to dismiss **WITH PREJUDICE** with respect to plaintiffs'

3   claims under the Sherman Act and RICO, and plaintiffs' state-law claims to the extent that they

4   arise out of the alleged under-reimbursement of claims for IOP services that were covered by

5   ERISA plans.  The Court **GRANTS** the motions to dismiss **WITH LEAVE TO AMEND** with respect to

6   plaintiffs' state-law claims to the extent that they arise out of the alleged under-reimbursement of

7   claims for IOP services that were covered by plans that fall outside of the scope of ERISA.[3]

8   I.   **BACKGROUND**

9        **A.    Initial complaint**

10   In the first iteration of the complaint, plaintiffs alleged as follows.  Plaintiffs are out-of-

11   network healthcare providers who provided IOP services to patients who had health insurance

12   policies that United administered.  Compl. ¶ 2, Docket No. 1.  The health insurance policies that

13   United administered are "health care benefit programs" covered by ERISA.  *Id.* ¶¶ 348-359.

14   Before providing treatment to these patients, "each of the Plaintiffs confirmed with United that the

15   patients had active coverage and benefits for out of network IOP treatment services" through

16   verification-of-benefits ("VOB") calls, during which United "represented" that it would pay the

17   patients' claims for such services at a percentage of the UCR.  *Id.* ¶¶ 3, 17, 188, 195, 202, 209.

18   Due to the communications in question, plaintiffs and United "understood" UCR to be "consistent

19   with United's published definition of UCR rates" on its website describing out-of-network plan

20   benefits.  *Id.* ¶ 324; *id.* ¶ 17 n.6 (alleging that United published a definition of UCR on its webpage

21   describing out-of-network plan benefits).  Plaintiffs provided IOP services to the patients in

22   reliance of United's representations.  *Id.* ¶¶ 3, 17, 188, 195, 202, 209.

23   United's representations that it would pay a percentage of the UCR were false, because

24   "United did not pay UCR amounts for any of the patient claims at issue in this litigation."  *Id.* ¶

25

26   _____

    [2] Plaintiffs moved for leave to file a sur-reply on December 14, 2020.  *See* Docket No. 80.
27   The Court **GRANTS** plaintiffs' motion for leave to file a sur-reply.
    [3] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court
28   finds this motion appropriate for decision without oral argument.  Accordingly, the Court
    VACATES the hearing set for December 22, 2020.

United States District Court
Northern District of California

13.  Instead, United engaged defendant Viant, a third-party "repricer," to "negotiate" reimbursements with Plaintiffs.  *Id.*  United has a contract with Viant pursuant to which Viant has "financial incentives" to negotiate reimbursements "at well below the UCR rate."  *Id.* ¶ 33. During its negotiations with plaintiffs, Viant represented that it had authority to negotiate with providers on the patients' behalf and that "the rate it offers is based on the UCR for the provider's geographic location."  *Id.* ¶¶ 34, 48, 52.  Viant's negotiations with plaintiffs resulted in offers to reimburse them for IOP services at an amount below the UCR, and United paid the patients' claims at the "reduced Viant amount."  *Id.* ¶¶ 13-14.  Neither United nor Viant disclosed to Plaintiffs the methodology they used for calculating the reimbursement rates for IOP services.  *Id.* ¶ 54.  United "unjustly retained" the difference between the amounts it "should have paid" to plaintiffs for the IOP services at issue and the amount that United actually did pay based on Viant's negotiated reimbursements.  *Id.* ¶ 15.

"[L]iability for the cost of care" that plaintiffs provided to patients ultimately falls on the patients.  *Id.* ¶¶ 55, 155, 4.  Plaintiffs "make every effort to recover unpaid amounts, first from United, then from patients."  *Id.* ¶ 55.  Plaintiffs "balance bill" patients for the amounts that the patients owe after taking into account any amounts that United reimbursed.  *Id.* ¶¶ 155, 4.

Further, United and other insurers were required as part of the settlement of an unrelated litigation ("*Ingenix* litigation") to underwrite the creation of a database called the "FAIR health" database, which contains rates for the reimbursement for IOP treatment.  *Id.* ¶ 20.  However, United and the other insurers were *not* required by the *Ingenix* litigation settlement to use the FAIR health database.  *Id.*

Plaintiffs asserted the following claims on their own behalf and on behalf of a proposed class of similarly-situated out-of-network IOP providers in the United States: (1) a claim for violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, against each defendant; (2) intentional misrepresentation and fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; (5) breach of oral or implied contract; (6) promissory estoppel; (7) a claim under RICO, 18 U.S.C. § 1962(c); and (8) a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1.

1    On August 25, 2020, the Court granted defendants' motions to dismiss all claims in the

2    initial complaint, and it did so with leave to amend.  Docket No. 61.

