Matthew M. Lavin, Esq. (*pro hac vice*)
mlavin@napolilaw.com
Aaron R. Modiano, Esq. (*pro hac vice*)
amodiano@napolilaw.com
NAPOLI SHKOLNIK, PLLC
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
Telephone: (212) 397-1000
Facsimile: (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
david@dllawgroup.com
Katie J. Spielman, Esq. (CA SBN 252209)
katie@dllawgroup.com
DL LAW GROUP
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC RECOVERY SOLUTIONS d/b/a WESTWIND RECOVERY, MIRIAM HAMIDEH PHD CLINICAL PSYCHOLOGIST INC. d/b/a PCI WESTLAKE CENTERS, BRIDGING THE GAPS, INC., SUMMIT ESTATE RECOVERY CENTER, INC., on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>UNITED BEHAVIORAL HEALTH, a California Corporation, and MULTIPLAN, INC., a New York Corporation,<br><br>     Defendants. | Case No.: 4:20-cv-02249-YGR<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED FOR ALL ISSUES SO TRIABLE |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

Table of Contents ............................................................................................................. i

Introduction ..................................................................................................................... 1

Summary of Claims ......................................................................................................... 3

Parties ............................................................................................................................. 4

    Plaintiffs ...................................................................................................................... 4

    Defendants .................................................................................................................. 4

Jurisdiction and Venue .................................................................................................... 5

Facts ................................................................................................................................ 6

    Summary of the Facts ................................................................................................. 6

    Usual, Customary, and Reasonable Rate ("UCR") ..................................................... 9

    Intensive Outpatient Program Treatment ................................................................. 10

        The Ingenix Precursor ........................................................................................ 12

    The Illegal Scheme .................................................................................................. 15

        The Defendants' Illegal Scheme Fraudulently Avoids Paying the Usual, Customary,
            and Reasonable Rates for Reimbursements for IOP Services ......................... 15

        The FAIR Health Database .................................................................................. 16

        The Underpayment Scheme's Mechanics ............................................................ 20

        Claims submission .............................................................................................. 24

        Rates of Payment ................................................................................................ 25

        Viant's Methodology ........................................................................................... 25

        Viant Facility Outpatient Review: "Viant OPR" .................................................. 26

        Standard Analytical Files .................................................................................... 26

        Target Pricing: Meet or Beat ............................................................................... 28

        MultiPlan and the Viant Methodology ................................................................ 29

        MultiPlan's Secret Annual Events ....................................................................... 30

        MultiPlan's Secret Road Shows .......................................................................... 31

        The Secret Internal Whitepapers ......................................................................... 32

        The Network Access Agreement ......................................................................... 33

    Defendants' Fraudulent Activities As to Plaintiffs ................................................... 33

        Pacific Recovery Solutions .................................................................................. 33

        PCI Westlake ....................................................................................................... 37

        Bridging The Gaps .............................................................................................. 41

        Summit Estate ..................................................................................................... 45

    General Allegations to All Counts ............................................................................ 49

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

The Direct Harm Caused to the Plaintiffs and Class ............................................ 50

Class Action Allegations ............................................................................................... 51

    The Plaintiff Class .................................................................................................... 51

    Rule 23(a) .................................................................................................................. 51

        Numerosity .......................................................................................................... 51

        Commonality ....................................................................................................... 51

        Typicality ............................................................................................................ 53

        Adequacy ............................................................................................................ 53

    Rule 23(b) ................................................................................................................. 54

Causes of Action ........................................................................................................... 54

    COUNT I: Violation of California Business & Professions Code §§ 17200 et seq. (Unfair and Unlawful Business Practices of United) ....................................................... 54

    COUNT II: Violation of California Business & Professions Code §§ 17200 et seq. (Unfair and Unlawful Business Practices of MultiPlan) ........................................ 56

    COUNT III Intentional Misrepresentation/Fraudulent Inducement ..................... 58

    COUNT IV: Negligent Misrepresentation ............................................................. 60

    COUNT V: Civil Conspiracy .................................................................................. 61

    COUNT VI: Breach of Oral and/or Implied Contract ........................................... 61

    COUNT VII: Promissory Estoppel ........................................................................ 63

Demand for Jury Trial ................................................................................................... 65

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Pacific Recovery Solutions d/b/a Westwind Recovery, Miriam Hamideh PhD Clinical Psychologist Inc. d/b/a PCI Westlake Centers, Bridging the Gaps, Inc., Summit Estate Recovery Center, Inc., bring this action on behalf of themselves and all other similarly situated out-of-network behavioral health providers (collectively, the "Plaintiffs") that provide Intensive Outpatient Program treatment ("IOP") against defendants United Behavioral Health, Inc., ("United") and MultiPlan, Inc. ("MultiPlan") and allege the following:

### Introduction

1.      Plaintiffs bring this class action on behalf of themselves and all those similarly situated out-of-network behavioral health providers that provide IOP treatment services (the "Plaintiff Class") and who were directly injured by United and MultiPlan's scheme to underpay valid, medically necessary claims.

2.      Each Plaintiff is a behavioral healthcare provider treating patients suffering from mental health and/or substance use disorders ("MH/SUD"). Each is a duly licensed, accredited provider.

3.      Plaintiffs provide medically necessary services for MH/SUD treatment.

4.      The Defendant, United Behavioral Health is one of more than 1,200 'United' Companies. The United companies are not independent, rather they act in concert to maximize profits for the shareholders of United Corporation. MultiPlan, Inc. is a 'cost management' company. Together, United and MultiPlan have formed a fraudulent scheme that furnishes a vehicle to deny proper payment for the IOP treatment services that Plaintiffs provided.

5.      The patients whose claims are at issue all had United health insurance plans that are not subject to ERISA.

6.      United and MultiPlan have also conspired together to withhold proper payment for IOP treatment services from Plaintiffs.

7.      United underpaid all of the claims for medically necessary treatment at issue in this litigation and amounts are still outstanding and owed directly to Plaintiffs, to whom the payments were promised by United.

8. Plaintiffs seek monetary and injunctive relief.

9. United is the largest health insurer in the United States, reporting $6.7 billion in profits for the second quarter of 2020, a 97 percent increase from the same period in 2019.[1] United insures approximately 80 million people and controls 14.1% of the commercial healthcare marketplace with annual premiums paid to it totaling $107 billion dollars.

10. The most recent data from the Centers for Disease Control and Prevention's (CDC) National Center for Health Statistics (NCHS) show a worsening of the drug overdose epidemic in the United States with the largest number of drug overdoses for a 12-month period ever recorded.[2]

11. With this increase, drug and alcohol treatment facilities are more essential than ever.

12. Most patients seeking treatment for drug and alcohol and abuse rely on having healthcare insurance to afford treatment.

13. United controls a large percentage of the commercial healthcare marketplace in the geographic areas where the Plaintiffs reside.

14. MultiPlan is a private, 'cost-management' company that partners with insurers to reduce the amounts they pay doctors and hospitals.

15. Together, United and MultiPlan created, developed, managed, and administered a fraud to underpay Plaintiffs and the class.

16. Every claim at issue in this litigation was required to be paid at a percentage of the usual and customary rate ("UCR"); the rate charged by similar providers of the same services in the same geographic location.

17. Each of the claims at issue in this litigation was underpaid.

---

[1] *U.S.' Largest Health Insurer Reports $6.7B In Profits Amid COVID, As N.Y. Cuts State Rates*, Newsweek, August 14, 2020, https://www.newsweek.com/us-largest-health-insurer-reports-67b-profits-amid-covid-ny-cuts-state-rates-1525210 (last visited September 14, 2020).
[2] *Increase in Fatal Drug Overdoses Across the United States Driven by Synthetic Opioids Before and During the COVID-19 Pandemic*, https://emergency.cdc.gov/han/2020/han00438.asp (last visited January 18, 2020)

18.    The underpayment directly and proximately damaged Plaintiffs.

19.    Without Court intervention, this fraudulent scheme will continue and continue to damage Plaintiffs and the class.

20.    This scheme injured the Plaintiffs and the class in their persons and property as Plaintiffs' and the class have a well-established property interest in their claims for services rendered to patients that is directly and proximately damaged by underpayment of the claim.

### Summary of Claims

21.    This action asserts state law claims for violations of the California Business & Professions Code § 17200, *et seq*, intentional misrepresentation and fraudulent inducement, negligent misrepresentation, civil conspiracy, breach of oral and/or implied contract and promissory estoppel. breach of implied-in-fact contract, unjust enrichment, and declaratory relief.

22.    Together, and as explained more fully in the following sections, United and MultiPlan have formed a fraudulent scheme and conspired to underpay valid, medically necessary claims.

23.    The fraudulent scheme underpays Mental Health and Substance Use Disorder ("MH/SUD") providers who do not participate in United's network.

24.    The relevant time period for the fraudulent scheme is from January 1, 2015 to present.

25.    Since 2015, the Plaintiffs have been damaged as a result of the thousands of underpaid claims at issue in this litigation and in the tens of thousands, or more, of underpaid claims to other Intensive Outpatient Program ("IOP") treatment providers in California and across the country.

26.    Plaintiffs are seeking damages and relief based on the underpayment of valid, medically necessary claims and for injunctive relief to prevent Defendants from continuing to operate their fraudulent scheme.

## Parties

### Plaintiffs

27.     Plaintiff, Pacific Recovery Solutions d/b/a Westwind Recovery ("Westwind"), is a California Limited Liability Company and a duly licensed behavioral health treatment provider with a primary place of business at 7966 Beverly Blvd Suite 200, Los Angeles, CA 90048.

28.     Plaintiff, Miriam Hamideh PhD Clinical Psychologist Inc. d/b/a PCI Westlake Centers ("PCI Westlake"), is a California corporation and a duly licensed behavioral health treatment provider with a primary place of business 37794 La Baya Dr. # 201, Westlake Village, CA 91362.

29.     Plaintiff Bridging the Gaps, Inc. ("BTG"), is Virginia corporation and a duly licensed behavioral health treatment provider with a primary place of business at 31 South Braddock Street, Winchester, VA 22601.

30.     Plaintiff, Summit Estate Recovery Center, Inc. ("Summit"), is a California corporation and duly licensed behavioral health treatment provider with a primary place of business at 20640 3rd Street Suite 350, Saratoga, CA 95070.

### Defendants

31.     Defendant United Behavioral Health ("United") is a California corporation, with its principal place of business at 425 Market Street, 14th Floor, San Francisco, CA 94105. United is a "provider of mental health[3]" and manages behavioral health services for UnitedHealth Group. It is responsible for payment of claims related to behavioral services covered under health plans sponsored or administered by UnitedHealth Group Incorporated or its many wholly owned and controlled subsidiaries, including United Healthcare. None of the subsidiary companies are independent, rather they all act in concert to maximize profits for the shareholders of UnitedHealth Group.

32.     Defendant MultiPlan, Inc. is a New York Corporation with its principle place of business located at 115 5th Avenue, New York, NY 10003. Viant, Inc., is a Nevada corporation

---

[3] 2018 Statement of Information of United Behavioral Health, Document G063267, Filed September 26, 2018.

and wholly owned subsidiary of MultiPlan. MultiPlan has several wholly owned and controlled subsidiaries, including Viant, all of which act in concert to maximize profits for MultiPlan.

### Jurisdiction and Venue

33.     At least one Plaintiff is diverse from the Defendants and the amount in controversy exceeds $5,000,000. Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action where at least one member of a class of plaintiffs is a citizen of a State different from any defendant.

34.     The claims asserted involve matters of interstate and national interest, and several of the claims at issue arise under federal law.