3        **B.    FAC**

4        In the FAC, plaintiffs continue to aver that United represented during VOB calls that it

5    would pay for IOP services at a percentage of the UCR.  *See, e.g.*, FAC ¶¶ 269, 276, 292.

6    Plaintiffs also continue to allege that their understanding as to what United meant when it

7    represented that it would pay a percentage of the UCR was based on United's published definition

8    of UCR on its webpage describing out-of-network plan benefits, suggesting that the UCR

9    definition has a connection to the terms of healthcare plans.  *See, e.g.*, FAC ¶ 529 (alleging that the

10   "UCR rate" was "understood by both parties to be consistent with United's published definition of

11   UCR rates"); *id.* ¶ 154 & n.19 (alleging that United publishes on its webpage regarding out-of-

12   network plan benefits a description of how it typically determines how to pay for out-of-network

13   services at the UCR rate).

14       The FAC differs from the initial complaint in the following ways: (1) plaintiffs deleted

15   most of the allegations that the Court relied upon in its order dismissing the initial complaint; (2)

16   plaintiffs added new allegations, some of which contradict the allegations in the initial complaint

17   upon which the Court relied in its order dismissing that pleading; (3) plaintiffs substituted

18   MultiPlan for Viant as a defendant; (4) plaintiffs added a claim for conspiracy in violation of

19   RICO, 18 U.S.C. § 1962(d); and (5) plaintiffs deleted their request for injunctive relief under the

20   Sherman Act.

21       Specifically, whereas in the initial complaint plaintiffs alleged that the plans administered

22   by United are healthcare benefit programs covered by ERISA, Compl. ¶¶ 348-59, the FAC

23   contains no such allegations.  Plaintiffs aver that each of the patients who received the IOP

24   services at issue had an insurance plan whose premiums were paid by the patient's employer, *see,*

25   *e.g.*, FAC ¶¶ 403, 388, but they also allege that a "large percentage" of these plans are not covered

26   by ERISA, FAC ¶ 33 (alleging that "[a] large percentage of the claims which underlie this lawsuit

27   do not involve ERISA plans").  In the FAC, plaintiffs do not specify which of the allegedly under-

28   reimbursed claims for IOP services at issue were covered by an ERISA plan, and which were not.

4

In the initial complaint, plaintiffs alleged that their patients are liable for any amounts not reimbursed by United for IOP services, and that their injuries arose from their patients' failure to pay outstanding balances for IOP services and from having to seek reimbursement from their patients for any amounts not reimbursed by United.  The allegations in the FAC attribute plaintiffs' injuries, not to their patients' failure to pay outstanding balances, but to United's failure to properly reimburse the claims for IOP services in question.  *See, e.g.*, FAC ¶ 20.

Plaintiffs also modified their allegations with respect to the process that United allegedly used to reprice the claims for IOP services at issue.  In the initial complaint, plaintiffs alleged that United had engaged Viant to "negotiate" reimbursements with plaintiffs; that Viant's negotiations with plaintiffs resulted in offers to reimburse them for IOP services at an amount below the UCR; and that United paid the patients' claims for IOP services at the "reduced Viant amount."  *See* Compl. ¶¶ 13-14.  In FAC, by contrast, plaintiffs allege that United entered into a contract with MultiPlan, Viant's parent company, to use a database that allowed defendants to generate "fraudulent UCR rates" for IOP services, which they used to under-reimburse for the cost of the IOP services at issue.  FAC ¶¶ 121, 13-62.  Plaintiffs deleted all allegations as to Viant's alleged negotiations with plaintiffs from the FAC.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks and citation omitted).  In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  "[A] court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in

1    opposition to a defendant's motion to dismiss." *Schneider v. California Dep't of Corr.*, 151 F.3d

2    1194, 1197 n.1 (9th Cir. 1998).  A court should grant leave to amend unless "the pleading could

3    not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal.*

4    *Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

5    **III.    DISCUSSION**

6         As noted, defendants move to dismiss all claims in the complaint on the grounds that (1)

7    plaintiffs' claims under Section 1 of the Sherman Act and RICO fail for lack of statutory standing;

8    (2) plaintiffs' state-law claims are preempted by ERISA; and (3) all claims in the FAC continue to

9    be inadequately pleaded.

10        The Court addresses each of these arguments in turn.

11   **A.    Section 1 of the Sherman Act**

12        Section 1 of the Sherman Act makes it unlawful to form a "contract, combination in the

13   form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

14   States[.]"  15 U.S.C. § 1.  "To establish a claim under Section 1 of the Sherman Act, Plaintiffs

15   must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement

16   unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis;

17   and 3) that the restraint affected interstate commerce." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,

18   236 F.3d 1148, 1155 (9th Cir. 2001) (citation and internal quotation marks omitted).  In addition

19   to these elements, plaintiffs also must show that they were "harmed by the defendant's anti-

20   competitive contract, combination, or conspiracy, and that this harm flowed from an anti-

21   competitive aspect of the practice under scrutiny." *Brantley v. NBC Universal, Inc.*, 675 F.3d

22   1192, 1197 (9th Cir. 2012) (citation and internal quotation marks omitted).  This requirement is

23   generally referred to as "antitrust standing." *Id.* (citation omitted).