35.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

36.     This court has personal jurisdiction over Defendants because United and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. United transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

37.     This court has personal jurisdiction over MultiPlan because MultiPlan and/or its subsidiaries transact business so frequently and with such regularity in Northern California that they avail themselves to the protections of California's laws, are at home in this jurisdiction, and subject to the personal jurisdiction of this court.

38.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965: a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this Judicial District and one or more of the Defendants conducts a substantial amount of business in this Judicial District.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

## Facts

### *Summary of the Facts*

39.     Plaintiffs are behavioral healthcare providers who provide, among other services, intensive outpatient treatment programs (or, "IOP") to patients with mental health and/or substance use disorders ("MH/SUD").

40.     Plaintiffs have no pre-existing contract with either United or MultiPlan that establishes the rate that they will be paid for providing IOP treatment to patients.

41.     All of the IOP treatment provided was medically necessary.

42.     All of the IOP treatment was underpaid.

43.     United was required to pay Plaintiffs for the treatment provided based on the usual and customary rate ("UCR"). UCR is a commonly accepted term in the healthcare industry and means generally, the rate charged by similar providers of the same specialty in the same geographic area.

44.     The parties all understood UCR to have this meaning as is commonly understood in the healthcare industry.

45.     The FAIR Health database, described in more detail in the following sections, allows the public, including Plaintiffs and their patients, to estimate the UCR for IOP treatment in a specified geographic area.

46.     United, for many years, until on or about 2015, was legally required to use the FAIR Health database to calculate UCR in its payment of claims, for reasons discussed below.

47.     The significant differences between the publicly available FAIR Health estimates and actual payments provide compelling evidence that the Plaintiffs were not paid based on the UCR for IOP treatment they provided.

48.     The fairly uniform under-payments received by Plaintiffs, all in different geographic locations, provide compelling evidence that geographic location was not considered in the payment received by Plaintiffs.

49.     Geographic location is part of what determines the UCR.

50.     Most patients cannot shoulder the full costs of MH/SUD treatment and, in the vast majority of cases, the provider bears the full cost of treatment services until they are paid by a commercial payer such as United.

51.     The patients whose claims are at issue all had plans that are not subject to ERISA regulation; *e.g.*, ACA marketplace plans, student health plans[4], certain small employer plans, short-term plans, government employee plans, and church plans.

52.     Plaintiffs treated patients with these types of non-ERISA plans.

53.     Patients with these types of non-ERISA plans had their claims, the claims at issue in the present matter, illegally underpaid by Defendants' fraudulent scheme.

54.     Approximately 40% of all healthcare insurance plans are not subject to ERISA regulation.[5]

55.     In California, as of early 2020, there are more that 1.5 million individuals who have non-ERISA, marketplace plans.[6]

56.     United underwrites a significant number of non-ERISA plans every year.

57.     United and its affiliates offer non-ERISA ACA exchange plans throughout the country.[7]

58.     United, in fact, offers many different non-ERISA forms of healthcare insurance

---

[4] *Student Health Insurance*, https://www.uhc.com/individual-and-family/insurance-plans/student-health-insurance

[5] 2017 *Employer Health Benefits Survey*, KFF, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/ (last visited January 18, 2021).

[6] *New California Policies Make Huge Difference, Increasing New Signups During Covered California's Open Enrollment by 41* Percent, https://www.coveredca.com/newsroom/news-releases/2020/02/18/new-california-policies-make-huge-difference-increasing-new-signups-during-covered-californias-open-enrollment-by-41-percent/ (last visited January 19, 2020).

[7] *Health insurance marketplaces (exchanges)*, https://www.uhc.com/united-for-reform/health-reform-provisions/health-benefit-exchanges (last visited January 19, 2021).

throughout the country.[8]

59.     Such is the case with the claims at issue in this litigation, all of the claims are for patients with non-ERISA plans.

60.     The Plaintiffs treated patients with both ERISA and non-ERISA plans.

61.     For all the claims here, the Plaintiffs have received from United less than the UCR based amount they were promised and are properly owed.

62.     The understanding of the term 'UCR' or its congeners did not depend upon any plan terms as it is a generally understood term in the healthcare industry.

63.     The same term, 'UCR,' is used for patients who have healthcare plans that are subject to ERISA requirements and those that are not subject to ERISA. The term has the same meaning in all instances.

64.     For all healthcare claims relevant to this action the amount of the underpayment remains due and owing to the providers from the Defendants.

65.     After providing services, the Plaintiffs' billing departments transcribed patients' medical charts into standardized billing codes, created invoices with standard charges, medical coding, patient demographics, and submitted the invoices electronically to United.

66.     Every claim at issue was approved for payment.

67.     Every claim at issue received an underpayment.

68.     Instead of paying a "reasonable" rate, UCR, to Plaintiffs, the Defendants utilized Viant's methodology to fabricate a fraudulent UCR rate and withhold a substantial part of the payment owed to Plaintiffs.

69.     Both United and MultiPlan had management and control over how Viant's methodology was employed to underpay the Plaintiffs.

70.     For every claim at issue, the Plaintiffs were paid at a rate that was well below the promised and agreed to UCR.

---

[8] *Individual and Family*, https://www.uhc.com/individual-and-family (last visited January 19, 2021)

71.     United and MultiPlan used Viant's improper methodology to justify the fraudulent withholding of most of the payment owed on each and every claim at issue, thereby directly and proximately injuring Plaintiffs in their business and property.

72.     Defendants fraudulently represented to Plaintiffs and others that the rate paid was the UCR rate, using telephone calls, other communications, and the mail by sending explanation of benefits ("EOBs") and electronic data interchange ("EDI") versions of EOBs to Plaintiffs through an electronic remittance advice ("ERA").

73.     It was represented to Plaintiffs that they were paid the UCR rate, that the rate was commensurate with the rates paid similar providers in the same geographic area.

74.     United and MultiPlan both profited from their participation in the fraudulent scheme.

75.     United and MultiPlan retained some or all of the amount by which the Plaintiffs and others were underpaid.

76.     The purpose of the fraudulent scheme was for United and MultiPlan to profit from the underpayments made to Plaintiffs and others.

77.     The rate generated by Viant's methodology is significantly less than the UCR rate amount.

78.     United and MultiPlan retained the difference between these two amounts, at the providers' expense.

*Usual, Customary, and Reasonable Rate ("UCR")*

79.     For every claim at issue, Plaintiffs and the class did not have a written contract with United or MultiPlan that would establish a contractual rate of payment for their IOP services.

80.     For every claim at issue, Plaintiffs were required to be paid at the UCR rate.

81.     UCR rates are a fixture of the managed care payment system in the United States. When doctors, hospitals, or other healthcare providers are out of network and do not have contracts with health insurance companies, claims from out-of-network are usually required to be paid at UCR rates.

82.     The Centers for Medicare Services (CMS), defines UCR as: "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."[9]

83.     Consumers choose to pay more in the form of higher premiums because they value the ability to receive treatment from out-of-network providers.

84.     Insurance consumers and healthcare providers depend on insurers' good faith calculation of UCR rates. Insurance consumers depend on the ability to determine their expected out-of-pocket costs when choosing an out-of-network provider. Out-of-network providers depend on the ability to determine their expected payment from the patient and their insurer.

85.     Where, as here, a scheme exists to fraudulently misrepresent the UCR, providers, such as Plaintiffs, most often shoulder the expense.

86.     Plaintiffs have been damaged in the amounts that they were underpaid for the IOP services that they provided.

*Intensive Outpatient Program Treatment*

87.     Intensive Outpatient Programs ("IOPs") are an important tool in traditional behavioral health treatment. IOP is a non-residential, semi-structured level of care that is typically rendered pursuant to a schedule that allows patients to reintegrate into society by returning to work, school, and other functions of daily life. Often, IOP programs are designed to be a support system for patients reintegrating into society from higher, more structured levels of care, such as residential inpatient treatment and partial hospitalization programs.

88.     IOP is a step-down level of care. Typically, a patient transitions to the IOP level of care after spending a month or more at higher, more structured levels of care such as detoxification, residential inpatient treatment, and partial hospitalization program treatment.

89.     Interestingly, United typically does not refer healthcare claims for higher levels of care, such as residential inpatient and partial hospitalization, to MultiPlan for processing. In

---

[9] Healthcare.gov "Usual Customary or Reasonable"
https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/ (accessed March 20, 2020)

cases where it does, MultiPlan does not use Viant's methodology to determine the payment amount, meaning the claim gets paid at a much higher rate, a rate that better approximates UCR, and is usually rate that is acceptable to providers.

90.     Yet, for intensive outpatient treatment, one of the most the most common services provided and billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United frequently sends the claims to MultiPlan who uses Viant's methodologies to process them using the illegal methodologies alleged in this complaint and described in greater detail in the following sections.

91.     Prior to 2019, United defined IOP as "a structured IOP program that maintains hours of service generally 9-19 hours per week […] in an outpatient setting […] to provide education, treatment, and the opportunity to practice new skills outside the program […] focused on addressing the member's condition to the point that the member can be safely, efficiently and effectively transitioned to a lower level of care."[10] According to the guidelines "An Intensive Outpatient Program can be used to treat substance-related disorders or can specialize in the treatment of co-occurring mental health and substance-related disorders." *Id*.

92.     Starting in January 2019, after their guidelines were ruled illegal in *Wit, et al. v United Behavioral Health* (Case No. 14-cv-02346-JCS, N.D. Cal.), United transitioned to the American Society of Addiction Medicine's ("ASAM") level of care guidelines to define its IOP criteria for substance abuse.[11] ASAM classifies IOP as ASAM Level of Care 2.1. Services may be delivered in any appropriate setting that meets state licensure or certification requirements. According to ASAM, IOP care is rendered by a team of appropriately credentialed addiction treatment professionals including counselors, psychologists, social workers, addiction-credentialed physicians, and program staff, many of whom have cross-training to aid in

---

[10] Optum, United Behavioral Health "Level of Care Guidelines," Doc. No. BH803LOCG052018, pp. 9-10, 19. Effective 05/28/2018

[11] United Healthcare, "Behavioral Health Level of Care Guidelines," https://www.uhcprovider.com/en/health-plans-by-state/tennessee-health-plans/tn-comm-plan-home/tn-cp-behavioral-health.html (last accessed March 20, 2020)

interpreting mental disorders and deliver intensive outpatient services. Services are typically offered for at least 9 hours per week. The goal of IOP treatment is to provide a support system including medical, psychological, psychiatric, laboratory, and toxicology. Elements of IOP treatment include counseling, educational groups, occupational and recreational therapy, psychotherapy, Medication Assisted Treatment ("MAT"), motivational interviewing, enhancement and engagement strategies, family therapy, or other skilled treatment services.[12]

93.     The illegal scheme between United and MultiPlan has its origin in United's past use of the illegal Ingenix scheme.

<u>The Ingenix Precursor</u>

94.     The illegal scheme of United and MultiPlan seeks to reproduce the Ingenix scheme that led United to pay $400 million in settlements in 2009.

95.     This time around, instead of using internally flawed and biased databases as was done with Ingenix, United has employed MultiPlan to play the role of Ingenix.

96.     The New York Attorney General's investigation into Ingenix "uncovered a fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[13]

97.     In 2009 United Healthcare and its affiliates paid $400 million to settle cases arising from the same conduct. Three hundred fifty million dollars was paid to settle a class action against those entities. Another fifty million dollars was paid for the establishment of the FAIR Health database and website. The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network

---

[12] Medicaid Innovation Accelerator Program, "Overview of Substance Use Disorder (SUD) Care Clinical Guidelines: A Resource for States Developing SUD Delivery System Reforms," pp 7, 8, April 2017

[13] *Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges*, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited September 16, 2020).