24        Plaintiffs assert a Section 1 claim for damages against defendants, which is predicated on

25   the theory that defendants entered into a "horizontal price fixing" conspiracy pursuant to which

26   United and "its competitors" fixed the prices that insurers paid to providers for IOP services,

27   which they achieved by using Multiplan's database and pricing tool.  FAC ¶¶ 389-394, 403.

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    Plaintiffs allege that they were injured by the alleged conspiracy because they "sold their services

2    for less than they would have sold for in a free, open and competitive market." *Id.* ¶ 558.

3         Defendants move to dismiss plaintiffs' Section 1 claim on the grounds that plaintiffs lack

4    antitrust standing because the injuries they allegedly suffered are derivative of their patients'

5    injuries, and because plaintiffs have otherwise not stated a claim under Section 1.

6         The Court first turns to the question of whether plaintiffs have shown that they have

7    antitrust standing.

8         Section 4 of the Clayton Act permits private parties to sue for damages arising out of

9    injuries caused by violations of the federal antitrust laws.  15 U.S.C. § 15.  In determining whether

10   a private party has "antitrust standing" under Section 4, courts consider the following factors: "(1)

11   the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were

12   intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4)

13   the risk of duplicative recovery; and (5) the complexity in apportioning damages." *American Ad*

14   *Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999).

15        Here, the first factor for antitrust standing is not met, because plaintiffs' allegations do not

16   raise the reasonable inference that the type of injury they suffered is of the type that the antitrust

17   laws were intended to prevent, which is to preserve competition.  *Knevelbaard Dairies v. Kraft*

18   *Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("[T]he central purpose of the antitrust laws, state

19   and federal, is to preserve competition.").

20        In the initial complaint, plaintiffs alleged that their patients had "agreed" to be liable for

21   any amounts that United did not reimburse for IOP services, and that plaintiffs suffered injury

22   only to the extent that their patients failed to pay them the difference between the amount

23   reimbursed by United and the amount their patients owed them pursuant to this agreement.  *See,*

24   *e.g.*, Compl. ¶ 151 ("[E]ach patient agreed to be liable for the difference between the amount the

25   treating provider billed, and the amount United reimbursed."); *id.* ¶ 155 (alleging that plaintiffs

26   "balance bill their patients for the amounts that they are owed" as a result of United's alleged

27   under-reimbursement); *Id.* ¶ 406 (alleging that plaintiffs were injured by the alleged conspiracy

28   because it caused them to be "underpaid" for their services and to incur "significant additional

expenses in seeking proper payment").   Based on these allegations, the Court concluded that plaintiffs' alleged injury "would arise directly from the patients' failure to comply with their financial obligations to plaintiffs, and not from defendants' conduct."  Order at 5-6, Docket No. 61.  The Court further concluded that this type of injury, which arises out of the breach of agreements between plaintiffs and each of their patients, was not of the type that the antitrust laws were intended to prevent, because the breach of a contract by individual patients has nothing to do with competition.  *Id.*

Although plaintiffs deleted from the FAC most of the allegations suggesting that plaintiffs' injury arises from their patients' failure to pay them the balance remaining for the IOP services at issue, the FAC still contains some allegations that support that proposition.  *See, e.g.,* FAC ¶¶ 62 (alleging that "[m]ost patients cannot shoulder the full costs of MH/SUD treatment" and as a result, "in the vast majority of cases . . . the provider bears the full cost of treatment services"); *id.* ¶ 89.  Plaintiffs have cited no case that supports the proposition that the antitrust laws were intended to prevent injury that arises from the breach of an agreement to pay for the cost of healthcare services.  Accordingly, the Court concludes that the nature of plaintiffs' injury is not of the type that the antitrust laws were intended to forestall.