Services or Supplies."[14] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[15]

98.     Also in 2009, the Office of the Attorney General for the State of New York announced the results of its investigation into Ingenix in a landmark agreement entitled "Assurance of Discontinuance Under Executive Law § 63(15)" ("Assurance Order"). According to the Assurance Order, the payment rates compiled by Ingenix were based on a "conflict of interest." As the Attorney General concluded that the system "meant to reimburse consumers fairly as a reflection of the market is[,] instead[,] wholly owned and operated by the [insurance] industry" who have an "incentive to manipulate the data they submit to Ingenix so as to depress reimbursement rates they determine using the Ingenix schedules, given their own reimbursement obligations toward consumers."

99.     The rates generated by Ingenix were inadequate because: 1) Ingenix did not audit the data provided by insurers to make sure that the charges properly reflect what providers actually charged in the marketplace; 2) Ingenix used statistically invalid "edits" to exclude a disproportionate amount of high charges from its UCR calculations; and 3) Ingenix "lumped" charges for the same service together regardless of whether the service was provided by a certified specialist with many years of experience or a less experienced provider such that the aggregate UCR rate calculated by the database was artificially low.

100.     Although this matter did not ultimately go to a jury, the allegations clearly show that this conduct was intentional.

101.     The Assurance Order required the insurance industry to cease using the Ingenix database and create a "new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates." The Assurance Order also established a

---

[14] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009, Pg. 14, term no. 4.4:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_
Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-
Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[15] *Id.*

"Healthcare Information Transparency Website" to inform and educate the public about reimbursement rates.

102.     This "new" database was funded by United ($50 million), Aetna ($20 million), Wellpoint ($10 million), Cigna ($10 million), MVP Health Care Inc. ($535,000), Independent Health ($475,000), and HealthNow ($212,500).

103.     Out of this settlement, the independent not-for-profit "FAIR Health, Inc." (which stands for "Fair and Independent Research") was created.

104.     When the settlement was announced, Thomas L. Strickland, at the time the Executive Vice President and Chief Legal Officer of UnitedHealth Group, stated: "We are committed to increasing the amount of useful information available in the health care marketplace so that people can make informed decisions, and this agreement is consistent with that approach and philosophy…We are pleased that a not-for-profit entity will play this important role for the marketplace."[16]

105.     Unfortunately, for healthcare providers and the insurance buying public, United's legal obligations under the Assurance Agreement to utilize Fair Health and pay out of network claims at a fair rate predicated upon UCR terminated five years after the creation of Fair Health, in or about 2015.

106.     Not long after the termination of its obligations under the Assurance Agreement, United reverted to its old tricks. Free of the terms of the settlement and a court order requiring it pay out of network healthcare providers using a UCR rate, but aware of the scrutiny it would receive for creating its own database again, United sought out the services of a third party, MultiPlan, to perpetrate the same fraud. That is what this case is about, at its essence: the substitution of Multiplan and Viant for Ingenix.

---

[16] *Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars*, NY OAG Press Release January 13, 2009.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

107.    The present litigation differs from the prior litigation in that the methodology employed by MultiPlan through Viant now plays the role formerly filled by the Ingenix databases.[17]

*The Illegal Scheme*

The Defendants' Illegal Scheme Fraudulently Avoids Paying the Usual, Customary, and Reasonable Rates for Reimbursements for IOP Services

108.    Defendants, United and MultiPlan, have formed and both participate in an illegal scheme fraudulently underpay out-of-network IOP services.

109.    Defendants joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

110.    The Defendants gain financial benefits as the direct result of the fraudulent scheme.

111.    Both Defendants worked together to develop the false and fraudulent UCR rates that were applied to Plaintiffs and IOP providers.

112.    This is clearly set forth in use and development of internal non-public "Whitepapers" described in the following sections. The Whitepapers provided the roadmap that United and MultiPlan jointly developed to produce specific, fraudulent, UCR rates.

113.    United determined the fraudulent rates for under-payment that would be presented as UCR, and MultiPlan developed the methodology employed through Viant to achieve United's low rates, without regard to actual usual and customary rates.

114.    As a part of the illegal scheme, United "verified" that it would pay the UCR reasonable rate for services knowing that it would never do so.

---

[17] See "Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars" (Jan. 13, 2009), available at https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends (last accessed June 19, 2020)

115.    Plaintiffs and providers have a property interest in their claims and the right to be paid for them.

116.    Underpaying the claims by fraudulent means deprives Plaintiffs and providers of their property.

117.    United and MultiPlan have profited and continue to profit from this fraud.

118.    United profits by fraudulently retaining money that should be paid for IOP treatment.

119.    MultiPlan profits when United pays it for successfully implementing Viant's fraudulent methodology.

120.    United and MultiPlan coordinate their efforts in undertaking the scheme.

121.    United and MultiPlan share the money obtained from Plaintiffs and other victims of the scheme.

<u>The FAIR Health Database</u>

122.    United could have avoided this litigation if they had employed an actual UCR methodology in determining out-of-network IOP rates.

123.    The creation of the FAIR Health database was intended to provide one such methodology. At the time of its creation, New York Attorney General Andrew Cuomo believed that the FAIR Health database would solve the inherent conflicts of interest that plagued the Ingenix databases.

124.    The FAIR Health database claims "to provide reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[18] No providers submit pricing information, only insurers do so. FAIR Health claims that it then uses "information from those claims to estimate what providers charge, and what insurers pay,

_____

[18] FAIR Health Consumer, "About FAIR Health," accessed at https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

for providing healthcare to patients."[19] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

125.    The purpose and intent behind the establishment of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments, as was done using Ingenix.

126.    As set forth earlier, United had utilized the Ingenix databases to significantly under reimburse valid claims.  This is the exact same conduct United and MultiPlan are accused of committing in this complaint.

127.    In past litigation, United has asserted to courts that FAIR Health "analyzes and groups medical procedures by codes, the geographical area where the procedures were performed, and the amount charged by the providers. This database is often used by private health insurers to calculate the "usual and customary" fee for specific procedures and inform the amounts that they will be willing to pay to out-of-network providers." *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (N.Y. Sup. Ct. 2015).

128.    United was required to use FAIR Health's UCR methodology until the expiry of the settlement agreement with the New York Attorney General.[20]

129.    United began using FAIR Health in 2011 and did so, as required, until 2016.[21]

130.    The settlement agreement dictated that "United shall use [FAIR Health] as the basis for determining Allowed Amounts for Covered Out-Of-Network Services or Supplies."[22]

---

[19] *Id*.

[20] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[21] *Id*.

[22] *Id*.

131.    The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[23]

132.    When the FAIR Health requirement expired in or about 2015, United began planning to resurrect the fraudulent scheme with MultiPlan wherein MultiPlan assumed the functions previously performed by Ingenix, with its wholly owned subsidiary Viant's methodology standing in for the Ingenix databases.

133.    As Plaintiffs billed less for IOP treatment than the similar providers in the same geographic area, the Plaintiffs UCR rate is equal to 100% of that providers' billed charges.

134.    The FAIR Health benchmark amounts allow providers such as Plaintiffs to compare their billed charges to the billed charges of other, similar providers in the same geographic area.When billed charges are less than the FAIR Health benchmark amounts, the provider will expect to be paid at 100% of billed charges. When a provider's charges exceed the FAIR Health benchmark, the provider can estimate what they will be paid based on the appropriate FAIR Health benchmark.

135.    The goal of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments. Defendants' methodology produced rates ranging from 11% to 25% of the FAIR Health benchmark. Plaintiffs do not assert that FAIR Health is the only possible method for determining UCR; rather, it is an accepted method for determining UCR.

136.    Even though United and Viant's employees responsible for Outpatient Repricing (OPR) had FAIR Health data at their fingertips through an in-house claims system at Viant known as "Toolbox," they could have properly applied FAIR Health benchmark pricing at any time but chose not to do so. Instead, they employed a fraudulent, underpayment scheme that damaged providers and Plaintiffs in their persons and property.

---

[23] *Id.*

18



* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiff's zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).

137.    That Defendants' scheme generates rates ranging from 11% to 25% of the comparable FAIR Health benchmark shows that Defendants' payment rate is not reflective of UCR as illustrated in the following chart.

138.    United represents to the general public that where payment for out-of-network services is to be made at the usual and customary rate, United "most commonly refer[s] to a schedule of charges created by FAIR Health, Inc. ('FAIR Health') to determine the amount of the payment."[24]

139.    As described more fully in the following sections, this statement is demonstrably false.

[24] https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits (last visited June 10, 2020).

19

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

The Underpayment Scheme's Mechanics

140.    Instead of reimbursing providers, including Plaintiffs, at UCR rates, United deployed a scheme to underpay claims for its own benefit forming a scheme with MultiPlan to reap profits from underpaying claims.

141.    This scheme injured not only Plaintiffs but all out-of-network providers of IOP services.

142.    The goals of United's scheme were to pocket the difference between the fair and reasonable price of healthcare (the UCR) and the underpaid amount; for United to retain funds that should have been paid to providers; to eliminate competition between contracting and non-contracting providers; to push non-contracting providers into unfavorable contracts with United; and to avoid liability for the scheme (the "underpayment scheme").

143.    United conspired with MultiPlan Inc. to perpetrate the underpayment scheme.

144.    MultiPlan Inc. promotes itself across the health insurance industry as an unregulated cost management company. MultiPlan offers a menu of services for "cost control." Some of the above services are legitimate, but others are fraudulent.

145.    MultiPlan offers a host of mechanisms for "cost control." It has an internal engine, known within the company as FRED. FRED takes inputs from the claims United forwards to it, and routes them to the chosen repricing tool. Publicly, Viant summarizes its methodology as follows: a tool to evaluate "outpatient claims for opportunities to reduce the charges to levels that are usually charged by the provider and customarily charged by similar providers in the area for equivalent services" based on "on payer-established parameters."[25]

146.    In reality, however, Viant's calculations and methodology are not completely or even partially transparent: *i.e.* they are deliberately opaque. Viant uses a complex methodology implemented by a proprietary software engine designed to cull the lowest possible number from

---

[25]MultiPlan Payer Resource Center: "Viant Facility Usual & Customary Review" https://www.multiplan.com/payers/resourcecenter/salescenter/pdfs/MKT5101_Viant_Facility_UC_Review.pdf. Last accessed September 21, 2020.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area.

147.    Despite having access to the largest database of provider data in the country, FAIR Health, at the click of button, Viant does not utilize the FAIR Health database's charge data.

148.    Viant does not utilize the FAIR Health data because, as the database is widely accessible, as designed, doing so would make Viant's fraudulent manipulations readily apparent.

149.    Instead, Viant utilizes a much less robust and more easily manipulated data set in its underpayment methodology.

150.    Viant's methodology thus operates by culling data from a "Outpatient Standard Analytical File" ("SAF"). An SAF is composed of data that are collected from Medicare Part B providers for services rendered to Medicare beneficiaries by the Department of Health and Human Services (DHHs) / Centers for Medicaid and Medicaid Services (CMS).

151.    Using a SAF from CMS to fabricate a UCR rate is improper for numerous reasons. First, the patient demographics of Medicare patients will differ significantly from and not be representative of the patient demographics in the commercial market. Second, the MH/SUD facilities that provide IOP treatment to patients with commercial insurance will not be 'similar' to those that may provide IOP treatment to a Medicare beneficiary.