The second factor for antitrust standing also is not met, because plaintiffs' injury, if any, was not proximately caused by the alleged conspiracy.  To assess the directness of the plaintiff's injury, courts "look to the chain of causation between [plaintiff's] injury and the alleged restraint in the market." *American Ad Management*, 190 F.3d at 1058.  Plaintiffs alleged in the prior iteration of the complaint that the direct victims of the alleged conspiracy were "United's members" (i.e., plaintiffs' patients) because they "incurred liability for illegally inflated out-of-pocket payments for out-of-network IOP services than they would have paid" in the absence of the conspiracy.  Compl. ¶ 407.  Plaintiffs deleted that allegation from the FAC and replaced it with conclusory allegations that contradict it.  *See, e.g.,* FAC ¶¶ 285, 314, 344 (alleging that plaintiffs have "been directly harmed by [United's] underpayment").  The Court does not consider these new allegations that contradict the allegations in the initial complaint.  *See Azadpoour v. Sun Microsys., Inc.*, No. 06–3272, 2007 WL 2141079, at *2 n. 2 (N.D. Cal. July 23, 2007) ("Where

8

1    allegations in an amended complaint contradict those in a prior complaint, a district court need not

2    accept the new alleged facts as true, and may, in fact, strike the changed allegations as 'false and

3    sham.'") (citations omitted); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990)

4    (holding that an "amended complaint may only allege other facts consistent with the challenged

5    pleading") (citation omitted).  As discussed above, plaintiffs' injury arises only to the extent that

6    their patients do not pay the amounts that United does not reimburse.  Accordingly, the proximate

7    cause of plaintiffs' injuries is their patients' failure to pay outstanding balances pursuant to their

8    agreements with plaintiffs, and not defendants' alleged conduct.

9         The third factor also is not met, because plaintiffs' injuries are speculative.  To the extent

10   that a patient pays the balance owed to plaintiffs for the IOP services at issue, then plaintiffs

11   would suffer no injury as to that patient.  Plaintiffs' allegations do not raise the reasonable

12   inference that it is certain that none of their patients who have outstanding balances will not pay

13   such balances in the future.  To the contrary, plaintiffs admit in their briefs that it remains possible

14   that they could receive a payment of the outstanding balances from their patients, *as well as* from

15   United to the extent that plaintiffs prevail in this lawsuit.  *See, e.g.*, Opp'n at 13, Docket No. 76

16   ("In the off-chance that a patient and United both paid Plaintiffs the underpayment amount, that

17   payment would be refused or promptly refunded by Plaintiffs.").

18        The remaining factors for antitrust standing also are not satisfied, because plaintiffs'

19   allegations do not foreclose the possibility that their patients, as the direct victims of the alleged

20   conspiracy, could also sue defendants to recover damages for the alleged conspiracy.  If both the

21   patients and plaintiffs were to sue defendants under the Sherman Act, the risk of duplicative

22   recoveries would be significant.  Avoiding such duplication would require fact-intensive inquiries

23   and calculations, which weighs against finding that plaintiffs here, whose alleged injuries are less

24   direct than those of their patients, have antitrust standing.

25        In an analogous action brought by healthcare providers against United for failure to

26   properly reimburse United-policy subscribers (i.e., patients) for covered out-of-network services,

27   the court dismissed with prejudice the providers' claims under the Sherman Act for lack of

28   antitrust standing.  *See In re Wellpoint, Inc. Out-of-Network* "*UCR*" *Rates Litig.*, 903 F. Supp. 2d

880, 902 (C.D. Cal. 2012) ("*In re Wellpoint*").  The court reasoned that "there exist more direct victims in the form of the Subscribers [patients]" and that the providers' alleged injury was "entirely derivative of the injury inflicted on the Subscribers," as the providers' alleged injury "merely flows from the misfortunes visited upon the Subscribers by" the defendants' alleged conspiracy.  *Id.*  Even though the Court relied upon this opinion in its order dismissing plaintiffs' Section 1 claim in the prior iteration of the complaint, Order at 6, Docket No. 61, Plaintiffs have not distinguished *In re Wellpoint*.  Nor have plaintiffs cited any authority that supports the proposition that a plaintiff can have antitrust standing where, as here, the plaintiff's injury flows from the injury of another.[4]

In light of the foregoing, the Court cannot conclude that plaintiffs have antitrust standing. Because plaintiffs' lack of antitrust standing requires the dismissal of plaintiffs' Sherman Act claim, the Court need not address defendants' alternative arguments with respect to that claim. The Court **GRANTS** defendants' motions to dismiss plaintiffs' Sherman Act claim **WITH PREJUDICE**.

## B.   RICO

Section 1962(c) of RICO provides, "It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of