152.    Facilities providing IOP treatment to a Medicare beneficiary have no reasonable expectation that they will be paid for IOP treatment as Medicare does not provide coverage for IOP treatment. These expectations and agreements are set forth in greater detail as to each Plaintiff in the following sections. Facilities providing IOP treatment to patients with commercial insurance expect to be paid by the payer for the IOP treatment they provide. Further, the facilities submitting Medicare claims will be institutional providers such as hospitals and home health agencies that are licensed to accept Medicare.

153.    IOP treatment providers are not licensed to accept Medicare and cannot be licensed to accept Medicare for IOP treatment because Medicare does not reimburse IOP treatment. Mental health facilities and treatment providers have different licenses than do

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

medical and surgical facilities and providers. Third, the SAF does not provide rates based on the provider's geographic location; instead, it provides a *national* number. Geographic location is an essential component of the UCR rate.

154.    The claims information in the SAF does not include the provider's charge data, the claims data only includes the amounts paid on the claim. As IOP claims are not covered or paid under Medicare, the SAF file will not show any payments for IOP treatment and thus be completely unsuitable for determining appropriate IOP rates.

155.    IOP treatment falls under HCPCS[26] code H0015: "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education."[27]

156.    The SAF data are particularly ill-suited and susceptible to manipulation for IOP treatment because HCPCS code H0015 is not even a service covered or paid for by Medicare hence there is little to no data for H0015 in the SAF. Any data for H0015 that is present will not be a representative sample because it will only reflect H0015 claims for Medicare beneficiaries and no H0015 claims are covered by Medicare.

157.    As such, the SAF, comprised of data from providers treating Medicare beneficiaries will not provide an accurate representation of IOP providers as the HCPCS code applicable to IOP treatment is not eligible to be paid by Medicare.

158.    As the SAF contains no charge data for services that Medicare does not cover, the SAF has no data about the IOP services at issue in this case.

---

[26] "HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and  services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers." *HCPCS (HCPCS - Healthcare Common Procedure Coding System) – Synopsis*, https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html (last visited September 23, 2020).

[27] https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2020-Alpha-Numeric-HCPCS-File (last visited September 23, 2020).

159. Instead of using FAIR Health that does contain actual data for HCPCS H0015, the Viant methodology "crosswalks" the healthcare claims. "Crosswalking" is technical jargon for the process of using rates for one service to come up with or fill-in rates for another service.

160. FRED uses crosswalking to fill gaps when it does not have enough data to come up with a valid output number. This is the act opposite of using a UCR calculation, such as FAIR Health, which would be based on actual data from actual providers, something both MultiPlan and United have at their literal fingertips if they were to choose to use it.

161. The Viant methodology's crosswalking, reflects a subjective decision that is directed by United and implemented by MultiPlan. The crosswalking is not subject to independent review, scrutiny, or oversight.

162. The crosswalking is wholly unnecessary given the presence of FAIR Health and the other data available to United and Viant.

163. MultiPlan does not disclose or even admit to the data "proxies" it uses in Viant's methodology.

164. The "proxies" are selected by MultiPlan based on direction given by United and used by the Viant methodology to provide fraudulently low payment amounts.

165. The direction given by United and implementation undertaken by MultiPlan shows that both United and MultiPlan exercised management and direction over the fraudulent scheme.

166. MultiPlan, as payment for access to the Viant methodology, receives a percentage of the difference between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

167. For all of the claims here, United conspired with MultiPlan to utilize Viant to generate and pay artificially depressed rates with no resemblance to the methodology United claimed to have used in mailed correspondence, electronic correspondence, its published media, and telephone conversations with Plaintiffs.

168. Plaintiffs were harmed in their businesses and property by Defendants' scheme. They were deprived the fair value of their services, and lied to by the Defendants who told them

that their rates were consistent with an objective calculation of usual, customary, and reasonable rates and comparable with rates charged by their local competitors.

169.    Plaintiffs bring this suit to recover the fair value of their services, to enjoin Defendants from continuing their fraud, and to ensure appropriate damages are levied against Defendants such that the verdict shall be precautionary for all payers contemplating using the false and fraudulent pricing tool.

<u>Claims submission</u>

170.    Plaintiffs' claims submission process operated as follows: Plaintiffs' billing departments translated the patients' medical charts into standardized billing codes, created invoices with standard charges, coding and patient demographics, and submitted the invoices electronically to United.

171.    The invoices were all submitted using standardized claims forms UB-04 forms. Every claim at issue in this case was submitted directly to United through an electronic clearinghouse to the unique United Payer ID.

172.    After receiving the claims, they were processed, approved for payment, the payment amount was determined, and the claims were paid to the provider with accompanying notes about how much the patient owed and United's explanation for the amount it paid.

173.    The invoices were all submitted using standardized claims forms called UB-04 forms to United.

174.    The UB-04 claim forms submitted all had box 53 checked, indicating that payment of benefits had been assigned to Plaintiffs and were to be paid directly to them.

175.    The claims were submitted both electronically using an Electronic Data Interchange ("EDI") process, by facsimile, or by mail.

176.    After United received the claims, they were processed, approved for payment, the payment amount was determined, and then the claims were underpaid to the Plaintiffs with accompanying notes about how much the patient owed and United's explanation for the amount it paid.

177.    Within the billing process, known in the healthcare industry as the "revenue cycle."

178.    United used MultiPlan's Viant methodology in a scheme to underpay Plaintiffs' claims for Defendants' benefit.

Rates of Payment

179.    When United processed the claims at issue in this case, it had to decide how much it would pay for services.

180.    Instead of deciding how much to pay internally, and despite having hundreds of millions of lines of claim data and years of claims history to reference, a database of payment information it paid to create, and its own in-house data analytics company, United outsourced the task of claims pricing.

181.    United knew that it was required to pay Plaintiffs' IOP claims based on rates equivalent to amounts charged for similar services by similar providers in the treating providers' geographic areas.

182.    However, instead of using the FAIR Health Database or its own internal data, United used MultiPlan to produce rates. The lower the rate that MultiPlan produced, the more money MultiPlan was paid.

183.    MultiPlan offered a menu of pricing tools that it knew would be used to produce fraudulently depressed payment rates for the UCR for IOP services.

184.    For all of the claims at issue here, United and MultiPlan agreed to use the Viant methodology instead of one of MultiPlan's other, legitimate services.

185.    United deliberately avoided using MultiPlan's legitimate services because those services priced claims at rates higher than what United wanted pay. United opted to use Viant's methodology because it knew, based on meetings between United and MultiPlan, that the payment rates Viant's methodology would produce would be artificially low.

Viant's Methodology

186.    The following summary represents a high-level overview of the Viant methodology for pricing claims:

25

187.    The pricing process starts with United forwarding a claim to MultiPlan. At its sole discretion, United chooses which claims to price internally, which claims to send for one of MultiPlan's other, legitimate, pricing services, and which claims to price through Viant.

188.    United sends claim information to MultiPlan via a software "electronic data interchange" program ( "EDI"). The EDI process allowed United to communicate several critical inputs to MultiPlan:

- Claims Information (Policy Type, Charge Amount, CPT/HCPCS Codes)
- Designated Repricing Tool (Data iSight, Negotiations, Viant, Rental Networks, or some combination of those tools)
- The Benchmark "target price" for the claim (i.e. the benchmark price that determined MultiPlan's compensation); or
- The percentile (usually 60% or 40%) of the manipulated, "crosswalked" SAF database to use to set a benchmark rate (explained below).

189.    Once MultiPlan received information from UHC, it started the repricing process by sending UHC's inputs through its "Claims Savings Engine" known internally as FRED which routed the claim to Viant.

190.    At issue here are only claims sent to Viant for repricing.

<u>Viant Facility Outpatient Review: "Viant OPR"</u>

191.    The Viant Outpatient Review or "Viant OPR" is the methodology that was employed to provide the false appearance of legitimacy to the underpayment amount.

192.    Viant OPR compared the claims sent to it with "similar" claims in the SAF.

193.    The fatal flaw however, as set forth above, was that the SAF contained no "similar" claims.

<u>Standard Analytical Files</u>

194.    The backbone of the Viant OPR tool is the "Standard Analytical File" or "SAF." The SAF is a collection of the claims data from every claim submitted to Medicare during a several year period, anonymized then condensed into a single database. Within that database are amounts that every hospital and facility charged for the services they provided to Medicare

beneficiaries. Viant's OPR uses the amounts those Medicare facilities charge to determine its rates.

195.     The SAF does not contain any charge information from intensive outpatient substance use providers, like those whose claims are at issue here. The SAF does not contain any charge data for non-participating providers. Those two gaps in the SAF file make the Viant OPR system a bad fit for repricing the claims at issue here, because there was no data in the database for Viant to manipulate, and because a database that includes only Medicare participating providers is categorically faulty when the database is used to price claims for Medicare non-participating providers.

196.     When the Viant OPR engine did not have any data from the SAF to reprice claims, Viant's software engineers, in effect, made it up. Software engineers, not clinicians, would decide on services that were "close-enough" to the billed services, and then use the "close-enough" services' rates to reprice claims. The process of finding the "close-enough" service was known internally at MultiPlan as "Crosswalking." Crosswalking was undisclosed, inaccurate, and inappropriate for services that Medicare does not cover.

197.     Even when Viant made-up a rate, that still wasn't good enough.  Viant would still apply the percentile chosen by United (usually 60% or 40%) to lower the rate even more.

198.     Viant never disclosed how or why it chose the services that were "close enough" to Plaintiffs' services.

199.     When Viant chose what services were "close enough" to Plaintiffs, it also used a nation-wide median rate. That meant that Viant did not adjust the rate based on geographic inputs. Every time Viant claimed that geography was a factor in pricing of the Plaintiffs' services, it was lying.

200.     Every time MultiPlan made a representative that the Viant OPR rates it paid were based on similar providers in a similar geographic area, it was lying, because the services were not the same.

201.     MultiPlan had complete control over the technical methodology of the Viant tool, and how it implemented the inputs and changes requested by United, and used its control to

manipulate and misrepresent rates for its own benefit, for the purpose of making as much money as possible.

<u>Target Pricing: Meet or Beat</u>

202.    In addition to the corrupted Viant methodology, United sent Viant a "target rate" for each claim.

203.    The "target rate" is United's arbitrarily selected rate for IOP treatment.

204.    United sent MultiPlan the target rate for each claim at issue in this litigation.

205.    The target rate thus became the benchmark amount to be paid for the IOP claim. Within MultiPlan this was known as a "meet or beat" price.

206.    In all cases, United had complete control over the Target Price and MultiPlan had complete control over its use in the Viant methodology.

207.    This flow chart summarizes the process Defendants use to illegally price the claims:



208.    The Viant methodology's imperative was to beat United's Target Price. MultiPlan was compensated based on if and by how much it could undershoot that benchmark.

209.    Typically, MultiPlan pocketed at least 4% of the "savings" amount, or the difference between the Target Price and the amount a provider was actually paid.

210.    The dollar amount that United ultimately paid for the claims in this case was the lowest of three numbers: Target Price, Billed Amount, or Viant produced rate. In every case, the compensation structure agreed upon between MultiPlan and United incentivized artificially low rate and, invariably, the application of the Viant produced rate.

211.    Once the Viant methodology yielded its supposedly data-backed rate, it returned the rate information to United via the EDI.

212.    United or its subsidiary then issued under-payment to Plaintiffs at the rate "derived" from the Viant methodology.

213.    While United would represent, among other things, that the Viant methodology derived rate was comparable to, and based on, what similar providers in Plaintiffs' geographic area charged or accepted for the same or similar services, in fact the purpose of the scheme was to produce a rate that was neither reasonable nor customary.

<u>MultiPlan and the Viant Methodology</u>

214.    MultiPlan actively offered the Viant methodology to United and other insurers as a product capable of underpaying claims with minimal provider pushback. MultiPlan knew and explained to United that the Viant methodology could provide the appearance of legitimacy and offer cover for the fraudulent underpayment of IOP claims.