---

[4] The authorities upon which plaintiffs rely in their opposition are inapposite.  In none of these cases did the plaintiff's injury flow from the injury of another.  In these cases, the alleged injury was the plaintiff's alleged exclusion from the market in which the defendants also competed; this injury flowed directly from the alleged anticompetitive conduct, and not from the injury of some other person or entity.  *See Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440 (9th Cir. 1988) (denying motion to dismiss antitrust claim brought by nurse anesthesiologist against four anesthesiologists and a hospital based on an alleged conspiracy to exclude the plaintiff nurse anesthesiologist from the market for providing anesthesia services in a county); *N. California Minimally Invasive Cardiovascular Surgery, Inc. v. Northbay Healthcare Corp.*, No. C 15-06283 WHA, 2016 WL 1570015, at *4 (N.D. Cal. Apr. 19, 2016) (denying motion to dismiss antitrust claim brought by a doctor against another doctor and a hospital based on an alleged conspiracy to exclude the plaintiff doctor from the market for providing cardiovascular surgery in two counties).  Relying on these authorities, plaintiffs argue in their opposition that they have antitrust standing because the alleged conspiracy "excluded" providers (i.e., plaintiffs) "from serving any patients insured under United plans."  Opp'n at 12, Docket No. 76.  This argument is unpersuasive because it contradicts plaintiffs' allegations that they *did and continue to* provide services to patients insured under United plans.  *See, e.g.*, FAC ¶¶ 259, 289, 318, 348; id. ¶ 19 ("Without Court intervention, this scheme will continue and continue to damage Plaintiffs and the class.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

2    18 U.S.C. § 1962(c).

3         Section 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of

4    the provisions of subsection (a), (b), or (c) of this section."  A defendant cannot be liable for a

5    RICO conspiracy under Section 1962(d) if the defendant is not liable under the substantive RICO

6    provisions, namely Sections 1962(a), (b), or (c).  *See Howard v. Am. Online Inc.*, 208 F.3d 741,

7    751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do

8    not adequately plead a substantive violation of RICO.").

9         Here, plaintiffs allege that defendants violated RICO Sections 1962(c) and 1962(d) by

10   committing wire fraud and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343 to under-

11   reimburse plaintiffs for the IOP services that plaintiffs provided to patients with United insurance

12   policies.  FAC ¶¶ 13-62.  Plaintiffs allege that defendants used a database and pricing tool that

13   allowed them to generate "fraudulent UCR rates" for IOP services, which they used to under-

14   reimburse for the cost of the IOP services at issue.  *Id.* ¶¶ 121, 13-62.

15        Defendants move to dismiss this claim on the grounds that plaintiffs lack RICO standing

16   and that plaintiffs' allegations are insufficient to state a claim under RICO Sections 1962(c) and

17   1962(d).

18        The Court first turns to the question of whether plaintiffs have shown that they have RICO

19   standing.

20        To establish RICO standing, a plaintiff must plead an injury to business or property that

21   was proximately caused by the alleged RICO predicate offense.  *Hemi Grp., LLC v. City of New*

22   *York*, 559 U.S. 1, 2 (2010) ("To establish that an injury came about by reason of a RICO violation,

23   a plaintiff must show that a predicate offense not only was a but for cause of his injury, but was

24   the proximate cause as well.") (citation and internal quotation marks omitted); *Holmes v. Sec.*

25   *Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (same).  In determining whether a plaintiff's injury

26   has a sufficient causal nexus to the RICO predicate offense, courts look to the same factors that

27   courts consider to determine whether a plaintiff has antitrust standing.  *See Oregon Laborers-*

28   *Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999)

11

United States District Court
Northern District of California

("To determine whether an injury is 'too remote' to allow recovery under RICO and the antitrust laws, the Court applies the following three-factor 'remoteness' test: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.").

Here, plaintiffs' allegations do not raise the inference that they have RICO standing for the same reasons that such allegations do not raise the inference that plaintiffs have antitrust standing. As discussed above, the proximate cause of plaintiffs' injury is the non-payment by their patients of any amounts that United did not reimburse. Plaintiffs' injury is, therefore, derivative of their patients' injuries and too remote to confer them with RICO standing. Further, the risk of duplicative recoveries and of having to engage in fact-intensive damages calculations to prevent such duplication is high to the extent that plaintiffs and their patients sue defendants for the same conduct. Indeed, plaintiffs admit that their patients have already filed a lawsuit against defendants captioned *L.D. v. United*, Case No. 4:20-cv-02254, which is also pending before this Court. FAC ¶ 8. In that case, the patients assert claims under RICO arising out of the same alleged enterprise that forms the basis of plaintiffs' RICO claims here. *See* First Amended Complaint, Docket No. 57, Case No. 4:20-cv-02254.

In *In re Wellpoint*, which, as noted above, is an analogous action brought by healthcare providers against United for failure to properly reimburse subscribers (patients) for covered out-of-network services, the district court dismissed the providers' RICO claims with prejudice for lack of RICO standing on the basis that the providers' claims were derivative of those of their patients. 903 F. Supp. 2d at 902. *In re Wellpoint*, which plaintiffs have not distinguished, supports the dismissal of plaintiffs' RICO claims here on the same ground.