215.    United believed that the "independent" Viant methodology could shield it from liability as compared to what had happened with Ingenix even though the scheme was the same.

216.    MultiPlan and United worked out the details of their illegal activities and created their fraudulent scheme to carry out their activities through, among other things, in person meetings and events and documents called Whitepapers.

1

MultiPlan's Secret Annual Events

2    217.    MultiPlan secretly discussed the Viant OPR Review methodology with United

3    and its market competitors, including Cigna, at annual events hosted by the Client Advisory

4    Board of MultiPlan ("CAB"). The "CAB" consists of the senior marketing individuals at

5    MultiPlan including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White,

6    the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network

7    Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

8    218.    At these events, all of MultiPlan's insurance company clients would come

9    together, at various locations around the country, to discuss, among other topics, the Viant

10    repricing scheme and how to make more money off it.

11    219.    During these events, MultiPlan presented slide shows outlining the profits or

12    "savings" that could made using Viant methodology.

13    220.    The Viant methodology is specifically designed to be adapted and customized

14    based on input and direction from the insurer and these events and the Road Shows described

15    below allowed United to discuss the customizations they wanted in the pricing with MultiPlan,

16    directly.

17    221.    The CAB emphasized the "liability shield" provided by Viant methodology and

18    the ability of the insurer to direct underpayments without appearing to do so.

19    222.    The CAB emphasized that MultiPlan's healthcare repricing tools were

20    unregulated.

21    223.    The absence of regulation allowed United and MultiPlan to jointly develop the

22    underpayment scheme unfettered.

23    224.    United and other insurers who are competitors of United, such as Cigna, partnered

24    with MultiPlan to use the Viant methodology so that the "UCR" rate produced through Viant's

25    methodology could be presented as "independent" and "defensible," permitting United and other

26    insurers to abdicate their responsibility for the derived rates.  All of this was hyperbole meant to

27    hide the fraud.

28

30

225.    MultiPlan emphasized to United and other insurers that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed.

226.    Strategies were discussed for how to handle situations where dissatisfied providers, such as the Plaintiffs in this case, pushed back or challenged the amount, the Viant methodology and rate was deceitfully presented as a "fair" and "transparent" justification for the underpayment.

227.    MultiPlan, United, and United's competitors, depended on keeping the actual terms and methodology of Viant secret.

MultiPlan's Secret Road Shows

228.    MultiPlan's CAB, including representatives Susan Mohler of MultiPlan and Dale White, MultiPlan's Executive Vice President of Sales, also brought secret "Road Shows" or client status updates mixed with sales pitches directly to United and presented PowerPoint slideshows detailing the profits that could be realized by insurers using the Viant pricing methodologies.

229.    During the Road Shows and in subsequent interactions, The CAB produced detailed descriptions of Viant's methodology through internal non-public "Whitepapers" and sought input from United on how it would like its claims routed through the myriad MultiPlan payment engines, including Viant OPR, to achieve the most profits for United.

230.    Representatives of United and MultiPlan discussed the OPR Review pricing methodology in detail at these Road Shows and other ways to illegal lower the rates paid to providers with United representatives such as Rebecca Paradise, the Vice President of Out of Network Payment Strategies at United.

231.    The Whitepapers are essential to the implementation of the scheme and formation of the scheme between United and MultiPlan to carry out their illegal activities and were developed through the collaboration of United and MultiPlan.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

The Secret Internal Whitepapers

232.   MultiPlan's marketing and sales departments, including Jaqueline Kienzle, Vice President of Sales and Account Management at MultiPlan, and manager of United's account, Susan Mohler and Dale White provided United with these internal non-public Whitepapers. The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers.

233.   Whitepapers are secret internal documents that explain, in detail, exactly how the Viant methodology could be implemented to output literally any payment price United wanted and achieve for any result, regardless of what a healthcare provider had been promised a claim would pay.

234.   Executives from United including Rebecca Paradise, the Vice President of Out of Network Payment Strategies, reviewed, commented, and provided feedback on MultiPlan's Whitepapers in order to structure United's relationship with MultiPlan and implement the Viant methodology to underpay claims in whatever manner would make the most money for United and Multiplan.

235.   United's representatives provided direction to MultiPlan such that MultiPlan would revise its Whitepapers to ensure that the Viant methodology would underpay claims such as those filed by Plaintiffs.

236.   The Whitepapers explain that United would set performance standards which were defined by Target Prices. MultiPlan would use Viant to derive a price under the Target Price. United would pay MultiPlan a percentage of the "savings" generated by use of the Viant methodology.

237.   The Whitepapers also explain that United could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at.

238.   As such, these jointly developed Whitepapers provide a partial blueprint of the scheme that would be used to carry out the fraudulent acts that directly damaged Plaintiffs through the underpayment of valid, medically necessary IOP claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>The Network Access Agreement</u>

239.    The National Network Access Agreement ("Agreement") is a written contract between United and MultiPlan the sets out how United and MultiPlan will profit from the proceeds of the Viant underpayments.

240.    Rebecca Paradise of United and Jaqueline Kienzle of MultiPlan are the custodians of this Agreement.

241.    Exhibits and Amendments to this Agreement detail the fee and incentive structure between the parties and how United compensates MultiPlan for access to the Viant methodology. It also discusses how MultiPlan receives a percentage of the margin between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

242.    Although a benign legal contract between business on its face, the Agreement actually serves as convenient cover and a vehicle for the parties to share the ill-gotten gains of the Viant Pricing methodology.

*Defendants' Fraudulent Activities As to Plaintiffs*

<u>Pacific Recovery Solutions</u>

243.    Plaintiff Pacific Recovery Solutions (PRS) was established in 2016 and is licensed to provide IOP behavioral health treatment, and other related services, by the California Department of Healthcare Services, and is accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

244.    PRS has treated United patients for whom claims for payment of IOP services were underpaid by Viant.

245.    Many of these patients had healthcare insurance plans not subject to ERISA.

246.    The claim verification, authorization, utilization, and payment process is substantially the same for all claims regardless of whether the patients' plan is subject to ERISA.

247.    United's and MultiPlan's scheme has left Westwind unpaid for years' worth of IOP services.

1

**Typical Claim for Pacific Recovery Solutions**

2

248.   In a typical claim for PRS, as is the case for the claims sought in this action, a

3   behavioral health patient has received treatment from PRS. As part of the pre-admission

4   insurance verification process, so as to determine whether or not to render services, the Provider

5   would call United at the phone number on the back of the patient's United ID card to determine

6   how much would be paid for treatment provided to the patient.

7

249.   During the call, a United representative would inform the Provider that it would

8   be paid at a certain percentage, **typically 80%,** of an amount rate that was referred to as 'UCR'

9   or similar and mutually understood term, until the patient's deductible and out of pocket

10   maximum were met.

11

250.   Once the out-of-pocket maximum was met, United's representative would

12   usually state that the claims would then be paid at **100%** of that same UCR rate.

13

251.   Provider would request authorization from United for the medically necessary

14   services. United would then explicitly authorize the services and claims discussed herein. Unique

15   authorization numbers would be provided to the Provider as confirmation.

16

252.   United's agent understood that Provider intended to provide treatment services

17   based upon these representations and relied upon these representations in expecting to be

18   properly reimbursed for providing treatment.

19

253.   Provider would ask if the patient's plan was an ERISA plan; however, Provider

20   was never told whether the plan was subject to ERISA by United or MultiPlan.

21

254.   Many patient plans are not 'large-employer' plans that are generally subject to

22   ERISA.

23

255.   Provider understood that they would be paid according to UCR without reference

24   to any specific plan term and without reference to whether the plan was an ERISA plan.

25

256.   The Provider then rendered the services in good faith based upon the verification

26   call and the authorization call and the shared understanding of 'UCR' or its congener.

27

28

257.    Based on United's many assurances regarding the expected rate of payment and authorizations, the Provider would then decide to admit the patient to treatment and would provide the services.

258.    However, when claims were submitted to United and were paid, United did not pay UCR, the rate that had been quoted on the verification and authorization calls.

259.    Instead, the Provider would receive payment well below UCR, often in an amount of 20% or less of UCR.

260.    The Provider's charge for treatment services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

261.    Invoices are submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoices were submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date that the invoice was electronically submitted.

262.    United would then route the claim to MultiPlan who, in turn, would rout the claim to Viant to be priced using the OPR Review pricing tool.

263.    After being thus priced, United would electronically transfer payment to the Provider in the form of an electronic funds transfer. The amount was usually equivalent to only 12% of the billed charge and far below any reasonable calculation of a percentile of UCR.

264.    According to the verification and authorization calls, the claims should have been paid at the percentage of UCR that was quoted, subject to copays and deductibles.

265.    The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate that was not UCR but was, instead, only a small fraction of UCR.

266.    With the underpayment, United would also send a Provider Remittance Advice (PRA). The PRA would usually contain the remark code of "CY" indicating that United used

MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification and authorization calls, UCR.

267.     Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

268.     The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, neither of that information is used by Viant when it calculates prices.  The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

269.     Importantly, for higher levels of services provided to these Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 60%, 80% or 100% of a rate based on UCR. This incongruity highlights the fraud present in the payment of IOP claims. IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and MultiPlan were going to use to price the claim.

270.     At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services rendered to the Patient and to other United patients.

271.     The Provider has been directly harmed by this underpayment.

272.     United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

273.     For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

PCI Westlake

274.     Plaintiff, PCI Westlake, was established in 2015. PCI Westlake is licensed to provide IOP behavioral health treatment, and other related services, by the California Department of Healthcare Services of, and is accredited by JCAHO.

275.     Since 2015, PCI Westlake has treated United patients for whom claims for payment of IOP services were repriced by Viant.

276.     Many of these patients had healthcare insurance plans not subject to ERISA.

277.     The claim verification, authorization, utilization, and payment process is substantially the same for all claims regardless of whether the patients' plan is subject to ERISA.

278.     United's and MultiPlan's scheme has left PCI Westlake unpaid for years' worth of IOP services.

**Typical Claim for PCI Westlake**

279.    In a typical claim for PCI Westlake, as is the case for the claims sought in this action, a behavioral health patient has received treatment from PCI Westlake. As part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider would call United at the phone number on the back of the patient's United ID card to determine how much would be paid for treatment provided to the patient.

280.    During the call, a United representative would inform the Provider that it would be paid at a certain percentage, **typically 80%,** of an amount rate that was referred to as 'UCR' or similar and mutually understood term, until the patient's deductible and out of pocket maximum were met.

281.    Once the out-of-pocket maximum was met, United's representative would usually state that the claims would then be paid at **100%** of that same UCR rate.

282.    Provider would request authorization from United for the medically necessary services. United would then explicitly authorize the services and claims discussed herein. Unique authorization numbers would be provided to the Provider as confirmation.

283.    United's agent understood that Provider intended to provide treatment services based upon these representations and relied upon these representations in expecting to be properly reimbursed for providing treatment.

284.    Provider would ask if the patient's plan was an ERISA plan; however, Provider was never told whether the plan was subject to ERISA by United or MultiPlan.

285.    Many patient plans are not 'large-employer' plans that are generally subject to ERISA.

286.    Provider understood that they would be paid according to UCR without reference to any specific plan term and without reference to whether the plan was an ERISA plan.

287.    The Provider then rendered the services in good faith based upon the verification call and the authorization call and the shared understanding of 'UCR' or its congener.

288.    Based on United's many assurances regarding the expected rate of payment and authorizations, the Provider would then decide to admit the patient to treatment and would provide the services.