Plaintiffs cite no authority supporting the proposition that a plaintiff can sue under RICO where, as here, the plaintiff's injury is derivative of the injury of another. To the contrary, the authorities that plaintiffs cite in their opposition support the opposite conclusion. *See, e.g.,* *Holmes*, 503 U.S. at 271-74 (holding that the plaintiffs "were not the proper plaintiffs" and lacked

RICO standing because their injury was derivative of the injury that a third party suffered as a result of the alleged RICO conspiracy); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-58 (2006) (applying *Holmes* and holding that plaintiffs lacked RICO standing because the "direct victim of this conduct [the alleged RICO enterprise] was the State of New York," not plaintiffs). In *Holmes*, which plaintiffs cite in their brief, the Supreme Court expressly rejected the argument that RICO ought to be "liberally construed to effectuate its remedial purposes" by allowing plaintiffs whose injuries were indirect to sue under RICO, reasoning that "[a]llowing suits by those injured only indirectly would open the door to massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits." 503 U.S. at 274 (citation and internal quotations omitted) (alterations in the original).

Plaintiffs appear to argue that they have satisfied the proximate causation requirement for RICO standing because they are not required to plead reliance with respect to defendants' fraudulent acts. Opp'n at 9-10, Docket No. 76. This argument misses the point. The RICO standing analysis here does not hinge on whether plaintiffs have pleaded, or must plead, reliance.[5] Instead, as discussed above, the analysis turns on the derivative and indirect nature of plaintiffs' injury.

In light of the foregoing, the Court cannot conclude that plaintiffs have RICO standing. Because plaintiffs' lack of RICO standing requires the dismissal of their RICO claims, the Court need not address defendants' alternative arguments with respect to whether such claims are

___

[5] The case that plaintiffs cite for the proposition that they are not required to plead reliance on defendants' alleged fraud does not actually support that assertion. In *Bridge v. Phoenix Bond & Indem. Co.*, the Supreme Court held that a plaintiff whose injury was "the direct result" of the alleged mail fraud committed by the alleged RICO enterprise can sue under RICO without having to plead that it itself relied on the fraudulent representations, so long as it pleads "at least third-party reliance in order to prove causation." 553 U.S. 639, 658-59 (2008). In other words, *Bridge* holds that, in the context of a RICO claim predicated on mail fraud, the plaintiff must plead at least third-party reliance on the alleged fraud. Importantly, the directness of the plaintiff's injury for the purpose of RICO standing was not at issue in *Bridge*; there, and unlike here, "there [were] no independent factors that account[ed] for [plaintiffs'] injury, there [was] no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim [was] better situated to sue." Accordingly, *Bridge* does not alter the Court's analysis, above, with respect to whether plaintiffs have RICO standing.

13

United States District Court
Northern District of California

adequately pleaded.  The Court **GRANTS** defendants' motions to dismiss plaintiffs' RICO claims **WITH PREJUDICE**.

### C.     State-law Claims

Plaintiffs assert the following state-law claims against defendants: (1) violation of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*; (2) intentional misrepresentation and fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; (5) breach of oral or implied contract; and (6) promissory estoppel.  All of these claims are predicated on the theory that United represented to plaintiffs during VOB calls that it would pay for IOP services at a percentage of the UCR.  *See, e.g.*, FAC ¶¶ 269, 276, 292.  Plaintiffs allege that, instead of paying for the IOP services at a percentage of the UCR, defendants used a database and pricing tool to generate a fraudulent UCR rate, which they used to under-reimburse the claims for IOP services at issue.  *Id.* ¶¶ 70, 121.

Defendants move to dismiss these claims on the ground that they are preempted under ERISA Section 514(a) because the claims depend on the existence and terms of ERISA plans.

ERISA Section 514(a) expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]"  29 U.S.C. § 1144(a).  "While this section suggests that the phrase 'relate to' should be read broadly, the Supreme Court has recently admonished that the term is to be read practically, with an eye toward the action's actual relationship to the subject plan."  *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004) (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655-56 (1995)).  "Generally speaking, a common law claim 'relates to' an employee benefit plan governed by ERISA 'if it has a connection with or reference to such a plan.'"  *Id.* (citation omitted).  "In evaluating whether a common law claim has 'reference to' a plan governed by ERISA, the focus is whether the claim is premised on the existence of an ERISA plan, and whether the existence of the plan is essential to the claim's survival.  If so, a sufficient 'reference' exists to support preemption."  *Id.* (citations omitted).  "In determining whether a claim has a 'connection with' an employee benefit plan, courts in this circuit use a relationship test.  Specifically, the emphasis is on the genuine impact that the action has on a relationship

1    governed by ERISA, such as the relationship between the plan and a participant." *Id.* (citations

2    omitted).

3            The Court previously held, based on the allegations in the initial complaint, that plaintiffs'

4    state-law claims depended on the existence and terms of ERISA plans administered by United and

5    that, as such, they were preempted under ERISA Section 514(a).  Order at 16-17, Docket No. 61.