289.    However, when claims were submitted to United and were paid, United did not pay UCR, the rate that had been quoted on the verification and authorization calls.

290.    Instead, the Provider would receive payment well below UCR, often in an amount of 20% or less of UCR.

291.    The Provider's charge for treatment services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

292.    Invoices are submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoices were submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date that the invoice was electronically submitted.

293.    United would then route the claim to MultiPlan who, in turn, would rout the claim to Viant to be priced using the OPR Review pricing tool.

294.    After being thus priced, United would electronically transfer payment to the Provider in the form of an electronic funds transfer. The amount was usually equivalent to only 9% of the billed charge and far below any reasonable calculation of a percentile of UCR.

295.    According to the verification and authorization calls, the claims should have been paid at the percentage of UCR that was quoted, subject to copays and deductibles.

296.    The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate that was not UCR but was, instead, only a small fraction of UCR.

297.    With the underpayment, United would also send a Provider Remittance Advice (PRA). The PRA would usually contain the remark code of "CY" indicating that United used

MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification and authorization calls, UCR.

298.     Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

299.     The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, neither of that information is used by Viant when it calculates prices.  The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

300.     Importantly, for higher levels of services provided to these Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 60%, 80% or 100% of a rate based on UCR. This incongruity highlights the fraud present in the payment of IOP claims. IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and MultiPlan were going to use to price the claim.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

301.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance. Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services rendered to the Patient and to other United patients.

302.    The Provider has been directly harmed by this underpayment.

303.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

304.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

### Bridging The Gaps

305.    Plaintiff, Bridging the Gaps ("BTG"), was established in 2001. BTG is licensed by the State of Virginia to provide IOP behavioral health treatment, and other related services and is accredited by JCAHO.

306.    Since 2015, BTG has treated United patients for whom claims for payment of IOP services were underpaid.

307.    Many of these patients had healthcare insurance plans not subject to ERISA.

308.    The claim verification, authorization, utilization, and payment process is substantially the same for all claims regardless of whether the patients' plan is subject to ERISA.

309.    United's and MultiPlan's scheme has left BTG unpaid for years' worth of IOP services.

41

**Typical Claim for Bridging The Gaps ("BTG")**

310.    In a typical claim for BTG, as is the case for the claims sought in this action, a behavioral health patient has received treatment from BTG. As part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider would call United at the phone number on the back of the patient's United ID card to determine how much would be paid for treatment provided to the patient.

311.    During the call, a United representative would inform the Provider that it would be paid at a certain percentage, **typically 80%,** of an amount rate that was referred to as 'UCR' or similar and mutually understood term, until the patient's deductible and out of pocket maximum were met.

312.    Once the out-of-pocket maximum was met, United's representative would usually state that the claims would then be paid at **100%** of that same UCR rate.

313.    Provider would request authorization from United for the medically necessary services. United would then explicitly authorize the services and claims discussed herein. Unique authorization numbers would be provided to the Provider as confirmation.

314.    United's agent understood that Provider intended to provide treatment services based upon these representations and relied upon these representations in expecting to be properly reimbursed for providing treatment.

315.    Provider would ask if the patient's plan was an ERISA plan; however, Provider was never told whether the plan was subject to ERISA by United or MultiPlan.

316.    Many patient plans are not 'large-employer' plans that are generally subject to ERISA.

317.    Provider understood that they would be paid according to UCR without reference to any specific plan term and without reference to whether the plan was an ERISA plan.

318.    The Provider then rendered the services in good faith based upon the verification call and the authorization call and the shared understanding of 'UCR' or its congener.

319.    Based on United's many assurances regarding the expected rate of payment and authorizations, the Provider would then decide to admit the patient to treatment and would provide the services.

320.    However, when claims were submitted to United and were paid, United did not pay UCR, the rate that had been quoted on the verification and authorization calls.

321.    Instead, the Provider would receive payment well below UCR, often in an amount of 20% or less of UCR.

322.    The Provider's charge for treatment services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

323.    Invoices are submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoices were submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date that the invoice was electronically submitted.

324.    United would then route the claim to MultiPlan who, in turn, would rout the claim to Viant to be priced using the OPR Review pricing tool.

325.    After being thus priced, United would electronically transfer payment to the Provider in the form of an electronic funds transfer. The amount was usually equivalent to only 20% of the billed charge and far below any reasonable calculation of a percentile of UCR.

326.    According to the verification and authorization calls, the claims should have been paid at the percentage of UCR that was quoted, subject to copays and deductibles.

327.    The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate that was not UCR but was, instead, only a small fraction of UCR.

328.    With the underpayment, United would also send a Provider Remittance Advice (PRA). The PRA would usually contain the remark code of "CY" indicating that United used

MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification and authorization calls, UCR.

329.    Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

330.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, neither of that information is used by Viant when it calculates prices.  The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is not based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

331.    Importantly, for higher levels of services provided to these Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 60%, 80% or 100% of a rate based on UCR. This incongruity highlights the fraud present in the payment of IOP claims. IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and MultiPlan were going to use to price the claim.

332.   At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.   Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services rendered to the Patient and to other United patients.

333.   The Provider has been directly harmed by this underpayment.

334.   United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

335.   For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

Summit Estate

336.   Plaintiff, Summit Estate, was established in 2017. Summit is licensed to provide IOP behavioral health treatment, and other related services, by the California Department of Healthcare Services and is accredited by JCAHO.  Summit Estate is the 3d ranked treatment center based on quality of clinical services in the State of California according to Newsweek magazine.

337.   Since 2017, Summit has treated United patients for whom claims for payment of IOP services were underpaid.

338.   Many of these patients had healthcare insurance plans not subject to ERISA.

339.   The claim verification, authorization, utilization, and payment process is substantially the same for all claims regardless of whether the patients' plan is subject to ERISA.

340.   United's and MultiPlan's scheme has left Summit unpaid for years' worth of IOP services.

**Typical Claim for Summit Estate**

341.     In a typical claim for Summit Estate, as is the case for the claims sought in this action, a behavioral health patient has received treatment from PRS. Summit Estate part of the pre-admission insurance verification process, so as to determine whether or not to render services, the Provider would call United at the phone number on the back of the patient's United ID card to determine how much would be paid for treatment provided to the patient.

342.     During the call, a United representative would inform the Provider that it would be paid at a certain percentage, **typically 80%,** of an amount rate that was referred to as 'UCR' or similar and mutually understood term, until the patient's deductible and out of pocket maximum were met.

343.     Once the out-of-pocket maximum was met, United's representative would usually state that the claims would then be paid at **100%** of that same UCR rate.

344.     Provider would request authorization from United for the medically necessary services. United would then explicitly authorize the services and claims discussed herein. Unique authorization numbers would be provided to the Provider as confirmation.

345.     United's agent understood that Provider intended to provide treatment services based upon these representations and relied upon these representations in expecting to be properly reimbursed for providing treatment.

346.     Provider would ask if the patient's plan was an ERISA plan; however, Provider was never told whether the plan was subject to ERISA by United or MultiPlan.

347.     Many patient plans are not 'large-employer' plans that are generally subject to ERISA.

348.     Provider understood that they would be paid according to UCR without reference to any specific plan term and without reference to whether the plan was an ERISA plan.

349.     The Provider then rendered the services in good faith based upon the verification call and the authorization call and the shared understanding of 'UCR' or its congener.

350.    Based on United's many assurances regarding the expected rate of payment and authorizations, the Provider would then decide to admit the patient to treatment and would provide the services.

351.    However, when claims were submitted to United and were paid, United did not pay UCR, the rate that had been quoted on the verification and authorization calls.

352.    Instead, the Provider would receive payment well below UCR, often in an amount of 20% or less of UCR.

353.    The Provider's charge for treatment services is the same, or less, than what is charged by other similar providers, offering similar services, in the same geographic area, as evidenced by data from the Fair Health database shown *infra*, and based upon the Provider's own knowledge of prevailing rates in the local healthcare market.

354.    Invoices are submitted electronically to United using healthcare billing software and an electronic billing "clearinghouse". The invoices were submitted by the clearinghouse to the electronic "Payer ID" for United, 87726. The claim was received by United on the same date that the invoice was electronically submitted.

355.    United would then route the claim to MultiPlan who, in turn, would rout the claim to Viant to be priced using the OPR Review pricing tool.

356.    After being thus priced, United would electronically transfer payment to the Provider in the form of an electronic funds transfer. The amount was usually equivalent to only 15% of the billed charge and far below any reasonable calculation of a percentile of UCR.

357.    According to the verification and authorization calls, the claims should have been paid at the percentage of UCR that was quoted, subject to copays and deductibles.

358.    The Provider would not have rendered services to the Patient if it had known that the claim was going to be paid at this rate that was not UCR but was, instead, only a small fraction of UCR.

359.    With the underpayment, United would also send a Provider Remittance Advice (PRA). The PRA would usually contain the remark code of "CY" indicating that United used

47

MultiPlan's Viant pricing tool to determine the price, instead of using the rates the provider had been quoted on the verification and authorization calls, UCR.

360.    Remark code CY reads: "This claim has been reduced by the amount that is above the eligible expense amount for out-of-network services under your plan in your area. If you are billed for an amount above the eligible amount, please call Viant directly at 1-800-598-6888." These statements in the PRA were materially false, misleading and intended to deceive the Provider and the Patient from the true nature of the methodologies used and to prevent either the Provider or the Patient from disputing the matter with United.

361.    The "CY" notation statement admits that 1) United lied on the verification call and that 2) Viant derived the payment using hidden methodology that has no relationship to what was told to the Provider. In fact, neither of that information is used by Viant when it calculates prices.  The information was further false because, as explained throughout this complaint, the data Viant uses to price these claims is <u>not</u> based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

362.    Importantly, for higher levels of services provided to these Patients, including residential inpatient treatment and partial hospitalization, United paid the claims precisely as it had promised on the verification call, at 60%, 80% or 100% of a rate based on UCR. This incongruity highlights the fraud present in the payment of IOP claims. IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.  Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to United on which it loses money, United used a completely different methodology, the one that it had secretly formulated with MultiPlan.  The Provider cannot afford and would not have provided IOP services to the United patient if it had known the true method United and MultiPlan were going to use to price the claim.

363.    At no time material to this action did the Provider negotiate with United, MultiPlan or Viant or agree to accept a discounted rate for IOP services, or to be bound by United's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services it provided to this Patient or any patient with United insurance.  Notwithstanding the absence of any such agreement, United and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid the Provider for IOP services rendered to the Patient and to other United patients.

364.    The Provider has been directly harmed by this underpayment.

365.    United and MultiPlan's use of Viant to underprice the claim deprived the Provider of property – money - that should have been paid to the Provider for the claim.  This money had already been paid to United through the Patient's insurance premiums.  The profit or 'margin' from this underpayment was shared by United and MultiPlan.

366.    For more than two years before the date of the filing of this action and continuing, for many similar Patients with identical healthcare claims, the Provider has been systematically misled and underpaid by United, MultiPlan and Viant.

*General Allegations to All Counts*

367.    For decades, commercial payors, including United, have purported to reimburse for out-of-network services according to the UCR rates. Reimbursement at UCR rates is so well-established that some states, including California, require certain health plans to reimburse out-of-network services at rates using criteria that parallel the industry-standard for determining UCR. *See, e.g.*, 28 C.C.R. § 1300.71(a)(3)(B) (referring to prevailing provider rates **charged** in the general geographic area in which the services were rendered); Fla. Stat. Ann. § 641.513(5) (referring to "usual and customary provider **charges**" for similar services in the community where the services were provided). Because the industry standard traditionally has been for payment according to the UCR, out-of-network providers and their patients reasonably expect claims to be paid based on UCR.