6    The Court reasoned that the allegations in the initial complaint connected United's alleged

7    obligation to pay for IOP services at a percentage of the UCR to the patients' healthcare plans,

8    which plaintiffs alleged were healthcare benefit plans covered by ERISA, because plaintiffs

9    alleged that "[e]very plan at issue in this litigation was obligated to pay out-of-network IOP claims

10   at the UCR rate."  *See* Compl. ¶¶ 74, 75, 348-59.  Further, plaintiffs averred that the parties'

11   understanding as to what United meant when it represented that it would pay a percentage of the

12   UCR was based on United's published definition of UCR on its webpage describing out-of-

13   network *plan benefits*, suggesting that the UCR definition is based on the terms of benefit plans.

14   *See* Compl. ¶ 324 (alleging that plaintiffs and United understood UCR to be "consistent with

15   United's published definition of UCR rates"); *id.* ¶ 17 n.6 (alleging that United published a

16   definition of UCR on its webpage describing out-of-network plan benefits).

17           In the FAC, plaintiffs continue to allege that the parties' understanding as to what United

18   meant when it represented that it would pay a percentage of the UCR was based on the terms of

19   the plans that United administered.  *See* FAC ¶ 428 ("It is arbitrary, capricious, improper, and a

20   *breach of plan terms* for United to pay rates other than a true UCR arrived at under a fair

21   methodology.") (emphasis added); *id.* ¶ 529 (alleging that the "UCR rate" was "understood by

22   both parties to be consistent with United's published definition of UCR rates"); *id.* ¶ 154 & n.19

23   (alleging that United publishes on its webpage for out-of-network plan benefits a description of

24   how it typically determines how to pay for out-of-network services at the UCR rate).

25   Accordingly, the FAC continues to raise the inference that the state-law claims at issue depend on

26   the terms of the patients' healthcare plans.

27           The question is whether the patients' healthcare plans are covered by ERISA.  If the plans

28   are so covered, then the state-law claims that depend on the terms of such plans are preempted by

United States District Court
Northern District of California

15

ERISA.  *See Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1191 (9th Cir. 2010) (holding that state-law claims predicated on "theories of fraud, misrepresentation, and negligence" are preempted under Section 514(a) because they "depend on the existence of an ERISA-covered plan to demonstrate that [the plaintiff] suffered damages").  If the plans are not covered by ERISA, then the state-law claims that depend on the terms of such plans would not be preempted, as defendants have not shown that a claim that depends on the terms of a plan that is not covered by ERISA can be subject to ERISA preemption.

In the initial complaint, plaintiffs alleged that the plans administered by United are healthcare benefit plans within the meaning of ERISA and are thus covered by ERISA.  Compl. ¶¶ 348-59.  The FAC contains no such allegations.  In the FAC, plaintiffs aver that each of the patients who received the IOP services in question had an insurance plan whose premiums were paid by the patient's employer, *see, e.g.*, FAC ¶¶ 403, 388, but they also allege that a "large percentage" of these plans are not covered by ERISA, FAC ¶ 33 (alleging that "[a] large percentage of the claims which underlie this lawsuit do not involve ERISA plans").  Plaintiffs do not specify in the FAC which of the claims for IOP services that United allegedly under-reimbursed are covered by an ERISA plan, and which are not.

The Court concludes that plaintiffs' state-law claims are preempted under ERISA Section 514(a) to the extent that they arise out of allegedly under-reimbursed claims for IOP services that are covered by ERISA plans, because such state-law claims depend on the existence and terms of ERISA plans based on the allegations discussed above.  *See Wise*, 600 F.3d at 1191.

Plaintiffs have not shown that a different conclusion is warranted with respect to these claims.  Plaintiffs argue that ERISA does not preempt their state-law claims because such claims depend, not on the terms of ERISA plans, but on duties that are independent of any plan.  Opp'n at 18, Docket No. 76.  But these arguments are inconsistent with the allegations in the FAC, which, as discussed above, raise the inference that the parties' understanding as to what United was required to reimburse was based on the terms of the patients' plans, and not on the terms of an agreement between plaintiffs and defendants that was independent of the plans.