368.    This understanding and usage was further confirmed during the initial VOB and authorization calls between Plaintiffs and United.

49

369.    In correspondence received by Plaintiffs, both from United and MultiPlan, as set forth in greater detail below, the Defendants fraudulently represented that the underpayment amount was based on UCR rates.

370.    Both Plaintiffs and Defendants understood 'UCR' to have the meaning as it is widely and generally understood in the healthcare industry.

371.    Plaintiffs and Defendants did not use 'UCR' to refer to a specific term in any patients plan.

372.    Plaintiffs and Defendants understood and used 'UCR' as the term is described in the section setting forth 'UCR' above.

373.    Plaintiffs and Defendants used the term 'UCR' or a congener thereof in the same manner as used, described, and presented by FAIR Health.

374.    This representation was deliberate and false.

375.    It is arbitrary, capricious, improper, and a breach of plan terms for United to pay rates other than a true UCR arrived at under a fair methodology.

*The Direct Harm Caused to the Plaintiffs and Class*

376.    All the claims at issue here were underpaid to Plaintiffs and the Class. These are all claims for which out-of-network rates for IOPs are meant to be paid at amounts based on the UCR rate.

377.    United has systematically underpaid the Plaintiffs and the Class since the beginning of the claims period for the present litigation.

378.    United intentionally led Plaintiffs and the Class to believe that rates were determined based on a UCR rate.

379.    As alleged above, when Plaintiffs contacted United to verify out-of-network rates during the pre-admission VOB calls, United routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by Viant.

380.    Plaintiffs then agreed to provide services and receive payment from United at the UCR rate.

381.     It is well established that Plaintiffs and providers have a property interest in their claims and the right to be paid for them.

382.     Underpayment of Plaintiffs' and other providers' claims is a deprivation of their property interest and direct damage to them.

**Class Action Allegations**

*The Plaintiff Class*

383.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are satisfied in this case.

384.     Plaintiffs bring this class action on behalf of the Plaintiff Class, defined as:

All out-of-network behavioral health providers in the United States who provided IOP services and whose claims for those services were underpaid by United due to use of MultiPlan's Viant pricing methodologies, during the class period, where health plans were not governed by ERISA.

### *Rule 23(a)*

Numerosity

385.     This putative plaintiff class includes thousands of mental health and substance use disorder treatment providers throughout the United States and is therefore so large as to make joinder of all members impracticable within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

Commonality

386.     Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of law or fact common to all class members, including, but not limited to, the following:

   a.   Whether the Defendants have underpaid the Plaintiff Class for out-of-network mental health and substance use disorder services based upon improper methodologies for pricing UCR rates;

b.  Whether Defendants made false representations to the Plaintiff Class as to how claims for out-of-network mental health and substance use disorder services would be paid;

c.  Whether the Defendants falsely representing the method that was used to pay the claims for out-of-network mental health and substance use disorder services at the time such claims were paid;

d.  Whether the Defendants falsely represented the method that was used to pay the claims for out-of-network mental health and substance use disorder at the time such claims were appealed;

e.  Whether the Defendants falsely represented that the patients owed the Plaintiffs and Class amounts which should have been paid by the Defendants, and are not the financial liability of the patients;

f.  Whether the improper methodologies and systematic misrepresentations employed by the Defendants made it futile for the Plaintiffs and Class to appeal the claims;

g.  Whether interest should be added to the payment of unpaid amounts;

h.  Whether Defendants' conduct in California violates California Business and Professions Code § 17200 *et seq.* ;

i.  Whether Defendants' conduct violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA);

j.  Whether United conduct violated their duty of faith and fair dealing to the Plaintiffs and Class in employing the Viant methodology for IOP claims;

k.  What process and data the Viant methodology used in payment determinations;

l.  Whether MultiPlan made fraudulent to representations to Plaintiffs and the Class as to the Provider and Class' claims for mental health and substance use disorder services provided to patients;

m.  Whether Defendants engaged in pre-authorization conversations with Plaintiffs and Class prior to the member receiving treatment;

n.  Whether MultiPlan received any appeals from Plaintiffs, Class, or members following benefit determinations;

o.  What payments were made to the Plaintiffs and Class;

p.  Whether the Viant methodology adequately and/or accurately applies the relevant UCR in determining benefit amounts;

q.  Whether the data used in the Viant methodology accurately reflect the relevant UCR in the relevant geographical area;

r.  Whether the service "proxies" used in the Viant methodology accurately reflect the relevant UCR in the relevant geographical area;

<u>Typicality</u>

387.    The claims of Provider plaintiffs are typical of the claims of the defined plaintiff class, within the meaning of Rule 23(a)(3) of the Federal Rules of Civil Procedure, and are based on and arise out of the same uniform and standard illegal practices of the Defendants, as alleged herein by the Plaintiffs. The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members. If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

<u>Adequacy</u>

388.    Provider plaintiffs are committed to pursuing this action and are prepared to serve the proposed class in a representative capacity with all of the obligations and duties material thereto. They will fairly and adequately represent the interests of the members of the proposed class within the meaning of Rule 23(a)(4) of the Federal Rules of Civil Procedure, and will not have any interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

389.    Plaintiffs have retained competent counsel experienced in class action litigation, which will adequately prosecute this action, and will assert, protect, and otherwise well represent the named Class representatives and absent class members.

***Rule 23(b)***

390.    The prosecution of separate actions by individual class members would create a risk of adjudication with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to this action, or could substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

391.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible rights within the Plaintiff Class. Fed. R. Civ. P. 23(b)(1)(A).

392.    United's and MultiPlan's actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole, within the meaning of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

393.    The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common or general proof will be used for each member of the class to establish each element of their claims, as identified above. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## Causes of Action

*COUNT I: Violation of California Business & Professions Code §§ 17200 et seq.*

*(Unfair and Unlawful Business Practices of United)*

394.    The General and Class Allegations are hereby repeated as if fully set forth herein.

395.    This cause of action is brought pursuant to California law.

396.    Defendant, United, has engaged in unfair and unlawful business acts and practices by, *inter alia*:

54

    a.  using arbitrary, capricious and improper methods to improperly and intentionally underprice and underpay out-of-network IOP mental health and substance use disorder claims;

    b.  employing MultiPlan as a third-party repricing entity without disclosing this agreement to Plaintiffs during the VOB process or at any time prior to IOP treatment being rendered;

    c.  employing MultiPlan as a third-party repricing entity without a contract or agreement with Plaintiffs, the Class, and/or patients, permitting them to do so for the underpaid claims at issue;

    d.  concealing and/or omitting material information in EOBs, ERAs, and other correspondence concerning the manner in which United and MultiPlan determine the payment amount for IOP out-of-network claims;

    e.  representing to Plaintiffs and the Class that United would pay IOP services at the UCR, when in fact United disregarded the UCR and paid arbitrarily low rates for IOP services;

    f.  paying arbitrarily low rates for IOP services uniformly across the country in disregard of the prevailing charges in the community;

    g.  misrepresenting the reasonable and customary rates of out-of-network IOP to Plaintiffs and the Class;

    h.  failing to correctly and accurately apply the criteria used to calculate UCR rates as set forth in Title 28 of the California Code of Regulations, section 1300.71(a)(3)(B), and by failing to comply with California Health and Safety Code § 1371 and 28 C.C.R. § 1300.71 by knowingly, among other things, engaging in an "unfair payment pattern," including, but not limited to, delaying payment of claims, reducing the amount of payment, failing on a repeated basis to pay uncontested portions of claims within the time period specified in Health and Safety Code §§ 1371 et seq., and not paying reasonable and customary rates.

397.    This conduct by United constitutes illegal and unfair business practices under California Business and Professions Code § 17200, *et seq*. As a result of their acts of unfair competition, United has and continues to receive and retain monies that rightfully belong to Plaintiffs and the Class as compensation for rendering covered, medically necessary IOP services.

398.    Additionally, United's unfair competition practices are likely to continue and/or increase absent judicial intervention. This conduct threatens not only the economic well-being and future viability of the Plaintiffs and the Class, but the health of the public in midst of a nationwide opioid crisis.

399.    California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby. Plaintiffs seek, on behalf of themselves and the Class, restitution of an amount to be proved at trial, plus applicable statutory interest, which is the amount that the United is obligated to pay the Plaintiffs and the Class for the IOP services they provided.

400.    United should be specifically ordered to disgorge amounts which represent the difference between what United underpaid the Plaintiffs and Class using an arbitrarily low payment rate and total billed charges on past claims, which appropriately represent the UCR.

401.    Plaintiffs seek, on behalf of themselves and the Class, an injunction prohibiting United's ongoing conduct in using or engaging Viant and/or any third-party repricing entity for IOP out-of-network claims. Furthermore, the injunction should force United to correctly price past and future out-of-network IOP claims by determining UCR based on appropriate data.

402.    The legal remedies of the Plaintiffs and Class are inadequate in that United's unfair and unlawful conduct is ongoing and repeated litigation to correct its ongoing actions is inefficient for the parties and the Court.

*COUNT II: Violation of California Business & Professions Code §§ 17200 et seq.*

*(Unfair and Unlawful Business Practices of MultiPlan)*

403.    The General and Class Allegations are hereby repeated as if fully set forth herein.

404.    This cause of action is brought pursuant to California law.

405.    Defendant, MultiPlan, has engaged in unfair and unlawful business acts and practices by, *inter alia*:

    a.  using arbitrary, capricious and improper methods to improperly underprice out-of-network IOP claims;

    b.  improperly representing that the proposed payment amount reflects the UCR;

    c.  improperly representing that MultiPlan represents the patient, despite the clear conflict of interest and financial incentives to the contrary provided in the agreement(s) between United and MultiPlan;

    d.  Makings such material misrepresentations on PADs and other correspondence sent to the Plaintiffs, the class, and the patients;

    e.  interfering with the contract between the Plaintiffs, the Class, and their Patients;

    f.  conspiring with United to uniformly underpay IOP services across the country;

    g.  failing to disclose to Plaintiffs and the Class that the proposed payment rates are arbitrarily set by United and MultiPlan and misrepresenting those fraudulent rates to Plaintiffs and the Class as UCR rates;

    h.  preventing the timely and full payment of IOP claims;

    i.  preventing Plaintiffs and the Class from appealing the underpayment;

    j.  refusing to disclose the methodology by which IOP claims are priced;

    k.  concealing and/or omitting material information in written and wire communications with Plaintiffs and the Class;

    l.  entering into agreement(s) with United that constituted illegal "kick-backs" or "rebates" in exchange for underpayment of Plaintiffs and the Class at rates well below the UCR.

406.    This conduct by MultiPlan constitutes illegal and unfair business practices under California Business and Professions Code § 17200, *et seq*. As a result of their acts of unfair

competition, MultiPlan has and continues to receive and retain monies that rightfully belong to Plaintiffs and the Class as compensation for rendering covered, medically necessary IOP services.

407. Additionally, MultiPlan's unfair competition practices are likely to continue and/or increase absent judicial intervention. This conduct threatens not only the economic well-being and future viability of the Plaintiffs and the Class, but the health of the public in midst of a nationwide opioid crisis.

408. California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby. Plaintiffs seek, on behalf of themselves and the Class, restitution of an amount to be proved at trial, plus applicable statutory interest, which is the UCR that the Plaintiffs and the Class should have been paid and underpayment they received for the IOP services provided.

409. MultiPlan should be specifically ordered to disgorge amounts that it received as "kick-backs," "rebates," or other unlawful incentives and payments it received in exchange for its "cost containment" of IOP claims for United.