United States District Court
Northern District of California

1    The authorities upon which plaintiffs rely are distinguishable.  *See* Opp'n at 11-13, Docket

2    No. 75.  In the opinions that plaintiffs cite, the state-law claims fell outside of the scope of ERISA

3    preemption because the claims depended on an agreement that was independent of the terms of an

4    ERISA plan.  *See Summit Estate, Inc. v. United Healthcare Ins. Co*., Case No. 4:19-cv-06724

5    YGR, 2020 WL 5436655, at *2 (N.D. Cal. Sept. 10, 2020) (holding that state-law claims were not

6    preempted under ERISA Section 514(a) because they did not "depend[] on the existence or terms

7    of an ERISA plan" and "United's alleged representations regarding payment for the services at

8    issue [were] independent of any statements that United allegedly made with respect to the

9    insurance policies of Summit Estate's patients"); *Doctors Med. Ctr. of Modesto, Inc. v. The

10   Guardian Life Ins. Co. of Am.*, No. 1:08-CV-00903 OWWGSA, 2009 WL 179681, at *6 (E.D.

11   Cal. Jan. 26, 2009) (holding that state-law claims were not preempted by ERISA because the

12   claims were predicated on "an independent contractual obligation" and not the terms of an ERISA

13   plan); *The Meadows v. Employers Health Ins.*, 47 F.3d 1006, 1008 (9th Cir. 1995) (same); *IV

14   Solutions Inc. v. United Healthcare Servs. Inc.*, No. CV124887GAFMRWX, 2012 WL 12887401,

15   at *6 (C.D. Cal. Nov. 19, 2012) (same).  Here, by contrast, plaintiffs' allegations raise the

16   inference that United's reimbursement obligations depend on the terms of the patients' ERISA

17   plans.  Plaintiffs have cited no authority that supports the proposition that state-law claims can fall

18   outside of the scope of ERISA preemption where, as here, the claims depend on the terms of

19   ERISA plans.

20   Accordingly, the Court **GRANTS** defendants' motions to dismiss the state-law claims that

21   arise out of the alleged under-reimbursement of claims covered by ERISA plans **WITH**

22   **PREJUDICE**.  *See Johnson v. Dist. 2 Marine Engineers Beneficial Ass'n-Associated Mar. Officers,

23   Med. Plan*, 857 F.2d 514, 517 (9th Cir. 1988) (affirming dismissal with prejudice of state-law

24   claims that were "preempted by ERISA" Section 514(a)).

25   As to plaintiffs' state-law claims that arise out of the alleged under-reimbursement of

26   claims for IOP services covered by healthcare plans that are *not* subject to ERISA, the Court

27   concludes that the FAC lacks allegations to raise the reasonable inference that the healthcare plans

28   in question fall outside of the scope of ERISA.  As noted, plaintiffs allege that the plans in

question are employer-sponsored healthcare plans.  FAC ¶¶ 386, 403.  Although certain types of employer-sponsored healthcare plans are exempted from ERISA, such as governmental and church plans, the FAC is devoid of allegations showing that any of the plans at issue falls within any of the exceptions to ERISA coverage.  *See* 29 U.S.C. § 1003(b) (listing exceptions to ERISA coverage for employee benefit plans).  Accordingly, in light of the totality of plaintiffs' allegations, the Court cannot conclude at this juncture that plaintiffs' state-law claims fall outside of the scope of ERISA preemption on the basis that the healthcare plans upon which they depend are not subject to ERISA.  The Court, however, will **GRANT** plaintiffs **LEAVE TO AMEND** the complaint with respect to these claims.

### D.    Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires."  *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 701 (9th Cir. 2011).  The Court, however, need not grant leave to amend where amendment would be futile. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004).

Here, it is not clear that amendment of the complaint would be futile to attempt to allege (1) facts identifying which of the allegedly under-reimbursed claims for IOP services in the FAC were covered by a plan that falls outside of the scope of ERISA and showing why; and (2) facts that raise the inference that defendants are liable under state law, based on United's alleged under-reimbursement of such claims, for violations of the UCL, intentional misrepresentation and fraudulent inducement, negligent misrepresentation, civil conspiracy, breach of contract, or promissory estoppel.  The Court, therefore, will grant plaintiffs leave to amend the complaint to allege such facts to the extent that they can do so without contradicting the allegations in prior iterations of the complaint.  In any amended complaint, plaintiffs may not reassert claims that the Court has dismissed with prejudice, assert theories that the Court has rejected, or add new claims for relief.

### IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motions to dismiss with respect to plaintiffs' Sherman Act and RICO claims, and plaintiffs' state-law claims to the extent that they

arise out of the alleged under-reimbursement of claims for IOP services that are covered by ERISA plans, **WITH PREJUDICE**. The Court **GRANTS** defendants' motions to dismiss **WITH LEAVE TO AMEND** with respect to plaintiffs' state-law claims to the extent that the claims arise out of the alleged under-reimbursement of claims for IOP services that are covered by plans that fall outside of the scope of ERISA. Plaintiffs may file an amended complaint within thirty (30) days of the date this order is filed. Defendants may file a response to the amended complaint within thirty (30) days of the date it is filed. The Court **GRANTS** plaintiffs' motion for leave to file a sur-reply.

This order terminates Docket Numbers 71, 72, and 80.

**IT IS SO ORDERED.**

Dated: December 18, 2020

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**