410. Plaintiffs seek, on behalf of themselves and the Class, an injunction prohibiting MultiPlan's ongoing conduct interfering with the agreements between Plaintiffs, the Class, and patients. MultiPlan should be prohibited from contacting or otherwise engaging with the Plaintiffs and/or the Class on the payment of IOP claims.

411. The legal remedies of the Plaintiffs and Class are inadequate in that MultiPlan's unfair and unlawful conduct is ongoing and repeated litigation to correct its ongoing actions is inefficient for the parties and the Court.

*COUNT III Intentional Misrepresentation/Fraudulent Inducement*

412. Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

413. Plaintiffs bring this Count under the Federal and State common law causes of action for Intentional Misrepresentation.

414. The elements of fraudulent inducement are: (1) misrepresentation; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages. *See, e.g., Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075 (C.D. Cal. 2017), *aff'd*, 747 F. App'x 643 (9th Cir. 2019). The elements of Intentional Misrepresentation are the same. *See, for example, Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).

415. As the communications between Plaintiffs and United during the initial phone calls, the communications between the Plaintiffs and MultiPlan following the submission of claims, and the written statements sent to Plaintiffs and patients following claim submissions show, United and MultiPlan represented that Plaintiffs and the Class were being compensated at the UCR as agreed to and required.

416. Plaintiffs followed all United and MultiPlan's policies and procedures when trying to obtain payment at the agreed upon rate, the UCR.

417. The Plaintiffs would not have continued to admit United's patients had they known that United intended to employ MultiPlan and the Viant methodology to reprice the IOP claims after services were provided.

418. Given the pattern, practice, and scale of these misrepresentations MultiPlan's and United's practices cannot have been other than intentional.

419. United knew that their insureds would still receive IOP treatment when they verified rates and gave payment terms, MultiPlan knew that the more money it fraudulently "saved" United, the more money it would make.

420. United knew it would keep money that should have been for patients' IOP treatment.

421. Both United and MultiPlan knew that they were deceiving the Plaintiffs as to a true and accurate UCR.

422. United and MultiPlan also knew that they would be pushing the more expensive, out-of-network providers out of business.

423. All of this was done to induce reliance by the Plaintiffs to provide IOP treatment services and preclude means of effective challenge to the underpayment of Plaintiffs.

424.     United did not pay Plaintiffs the UCR as it represented it would.

425.     This tort claim is not precluded by the economic loss rule and it is predicated upon fraud, conspiracy, and criminal acts. Claims for fraudulent inducement are recognized as an exception to the economic loss rule as they arise from conduct that is intentional and intended to harm. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).

426.     United and MultiPlan's conduct clearly goes beyond 'useful business practices' and are independent of the breach of contract in this action.

427.     Plaintiffs and the Class are entitled to damages in an amount to be proven at trial for the underpayment of claims.

*COUNT IV: Negligent Misrepresentation*

428.     Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

429.     Plaintiffs bring this Count under the Federal and State common law cause of action for Negligent Misrepresentation.

430.     Plaintiffs' verification of patients' eligibility, rates, and payment at UCR for IOP services was a representation that United would cover each patient's IOP treatment and this representation was not true.

431.     United did not intend to pay a UCR based rate for IOP services.

432.     Similarly, MultiPlan knew that the Viant methodology did not produce an amount equivalent to the actual UCR rate as doing so would preclude MultiPlan from receiving any payments from United.

433.     It was the intent of United and MultiPlan that the Plaintiffs would rely on the representations made to them.

434.     As a result of United's and MultiPlan's misrepresentations, the Plaintiffs and the Class have been damaged in the amount that they were underpaid for IOP services in an amount to be determined at trial.

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT

*COUNT V: Civil Conspiracy*

435.    Plaintiffs re-allege and incorporate the General and Class action allegations above, as though such allegations were fully stated herein.

436.    Plaintiffs bring this Count pursuant to the Federal and State common law cause of action for civil conspiracy.

437.    The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages.

438.    As described at length in the *supra*, the elements are clearly met.

439.    As to the first element, United and MultiPlan are the parties that conspired together. They engaged in a common plan to illegally underpay the claims at issue and to do so by deceptive, dishonest, and fraudulent means.

440.    The acts set forth above clearly describe a common plan to commit tortious acts and that United and MultiPlan committed such acts pursuant to their agreement and in furtherance of the conspiracy.

441.    The element of damages is likewise described in detail *supra* in setting forth the underpayments to Plaintiffs and the class.

442.    The conspiracy between United and MultiPlan caused Plaintiffs to be underpaid tens of millions, or more, of dollars while United was unjustly enriched by this amount and kicked back a portion of the illicit proceeds to MultiPlan to reward them for their participation in the conspiracy.

*COUNT VI: Breach of Oral and/or Implied Contract*

443.    Plaintiffs re-allege and incorporate the factual allegations above, as though such allegations were fully stated herein.

444.    Plaintiffs bring this Count under the Federal and State common law cause of action for Breach of Oral and/or Implied Contract.

445.    Based on the facts alleged *supra*, including United verifying insurance coverage to Plaintiffs through detailed calls, verifying/stating the payment rate Plaintiffs would receive

61

relative to the UCR and/or billed charges through detailed calls, the Plaintiffs and United entered into enforceable oral and/or implied contracts whereby the Plaintiffs would provide IOP treatment and would be paid as agreed.

446.   As described above, numerous oral representations were made by United to Plaintiff and there were continued actions and course of dealings such that oral and/or implied contracts were formed.

447.   The detailed calls described above constitute the oral representations made between the parties. The lengthy course of conduct and dealing between the parties shows sufficient predicate that Plaintiffs and the Class relied on United's prior conduct wherein Plaintiffs and United used UCR as the method and/or standard by which to set the reasonable value/payment amount for the services to be provided by Plaintiffs.

448.   All of the calls and representations followed an identical format and resulted in identical promises and representations by United.

449.   The Plaintiffs fully and substantially complied with all their obligations formed under the oral and/or implied contract between the parties.

450.   The Plaintiffs rendered IOP treatment to United's insureds at a rate agreed to between them, the UCR.

451.   At no time did the Plaintiffs breach the terms of their contracts with United.

452.   Any breaches by Plaintiffs were minor and not material.

453.   After rendering the IOP treatment services, the Plaintiffs properly and timely invoiced United for the care they provided using the appropriate authorization numbers, revenue codes, and procedure codes.

454.   United breached their agreements with Plaintiffs by not paying UCR and instead sending the claims to MultiPlan as described *supra.*

455.   United's actions in employing MultiPlan have resulted in the gross underpayment of all claims at issue in the present litigation.

456.   Breach of a contract consists of four elements: (1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages.

457.   As to the first element, as set forth above, detailed verification calls, including an agreement to payment at UCR were conducted between the parties. The Plaintiffs and the Class also had an extended course of dealing with United wherein they reasonably could rely on their representations of payment rate and UCR. Plaintiffs' and United agreed orally and/or implicitly, that the payment rate for the IOP services would be determined using the UCR as the method and/or standard for determining the payment rate (California Civil Code section 1610). Plaintiffs and United understood that in determining the payment amounts, United would/was using UCR to establish the reasonable value of the services provided by Plaintiff (California Civil Code section 1611).

458.   In the bargained for exchange, the Plaintiffs provided IOP services and United was to pay for the services at an accurate, appropriate, UCR rate. This rate was understood by both parties to be consistent with United's published definition of UCR rates.

459.   Therefore, the requisite meeting of the minds occurred, and a contract was formed between the parties.

460.   As to the second element, performance by the plaintiff or excuse for nonperformance, the Plaintiffs rendered the IOP treatment services. Only claims for IOP treatment services that were actually rendered to patients were submitted for payment on the appropriate claim forms to United.

461.   As to the third element, breach by the defendant, United underpaid Plaintiffs and the Class for IOP services that were provided.

462.   The fourth element, damages, is the direct consequence of United's breach. United underpaid the Plaintiffs and the Class and rates demonstrably below a fair and accurate UCR rate.

463.   Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

*COUNT VII: Promissory Estoppel*

464.    Plaintiffs re-allege and incorporate the allegations above, as though such allegations were fully stated herein.

465.    Plaintiffs bring this Count under the Federal and State common law cause of action for Promissory Estoppel.

466.    The elements of promissory estoppel are (1) a clear promise, (2) reasonable reliance, (3) substantial detriment, and (4) damages measured by the extent of the obligation assumed and not performed.

467.    United made the clear promise to pay UCR for IOP services.

468.    MultiPlan made the clear promise that it had calculated the UCR for IOP services.

469.    Plaintiffs reasonably relied on the promises of both United and MultiPlan.

470.    It is United and MultiPlan's promise to pay the UCR that is the specific promise that forms the basis of this promissory estoppel claim.

471.    As to the second element, reasonable reliance, there was a well-established course of conduct where Plaintiffs had been promised payment at the UCR rate and had received payment at the UCR rate; therefore, reliance was reasonable.

472.    The third element, substantial detriment, is clear. Plaintiffs were greatly underpaid paid for the claims at issue here because they were paid at a fake, low "UCR." The failure to pay at a true and accurate UCR shows Plaintiffs' and the Class' substantial detriment.

473.    The fourth element, damages 'measured by the extent of the obligation assumed and not performed' is met as Plaintiffs were promised payment at UCR rates for the IOP services Plaintiffs rendered, subject to any co-insurance or deductible amounts for which the patient is responsible.

474.    All IOP services at issue in this litigation were vastly underpaid.

475.    United incurred the obligation to pay for IOP services at the UCR. United's contract with MultiPlan and MultiPlan's interjection into the payment process likewise bound them to this obligation.

476.    As such, Plaintiffs and the Class are entitled to damages resulting from the underpayment in an amount to be proven at trial.

**Demand for Jury Trial**

477.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment against the Defendants as follows:

1.    Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

2.    Appointing the Plaintiffs as Class Representatives for the Class;

3.    Designating Matthew M. Lavin, Esq. and Paul J. Napoli, Esq. of Napoli Shkolnik, PLLC, as counsel for the Class;

4.    For general, special, restitutionary and compensatory damages in an amount according to proof.

5.    That the Court enter judgment for plaintiffs and each of them against defendant and its co-conspirators and each of them, jointly and severally, for damages sustained by plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorney's fees.

6.    That Defendants and its co-conspirators, their respective affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behavior, be restrained from, in any manner: continuing, maintaining, or renewing in any manner the contract, combination or conspiracy herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect.

7.    For prejudgment interest on amounts wrongfully withheld.

8.    Injunctive and equitable relief enjoining Defendants from the conduct alleged herein and/or other appropriate equitable relief;

9.    Declaring that United's payments were improper underpayments,

10.   Declaring that United's payment methodologies were and are improper;

11.    Declaring that MultiPlan's rate determination and the Viant methodologies are improper;

12.    Ordering United and MultiPlan to provide transparency as to the methodology applied in the future processing of claims and that the methodology be approved by the Court;

13.    For attorney's fees and costs pursuant to statute;

14.    and such other and further relief as the Court may deem appropriate, including but not limited to awarding a surcharge, disgorging Defendants unjust enrichments from their wrongful conduct.

Dated: January 19, 2021          **NAPOLI SHKOLNIK, PLLC**

By: */s/ Matthew M. Lavin*
Matthew M. Lavin, Esq. (*pro hac vice*)
Aaron R. Modiano, Esq. (*pro hac vice*)

DL LAW GROUP

By: */s/ David M. Lilienstein*
David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)

*Attorneys for Plaintiffs and the Putative Class*

*PRS, et al. v. United, et al.* – SECOND AMENDED CLASS ACTION COMPLAINT